# EXHIBIT 26

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


LISA McCALL,

    Plaintiff,

vs.                          CASE NO. 2:06-CV-39-MHT

MIKE JOHANNS, Secretary
of the United States
Department of Agriculture,

    Defendant.




* * * * * * * * * *

DEPOSITION OF LISA McCALL, taken pursuant to

stipulation and agreement before Mallory M. Johnson,

Court Reporter and Commissioner for the State of

Alabama at Large, at the United States Attorney's

Office, One Court Square, Suite 201, Montgomery,

Alabama, on Monday, March 26, 2007, commencing at

approximately 9:11 a.m.

* * * * * * * * * *

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

2 (Pages 2 to 5)

## Page 2

1           APPEARANCES
2  FOR THE PLAINTIFF:
3  Mr. Gary Atchison
   LAW OFFICE OF GARY ATCHISON
4  Attorney at Law
   492 South Court Street
5  Montgomery, Alabama 36104
6  FOR THE DEFENDANT:
7  Mr. R. Randolph Neeley
   Assistant United States Attorney
8  UNITED STATES ATTORNEY'S OFFICE
   One Court Square
9  Suite 201
   Montgomery, Alabama 36104
10
11         * * * * * * * * * *
12         EXAMINATION INDEX
13  LISA McCALL
      BY MR. NEELEY            5
14    BY MR. ATCHISON          173
15         EXHIBIT INDEX
16  PLAINTIFF'S EXHIBIT NO.:
17  2  Certification of        32,51,80,82,83
       Expected Separation
18
    3  Specific Reduction      51,52,83,94,95
19     in Force Notice
20  4  Subchapter 9, Establishment  104,120
       of the Employment Priority
21     List
22  8  6/21/96 Horn letter     34
       to McCall
23
24  9  6/21/96 Horn letter     35
       to McCall
25

## Page 3

1  PLAINTIFF'S EXHIBITS:
2  10  6/21/96 Horn letter     35,46
       To McCall
3
    11  6/21/96 Horn letter    35,47
4      to McCall
5  12  10/29/96 McCall letter  59,61,68,118
       to Horn                 119,125
6
    13  10/30/07 Horn letter   62,118,119,
7      to McCall               123
8  14  12/20/96 Horn letter to USDA  109,118,119
                               123,125
9
    15  2/25/97 McCall letter to  109,118,119
10     Lincoln at USDA           123,125
11  16  4/30/97 McCall letter to USDA  109,118,119
                               123,125
12
    17  4/20/98 McCall letter to USDA  109,118,119
13                             121,123
14  18  8/24/99 McCall Letter  109,118,119
       to Hammon               174
15
    19  Report of Investigation DS2  105,106,173
16     (Retained by Mr. Neeley)
17  20  Report of EEO Investigation  173
       (Retained by Mr. Neeley)
18
    21  Personnel RIF          173
19     Effective 4/27/97
20  DEFENDANT'S EXHIBIT NO.:
21  2  Certification of        32,51,80,82,83
       Expected Separation
22
    3  Specific Reduction in Force  51,52,83,94,95
23
    4  Subchapter 9 - Establishment  104,120
24     of the Employment Priority List
25  8  6/21/96 Horn letter to McCall  34

## Page 4

1  DEFENDANT'S EXHIBITS:
2  9  6/21/96 Horn letter to McCall  35
3  10  6/21/96 Horn letter to McCall  35,46
4  11  6/21/96 Horn letter to McCall  35,47
5  12  10/29/96 McCall letter  59,61,68,118
       to Horn                 119,125
6
    13  10/30/07 Horn letter   62,118,119,123
7      to McCall
8  17  4/20/98 McCall letter to USDA  109,118,119
                               123,125
9
    18  8/24/99 McCall letter  109,118,119,174
10     to Hammon
11  19  Report of Investigation  105,106,173
       (retained by Mr. Neeley)
12
    20  EEO Report of Investigation  173
13     (Retained by Mr. Neeley)
14         * * * * * * * * * *
15         STIPULATIONS
16     It is hereby stipulated and agreed by and
17  between counsel representing the parties that the
18  deposition of LISA McCALL is taken pursuant to the
19  Federal Rules of Civil Procedure and that said
20  deposition may be taken before Mallory M. Johnson,
21  Court Reporter and Commissioner for the State of
22  Alabama at Large, without the formality of a
23  commission; that objections to questions other than
24  objections as to the form of the questions need not be
25  made at this time but may be reserved for a ruling at

## Page 5

1  such time as the deposition may be offered in evidence
2  or used for any other purpose as provided for by the
3  Federal Rules of Civil Procedure.
4     It is further stipulated and agreed by and
5  between counsel representing the parties in this case
6  that said deposition may be introduced at the trial of
7  this case or used in any manner by either party hereto
8  provided for by the Federal Rules of Civil Procedure.
9         * * * * * * * * * *
10         LISA McCALL
11     The witness, having first been sworn to speak
12  the truth, the whole truth and nothing but the truth,
13  testified as follows:
14         EXAMINATION
15  BY MR. NEELEY:
16     Q.  Just before we went on the record, I asked
17  you whether or not you and your attorney had discussed
18  your right to read and sign this deposition before it
19  becomes official.  And it's my understanding that you
20  wish to waive -- do not wish to waive that right and,
21  therefore, would like to read and sign; is that
22  correct?
23     A.  Yes.
24     Q.  Okay.  If you would please state your name
25  for the record.

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

3 (Pages 6 to 9)

| Page 6 |
|---|
| 1    A. Lisa McCall. |
| 2    Q. And is that your married name or your maiden |
| 3  name? |
| 4    A. Maiden name. |
| 5    Q. Maiden name. Are you presently married? |
| 6    A. No. |
| 7    Q. Have you been married? |
| 8    A. No. |
| 9    Q. Okay. That takes off one section. Let me |
| 10 ask, do you have any children? |
| 11    A. Yes. |
| 12    Q. Okay. And how many? |
| 13    A. Two. |
| 14    Q. And their ages? |
| 15    A. 13 and seven. |
| 16    Q. 13 and seven? |
| 17    A. Yes. |
| 18    Q. Okay. And your date of birth please? |
| 19    A. The fourth month, April 18th, 1965. |
| 20    Q. And your social? |
| 21    A. 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. |
| 22    Q. And your current address? |
| 23    A. 3424 Sommerville Drive. |
| 24    Q. And that's here in town? |
| 25    A. Montgomery, Alabama, 36111. |

| Page 7 |
|---|
| 1    Q. Okay. Go over your educational background. |
| 2  You gradated from high school? |
| 3    A. Yes. |
| 4    Q. Where from? |
| 5    A. Calhoun High School. |
| 6    Q. Calhoun County? |
| 7    A. No. Lowndes County. |
| 8    Q. In Lowndes County. Okay. Calhoun High |
| 9  School, Lowndes County. What year? |
| 10    A. 1983. |
| 11    Q. Any college? |
| 12    A. Yes. |
| 13    Q. Okay. How many years? |
| 14    A. Three. |
| 15    Q. Okay. And where did you attend? |
| 16    A. Trenholm State Technical College. |
| 17    Q. Okay. Did you receive a degree? |
| 18    A. Yes. |
| 19    Q. And what was that? |
| 20    A. An associate degree in accounting. |
| 21    Q. What year? |
| 22    A. 1987. |
| 23    Q. Any other postgraduate -- anything post high |
| 24  school? Any other education beyond that? |
| 25    A. Yeah, the travel agency. I went to ACT |

| Page 8 |
|---|
| 1  Travel Agency. |
| 2    Q. Okay. When was that? |
| 3    A. That was in 1983. |
| 4    Q. Okay. Did you complete that program? |
| 5    A. Yes. |
| 6    Q. And did that last? |
| 7    A. A year, 1984. |
| 8    Q. Okay. Did you work in the travel industry |
| 9  for a period of time? |
| 10    A. Yes. |
| 11    Q. Okay. I'm assuming that was before you went |
| 12  to work for -- |
| 13    A. Yes. |
| 14    Q. I always get these confused. You worked for |
| 15  Rural Development, right? |
| 16    A. That's correct. |
| 17    Q. And it was Rural Development at the |
| 18  time you worked for it? |
| 19    A. No, sir. It was Farmers Home Administration. |
| 20    Q. Okay. That's where I get confused. |
| 21    A. Farmers Home Administration. |
| 22    Q. So Farmers Home -- so that it's clear on the |
| 23  record, if you state Farmers Home or if I state Rural |
| 24  Development, I want to make sure we get this right. |
| 25  Farmers Home in time became Rural Development. Is |

| Page 9 |
|---|
| 1  that a fair statement? |
| 2    A. Yes. Yes. |
| 3    Q. Okay. So if you say Farmers Home and I say |
| 4  Rural Development or vice versa, we're talking about |
| 5  the same entity. |
| 6    A. Yes. |
| 7    MR. ATCHISON: May I go off the record? |
| 8    MR. NEELEY: Yes. |
| 9    (Off-the-record discussion) |
| 10    Q. And before we took a second, we just wanted |
| 11  to clarify. If I say Farmers Home or you say Farmers |
| 12  Home and the other says Rural Development, they're one |
| 13  and the same; is that right? |
| 14    A. That's correct. |
| 15    Q. Okay. There was a transition or change in |
| 16  name sometime in the late '90s; is that right? |
| 17    A. Yes. In the -- yeah, the late '90s. |
| 18    Q. Okay. Was that change in name -- was that |
| 19  part of the -- was that contemporaneous or about the |
| 20  same time as the RIF that's in question here? '97, |
| 21  '98? |
| 22    A. No. It was changed before '97. |
| 23    MR. ATCHISON: And, Rand, can we stipulate on |
| 24  the record that both of those agencies were |
| 25  subagencies of, at the time, the Department of |

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

4 (Pages 10 to 13)

Page 10

1   Agriculture?
2        MR. NEELEY: Yeah. That's fine.
3        MR. ATCHISON: Okay. Thank you.
4        Q. Okay. I diverted a little bit there from my
5   plans, so we're going to back up. Okay? So after you
6   received -- you went to ACT and took some course work
7   regarding the travel industry. And you went to work
8   in the travel industry; is that right?
9        A. That's correct.
10       Q. For whom?
11       A. For Northwest Airline.
12       Q. Okay. How long did you work for Northwest?
13       A. I worked there a year and a half.
14       Q. So '80 -- '84 to say '85, '86?
15       A. It's like the mid part of '86, because I went
16  back to school.
17       Q. Okay. And why did you leave Northwest?
18       A. To better my career.
19       Q. And where did you go to?
20       A. I went back to school.
21       Q. And what type of school?
22       A. To Trenholm State Technical College.
23       Q. Okay. And after you -- from the time you
24  started back at Trenholm until the time you graduated
25  1987, did you have any employment or did you work

Page 11

1   part-time, full-time, what?
2        A. I was working full-time. I went to work with
3   National Industry.
4        Q. Okay. I saw that, I think, in some of the
5   paperwork. That's when you were, say, an assembly
6   line worker?
7        A. Yes.
8        Q. Okay. Putting together harnesses.
9        A. Yes.
10       Q. And how long did you work with National?
11       A. I worked with National until a couple of
12  months before I got hired with Rural Development.
13       Q. And that was in, what, November of '96?
14       A. No. I got hired there in July of 1990.
15       Q. I'm sorry. November of '96 is a point -- I'm
16  sorry. I'm mumbling. July of '90?
17       A. Yes, sir.
18       Q. Okay. And where within the Department of
19  Agriculture did you go to work in July of '90?
20       A. With the agency was Farmers Home
21  Administration at that time.
22       Q. Okay. Down in Lowndes County?
23       A. In Hayneville, Alabama. Yes.
24       Q. Okay. And your supervisor at that time would
25  have been Carnell McAlpine?

Page 12

1        A. Carnell McAlpine.
2        Q. Was it Mr. McAlpine that interviewed you for
3   the position that you took?
4        A. Yes.
5        Q. Did anybody else?
6        A. Yes. Fred Callison.
7        Q. Okay. And they hired you?
8        A. Yes.
9        Q. And who was Mr. Callison at the time?
10       A. Mr. Callison was the district director.
11       Q. Okay. And Carnell McAlpine's title at the
12  time was?
13       A. County supervisor.
14       Q. County supervisor. Okay. And what was your
15  title that you -- well, when you went to work for
16  Farmers Home --
17       A. What was the first job I had?
18       Q. -- what position?
19       A. A clerk.
20       Q. And your GS rating?
21       A. It was a GS-1.
22       Q. Okay. Was that in -- was that -- were you a
23  GS-1 during a probationary period of some sort, or did
24  you start as a one and have to get promoted on up?
25       A. It was -- it started as a clerk, GS-1, worked

Page 13

1   a training position.
2        Q. And you completed the training obviously?
3        A. Yes.
4        Q. And when you completed the training, did you
5   get a promotion?
6        A. Yes.
7        Q. To what rate?
8        A. I went to a GS-2.
9        Q. Okay.
10       A. Then later I went to a GS-3.
11       Q. All in the same position?
12       A. Yes.
13       Q. Okay. When did you become a GS-4?
14       A. I became a GS-4 in 1994, '93 or '94. I think
15  it was '93.
16       Q. Okay. And was that -- was Mr. McAlpine still
17  your supervisor at the time?
18       A. Yes.
19       Q. So he would have recommended and approved
20  your promotion?
21       A. Yes.
22       Q. So, from the time you started until the time
23  you achieved the rank of GS-4, you were in essentially
24  the same position?
25       A. Yes.

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

5 (Pages 14 to 17)

Page 14

1    Q. And what were the -- what were the -- in a
2 general sense, the duties of that position?
3    A. A GS-4?
4    Q. Yeah.
5    A. My duties?
6    Q. Yeah.
7    A. At that time, I was doing timekeeping along
8 with the payroll clerk and just credit reviews, filing
9 complaints to the state office -- to the district
10 director so that they can be foreclosed accounts. I
11 did collection. I did all the banking transactions.
12 It was a lot of stuff. I did correspondence.
13    Q. Well, how many -- let me ask you this. How
14 many people were in the office at the time?
15    A. At that time, four of us.
16    Q. Four of you. Carnell McAlpine, yourself.
17 Who else?
18    A. Arlesa Hunter and Patsy Williams.
19    Q. Okay. From 1990 until the transfer, which
20 was in November of '96 -- is that right?
21    A. Yes.
22    Q. Okay. Was there, generally speaking, for the
23 majority of that time, four people that worked in the
24 Hayneville office?
25    A. Yes.

Page 15

1    Q. And there was, essentially, the four of y'all
2 the whole time?
3    A. No. They had -- we had an assistant county
4 supervisor came in, but he left. He left and got
5 another job.
6    Q. Okay. How long did he work there?
7    A. I think John was there about a year.
8    Q. So with the exception of the year, there were
9 primarily four of y'all in the office?
10    A. Yes.
11    Q. And I know Mr. McAlpine transferred out -- or
12 was transferred out sometime around November of '96;
13 is that right?
14    A. Yes.
15    Q. Just about the time you transferred to
16 Luverne --
17    A. He transferred like a year before that.
18    Q. Okay. And that's when Mr. Powers took over
19 in Hayneville?
20    A. Yes.
21    Q. So it was -- consistently, then, there was
22 four people in that office, either Carnell or Art.
23    A. Yes.
24    Q. Yourself.
25    A. Arlesa Hunter and Patsy.

Page 16

1    Q. Arlesa and Patsy.
2    A. Yes.
3    Q. Okay. Is it a fair statement that you,
4 Arlesa, and Patsy -- well, you and Arlesa,
5 particularly. Let me start there. Is it a fair
6 statement that you and Arlesa essentially did the same
7 functions?
8    A. Yes.
9    Q. Okay. And you may have had a few
10 responsibilities she didn't have and vice versa; but
11 essentially, y'all did the same type of work?
12    A. Yes.
13    Q. Okay. Now, Patsy -- Williams?
14    A. Patsy Williams.
15    Q. She was a GS-6; is that correct?
16    A. Yes.
17    Q. What was her title within the Hayneville
18 office?
19    A. She was a program technician.
20    Q. From what you could see or know, were
21 her responsibilities somewhat different than you and
22 Arlesa's?
23    A. No.
24    Q. So the three of y'all were, then, as far as
25 from what you saw or knew, essentially doing the same

Page 17

1 functions interchangeably?
2    A. That's correct. Yes.
3    Q. Okay. From the time that -- from July of
4 1990 until -- and we just -- November of '96 is just
5 significant simply because of the transfer -- or the
6 shutting down of the office and the move to Luverne,
7 just a way to kind of time line things and
8 compartmentalize the information. So the significance
9 it really for this type of questions. But between
10 July of 1990 and that transfer, were you subject to
11 any disciplinary actions related to your performance
12 in the Hayneville office?
13    A. During the time in 1990 until?
14    Q. Yeah.
15    A. No, not until 1996.
16    Q. Okay. In 1996, was that before or after the
17 transfer to Luverne?
18    A. Are you speaking regarding to?
19    Q. Yeah. I mean, were you -- any disciplinary
20 actions, I mean, were you ever -- say a letter of
21 reprimand regarding a performance issue?
22    A. No.
23    Q. Okay. A formal counseling regarding a
24 performance issue?
25    A. No.

Page 22

1   approximately, were you working?
2     A.  15 to 20 hours.
3     Q.  15 to 20.  In the customer service function?
4     A.  No, sir.
5     Q.  Doing what?
6     A.  Loading and unloading.
7     Q.  At some point in time, I'm assuming you were
8   converted to full-time status?
9     A.  No, sir.  No.
10    Q.  Are you still at part-time?
11    A.  Part-time.
12    Q.  And how many hours a week are you working
13  currently?
14    A.  20 to 25.
15    Q.  And when you started with UPS back in '97, do
16  you remember what your hourly rate was?
17    A.  7.50.
18    Q.  And what is it today?
19    A.  Today?
20    Q.  Yeah.
21    A.  15.65.
22    Q.  Do you have health insurance benefits through
23  UPS?
24    A.  Yes.
25    Q.  Have you had it the whole time?

Page 23

1     A.  Yes.
2     Q.  Okay.  Are you able to participate in some
3   type of retirement program that they may offer, like a
4   401(k)?
5     A.  Not part-timers.
6     Q.  Not part-time?
7     A.  No.
8     Q.  Okay.  But you received health -- what other
9   benefits?  You receive health benefits.  Any other
10  major benefits that you receive?
11    A.  From UPS?
12    Q.  Yeah.
13    A.  Just my health benefits and that's it.
14    Q.  Okay.  Do you have to contribute to the cost
15  of your health benefits?
16    A.  No.
17    Q.  And they've always paid all of it?
18    A.  I guess my health benefits are paid through
19  the union.
20    Q.  Okay.
21    A.  And we contribute to the union.
22    Q.  And you're able to have family coverage?
23    A.  Yes.
24    Q.  You say one of your children is nine?  Nine?
25    A.  Uh-huh.  The ages?

Page 24

1     Q.  Your youngest child is --
2     A.  Seven.
3     Q.  Seven.  I got 2000.
4     A.  1999.
5     Q.  '99.  Okay.  Who's -- currently, who is your
6   supervisor at UPS?
7     A.  Bob Biancas.
8     Q.  And I didn't ask.  Is that in Montgomery?
9     A.  Yes.
10    Q.  Are you working at the Montgomery plant?
11    A.  Yes, sir.
12    Q.  And who was your supervisor when you first
13  start working there?  Do you remember?
14    A.  Kevin Lawrence.  He's retired.
15    Q.  Okay.  We won't worry about that, then.  And
16  while you've been employed at UPS, have you been
17  subject to any disciplinary actions?
18    A.  No.
19    Q.  Okay.  Have you been offered full-time
20  employment?
21    A.  No.
22    Q.  Okay.  As far as you know -- and I suspect;
23  but as far as you know, would you accept it if
24  offered?
25    A.  Full-time at UPS?

Page 25

1     Q.  Yeah.
2     A.  Well, I don't think that --
3     Q.  I know it depends on a lot of things perhaps;
4   but just generally speaking, if they offered you
5   full-time, would you be willing to accept it?
6     A.  Yes.  But they're not, because you have to be
7   there at least 15 years to 20 years before you get
8   full-time.
9     Q.  Okay.  Now, other than -- let me ask you
10  this.  Other than the claims that we're talking about
11  in this lawsuit, as they relate to the Title 7
12  claims -- and when I say Title 7, that's legalese for
13  saying employment discrimination claim.  Okay.  So if
14  I say that, that's generally what I mean,
15  discrimination complaint.  I'm just so used to calling
16  it Title 7.  Other than the Title 7 or discrimination
17  complaints that we're talking about as a part of this
18  lawsuit, have you filed any other employment
19  discrimination claims against either -- I guess, any
20  other employer that you ever worked for?
21    A.  No.
22    Q.  Okay.  No problems at UPS?
23    A.  No.
24    Q.  Okay.  Let's see.
25      MR. NEELEY:  I thought -- off the record.

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

8 (Pages 26 to 29)

Page 26

1       (Off-the-record discussion)
2    Q.  Okay.  I think I'm ready.  Now, let's go back
3  to the Department of Agriculture.  And I appreciate
4  you bearing with me while I keep myself on track.  I
5  think we discussed, before we went to your current
6  status, that in November of 1996, there was a -- would
7  it be a fair statement -- consolidation, so to speak,
8  of various departments of agriculture here in
9  Alabama?  Is that a fair statement?
10    A.  Yes.
11    Q.  Okay.  In other words, your office in
12  Hayneville, where you were working and where you had
13  been hired, was closing and its functions, its job,
14  was being transferred to the office in Luverne?
15    A.  That's correct.
16    Q.  Okay.  As a part of that, you were, say,
17  transferred to work in Luverne?
18    A.  Yes.
19    Q.  Okay.  At that time, were you living in
20  Montgomery?
21    A.  Yes.
22    Q.  How far -- so you had to travel from
23  Montgomery to Hayneville.  And that's what about 20
24  miles one way?
25    A.  From Montgomery to Hayneville, yeah, about 20

Page 27

1  miles.
2    Q.  And how far from Montgomery to Luverne?
3    A.  From my home to Luverne, it was 50 miles one
4  way and 50 miles back.
5    Q.  So Montgomery, that's -- it doesn't matter.
6  Okay.  And when you went to Luverne, everybody that
7  was in the Hayneville office -- now, we understand
8  about Mr. Harris and -- about Mr. McAlpine had been
9  your supervisor; but about a month before your
10  transfer, he had moved on; and Mr. Powers had started
11  supervising the Hayneville office, correct?
12    A.  Mr. McAlpine was gone several months before.
13    Q.  Several months.  But then Mr. Powers was now
14  the Hayneville supervisor?
15    A.  Supervisor, yes.
16    Q.  All right.  So when the transfer happened,
17  your supervisor was Mr. Powers?
18    A.  Yes.
19    Q.  And transferring with you was Ms. Hunter or
20  Arlesa, Ms. Williams or Patsy, and yourself?
21    A.  That's correct.
22    Q.  Okay.  And at the time you went to Luverne,
23  there was already -- already working in Luverne was
24  Ms. Davenport, Ms. Blackman, and a Ms. Welch?
25    A.  That's correct.

Page 28

1    Q.  Okay.  And when y'all made this move, do you
2  know whether or not they acquired new or bigger office
3  space for all y'all to get into in Luverne?
4    A.  No, I didn't.
5    Q.  Okay.  As far as you knew, they just moved
6  y'all into the same office that they already had?
7    A.  Yes.  That's correct.
8    Q.  All right.  Now, after Mr. Powers took over
9  for Mr. McAlpine, was he in the Hayneville office on a
10  daily basis?
11    A.  Yes, sir.
12    Q.  Now, once you made the transfer from
13  Hayneville to Luverne, did you see Mr. Powers every
14  day?
15    A.  No, I didn't.
16    Q.  Okay.  Do you know why that was?
17    A.  Because Mr. Powers was supervising other
18  county offices also.  So he was there a few days, like
19  two or three day days out of a week.
20    Q.  Okay.  And you would assume on the other
21  days, he was at the other county offices?
22    A.  Yes.
23    Q.  Do you know which other county offices those
24  were, just by chance?
25    A.  I can't remember that.

Page 29

1    Q.  Okay.  On a daily basis within this office
2  was everybody else, other than Mr. Powers?
3    A.  Yes.
4    Q.  I say everybody else.  Just for
5  clarification, Ms. Davenport, Ms. Blackman, Ms. Welch,
6  Ms. Hunter, yourself, and Ms. Williams?
7    A.  Yes.
8    Q.  So from eight to five, so to speak, Monday
9  through Friday, y'all were there.
10    A.  Yes.
11    Q.  Y'all were the Luverne office.
12    A.  Yes.
13    Q.  All right.  And Mr. Powers would show up --
14  that sounds bad.  He would come to that office a
15  couple of days a week, maybe three?
16    A.  Yes.
17    Q.  And when he would come for those couple or
18  three days out of the week, would he tend to stay,
19  say, eight to five, spend the whole day with y'all?
20    A.  Yes.
21    Q.  Was there anything in particular, any
22  function, that Mr. Powers did on those two or three
23  days out of the week that you or any other -- that
24  couldn't be handled by you or any of the other
25  employees that were in the office five days a week

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

9 (Pages 30 to 33)

Page 30

1  eight to five?
2      A.  Dealing with his job duties?
3      Q.  Yeah.  Was there something in particular he
4  had to come in and do other than just, say --
5      A.  Yes.
6      Q.  -- be supervisor?
7      A.  Yes.  He could have done interest credit
8  reviews.  He could have done the collections.
9      Q.  But I mean -- I'm not being clear, I don't
10  think.  Those were things you were doing, all of y'all
11  were doing; is that right?
12      A.  That's correct.
13      Q.  Okay.  I'm saying beyond those duties.
14  Beyond the things that all of y'all were already doing
15  eight to five Monday through Friday, was there
16  something else in addition that he had to do that you
17  were aware of, like signing off on applications or
18  approvals or anything like that?
19      A.  Yes.  He -- he had to sign off on the loan
20  approvals that we did.
21      Q.  Okay.  And that was something none of y'all
22  could do that he had to do?
23      A.  Well, we didn't have the authority to sign
24  off on loan closings, but we can do the paperwork.
25      Q.  Right.

Page 31

1      A.  But he had to be the one to sign off on it.
2      Q.  I understand.  So y'all did all the work and
3  he signed the documents.
4      A.  That's correct.
5      Q.  Okay.  Just for clarity, what all -- we're
6  talking about loan closing and things.  Now, this --
7  at this time, were y'all still known as Farmers Home
8  or were y'all now known as Rural Development?
9      A.  Known as Rural Development.
10      Q.  All right.  And the loan -- what type of
11  loans is it that you're referring to?
12      A.  Housing.
13      Q.  Would this be --
14      A.  Low income housing.
15      Q.  Okay.  City or farm?
16      A.  No.
17      Q.  Okay.  Just city?
18      A.  The housing?
19      Q.  Yeah.
20      A.  It was rural housing, rural area.
21      Q.  Okay.  So it's low -- lower income rural
22  housing --
23      A.  Housing.
24      Q.  -- loans.  What other things were y'all
25  doing?

Page 32

1      A.  The interest credit reviews when borrowers
2  comes in to be renewed on their loan.
3      Q.  So the whole function of this office was to
4  make and service these loans?
5      A.  That's correct.
6      Q.  Okay.  Any other functions that y'all had
7  that were not related to making and/or servicing these
8  loans?
9      A.  No.  Other than foreclosure.
10      Q.  Okay.  And that's the unfortunate end of
11  servicing a loan, isn't it?
12      A.  Yes.
13      Q.  Yeah.  Exactly.  Okay.  At the time that you
14  transferred to Luverne -- let me ask you just before
15  the transfer to Luverne.  I'm going to show you
16  Exhibit #2.  It's the certification of expected
17  separation.  And that's dated November the 7th of
18  1996.  Did you -- looking at number one, it says your
19  current position is Community Development Assistant
20  located in Lowndes County, Hayneville, Alabama, right?
21      A.  That's correct.
22      Q.  So, I'm assuming -- tell me if I'm wrong --
23  that at the time you transferred to Hayneville, to
24  Luverne, you were already aware of the possible
25  reduction in force that could occur later on; is that

Page 33

1  right?
2      A.  Yes.
3      Q.  Right.  Go ahead.
4      A.  Yes.  But according to the GS-4 position,
5  there were several positions that came open during
6  that time that you can apply to be a GS-5 position,
7  which I applied for several of those positions and was
8  not appointed for neither one of them.
9          MR. ATCHISON:  Can I go off the record?
10          (Off-the-record discussion)
11      Q.  We're going to diverge again a little bit
12  again from the plan.  While we're here, I want to make
13  sure I understand these.
14      A.  Okay.
15      Q.  Now, off the record, you mentioned to me --
16  or to us -- you stated in response to my question that
17  there were four selections for positions -- that there
18  were four positions for which --
19      A.  I applied for.
20      Q.  Thank you.  For which you applied, yeah.
21  Now, those four positions, were all of those prior to
22  receiving the certification of expected separation, or
23  were there some that were after that, some before?  Do
24  you recall?
25      A.  It was prior to receiving this here.

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

10 (Pages 34 to 37)

Page 34

1  Q.  Okay.  At the time these of four positions to
2  which you're referring -- we're going the talk about
3  each one specifically; but in a general sense, at the
4  time you applied for those, were you aware that there
5  was some potential for a reduction in force?
6  A.  No.
7     MR. ATCHISON:  Rand, can we go off the record
8  again?
9     MR. NEELEY:  Yeah.
10    (Off-the-record discussion)
11  Q.  Okay.  Now, let's see.  Mr. Atchison provided
12  us today some documents, four documents, which were
13  signed by Mr. Horace Horn.  And I'm trying to put some
14  shape on this issue regarding the four positions.
15  Okay?
16  A.  Yes, sir.
17  Q.  Okay.  And I want you to look at them to
18  make sure that I don't misstate anything.  I'm going
19  to start marking them.
20     Okay.  Defendant's Exhibit #8, appears to me to
21  be a letter to you from Mr. Horn, who was the state
22  director of Rural Economic and Community Development
23  in the state of Alabama.  Is that right at the time?
24  A.  Yes.
25  Q.  Okay.  And it states that you had applied for

Page 35

1  a position vacancy announcement number 9604; is that
2  right?
3  A.  Yes.
4  Q.  Okay.  And you were not selected for that
5  position, and that letter tells us that Ms.--
6  A.  Debra Yates.
7  Q.  All right.  I'm going to hand you another
8  letter, which I've marked as Defendant's Exhibit #9,
9  again to you from Mr. Horn regarding another position
10  for which you applied in vacancy announcement 9605.
11  Is that what that letter is?
12  A.  Yes.  In Montgomery.
13  Q.  All right.  And that indicates that someone
14  else -- someone other than you was selected for that
15  position; is that right?
16  A.  Yes.
17  Q.  Okay.  That's two.  Here's another letter
18  dated the same day, June 21st of '96, from Mr. Horn to
19  you, indicating that you had applied for vacancy -- or
20  position announced in vacancy announcement 9607; is
21  that right?
22  A.  Yes.
23  Q.  Okay.  And selected for that was Nancy
24  Boldog?
25  A.  Boldog.

Page 36

1  Q.  Okay.  And finally, a fourth letter, which
2  I've marked as Defendant's Exhibit #11, to you from
3  Mr. Horn regarding vacancy announcement 9608, which is
4  a letter of the same nature, advising you that a Lisa
5  Hardy had been selected for a position in Bay Minette,
6  Alabama; is that correct?
7  A.  Yes.
8  Q.  Now, you said a letter.  Do these letters
9  relate to the four positions to which you were
10  referring?
11  A.  Yes.
12  Q.  All right.  That really clarifies things.
13  Now, again -- and ask me for any of these letters if
14  you like as I go.  I'm going to ask a few questions
15  about each position.
16     MR. ATCHISON:  May I just give her my copy?
17     MR. NEELEY:  Sure.  Sure.
18  Q.  You're probably -- you're much more familiar
19  with this than I am; so I was just going to say if you
20  need them, let me know.  As to 9604, that's the
21  position that was titled Secretary in the Public
22  Affairs Rural Development section at the state office
23  in Montgomery, for which Debra Yates was hired.  Do
24  you know Ms. Yates?
25  A.  Yes.  Not personally, but I knew her.

Page 37

1  Q.  Knew who she was?
2  A.  Yes.
3  Q.  Okay.  You could, so to speak, pick her out
4  of a lineup if you saw her?
5  A.  Now?
6  Q.  Then you could have?
7  A.  Back then, yes.
8  Q.  Okay.  I really just have one.  Is she a
9  black or white female?
10  A.  White.
11  Q.  Okay.  That's really all I'm trying to
12  establish.  Now, do you know anything about that
13  selection in terms of number of applicants, in terms
14  of the racial composition of the applicant pool?
15  A.  No.
16  Q.  Do you know who the selecting official was
17  for that selection?
18  A.  According to my letter, it looks like Horace
19  Horn was.
20  Q.  It may have been Mr. Horn?
21  A.  Horace Horn.
22  Q.  But to finish, you don't know that for sure?
23  A.  No.
24  Q.  Okay.  Has anybody made any statements or
25  have you seen any writings that indicate to you that

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

Page 38

1  the selecting official, be it Mr. Horn or another,
2  made the selection of Ms. Yates over you on the basis
3  of her -- of your race?
4      A.  No.
5      Q.  Okay.  Then, what, if anything, can you tell
6  us about Ms. Yates' professional background?
7      A.  Well, she was -- she was already a GS-4 in
8  the state office, there in the state office with
9  personnel.
10     Q.  This was a 5 position?
11     A.  Yes.
12     Q.  Okay.  Thank you.  So she was already working
13  in --
14     A.  The state office.
15     Q.  -- in the state office.  Do you know in what
16  part of the state office?
17     A.  I can't remember what part.
18     Q.  All right.  Do you know anything of
19  Ms. Yates' qualifications that would lead you to
20  conclude that she was not as equally or better
21  qualified then you for the position?
22     A.  Her qualification?
23     Q.  Uh-huh.
24     A.  Only one thing I knew, that she wasn't -- she
25  wasn't -- she had not been there longer than I have.

Page 39

1  She was not employed longer than I have.
2      Q.  So as far as you knew, just seniority?
3      A.  As far as I knew, yes.
4      Q.  You had seniority over Ms. Yates?
5      A.  Yes.
6      Q.  Okay.  To your knowledge, did seniority alone
7  entitle you to the position?
8      A.  Yes.
9      Q.  Is that your opinion, or do you know that as
10  a matter of fact?
11     A.  That's my opinion.
12     Q.  And there's nothing wrong with your opinion.
13  Okay?  I was just asking.  I'm trying to say, do you
14  know of any regulation of the Department of
15  Transportation (sic) that would have required them to
16  place you in the position ahead of her for example?
17     A.  Yes.
18     Q.  Okay.  Do you know of any?
19     A.  Nothing but my race.
20     Q.  Okay.  So at this point in time, the only
21  thing that you could -- wait a minute.  The only
22  factor upon which you can infer discrimination is the
23  difference in y'all's racial makeup or the fact that
24  she's white and you're black?
25     A.  Yes.

Page 40

1      Q.  Okay.  And we're going to flip over to the
2  next job, which would be that noted as a secretary in
3  the single family housing section here in the state
4  office in Montgomery, vacancy announcement 9605.
5  Tammy Martin was selected for that position; is that
6  right?
7      A.  Yes, sir.
8      Q.  Now, as to Ms. Martin, do you know her well
9  enough to tell me what her race was?
10     A.  Yes.
11     Q.  Okay.  What was that?
12     A.  She was a white lady.
13     Q.  White female.  Okay.  Was this to a GS-5
14  position?
15     A.  Yes.
16     Q.  Do you know what her -- did this equate to a
17  promotion for Ms. Martin?
18     A.  Yes, it did.
19     Q.  So, as far as you knew, she was a GS-4 prior
20  to this selection?
21     A.  Yes, she were.  Ms. Martin and I started
22  around the same time.
23     Q.  Oh, okay.
24     A.  We both worked in the county office.  We did
25  the same thing in the county office.  Our job duties

Page 41

1  were the same.
2      Q.  You say the county office.  Did she work with
3  you in Hayneville?
4      A.  No, sir.  She worked in the Wilcox County
5  office.  But in a county office --
6      Q.  Yes.
7      A.  Yes.
8      Q.  -- just a different county?
9      A.  She was in Wetumpka, the Wetumpka County
10  office.
11         MR. ATCHISON:  Rand, we've been going for a
12  time.  Can we take a break shortly?
13         MR. NEELEY:  Sure.  Let me get through this
14  one, and then we'll have a nice start and stop spot.
15  I don't have too much longer on it either.  And I
16  apologize.  Kick me, whatever you need to do.
17     Q.  Ms. Martin.  So Ms. Martin, you said, started
18  about the same time you did, but in a different
19  county?
20     A.  Yes.  She was in Wetumpka.
21     Q.  I'm sorry?
22     A.  Wetumpka County office.  Wetumpka.
23     Q.  Wetumpka.  Oh, she was in Elmore County then?
24     A.  Yes.
25     Q.  Okay.  At the risk of being too general --

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

12 (Pages 42 to 45)

Page 42

1  and you feel free to tell me -- if I ask a general
2  question and you know of a fact that you want me to
3  know, feel free to tell me. Okay? I'm just trying to
4  just kind of short circuit not your ability to tell
5  me, just in the interest of all the hours time.
6  Okay?
7      Do you know of any factor, anything, regulation,
8  for example, as my earlier an example, anything that
9  would lead one to conclude that she was selected over
10 you simply because she was white, other than that
11 fact?
12     A. Can you rephrase that another way?
13     Q. Yeah. That one was kind of confusing. Are
14 you aware of any regulation that required you to be
15 promoted ahead of her?
16     A. Yes.
17     Q. What regulation -- what is that?
18     A. My -- well, I seen -- I started a month
19 before her.
20     Q. So again seniority?
21     A. So again my seniority. And we did the same
22 job performance in the county office. We was at the
23 same grade level. And the only thing it could have
24 been were my race.
25     Q. Okay. And let me go back to the previous

Page 43

1  position as well as this one. For either of those two
2  positions, were you interviewed?
3      A. No, sir.
4      Q. Okay. Do you know whether or not there was
5  an interview done --
6      A. No, I do not.
7      Q. -- or interviews? Okay. So you don't know
8  whether or not -- and I don't either - as we sit here
9  today, whether or not Ms. Yates or Ms. Martin
10 interviewed for the positions or if they were selected
11 on the basis of a written record?
12     A. Right.
13     Q. Okay. As with the previous one, you don't
14 know for -- do you know for certain who the selecting
15 official was for the family housing section job that
16 Ms. Martin received?
17     A. No, I do not. Just according to the letter.
18     Q. Sure. It looks like Mr. Horn anyway, right?
19     A. Yeah.
20     Q. Any factor other than race that you think
21 shows that -- and when I say race, the fact that
22 you're black and that she was white. Other than that
23 fact alone, is there any other fact that you can tell
24 me that leads you to believe that race was a
25 motivating factor in your nonselection or that they

Page 44

1  didn't pick you because you were black, other than the
2  difference in y'all's race that you have knowledge of?
3      A. No. Not other than the complaints that I was
4  making.
5      Q. Okay. Now, this was dated June 21st of '96,
6  was the letter from Mr. Horn. Do you recall
7  approximately when it was that you applied for this
8  position? Again, the single family housing secretary
9  position.
10     A. Those positions were supplied right before
11 the RIF come in.
12     Q. Now, the RIF was in November? When I say the
13 RIF letter -- and let's go back real quick. I'm
14 sorry. I know you need to take a break. I'm getting
15 there. I promise. We know the certification of
16 expected separation, you received on or about,
17 somewhere in the neighborhood of November the 7th of
18 '96, right?
19     A. Yes.
20     Q. Yeah, I mean not exactly that day. Maybe it
21 was. Was this hand delivered to you --
22     A. No.
23     Q. -- or did you receive it in the mail, or did
24 Mr. Powers hand it to you? Do you know? Do you
25 remember?

Page 45

1      A. No.
2      Q. Okay. Well, we know before November the 7th
3  of '96 though on or about that date, you were aware
4  that there was possibly going to be a RIF, correct?
5      A. Yes. And that there was jobs that was open
6  that you can apply for to avoid the RIF, which is the
7  jobs that I applied for.
8      Q. That's what all of these were?
9      A. Yes.
10     Q. So sometime prior to June 21st, then, it is
11 your recollection that you had notice that there was
12 possibly going to be a RIF?
13     A. No. According to those jobs, there was jobs
14 being open for GS-5 positions. And the GS-5 position
15 were for you to be a GS-5 position in order to stay in
16 the position where you are instead of them
17 transferring you to another county and to be able to
18 compete in other agencies if there were a RIF. If I
19 would have gotten either one of these jobs as a GS-5
20 position, I wouldn't have been near to be able to
21 compete for another job during the RIF, which I was in
22 an area where --
23     Q. Yeah. Go ahead.
24     A. -- which I was in an area that I didn't even
25 have the rights to compete against anyone for a job.

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

Page 46

1    Q.   When you say in the area, you're referring to
2  a geographic area?
3    A.   The area -- the competing area, the commute
4  area.
5    Q.   Right.  We're on the same wave.  And let's
6  move on to what I've marked as #10 and #11.  I'll try
7  to do these -- well, no.
8        MR. NEELEY:  You want to take a break.  I
9  tell you, we'll stop for a few minutes and take a
10 break.
11       (Brief recess)
12    Q.   I'm going to hand you now what's been marked
13 as Defendant's Exhibit #10, which is a letter like the
14 previous two, from Mr. Horn to you dated June 21st.
15 Oh you got it.  Thank you.  June 21st of '96.  Nancy
16 Boldog, right --
17    A.   Yes
18    Q.   -- was the selectee for that position?
19 That's the same letter.
20    A.   Yes.
21    Q.   And that's for a Rural Development Assistant
22 position, GS-5, Bay Minette, Alabama.  Do you have any
23 evidence that you could offer that Ms. Boldog was not
24 at least equally as qualified as for you for the
25 position of Rural Development Assistant?

Page 47

1    A.   No, because I basically didn't know her
2  personally as I knew Tammy Martin and --
3    Q.   Okay.  Did you know at the time or have you
4  since learned Ms. Boldog's race?
5    A.   Yes.
6    Q.   Okay.  Did you know it at the time?
7    A.   Yes.  Her race was white.
8    Q.   All right.  At the time, do you know where
9  Ms. Boldog was working within the agency?
10    A.   No.
11    Q.   Okay.  And like the previous two, you're not
12 aware of who the selecting official was, if it was not
13 Mr. Horn?
14    A.   That's correct.
15    Q.   Okay.  Do you know any -- do you have any
16 information you could provide me regarding the number
17 of applicants for this position?
18    A.   No.  I have no idea how many applied.
19    Q.   Okay.  I'm going -- if you'll go to #11.
20 Defendant's Exhibit #11 is another letter dated June
21 21st of '96 from Mr. Horn to you; is that right?
22    A.   Yes.
23    Q.   And this is referencing another Rural
24 Development Assistant position, GS-5, in Bay Minette;
25 is that right?

Page 48

1    A.   Yes.  Which was Bay Minette district office.
2  That was in the district office.
3    Q.   Okay.  As opposed to the -- it was '90 -- was
4  07 in a different office other than the district
5  office?  Do you know?
6    A.   No.
7    Q.   Okay.  These, as far as you know, were two
8  totally separate positions?
9    A.   Yes.
10    Q.   Okay.  And Ms. Hardy was selected for this
11 position announced in 9608; is that right?
12    A.   That's correct.
13    Q.   And do you know her to be a white female?
14    A.   Yes.
15    Q.   Do you have -- is there any evidence that you
16 can point me to that suggests that Ms. Hardy was not
17 at least as equally qualified for the position in
18 question as you were?
19    A.   Yes.
20    Q.   What's that?
21    A.   Because Ms. Hardy, she was -- she had a year
22 less time than I had.  We both was in the county
23 office.  She was working in Monroeville County
24 office.  And that district office did not have any
25 blacks in that office.

Page 49

1    Q.   You're talking about the one in Bay Minette?
2    A.   Bay Minette, yes, which were the Bay Minette
3  area district office.  That was the position.  And
4  Ms. Hardy was also a GS-4.
5    Q.   So she was promoted to a 5?
6    A.   Yes.
7    Q.   Okay.  Do you know -- if it were not
8  Mr. Horn, do you know who the selecting official was
9  for this position?
10    A.   No, not other than what the letter said.
11    Q.   Okay.  As with the previous one and the other
12 three, do you have any information you could provide
13 me regarding the applicant pool for this position?
14 Know anything about how many people applied or who
15 they were?
16    A.   No, I don't.
17    Q.   Okay.  We're going back to -- let's go back
18 to the RIF issue, the RIF itself.  Approximately when
19 was it that you -- you previously stated that you
20 became aware that there was a possibility for a
21 reduction in force prior to November 7th, 1996.  As
22 best you recall, approximately when was that, that you
23 first became aware that there might be a RIF?
24    A.   It was back in -- when we got transferred,
25 there was something in January about the RIF.

LISA McCALL v. MIKE JOHANNS                           3/26/2007
DEPOSITION OF LISA McCALL

14 (Pages 50 to 53)

---

Page 50

1    Q.  As early as January of '96?
2    A.  No.  The previous year.
3    Q.  In January of '95?
4    A.  No.  '97.
5         MR. ATCHISON:  Can we go off the record just
6    a second?
7         MR. NEELEY:  Yeah.
8         (Off-the-record discussion)
9    Q.  When you became aware of the reduction in
10   force, did you have an understanding of -- or what was
11   your understanding, I should say, of why there was
12   going to be a reduction in force?
13   A.  When I -- in January when I had --
14   Q.  Whenever you first became aware of it.
15   A.  In January of 1997?  My aware of it were that
16   there's going to be a RIF and the agency were going to
17   provide the ones that got RIF'd a position.  And it
18   also was going to provide a position for them.  If
19   they got RIF'd, they was going to provide for us to go
20   out and search other jobs and be able to apply for
21   those jobs also.
22   Q.  Do you know why -- I guess what I'm asking
23   why did you think the agency was going to have a
24   reduction in force.
25   A.  At that time, really didn't know.

---

Page 51

1    Q.  Okay.  Now, Exhibit #2, that one that's in
2    front of you, we're talking about -- and you've seen
3    this exhibit before?  I mean you got a copy of this
4    letter at or about -- on or about November the 7th,
5    correct?
6    A.  This is it right here?
7    Q.  Yeah.
8    A.  No.
9    Q.  The agency didn't provide you at or about
10   this time a statement -- a letter titled Certification
11   of Expected Separation?
12   A.  No, I did not get that.
13   Q.  Okay.
14   A.  The one I got was in January of 1997.
15        MR. ATCHISON:  Can we go off the record
16   again?
17        (Off-the-record discussion)
18   Q.  Have you ever heard the acronym CTAP?
19   A.  Can you rephrase that?
20   Q.  CTAP, the Career Transition Assistance Plan.
21   A.  No.
22   Q.  All right.  Let's go to Exhibit #3, if you
23   can get #3.  That's a pretty thick exhibit.  It's got
24   several pages, because it's a letter that you -- I
25   understand that you received, as well as attachments

---

Page 52

1    to that letter.  Okay?  Now, this is a letter dated
2    January the 23rd of 1997.  And the subject is a
3    Specific Reduction in Force Notice.  And it's
4    addressed to you.  Have you seen that before?
5    A.  Yes.
6    Q.  Or the original of this letter, you've seen
7    before?
8    A.  Yes.
9    Q.  Now, this was a letter that told you that you
10   were in fact going to be subject to the reduction in
11   force, is that right, or that you were going to lose
12   your position?
13   A.  Yes.
14   Q.  All right.  Going down about the fourth
15   paragraph on page 1, the paragraph begins, A review of
16   your retention standing indicates that you've been
17   reached for release.  Do you see where I'm referring,
18   that paragraph?
19   A.  Yes.
20   Q.  If you go down further into that paragraph,
21   the statement says, Through further application of RIF
22   regulations, it has been determined that you have no
23   assignment rights within your competitive area.
24   Through application of the mission area's policy on
25   use of vacancies, it has determined that there is no

---

Page 53

1    placement for you in a vacant position within or
2    outside your competitive area.
3    Do you see that -- those two sentences?
4    A.  Yes.
5    Q.  Are you aware as to whether or not at the
6    time of this RIF in January of 1997, which became
7    effective in April of 1997, any vacant position that
8    became available for which you were qualified in
9    accordance with the RIF regulations?  Were you aware
10   of any GS-4 position that became available between
11   January and April of 1997?
12        MR. ATCHISON:  Is this full-time or part-time
13   question?
14        MR. NEELEY:  Full-time.
15   A.  No.
16   Q.  All right.  Now, were you aware of any -- and
17   let's clarify.  I said full-time.  I really mean
18   full-time permanent positions.  You weren't of any
19   that came up; is that right?
20   A.  No.
21   Q.  All right.  During the same time frame, from
22   January of 1997 to April 27th of 1997, were you aware
23   of any temporary positions that became open at the
24   GS-4 level?
25   A.  No, not during the time of the RIF.

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

15 (Pages 54 to 57)

Page 54

1    Q.  Okay.  Between that same time period, from
2  January of 1997 to the end of April 1997, what other,
3  if any, jobs did you apply for within the agency, if
4  any?  From January of '97 through April of '97, did
5  you apply for any other positions within the agency?
6    A.  No.  With other agencies, I did, other
7  agencies outside of Rural Development.
8    Q.  Okay.  Within the Department of Agriculture
9  or within various departments of the Federal
10  Government?
11    A.  With areas of other employers and also with
12  some USDAs.
13    Q.  Some other agencies.  What other agencies do
14  you recall?
15    A.  I applied for Maxwell Federal Prison.
16    Q.  Okay.  So DOJ.
17    A.  USDA Soil Conservation, which is Farmers
18  Service now.
19    Q.  Now, these positions, were those GS-4 or
20  less -- lower positions?
21    A.  Some of them were GS-4s, and some were
22  GS-3s.  And I applied for the VA.
23    Q.  Again, either a 4 or a 3 or a 5?
24    A.  It was 3s and 4s.
25    Q.  Okay.  And all this between January and

Page 55

1  April?
2    A.  Yes.
3    Q.  And how did you aware of these other
4  positions?
5    A.  Through the Internet.
6    Q.  Did you seek the -- what assistance, if any,
7  did you seek from the Department of Agriculture or
8  Rural Development, Farmers Home, to -- what
9  assistance, if any, did you seek from them to help you
10  secure any of these positions?
11    A.  None.
12    Q.  Now, sometime between November of 1996 and
13  April the 27th of 1997, were you -- what, if any, for
14  lack of a better phrase, training, meetings,
15  gatherings were you invited to or asked to attend by
16  the USDA?
17    A.  None.
18    Q.  Are you aware of any such meetings that they
19  had --
20    A.  No.
21    Q.  -- to explain the re-employment rights of
22  folks?
23    A.  No.
24    Q.  Okay.  So, you were not notified -- your
25  potential meeting that occurred -- not a potential

Page 56

1  meeting that occurred.  Let me find it.  There was
2  a -- you were not invited to attend a meeting that
3  occurred on March the 4th of 1997 here in Montgomery
4  regarding -- I think the title, The Seminar, is the
5  word.  They call it, The Seminar, Keys to Successful
6  Career Transition.
7    A.  No, I was not.  Because if I would have been
8  aware of going to a meeting to keep my job, I would
9  have went -- did everything I possibly could do.
10    Q.  This wasn't anything about keeping your job.
11  It was a meeting that they had to help you find -- try
12  and help you find other job opportunities.
13    A.  Right.  And if I was aware of that, I would
14  have been there.  Probably the first one there.
15    Q.  Okay.  Now, during the period of, again,
16  November 1996 to April of 1997, what efforts -- did
17  you make any efforts to contact anybody within the
18  agency --
19    A.  Regarding to?
20    Q.  -- requesting assistance in finding other
21  placement?
22    A.  Yes.
23    Q.  Okay.  Who did you speak to?
24    A.  Barbara Price.
25    Q.  Okay.  Anything else?

Page 57

1    A.  No.  She was the only person that they would
2  let me speak to.
3  ·  Q.  And what, in essence, did Ms. Price tell you?
4    A.  She wasn't giving me anything.  It was like
5  she really didn't want to help me.  She -- it was like
6  she was giving me a turn-off.  She would tell me,
7  there's no jobs for you available.  And she never
8  tried to assist me with any type of employment.
9    Q.  What did you -- what would you have expected
10  her to do?
11    A.  At least, I was expecting for her, since she
12  was in the position as being a human resources -- in
13  human resources, I was expecting her to at least help
14  me get out there and find a career, at least help me
15  find another job, or give me some points on where I
16  can go to find another job, if she was in that
17  position to help me.
18    Q.  Okay.  Approximately how many times did you
19  speak with Ms. Price?
20    A.  Several.
21    Q.  Now, regarding your being separated because
22  of the RIF, let's talk about just that.  Do you
23  contend that you were separated at least in part on
24  the basis of your race?
25    A.  Yes.

LISA McCALL v. MIKE JOHANNS                               3/26/2007
DEPOSITION OF LISA McCALL

16 (Pages 58 to 61)

---

Page 58

1   Q.  Okay.  And why is that?
2   A.  Because based on my -- my race, which is my
3   color, and based on the former complaints that I had
4   done back in 1996.
5   Q.  Okay.
6   A.  Like my documents will show that I did
7   address to Horace Horn regarding the situation that
8   was going on --
9   Q.  Okay.
10  A.  -- after I took a part-time job with Lerner's
11  New York.
12  Q.  What was that all about?
13  A.  With Art Powers?
14  Q.  Uh-huh.  And Lerner.  What --
15  A.  Lerner New York.  It's a clothing store.
16  Q.  Yeah.  But, I mean, why did you and Mr. Horn,
17  tell me about the dispute between you and Mr. Horn
18  regarding your part-time employment.
19  A.  The dispute were that I -- I sent the
20  complaint to him regarding to what was happening
21  inside the county office with me and Art Powers.  I
22  took the -- part-time job with Lerner's New York.
23  And Art was harassing me about taking the job and
24  saying that I had to have proof from the agency in
25  order to take a part-time job, which I thought my time

---

Page 59

1   off from that job was -- didn't have anything to do
2   with my full-time job there, which I was only there
3   eight hours.  And what I do after those hours, I feel
4   like it didn't have anything to do with me taking a
5   part-time job; but he said it was conflicts of
6   interest with the company.
7   Q.  Did he say you wrote Mr. Horn a letter
8   regarding this?
9   A.  Yes.
10  Q.  Just for clarity, I'm going to hand you what
11  I've just marked as Defendant's Exhibit #12.  It's a
12  letter dated October the 29th of 1996 to Mr. Horn.  Is
13  that --
14  A.  I hand delivered it to him, and I had papers
15  signed for it that he received it.
16  Q.  Okay.  Let me get a stapler.  I'm going to
17  hand you another sheet of paper I had not marked.
18  It's dated 10/29, do you see that?
19  A.  Yes.  That's my attachment that I had along
20  with the letter that I gave Horace Horn.
21  Q.  Okay.  So that would go with #12?
22  A.  Yes.
23  Q.  Okay.  So Mr. Powers had told you -- in
24  essence, suggested to you that your employment with
25  Lerner was a conflict of interest with your employment

---

Page 60

1   with --
2   A.  Rural Development.
3   Q.  Okay.  And you -- did Mr. Powers suggest to
4   you that you needed to have a clearance to work a
5   part-time job?  Is that right?  Is that what he
6   basically told you?
7   A.  No, not me.
8   Q.  Okay.  What did he tell you exactly?
9   A.  He told me when I -- when they found out that
10  I was working a part-time job, the way they found out
11  I was working a part-time job, one of the people from
12  the state office came in the office, Sherry Perdue.
13  And her and Patsy Williams was friends, Patsy Williams
14  in the office with me.  And she told Patsy I had a
15  part-time job outside of Rural Development.  And Patsy
16  and Art Powers -- Patsy Williams and Art Powers
17  discussed it, the part-time job that I had regarding
18  to it.  Then he fronted me and told me I have no
19  rights to get a part-time job without letting anyone
20  in the office know about it, which I felt like I had
21  my rights to go out and get a part-time job if I
22  needed a part-time job at that time.
23  Q.  Did anybody -- or did Art or anybody else
24  explain to you that it -- that it may be -- I don't
25  know.  I know for the Department of Justice, if I have

---

Page 61

1   a part-time job, I have to have clearance, simply
2   because it's just what we have to do.  It has to be
3   approved by my supervisor because of the nature of our
4   work sometimes requires us to work more than 40 hours,
5   according -- for any number of reasons.  But did
6   anybody ever explain to you whether or not there was
7   such a regulation in place for the Department of
8   Agriculture employees?
9   A.  No.
10  Q.  So you don't know if there was or there
11  wasn't?
12  A.  No, I don't.
13  Q.  Okay.  But you're not aware of it?
14  A.  I'm not aware.
15  Q.  Did Mr. Horn respond to your letter?
16  A.  Yes.  He respond to me about the part-time
17  job, but he never respond to me regarding to my
18  complaint.
19  Q.  What did he say about the part-time job?
20  A.  Here's a copy of his letter.  It's in my
21  notes.
22      MR. NEELEY:  I don't see it.
23      MR. ATCHISON:  Excuse me.  What's the 29th
24  letter marked?  It was, what, #3?
25      MR. NEELEY:  October.

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

Page 62

1        MR. ATCHISON: No. What -- what is your
2   exhibit number?
3        MR. NEELEY: I'm on #12, which is her letter
4   of October 29th to Mr. Horn.
5        MR. ATCHISON: That was #12?
6        MR. NEELEY: Yeah. She said this was her
7   response from Mr. Horn. And do you have this?
8        MR. ATCHISON: Yeah. I think that's --
9        THE WITNESS: That's it right there.
10       MR. ATCHISON: -- going to be the next one in
11  your line.
12       MR. NEELEY: I'm sure I -- I must have
13  misplaced it.
14       THE WITNESS: That's it right there.
15       MR. NEELEY: Yeah. I didn't misplace it.
16  Oh, thank you.
17    Q. I mark this as Defendant's Exhibit #13. And
18  this is a letter dated October 30th, 1996, from
19  Mr. Horn to you saying that there was no conflict of
20  interest, correct?
21    A. Yes.
22    Q. Okay. So, in essence, at least as it
23  involved your -- what else were you complaining --
24  from your letter of October the 29th, what else were
25  you complaining to Mr. Horn about?

Page 63

1     A. About the harassing that Art was giving me in
2   the office.
3     Q. What else in there did you tell him was the
4   basis of the harassment?
5     A. I was -- I told him I was having problems in
6   the county office with the supervisor, Art Powers.
7   And -- and I told him about the complaint. I was
8   telling him I had complaints against him.
9     Q. Okay.
10    A. And I also requested that he set up an
11  appointment with me to resolve the problems, but I
12  never -- he never called me or set up any appointment
13  or anything.
14    Q. What about his letter -- the following
15  letter, the letter that he sent you the very next day,
16  as a matter of fact?
17    A. He sent me the letter regarding to my
18  employment. And I called them, but they weren't --
19  they never responded to me regarding to anything that
20  I had to say that was going on in the county office.
21  It was like everybody there was ignoring what I had to
22  say.
23    Q. What else was there?
24    A. What else I had to say?
25    Q. Yeah.

Page 64

1     A. With the harassing that Art Powers was giving
2   me in the office, which he -- he talked to me in a
3   hostile way, tone of voice, which he didn't talk to
4   Ms, Williams, Patsy Williams, which is a white
5   employee there. About the way he carried on with
6   black borrowers
7     Q. With what? I'm sorry.
8     A. The black borrowers there.
9     Q. Oh, borrowers.
10    A. How he talked to the black borrowers in the
11  office.
12    Q. Okay. And who did you speak with at the
13  state office regarding these things that you've just
14  discussed with me?
15    A. I left messages with Beverly Heftin, which is
16  the -- was the secretary at that time. Beverly Heftin
17  was Horace Horn's secretary. I left messages with her
18    Q. I mean, this type of detail?
19    A. Yes.
20    Q. Okay. And what was her response?
21    A. That she would give him the message.
22    Q. Now, when you wrote this letter in October of
23  1996, it was your belief that Art Powers -- I'm
24  asking. Was it your thought or belief that Art Powers
25  was harassing you at least in part because you were

Page 65

1   African-American?
2     A. Yes.
3     Q. Okay. And at that time in 1996, you had been
4   employed with the agency almost -- approximately six
5   years; is that correct?
6     A. Yes.
7     Q. Okay. And at the time, you were also working
8   or had recently -- let me back up. Prior to working
9   with Mr. Powers, you had been working with
10  Mr. McAlpine; is that right?
11    A. Yes. That's correct.
12    Q. Okay. In October of 1996, what knowledge did
13  you have regarding the Equal Employment Opportunity
14  process or grievance procedures that were available to
15  employees in the United States Department of
16  Agriculture?
17    A. At that point, I had -- I didn't have -- very
18  little knowledge, because like I'm not an attorney or
19  anything. I just had very little knowledge. And I
20  walked into a USDA office and seen this address and
21  everything on the board. And I was reading the board,
22  and that's when I found out about the addresses that I
23  can write to and file my complaints.
24    Q. Would that have been the December --
25    A. The December letter

LISA McCALL v. MIKE JOHANNS                              3/26/2007
DEPOSITION OF LISA McCALL

18 (Pages 66 to 69)

Page 66

1    Q. The December 20th of 1996 letter --
2    A. Yes.
3    Q. -- to the Office of Civil Rights?
4    A. Yes.
5    Q. Okay. Mr. McAlpine had hired you; is that
6  correct?
7    A. Yes.
8    Q. And Mr. McAlpine is a black male; is that
9  right?
10   A. And I was hired by Fred Callison, also, which
11 is a white male.
12   Q. But on a day-to-day basis, you worked with
13 Mr. McAlpine up until what? Say -- what month in '96
14 did he leave? Or '95. Do you remember exactly?
15   A. He left in the early part of '96.
16   Q. Okay. So from the time that you were hired
17 in 1990 until the early part of 1996, on a daily
18 basis, you worked with Carnell McAlpine?
19   A. Yes.
20   Q. Now, what conversations, if any, did you have
21 with Mr. McAlpine regarding Mr. Powers' actions?
22   A. How he was treating me?
23   Q. Yeah.
24   A. Very little.
25   Q. All right. In the six years you worked for

Page 67

1  Mr. McAlpine, was there ever any discussion or
2  training you received on your rights under Title 7 or
3  rights under the Equal Opportunity laws?
4    A. Rephrase that.
5    Q. Okay. Did you ever receive any training or
6  letters or anything from Mr. McAlpine or from the
7  Department of Agriculture in the six years prior to
8  '96, from the time that you started, about your rights
9  under Title 7 or the grievance process for EEO?
10   A. No.
11   Q. Never any training?
12   A. No.
13   Q. Okay. What, if any -- what, if anything, was
14 your knowledge in 1996 about what you could do if you
15 thought you were being discriminated against on the
16 basis of your race, sex, any number of bases?
17   A. Yeah, my race and the retaliation that I was
18 getting.
19   Q. Okay. What were you being retaliated for in
20 1996?
21   A. Those complaints that I made.
22   Q. When was the first complaint that you made?
23   A. In 1996, in December.
24   Q. Okay. So anything that happened before that
25 couldn't have been in retaliation for that, correct?

Page 68

1    A. Yes.
2    Q. Okay.
3    A. If you're not including the one that I made
4  with Horace Horn.
5    Q. Okay.
6      MR. ATCHISON: That was the October '96.
7    A. That was October '96.
8    Q. All right. Let me go back to #12. What
9  information did you give me Mr. Horn in that letter
10 that would indicate to him that you were being
11 harassed on the basis of your race or gender or
12 pregnancy or disability or anything? Is there
13 anything in there that indicates to Mr. Horn that you
14 thought you were being harassed on the basis of your
15 race? Let me ask you directly.
16     MR. ATCHISON: I'm going to object. The
17 document speaks for itself.
18   Q. You can answer, though.
19   A. Because in my letter, I stated to him that I
20 was having problems with the supervisor there.
21   Q. Did you state to him that you were having any
22 problems because you were black and he was white?
23     MR. ATCHISON: Same objection.
24   A. The same as my letter stated. I let him know
25 that I was having problems in the county office with

Page 69

1  Arthur L. Powers.
2    Q. Okay. And all I'm asking, I'm asking you to
3  state if it's true. From the face of the letter,
4  there's nothing in that letter that says -- that would
5  have told Mr. Horn that you thought that harassment
6  was on the basis of your race, is there?
7      MR. ATCHISON: Same objection.
8    A. Yeah. Because my letter is stating that.
9    Q. Okay.
10   A. If he would have read the letter and he would
11 have referred to me, according to my letter, he would
12 have seen that there was a problem there and that he
13 should have take the effect of saying, let me have a
14 meeting with her and let me see what is going on in
15 that office.
16   Q. Okay.
17   A. Which I do believe it had something to do
18 with my race.
19   Q. Did you tell him that?
20   A. In my opinion, yes, he were notified.
21 Because I probably used the terms wrong as saying
22 harassment problems, which, like I stated earlier, I'm
23 not an attorney. I was writing my letters according
24 to my knowledge.
25   Q. Okay. Now --

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

Page 70

1    A.  And he should have picked up on my letter to
2  say, there's a problem going on in the office; we
3  should take an issue of seeing what's going on.
4    Q.  Let me ask you this.  You said Mr. Powers
5  treated you differently, where he spoke harshly to
6  you?
7    A.  Yes.  And the other black, Arlesa Hunter,
8  also, which was another black that was in the office
9  with me.
10    Q.  Okay.  And the other person in the office is
11  Ms. Williams?
12    A.  Yes.  Ms. Williams, which is a white male --
13  female.
14    Q.  Other than the fact that you were
15  African-American -- and Ms. Hunter, but this is really
16  about you.  Other than the fact that you were
17  African-American, is there any other fact that would
18  show that Mr. Powers treated you differently because
19  of that?
20    A.  Yes.
21    Q.  Okay.
22    A.  The way that he would speak to me.
23    Q.  Okay.  Could it be possible that Mr. Powers
24  spoke to you differently because of a performance
25  issue?

Page 71

1    A.  No, sir.
2    Q.  Could it be possible that he thought your
3  performance was different?
4    A.  No.
5    Q.  Okay.  But did he ever make any racially
6  derogatory statements to you?
7    A.  When he -- yes.  When he speak to me, he
8  would always say you people, which I took it as being
9  something racial toward me because he said you
10  people.  And I am black; the others are white.  So,
11  why you making statements to me as "you people" when
12  I'm only one person?  You can -- I would like for him
13  to refer to me by my name.
14    Q.  Did you tell him that?
15    A.  Yes, several times.
16    Q.  And his response was what?
17    A.  He can talk to me any way he want to.
18    Q.  Okay.  Did ever hear him speak to Arlesa in
19  that manner?
20    A.  Yes.
21    Q.  What about Ms. Williams?
22    A.  No.
23    Q.  How did he refer to her?
24    A.  He referred to her nice.
25    Q.  How many -- okay.  I'm sorry.

Page 72

1    A.  He referred to Ms. Williams as Ms. Williams,
2  Miss Patsy.  And he would speak to her in a very
3  silent, quiet voice.  He wasn't hostile, like he get
4  real loud with her.  He was more easy-going with her
5  then he was with us.
6    Q.  How many times while y'all were in the
7  Hayneville office did he refer to you as "you people"?
8    A.  Several.
9    Q.  More than five?  Less than five?
10    A.  More.
11    Q.  Okay.  Less than 10?
12    A.  Less then 10, but it was more than 5.
13    Q.  Was he ever -- did he ever threaten you in
14  any way, physically threaten?
15    A.  As far as telling me that I should not ask a
16  borrower about something and if I do, I would be
17  sorry.
18    Q.  How does that -- I guess I'm asking you
19  this.  What does -- what happened?  Tell us about
20  that.
21    A.  Okay.  It was this -- it was a borrower.  She
22  was a white borrower.  I was doing an interest credit
23  review with her.  I found out that she had a husband.
24  So I gave her the proper form, which was a BOE, which
25  is a verification -- a verification of income form for

Page 73

1  her to fill out to give to her husband so his employer
2  can fill out, because the process were to verify
3  everybody's income inside the home.  So the borrower
4  called Mr. Powers and told him that I was questioning
5  her about the BOE form to give her husband, saying she
6  was separated, which everybody knows that she wasn't
7  separated from the husband.
8    Q.  Wait a minute.  Everybody knows.  What's --
9  what's the basis for everybody knows?
10    A.  Everybody in the office.  Everybody in the
11  office.
12    Q.  How did everybody know that?
13    A.  Because in that Hayneville office, everybody
14  knows everybody, the borrowers that comes in.  And she
15  had a big wedding.  There was a big wedding.
16    Q.  Wait a minute.  So it was your belief or
17  y'all's belief in the office that she was or was not
18  separated?
19    A.  She was not separated.
20    Q.  That was she not separated?
21    A.  Yes.
22    Q.  And that was based on the fact that she had a
23  wedding?
24    A.  No.  That was based on the fact that she had
25  verified her husband's income earlier.  And then when

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

20 (Pages 74 to 77)

---

**Page 74**

1  it came down to doing the interest credit review, they
2  were separated.
3      Q.  Okay.  So y'all had a disagreement.  Would it
4  be a fair characterization, then, that there was a
5  disagreement about whether or not this woman should be
6  subjected to the income -- to the information on her
7  credit review form?
8      A.  The interest credit review form?
9      Q.  Yeah.
10     A.  Rephrase that.
11     Q.  I mean, y'all had a disagreement regarding
12 her status, this lady's status -- is that fair
13 statement -- whether she was separated or not
14 separated?  Is that what it was about?
15     A.  Yes.
16     Q.  Okay.  And as a result of that disagreement
17 over a matter related to the performance of the
18 function of the job --
19     A.  Uh-huh.  The function of the job were for us
20 to verify everyone income.
21     Q.  Okay.
22     A.  If she showed in that file case that she had
23 a husband, that income had to be verified also.
24     Q.  But she told you that they -- they were
25 separated?

---

**Page 75**

1      A.  No, she did not.  She told Mr. Powers, Art
2  Powers, that they were separated.
3      Q.  Okay.
4      A.  And he came to my desk and told me do not ask
5  any more questions about that borrower and if I do,
6  I'll be sorry.
7      Q.  What reason do you think he would say that?
8      A.  Because I felt like he didn't have any
9  interest in bringing out the truth about her, that he
10 would have interest in a black borrower, which if it
11 had have been a black borrower, he would have dig
12 deeper into that case.
13     Q.  Okay.  That's just how you feel about it?
14     A.  That's how I seen it in the office.
15     Q.  Okay.  Well, we can't break down every loan,
16 but is it a possibility there could have been
17 something distinguishing about that particular
18 situation?  Do you know all the facts regarding that
19 loan?
20     A.  Yes.
21     Q.  All the facts?
22     A.  It could have been a case -- it could have
23 been proven that she was still married.
24     Q.  That's what you think?
25     A.  And it could have been proven that she was

---

**Page 76**

1  not eligible to receive those assistance on that loan.
2      Q.  But it's also likely that she could have
3  been.  Is that a fair statement?
4      A.  Yes.  If she was eligible for it.
5      Q.  So it's also the possibility that
6  Mr. Powers -- is it a possibility that Mr. Powers had
7  available to him information that was not available to
8  you regarding her status?
9      A.  He had the same information that I had.
10     Q.  No.  I'm asking you, is it not possible that
11 he had additional information that you did not have
12 for whatever reason?
13     A.  No, he did not.
14     Q.  Okay.  So if he's -- okay.  We're not going
15 to argue about it.  Okay.  So how many times was Art
16 in the office in Hayneville?  Is that everyday?  Is
17 that what you -- I can't remember what you told me
18 earlier.
19     A.  Yes.  He's there every day.
20     Q.  Okay.
21     A.  He was only there three days a week in
22 Luverne, remember.
23     Q.  There you go.  I can remember.  What other
24 racially derogatory statements did Mr. Powers make to
25 you that you recall, if any?

---

**Page 77**

1      A.  Rephrase that.
2      Q.  I mean, other than saying "you people," did
3  he make any other type racially derogatory statements
4  to you?
5      A.  No, no more than his tone or his voice.
6      Q.  Okay.  Did Mr. Powers have the opportunity to
7  rate your performance?
8      A.  No, not as I know of.
9      Q.  Okay.  In what ways did Mr. Powers'
10 harassment there in Hayneville -- and I use your term,
11 harassment -- how did that affect your job
12 performance?
13     A.  The way that I worked?
14     Q.  Yeah.
15     A.  It -- well, the way he came off on me, it
16 made me feel like he didn't want me there; but it at
17 no time changed my work performance.  I still did my
18 same duties that I had to do.  It just made me feel
19 like he didn't want me there to be in that office.
20     Q.  Well, I'm sorry for jumping around.  I am
21 going to go back to the RIF some.  The RIF in
22 itself -- I apologize if I've asked you this before,
23 so bear with me.  Can you identify any person -- we
24 use the term "similarly situated," but essentially any
25 other GS-4 person who was an employee of the

LISA McCALL v. MIKE JOHANNS                           3/26/2007
DEPOSITION OF LISA McCALL

Page 78

1   Department of Agriculture in Alabama at the time, of
2   Rural Development, particularly who was a GS-4, who
3   was not RIF'd?
4      A.  Are we speaking during the time of --
5      Q.  During the RIF?
6      A.  -- January?
7      Q.  Yeah.
8      A.  During the time.
9      Q.  People who were ultimately, subsequently laid
10  off?
11     A.  Besides the one -- besides the one that got
12  promoted --
13     Q.  Right.
14     A.  -- to GS-5?
15     Q.  Right.
16     A.  Are you saying -- let me make sure what
17  you're saying.
18     Q.  Yeah.  Well, let me try again.  Okay.  Can
19  you identify for me any other employees of Rural
20  Development who were GS-4s in April of 1997 that were
21  not laid off or as a result of the RIF?
22     A.  You still confusing.
23     Q.  I'll ask you this way, because this is where
24  it's going.  Can you identify for me any white person,
25  similarly situated to you -- that is -- and again,

Page 79

1   that's a legal term, but I'm going to put some general
2   parameters on it.  And Gary can add to it or take
3   away.  But similarly situated means was a GS-4 who was
4   employed by the Rural Development in Alabama, that was
5   white -- that's not similarly situated, but that's the
6   distinguishing factor of course.
7      A.  No.
8      Q.  -- that was not laid off when you were?
9      A.  No.  Because all the GS-4 whites that were
10  similar to me, they got promoted to GS-5 positions.
11     Q.  There were no whites that were laid off?
12     A.  Not GS-4s.
13     Q.  Well, what about -- well, GS-5s?  Was Sandra
14  Davenport laid off?
15     A.  Yes.
16     Q.  And she's a white female, correct?
17     A.  Yes.
18     Q.  Sandra Welch?
19     A.  Yes.
20     Q.  And is she a white or black female?
21     A.  She was white.
22     Q.  In fact, the people that you -- we just
23  talked about earlier, Ms. Davenport was laid off; is
24  that correct?  Ms. Welch was laid off; is that
25  correct?

Page 80

1      A.  Yes.
2      Q.  Okay.  And Patsy Williams retained her job,
3   or was she laid off?
4      A.  She retained her job.
5      Q.  And she was a GS-6?  Can you recall?
6      A.  Yes.
7      Q.  And Ms. Blackman?
8      A.  She retained her job.
9      Q.  Okay.  And she was a GS-6 as well; is that
10  right?
11     A.  No.
12     Q.  A 5?
13     A.  She was a 5, which position was a 4/5 that
14  they said was supposed to be.
15     Q.  Okay.  So there were some others who were
16  white that were laid all or RIF'd in the same action
17  as you, correct?
18     A.  Yes.
19     Q.  Okay.  Do you know for any reason why -- I
20  want to go to Exhibit #2.  If other employees who were
21  RIF'd had received that, do you know of any reason why
22  you did not receive the certification of expected
23  separation?
24     A.  Rephrase that for me.
25     Q.  Do you know of any reason -- do you have any

Page 81

1   explanation for why you didn't receive that letter,
2   the original of that letter, of course?
3      A.  No.
4      Q.  Okay.
5      A.  I don't think anybody received it in that
6   county office.
7      Q.  Okay.
8         MR. ATCHISON:  Off the record.
9            (The deposition was recessed at
10              11:19 a.m.)
11           (The deposition resumed at
12              1:53 p.m. on Tuesday, March 27,
13              2007, as follows:)
14     Q.  (Mr. Neeley continuing:)  So you're still
15  under oath, right?
16     A.  Right.
17     Q.  We left off yesterday talking about
18  Plaintiff's Exhibit #2.
19        MR. NEELEY:  You still have your stack over
20  there, Gary?  Here we go.  I got mine.
21        MR. ATCHISON:  No.
22     Q.  Well, I'm spinning across because I found
23  mine.  #2 is the letter with the subject line of
24  Certification of Expected Separation.  And it's dated
25  November the 7th of 1996, and it's addressed to you at

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

22 (Pages 82 to 85)

Page 82

1  CDA01-43; is that right? I mean, the exhibit I'm
2  showing you is what I've just described, correct?
3      A. Yes.
4      Q. That CDA01-43, do you know what that refers
5  to? Right up under your name. Is that like your pay
6  location?
7      A. Yes.
8      Q. Or do you know? I'm asking.
9      A. Yes.
10     Q. Okay. And so that -- so it was not -- and I
11 think you testified yesterday you did not -- did you
12 testify that you did not receive this letter or you do
13 not recall receiving this letter?
14     A. I do not recall receiving it.
15     Q. Okay. That's CDA01-43?
16     A. That's correct.
17     Q. Okay. I'm jumping around again. And what is
18 it that that refers to, if you know?
19     A. According to reading it, it's referring to
20 the reduction in force.
21     Q. Okay. No, no, no. Right up under your
22 name. That's like an address of some kind.
23     A. It's the county -- county office in Lowndes
24 County.
25     Q. Okay. And on November the 7th of 1996,

Page 83

1  that's where you would have been physically working?
2      A. That's correct.
3      Q. Okay. Now, that takes me right into an
4  area. When was it that you first learned of the
5  possibility that you -- not just you personally, but
6  that any number of you or your fellow employees -- may
7  lose their positions as a result of a reduction in
8  force?
9      A. The letter that I seen?
10     Q. Well, the -- okay. Yeah, that you saw. When
11 did you first see something in writing?
12     A. After we transferred to the Luverne office.
13     Q. Okay. Would it have been -- would that have
14 been the actual separation letter? I'm sorry. Here
15 we go. This is #3 for both parties. And you say
16 after you got to the Luverne office. Is that the
17 writing that you're referring to, Plaintiff's
18 Exhibit -- Defendant's Exhibit #3?
19     A. Yes.
20     Q. Okay. Now, that's dated January the 23rd of
21 1997. And the preceding one I showed you, #2, is
22 November the 7th of the 1996; so, what, about two
23 and half months prior. Now, other than you said in
24 writing, prior to receiving this letter in writing,
25 had you heard any rumors to the effect that there was

Page 84

1  going to be or possibly going to be a reduction in
2  force?
3      A. No.
4      Q. So you're telling me that --
5      A. Well, no, until a few months getting closer
6  till the RIF.
7      Q. That's what -- right. So November of 1996,
8  did you or did you not -- had you or had you not at
9  least heard that there was the possibility of a RIF,
10 or reduction in force?
11     A. I don't remember.
12     Q. Okay. As best you can recall, when did you
13 have any inclination or idea or thought that you or
14 any of your fellow employees may be subject to losing
15 your positions because of a RIF or a restructuring?
16 I'm maybe confusing apples and oranges, because that
17 is apples and oranges in this case by virtue of a
18 reduction in force. When did you first -- as best you
19 recall today, when did you first have knowledge that
20 there was a reduction in force possibly coming?
21     MR. ATCHISON: Object to the form. Go ahead
22 and answer, please.
23     A. In March of 1996, when I seen this notice
24 that it's going to be a RIF, I contact the state
25 office, spoke to Ms. Price, regarding to the RIF and

Page 85

1  getting information. The information was never sent
2  to me.
3      Q. Okay. And this letter is dated January of
4  1997.
5      A. That's correct.
6      Q. But you just said March of 1996?
7      A. It was March of 1997 when I gotten into the
8  RIF, in 1997. And I contact Ms. Price by phone from
9  the county office in Luverne regarding to the RIF.
10 And I spoke to her in the state office regarding to
11 her by phone, and she stated that she would mail me
12 the information.
13     Q. Okay. Not so much about the re-employment.
14 Let me -- what I'm trying to ascertain is surely --
15 and I'm not trying to argue with you. And I'm
16 probably going to draw an objection, but I'll take my
17 chances. Surely -- and this is going to be a question
18 eventually -- that you had some idea from some source
19 prior to receiving this letter that you were on the
20 verge of possibly losing your position. No or yes?
21     A. I don't remember it.
22     Q. You don't remember having had such knowledge,
23 or you don't remember if you did or did not have such
24 knowledge?
25     MR. ATCHISON: Object to the form.

Page 86

1    Q.  Which is it?
2    A.  I don't remember it.
3    Q.  Okay.  Wait a minute.  The question is, is
4    it -- do you not remember?  You say you don't
5    remember.  What don't you remember?
6    A.  I don't remember them telling me that I was
7    going to be one to be RIF'd out of that office.
8    Q.  Okay.  Not just you being RIF'd.  I'm talking
9    about when did you first acquire knowledge that
10   anybody would be subject to a reduction in force?
11   A.  In March of 1997 when I --
12   Q.  Go ahead.
13   A.  After I contact Barbara Price regarding to
14   the rumors was going on about the RIF.
15   Q.  But in January of 1997, you received a letter
16   stating that you were going to be subject to a RIF,
17   that you were going to lose your position, right?
18   A.  That's the letter that they supposedly sent
19   in January of 1997.
20   Q.  Oh, also it's your testimony nobody gave you
21   this letter?
22   A.  I didn't -- I didn't know about the RIF until
23   March when I contact her.
24   Q.  All right.  So is it your testimony you did
25   not get this letter?

Page 87

1    A.  Not in the county office.
2    Q.  Did you get this letter in January of 1997
3    from any source or from any place?
4       MR. ATCHISON:  Take a moment and read the
5    letter, if you could.  Make sure you know which letter
6    he's talking about.
7       (Brief pause)
8    Q.  Okay.  I think the question was again, when
9    did you first become aware of the possibility of a
10   RIF?
11   A.  Yes.  I remember seeing this notice.  And
12   after I seen the notice, I contact the state office
13   regarding to it, trying to get information about this
14   notice.  And that was before the RIF.  It was in March
15   of 1997.
16   Q.  And the RIF took place April -- the last day
17   of employment was April the 27th of '97, right, as
18   best you recall?
19   A.  I think it was April the 25th, 1997.
20   Q.  Okay.  All right.  So, again, I just want to
21   make sure I understand your testimony, then.  Is it
22   you did not have -- as early as January -- say January
23   the 30th of 1997.  You did not have knowledge -- did
24   you or did you not have knowledge that you were being
25   RIF'd?

Page 88

1    A.  No.
2    Q.  Okay.  How was it that you came to acquire
3    that knowledge?
4    A.  When this notice was sent out right there
5    regarding to the RIF, the notice dated January 23rd,
6    1997.
7    Q.  Okay.  But that's -- and you received that
8    approximately when, as best you recall?
9    A.  I don't remember.
10   Q.  Okay.
11   A.  It had to be during the period of the time
12   that I called the state office in March of '97.
13   Q.  So, is it your best recollection that
14   immediately upon receiving that notification is when
15   you first contacted the office?  In other words, you
16   got that in March and turned around and called them?
17   Is that what happened?
18   A.  I don't remember the actual date of --
19   Q.  What?
20   A.  I don't remember the actual date of when did
21   I receive it, but I know that I called in regard to
22   it --
23   Q.  Okay.  I don't dispute you called?
24   A.  -- regarding to information about the RIF.
25   Q.  And this -- I want to make sure you

Page 89

1    understand me.  I don't dispute you called Ms. Price
2    or the office sometime in March of 1997.  I think I've
3    seen that, and I don't dispute that.  And I don't
4    dispute that y'all had a couple of conversations
5    regarding your RPL form.
6    A.  Yes.
7    Q.  Okay.  I'm not trying to argue about that.
8    And I'm really not trying to argue about anything.
9    A.  Yes.
10   Q.  Believe it or not, I'm trying to restore your
11   recollection, if I can, you know, that maybe that you
12   received it earlier than that.  But if you didn't --
13   if you don't recall having received it earlier than
14   March, you don't recall.  Now, let's assume for an
15   example that other employees within the same office --
16   say Ms. Hunter.  You heard Ms. Davenport today.  Other
17   folks have all testified that they received those
18   notifications -- or excuse me.  Ms. Davenport or
19   Johnson has.  Ms. Hunter, you know, we haven't heard
20   her testimony.  But let's assume they all say -- would
21   all agree that they received that on or about this
22   date.  On or about January the 23rd of 1997, they
23   received official notice of their -- that they were
24   being RIF'd.  Would you agree that -- then, would that
25   refresh your recollection that possibly you did?

LISA McCALL v. MIKE JOHANNS                                3/26/2007
DEPOSITION OF LISA McCALL

24 (Pages 90 to 93)

| Page 90 | Page 92 |
|---|---|
| 1  A. No.<br>2  Q. Okay. Then, why is it that if, in fact, they<br>3  said they received theirs in or about January of<br>4  '97 -- and I think Ms. -- the record will reflect, but<br>5  I think Ms. Davenport testified that she had knowledge<br>6  of it sometime prior to that. Why is it -- for what<br>7  reason do you think you were not told that you were<br>8  going to lose your job until March?<br>9  A. If -- it could have been I was out a day that<br>10  it was supposed to have been issued to us.<br>11  Q. Okay. Is it your contention -- that's what<br>12  I'm really trying to get to. Is it your contention<br>13  that they delayed advising you of your being RIF'd on<br>14  the basis of your race?<br>15  A. Repeat that for me.<br>16  Q. Okay. Is it your belief -- let me say it<br>17  that way, that you were not timely -- let's say just<br>18  timely -- we'll use it in a general term -- that you<br>19  were not timely notified of your pending separation or<br>20  the fact that you were going to be RIF'd from your<br>21  job, that you weren't timely notified of that because<br>22  you're black?<br>23  A. Yes, because of the complaints that I had<br>24  made earlier.<br>25  Q. And who do you contend was the person | 1  Assistant. That was his title.<br>2  Q. And maybe he's got his declarations wrong.<br>3  Okay. So you think Art Powers didn't tell you about<br>4  your being separated because you're black, because of<br>5  your race; is that right?<br>6  A. Yes.<br>7  Q. Okay. Anybody else that you contend did not<br>8  timely advise you of your being terminated or losing<br>9  your position because of your race?<br>10  A. John Sasser, the district director.<br>11  Q. Okay. Anybody else?<br>12  A. I can't remember anybody else.<br>13  Q. Okay. Now, let me ask you this. What<br>14  evidence, be it in terms of actions or statements, do<br>15  you have to offer that suggests that Mr. Powers<br>16  intentionally delayed providing you a reduction in<br>17  force notice because of your race?<br>18  A. Because he was already hostile, harassing me<br>19  with -- hostile harassing me in the office. And the<br>20  way that he treated me, like he really didn't want me<br>21  there in that office.<br>22  Q. Okay. What about Mr. Sasser?<br>23  A. With Mr. Sasser, I took the fact he didn't<br>24  want any blacks working in those office that he was<br>25  carried under. Because he was in an office where he |

| Page 91 | Page 93 |
|---|---|
| 1  responsible for not providing you timely notice of<br>2  your RIF because of your complaints?<br>3  A. One being the county supervisor.<br>4  Q. And that being who?<br>5  A. Art Powers.<br>6  Q. Okay. Well, the record shows and I think<br>7  Mr. Powers will testify that he wasn't the county<br>8  supervisor there in January of '97.<br>9  A. Yes, he were. When we transferred over to<br>10  Luverne office, Mr. Powers transferred with us.<br>11  Q. And he'll clarify this tomorrow. And perhaps<br>12  this declaration provided in this matter earlier is<br>13  incorrect, but he states that from -- it took over<br>14  supervision when McAlpine left. The Hayneville office<br>15  was closed in '96, November. From early March of '97<br>16  through June of '97, he was the supervisor in<br>17  Luverne. He doesn't say he was the supervisor in<br>18  Luverne from January. I'm just asking. Maybe he's<br>19  got this wrong. It could be.<br>20  A. Well, the Hayneville office closed in 1996,<br>21  Art Powers was our supervisor there. Everyone in that<br>22  office got transferred to Luverne.<br>23  Q. Okay.<br>24  A. Art Powers was filling in, in the Luverne<br>25  office as county supervisor, Community Development | 1  had no blacks, and he only worked closer with whites.<br>2  Q. Okay. Any statements -- any racially<br>3  derogatory statements that you ever heard Mr. Sasser<br>4  make?<br>5  A. One statement he made to Arlesa Hunter.<br>6  Q. And what did he say to Ms. Hunter?<br>7  A. He was trying to get her to transfer, to go<br>8  out to Andalusia to work in a county office where a<br>9  white employee was going to be out for a couple of<br>10  weeks. And she was questioning him on why she had to<br>11  drive further than what she was driving to go down to<br>12  Andalusia to work. And he stated to her, You people<br>13  would not have a job anyway.<br>14  Q. Did he -- and so just because he says "you<br>15  people," what do you take "you people" to mean in that<br>16  context?<br>17  A. In that context, I took it as he was stating<br>18  to her as you people because Arlesa Hunter was black<br>19  also.<br>20  Q. Okay. Now, there were -- could he just as --<br>21  possibly, could he be referring to you people from the<br>22  Hayneville office?<br>23  A. No. Because there was only Arlesa that he<br>24  was talking to. There was no others.<br>25  Q. Okay. So everybody says you people. And |

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

25 (Pages 94 to 97)

Page 94

1    that -- because if I recall yesterday, that was the
2    testimony you gave me regarding Art Powers.
3       A.  Yes.  Art said it several times.
4       Q.  Art said it several times.  How many,
5    approximately?
6       A.  I don't remember, but I know it was several
7    times.  I don't remember a count.
8       Q.  Now, after the RIF, were there any black
9    employees remaining in the Hayneville office, do you
10   recall?
11      A.  No.
12      Q.  Now, what impact, if any, did Mr. -- can you
13   demonstrate for us that Mr. Sasser or Mr. Powers had
14   on the retention information that was -- that was
15   applicable to you; i.e., your performance reviews?  Do
16   you remember that?  You looked at that, I think,
17   yesterday -- or some witness did.  Let me ask -- give
18   me a second.
19      Ms. Price.  Would you agree from what you heard
20   Ms. Price testify to that this retention information
21   was critical in determining who and who would not be
22   RIF'd?  Is that a fair statement?  Do you recall that
23   from yesterday?  And I'm referring to the sheet
24   entitled Retention Information that's a portion of
25   Exhibit #3 of both Plaintiff and Defendant.  Do you

Page 95

1    remember us discussing that sheet yesterday with
2    Ms. Price?
3       A.  Yes.
4       Q.  Okay.  Of all the information on that sheet,
5    can you point out to me any piece of information on
6    that sheet that is not true?  Does that all appear to
7    be accurate?
8       A.  The only thing different on this form is
9    grade level.  I was a GS-4 slash.
10      Q.  No.  Is that #2?  Is that what you're
11   referring to?  No.  Go ahead.  You tell me.
12      A.  It wasn't a 2.
13      Q.  Go ahead.  You tell me.  I'm sorry.
14      A.  It was a 4.
15      Q.  No.  Go ahead and tell me what you were going
16   to tell me.
17      A.  The series of grade, they had me listed as a
18   GS-4.  And when I left the agency, my grade series
19   showed a GS-4/4.
20      Q.  Okay.  Step 4?
21      A.  Yes.
22      Q.  And there are you referring to that portion
23   called Competitive Level at the bottom or just
24   throughout where it refers to your GS rate?  See right
25   here at the bottom, where it says competitive level,

Page 96

1    GS-4, number 2.  Is that to what you're referring?  Or
2    are you just saying all across the board, it should
3    say GS1101-4, step 4?
4       A.  Yes.
5       Q.  Okay.  It just doesn't denote your step?
6       A.  Yes.
7       Q.  All right.  But in terms of this is actually
8    when you came to work for the agency, 7/29 of '90?
9       A.  Yes.
10      Q.  Okay.  And as best you recall, your
11   performance reviews for 1995 and 1994 were fully
12   successful, right?
13      A.  Yes.
14      Q.  And in 1993, superior; is that correct?
15      A.  Yes.
16      Q.  And I was asking somebody questions
17   yesterday, and I think you can affirm this for me
18   now.  Your performance review for the years 1993,
19   1994, and 1995, were those completed by Mr. McAlpine?
20      A.  Yes.
21      Q.  Okay.  So there -- let me make sure.  Is
22   there any piece of information on this retention
23   information list regarding you that you contend that
24   Mr. Powers and/or Mr. Sasser manipulated or made --
25   again, there's nothing false on there, is there?

Page 97

1       A.  Referring to?
2       Q.  Any of --
3       A.  If they're stating that the location this
4    performance rating was done, the location of it would
5    be wrong.
6       Q.  Now, this is your current position.  At this
7    time that this was prepared, you were working in the
8    Crenshaw County office; right?
9       A.  That's correct.
10      Q.  Okay.  so bottom line, this information is
11   all correct?
12      A.  Yes.
13      Q.  So if it's all correct, would it be a fair
14   conclusion that Mr. Powers and/or Mr. Sasser did not
15   change any of this to make -- there are no false
16   statements on here that they could have made regarding
17   you, is there?
18      A.  According to that piece of paper, no.
19      Q.  Okay.  Now, tell me what impact -- what input
20   or action, if any, are you aware of that Mr. Powers
21   took in regards to you being selected to be RIF'd?
22      A.  The inputs that I took from Mr. Powers to
23   be -- say that again?
24      Q.  I mean, what -- you're -- is it your
25   contention that Mr. Powers somehow or another

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

26 (Pages 98 to 101)

Page 98

1  manipulated it so that you could -- so that you would
2  have to be RIF'd?
3      A.  He could have spread rumors about me that
4  even though he -- as he stated, he knew I was going to
5  be RIF'd.  He could have spreaded rumors so that I
6  will be or that I were.
7      Q.  Where in the RIF process is there input for
8  people like Art Powers to determine whether -- I mean,
9  are you aware of any aspect of the RIF regulations
10  that allow for former supervisors or supervisors to
11  make recommendations regarding you being RIF'd or not
12  RIF'd?
13          MR. ATCHISON:  Object to the form.
14      A.  No.  But in regarding to jobs that I applied
15  compared -- compared to the RIF, supervisors had
16  say-so in those jobs.
17      Q.  You're talking about what job?  Those jobs
18  you applied for prior to the RIF?
19      A.  Yes.
20      Q.  Okay.  Do you know or do you have any facts
21  to establish that Mr. Powers in fact had communication
22  with any of the selecting officials?  Was it two jobs
23  you applied for?
24      A.  Four.
25      Q.  Four, yeah.  Excuse me.  Do you have any

Page 99

1  information that Mr. Powers had contact with any of
2  the selecting officials?
3      A.  No.
4      Q.  Do you know whether or not Mr. Sasser, by the
5  same token, had any communication with the selecting
6  officials for the four positions that you applied?
7      A.  Mr. Sasser, yes, because he could have had
8  input in that matter.
9      Q.  No, not could he.  Did he?
10      A.  He --
11      Q.  To your knowledge --
12      A.  But there was a --
13      Q.  Excuse me.  Wait a minute.  And I don't mean
14  to argue with you, but the question is not could he.
15  The question is, do you have any evidence that he did
16  have conversations with any of the selecting officials
17  in the other four positions?  Not could he have.  Did
18  he?
19      A.  Yes.  Because one of the jobs were in his
20  office.
21      Q.  Okay.  That's what I need to know.  Which job
22  was that?
23      A.  The Bay Minette County office job that Lisa
24  Hardy got.
25      Q.  Who interviewed you?  Was there an interview

Page 100

1  for that position?
2      A.  No, I don't know of -- I didn't get
3  interviewed.
4      Q.  Okay.  Now, that position, you applied for
5  that position prior to June 21st, 1996, correct?
6      A.  Yes.  And those was jobs that the agency had
7  opened for the GS-4 positions so that you wouldn't be
8  in the RIF or you would not be considered.
9      Q.  Oh.  So as early, then, as June 21st of 1996,
10  you had knowledge that you may possibly be RIF'd?
11      A.  No.  They told us that there was -- there was
12  a plan for the RIF, but the RIF hadn't even taken
13  effect.
14      Q.  That's not the question.  I know that.
15      A.  Those were jobs that they --
16      Q.  Wait a minute.  Time out.  I know the RIF
17  didn't take place prior to June 21st of '96.  I know
18  the RIF took place April 27th or 25th of 1997.  What
19  I'm trying to establish is when did you first become
20  suspicious that you might be RIF'd.  Now, prior to
21  June 21st of 1996, if I understand correctly, you
22  applied for a job, correct?
23      A.  Yes.
24      Q.  For several jobs?
25      A.  Several jobs.

Page 101

1      Q.  That were GS-5 level positions, correct?
2      A.  Right.
3      Q.  And if I understood what you told me just a
4  second ago, you applied for those jobs because of the
5  impending RIF and that you might be RIF'd?
6      A.  No, that's not what I'm saying.
7      Q.  Okay.  But you had knowledge of the RIF when
8  you applied for those jobs?
9      A.  When I applied for those jobs, those were --
10  those GS-5 position jobs, those were jobs that they
11  was promoting for GS-4's position.
12      Q.  Right.  And you stated a second ago because
13  of the RIF.
14      A.  And they was planning.  The RIF hadn't even
15  got in effect or anything.
16      Q.  I know.  I know.  But as early as June 21st
17  of 1996, you had some idea -- did you not have some
18  idea that there may possibly in the near future be a
19  RIF?
20          MR. ATCHISON:  Asked and answered.
21      Q.  If --
22      A.  Yes, I had some idea.
23      Q.  Okay.  That's what I needed to know.  That's
24  what I've been trying to find out for ten minutes.
25  Okay.

LISA McCALL v. MIKE JOHANNS                              3/26/2007
DEPOSITION OF LISA McCALL

Page 102

1    A.  But I didn't have an idea there was going to
2    be a -- possibly a RIF was going to occur.
3    Q.  Okay.  Well, I'm going back to a point; but
4    before I get there, do you know where Arlesa Hunter is
5    presently employed?
6    A.  Arlesa?
7    Q.  Yeah.
8    A.  No.  Only thing I know, she is a teacher.
9    Q.  Okay.  You don't know what school?
10   A.  No.
11   Q.  All right.  Do you know if she's here in
12   Montgomery County or not?
13   A.  No.  I don't think she lives in Montgomery.
14   Q.  Okay.  When is the last time you had contact
15   with Ms. Hunter?
16   A.  Several years ago.
17   Q.  And where was she when you had that contact?
18   A.  At a baseball game.
19   Q.  In what city?
20   A.  Montgomery.
21   Q.  Do you know if she is remarried or if she's
22   married?
23   A.  Yes, she's still married.
24   Q.  Okay.  What's her husband's name?
25   A.  George Hunter.

Page 103

1    Q.  George Hunter.  What does George Hunter do?
2    Do you know what his profession is or where he's
3    employed?
4    A.  The last time I seen him, he was employed
5    with Tuskegee, Tuskegee Institute.  I don't really
6    remember the name of it.
7    Q.  Okay.  I'm going to try to get back on an
8    outline, because things tend to go smoother and
9    quicker that way.  Just to be sure that I've asked it,
10   I want to ask you -- and I think I'm being redundant,
11   but bear with me.
12   A.  Okay.
13   Q.  Can you identify any irregularity, anything
14   that was done wrong in the process of the RIF, in
15   accordance with the RIF regulations, that was done or
16   calculated to affect you?
17       MR. ATCHISON: Object to the form.
18   A.  Rephrase that again.  I don't understand what
19   you said.
20   Q.  Okay.  If it's established by other evidence
21   that this RIF was carried out in accordance with an
22   established procedure, you know, set out in certain
23   federal codes, are you aware of any code or any
24   regulation that was violated in this RIF such that it
25   would have affected whether or not you were retained

Page 104

1    or let go?
2        MR. ATCHISON: Object to the form.  Answer if
3    you know what the question is, if you understand the
4    question.
5    A.  I don't understand it.
6    Q.  Okay.  What rules did they violate when they
7    let you go?
8        MR. ATCHISON: Objection.  Calls for a legal
9    conclusion.
10   Q.  Are you aware of any rules that were
11   violated, rules of a RIF, or regulations that were
12   violated when they determined to let you go?
13   A.  Yes.  One, I wasn't put on the repriority
14   list.
15   Q.  Timely, but ultimately you were placed on the
16   list; is that correct?
17   A.  Two years later.
18   Q.  But wasn't it a year later?  Weren't you put
19   on the list in April of '98, I think it is?  You sent
20   the form in.  We went through this yesterday with
21   Ms. Price.  I think it's in evidence, the RPL, the
22   list, the form.  And it shows that you signed that
23   form -- I think it's like April 26th of 1998.  It's in
24   the record somewhere.
25       MR. ATCHISON: I believe it's April 27th.

Page 105

1    Look at Exhibit #4.
2    Q.  It's real close to a year.  Here we go.
3    Yeah.  Just for clarity, it's April 27th of 1998 is
4    when you signed that.
5    A.  Yes.
6    Q.  Right.  Attached to #4.
7    A.  Yes.
8    Q.  So approximately one year later, you were
9    placed --
10   A.  Yes.
11   Q.  -- on the RPL?
12   A.  That's correct.
13   Q.  Okay.  And as you stated, you tried to call
14   Ms. Price.  You did speak with someone -- Ms. Price or
15   someone in her office in March about this, correct?
16   A.  I spoke to Ms. Price in March about the
17   letter that was dated January 23rd.
18   Q.  Did you not also speak with her about being
19   placed on the re-employment priority list?
20   A.  No.  Because I wasn't aware there was a list.
21       MR. NEELEY: I'm going to borrow this, Gary.
22   Didn't mean to just reach across and grab it.
23       MR. ATCHISON: That's fine.  If you want to
24   mark it as Government's Exhibit #19, that would be
25   fine.  We've already marked it as #19.

LISA McCALL v. MIKE JOHANNS                                3/26/2007
DEPOSITION OF LISA McCALL

28 (Pages 106 to 109)

---

Page 106

1    Q.  I'm going to show you a portion of
2  Plaintiff's Exhibit #19.
3        MR. ATCHISON:  Rand, can we go off the
4  record?
5        (Off-the-record discussion)
6    Q.  Okay.  There's several things.  I'm going to
7  hand you portions of Plaintiff's Exhibit #19 that are
8  Bates stamped pages 1 -- MC 000140 through 141, 1 --
9  oh, excuse me.  I'm going to exclude 141.  It's
10  blank.  142, 143, 144.  Do you recognize those?
11    A.  Dated February of 1998?
12    Q.  Is that your handwriting?
13    A.  Yes.
14    Q.  Okay.  Now, are those notes that you made and
15  provided to an EEO investigator in this matter
16  sometime back in 2000?
17    A.  Yes.
18    Q.  Okay.  I see date and time entries on there.
19  Were those made at the time -- in other words, the
20  first one says date, February the 3rd, 1998; time
21  11:30.
22    A.  That's the time that I called her.
23    Q.  Okay.  And what I was going to ask, was that
24  notation, that specific one, was that made on or about
25  February the 3rd, 1998?

---

Page 107

1    A.  The exact date.
2    Q.  Okay.  Shortly after the conversation?  But
3  it was made on that day at some point.  I think that's
4  fair enough.  Is that right?
5    A.  Yes.
6    Q.  Okay.  Now, you talked to Ms. Price, you
7  said, in March -- of what year -- in '97, about the
8  re-employment process, is that right, or '98?  The RIF
9  occurred in April of '97.
10    A.  No.  In March of 1997 --
11    Q.  Okay.
12    A.  -- I spoke to her regarding the letter, not
13  the repriority list.
14    Q.  Okay.  And you were not placed on that
15  list -- the RPL, that particular list, at least until?
16    A.  April of '98.
17    Q.  April of 1998.  And why was that?  Do you
18  know?
19    A.  Do I know why I was not placed on there?
20    Q.  Uh-huh.  Yeah.
21    A.  No, I do not.
22    Q.  Okay.  Is it your contention that you were
23  not placed on that list because you were
24  African-American?
25        MR. ATCHISON:  Object.  That calls for legal

---

Page 108

1  conclusions.
2        MR. NEELEY:  I'm asking if that's her
3  contention.
4        MR. ATCHISON:  Okay.  You must answer if you
5  know.
6    A.  Yes.
7    Q.  And upon what?
8    A.  The reason I say yes were because I had filed
9  formal complaints against the agency and the
10  harassment that I was having from the supervisor in my
11  office.
12    Q.  Was that because -- who do you contend didn't
13  put you on the RPL because of those -- for those
14  reasons?
15    A.  The agency staff.
16    Q.  Well, who on the agency staff?
17    A.  Ms. Price would be one, because I was
18  communicating with her about it.
19    Q.  About what?  I don't mean -- you're talking
20  about you communicated with her about the list?
21    A.  About the list.
22    Q.  Okay.
23    A.  The repriority list.
24    Q.  Okay.  Did you ever advise her of your
25  previous complaints that we've looked at several

---

Page 109

1  times?
2        MR. ATCHISON:  Object to the form.  Are you
3  talking about the complaints found in 14 through 18, I
4  believe?  I withdraw my objection.
5        MR. NEELEY:  That's fine.
6    Q.  Did you speak with her about the complaints
7  evidenced #14 through #18 --
8        MR. ATCHISON:  Exhibits #14 through #18.
9    Q.  -- the letters?
10    A.  No, because I thought they was aware of it,
11  which they should have been aware of those letters
12  because I sent one in October of 1996 to Horace horn.
13    Q.  Okay.  And when was that?
14    A.  '96 was my first notice that I sent.
15    Q.  October of 1996?
16    A.  Yes.
17    Q.  October 29th of 1996, but other than that,
18  other than -- you don't have any evidence, other than
19  that inference that Ms. Price was aware of it?
20    A.  No.
21    Q.  Okay.  Now, you did go in the RPL again.  And
22  I'm so lost right this second.
23        You did go back on the RPL.  You were finally
24  placed on the RPL, as best we know, on or about
25  4/27/98, correct, or after 4/27/98?

LISA McCALL v. MIKE JOHANNS          3/26/2007
DEPOSITION OF LISA McCALL

Page 110

1    A.  I don't know the exact date that I supposed
2  to have been put on the priority list, but that's the
3  date that I signed it.
4    Q.  Okay.  And it got to Ms. Price sometime
5  around May the 26th, I think was her testimony.  And
6  she indicates that she faxed -- I don't know if she
7  said faxed it, but she saw to it.  You know you were
8  subsequently put on the list; is that correct?
9    A.  No, sir, I don't.
10    Q.  You don't know that?
11    A.  No.  The only thing I know, that I was told
12  by Ms. Price that I was put on that priority list.
13    Q.  Okay.  Can you identify any jobs that became
14  available at a GS-4 or a lower level between April of
15  1997 and April of 1999 that were permanent positions
16  that you should have been notified of?
17    A.  Are you speaking in regard to USDA?
18    Q.  Yeah.
19    A.  Or any other agency?
20    Q.  Now, do you understand that the RPL only
21  applies to jobs within the USDA?
22    A.  That's not what I was told when I did the
23  form.
24    Q.  Well, you were told probably that you were on
25  a list that went to all federal agencies, correct?

Page 111

1    A.  Yes.
2    Q.  And you were told, as well -- were you told
3  whether or not if you went to some of these federal
4  agencies, that you would have to produce your SF50 or
5  the form saying you had been terminated because of a
6  RIF?  Is that right?
7    A.  Yes, and I did that.
8    Q.  But they chose not to hire you.
9    A.  The notices that I kept getting back was
10  telling me to refer back to the OPM handbook, which
11  was Office of Personal Management.
12    Q.  Let me ask you this.  Are you aware that the
13  re-employment priority list only applied to positions
14  within the Department of Agriculture?
15    A.  I was not told that.
16    Q.  Okay.  If the pertinent regulations so state,
17  would you dispute that?
18      MR. ATCHISON:  Object to the form.
19    Q.  It doesn't matter.  Scrap that.  Let me
20  withdraw the question.
21    Assuming the evidence in the record shows that
22  this RPL only applied to jobs within the Department of
23  Agriculture.  Okay?
24    A.  Okay.
25    Q.  Can you identify for me any jobs within the

Page 112

1  Department of Agriculture at the GS-4 level that were
2  permanent positions that became available between
3  April of 1997 and April of 1999?
4    A.  With that agency?
5    Q.  With that agency, right?
6    A.  Yes.  It was a position came open that I
7  found out like a year or two after it was filled in
8  Wilcox County.
9    Q.  And what was that position?
10    A.  It was a Community Development Assistant, the
11  same position that I left from.
12    Q.  Was that a GS-4?
13    A.  Yes.
14    Q.  In Wilcox County.  How did you find out about
15  that?
16    A.  I ran into Carolyn Phillips in the grocery
17  store, and -- and I was asking her about were there
18  any jobs that had came open within the agency.  And
19  she told me that they had just hired a clerk in Wilcox
20  County as a GS-4.
21    Q.  Who was that person that was hired?  Do you
22  know?
23    A.  No.
24    Q.  And when was this hiring?
25    A.  It was like between '98 and '99.  I'm not

Page 113

1  sure of the date.
2    Q.  Okay.  Do you know who did the hire?
3    A.  No.
4    Q.  Who the selecting official was?
5    A.  No.
6    Q.  Okay.  And you said Carolyn Phillips was the
7  selectee?  No, that's who you had spoken with.
8    A.  No.  I ran into her in the grocery store and
9  was asking her about jobs, but she told me that that
10  was that job field, but the job was already filled
11  prior.
12    Q.  Okay.  That would be in Camden?
13    A.  Yes.
14    Q.  Was Camden within the commuting area?
15    A.  From?
16    Q.  Luverne.  Do you know?
17    A.  I don't know.
18    Q.  Okay.  So possibly that was another job, but
19  you don't know for sure.  Is that a fair statement?
20    A.  If there was a possible job for sure?
21    Q.  Possibly that was a job for which you should
22  have been notified, but you're not certain because you
23  don't know if it was in the commuting area or not.  Is
24  that a fair statement?
25    A.  Yes.

LISA McCALL v. MIKE JOHANNS                              3/26/2007
DEPOSITION OF LISA McCALL

30 (Pages 114 to 117)

Page 114

1  Q. Okay. Can you identify anyone else within
2  Rural Development who was not RIF'd the same time you
3  were, under the same RIF, that was a GS-4 and that was
4  white?
5  A. I don't remember.
6  Q. Okay. So you can't identify one today?
7  A. No.
8  Q. And we agree we haven't discussed them all.
9  Is there any other reasons that you can tell me for
10 which you believe you were RIF'd because of your race?
11 A. Yes.
12 Q. And what reason is that?
13 A. The area that they selected me to be until --
14 working in the Luverne office where I didn't have
15 anyone to compete against.
16 Q. Okay. Now, you think they did that -- they
17 placed you personally in that -- okay. Is it your
18 contention, based upon the evidence, the testimony you
19 just heard previously from Mr. McAlpine --
20 A. No.
21 Q. -- that the competitive area was limited such
22 to disproportionately affect African-Americans?
23 A. It did.
24 Q. No. But are you contending that in
25 accordance with what he previously testified to?

Page 115

1  A. No.
2  Q. Okay. Were you aware of that theory prior to
3  today?
4  A. Yes.
5  Q. You were? Can you point to me any of the
6  administrative proceedings that have gone before where
7  you raised that issue?
8  A. When I -- in the statement where -- my
9  letters. I stated how far that we had to travel.
10 Q. But that's -- you're saying -- that's not
11 saying that they -- you make reference that you had to
12 travel, but was the -- the distance you had to travel
13 was not, as a matter of regulation, too far for them
14 to require you to travel, was it?
15 A. It was -- it was too far for borrowers to be
16 traveling.
17 Q. For who?
18 A. For the borrowers to travel.
19 Q. We're talking about you, with all due
20 respect. I mean, whatever the deal with the borrowers
21 is the deal with the borrowers; but this case is about
22 you, not about them. So what I'm asking you is this.
23 Was the distance that you were required to travel to
24 maintain your employment from Montgomery -- is that
25 where you were living at the time?

Page 116

1  A. Yes.
2  Q. -- to Luverne, Alabama, is it your contention
3  that that was beyond the commuting area that is
4  established by regulations for which you -- in other
5  words, if you want to maintain your job, you have to
6  drive up to 50 miles.
7  A. Are you speaking in regard to the distance
8  that I was traveling?
9  Q. Yeah.
10 A. Yes. Because I was traveling 50 miles one
11 way, 100 miles round trip, to be able to commute in an
12 area where I know I wasn't going to be able to compete
13 with anybody. Like, if there was a job came open in
14 Mobile, I wouldn't have been able to commute because
15 of the distance of the drive.
16 Q. It wouldn't have been in the commuting area,
17 the's correct.
18 A. In which that were -- they had it set where
19 that would have been a community -- commute area in
20 the area that was we in, because we were -- in the
21 district area that they put us from Lowndes-Montgomery
22 in, we came in the district with John Sasser, which
23 was the Bay Minette-Mobile district.
24 Q. Okay. I'm sorry. You've told me -- and I
25 guess before we start on this, you told me that an

Page 117

1  additional reason that's not been previously discussed
2  that you believe -- I asked you any other reasons that
3  you believed you were RIF'd because of your race that
4  you had not previously told us about. And you said
5  because of the --
6  A. Other than my race and the complaints that I
7  filed.
8      MR. NEELEY: Yeah. Can we take a break?
9      MR. ATCHISON: Yeah, that sounds good.
10 That's what I was suggesting.
11     (Brief recess)
12 Q. When we left off, we were talking about the
13 re-employment priority list. And I may have asked
14 this previously, and I apologize for my redundancy if
15 I did. I think this is where we left off. Is it your
16 contention that Ms. Price did not place you on the
17 re-employment priority list in part at least because
18 of your race? And let me -- is it your belief that
19 she didn't put you on that list any earlier than
20 April-May of 1998 because you were black?
21 A. Yes.
22 Q. Okay. And upon what do you base that
23 belief?
24 A. I base that belief on the former complaints
25 that I had made.

Page 118

1    Q. Okay. I think we were covering this; but
2  just to be sure, other than the inference, do you have
3  any evidence other than the fact that you sent one of
4  those -- one or more -- I can't remember exactly how
5  many -- of those complaints, #14 through #18, to
6  Mr. Horn -- other than that fact, do you have any
7  other information that says Ms. Price was aware of
8  those complaints?
9        MR. ATCHISON: Rand, the complaint that went
10 to Mr. Horn may have actually been marked as #13, I
11 believe.
12       MR. NEELEY: Okay. Thank you. Let's get it
13 straight. I think you're right, now.
14       MR. ATCHISON: The October 29th letter.
15       MR. NEELEY: #13?
16       MR. ATCHISON: It's --
17    Q. It's coming. The #13 is the one -- is the
18 letter from Horn to you regarding the Christmas work.
19    A. Yes.
20       MR. ATCHISON: Okay. It would be #12, then.
21       MR. NEELEY: Thank you. #12 is what I was
22 referring.
23       MR. ATCHISON: Okay.
24       MR. NEELEY: I think that's the only -- let
25 me just check and make sure

Page 119

1        MR. ATCHISON: That's the only one addressed
2  directly to her.
3        MR. NEELEY: I think you're right.
4    Q. Other than this letter and the belief that
5  Mr. Horn or somebody for him communicated this letter
6  to Ms. Price, you don't have any other information
7  that she knew -- or didn't place you on the list
8  because of your race?
9        MR. ATCHISON: She's already testified the
10 other exhibits that -- that are #14 through #18 were
11 part of it.
12    Q. Okay. Do you have any information -- let me
13 just -- do you have any information that Mr. Horn
14 provided this letter or discussed the contents of this
15 letter with Ms. Price? And that is #12.
16    A. No, I don't.
17    Q. Okay. Do you have any information that
18 anyone within Mr. Horn's office that had knowledge of
19 this letter discussed it with Ms. Price?
20    A. No, I don't.
21    Q. Okay. And that's for #12. As to #14 through
22 #18, these would be the letters to USDA, Office of
23 Civil Rights, the Secretary of Agriculture themselves,
24 Yeah. Yeah, all five of those letters. Do you have
25 any information that the information in #14 --

Page 120

1  Plaintiff's #14, #15, #16, and #17 was conveyed by
2  anybody within the offices identified to Ms. Price?
3    A. No.
4    Q. Okay. Regarding the re-employment priority
5  list again #4, can you identify any people, any
6  persons that were not African-American -- who were not
7  African-American who were put on the RPL and were
8  notified of a permanent position?
9    A. Rephrase that.
10    Q. Okay. Can you identify anybody that's not
11 black that received a permanent position because they
12 were placed on the RPL? In other words, they received
13 a benefit that you didn't.
14    A. That didn't do that form, right?
15    Q. Okay. Yeah, I'm not asking you a good
16 question. I'll try again. Bear with me. I'm trying
17 to get there.
18       Okay. Can you identify any -- let's just say it
19 this way. And if I say white, I mean any person not
20 African-American. Okay? I'm going to just use white,
21 black. And it's easy for you and I to just talk about
22 it that way. I mean, Native American, Asian, when I
23 say white, okay? Can you identify any white person
24 that was placed on the RPL that came into a
25 position -- who was notified of a position?

Page 121

1    A. Are we speaking in general part-time,
2  permanent?
3    Q. Of a permanent position, correct?
4    A. Permanent position. no.
5    Q. Okay.
6    A. Because I don't know who all did those forms.
7    Q. That's fair enough.
8    A. I don't know who all did priority list.
9    Q. Yeah. You may not know who all was on the
10 priority list. And that's fair enough. Okay. As I
11 read, I'm going -- I don't know that we've ever put
12 this in. This would be Defendant's Exhibit Number 5.
13 Scratch that. We're going to make it Defendant's
14 Exhibit #17, which is the April 20th, 1998, letter to
15 the Department of Agriculture, sent in to the
16 Secretary of Agriculture. Okay? And I just want to
17 be sure. You wrote that letter, correct?
18    A. Yes.
19    Q. All right. And that letter outlines your
20 complaint regarding harassment as well as -- I'm
21 sorry. I can't read it all from here.
22    A. This?
23    Q. Yeah. Is it a fair statement that this
24 letter contains all the complaints of alleged
25 discrimination that you had against the Department of

Page 122

1    Agriculture and/or its employees at that time, being
2    April 20th, 1998?
3        A.  Yes.
4        Q.  Okay.  Anywhere in that letter, did you
5    submit to the Department of Agriculture that it was
6    your belief that you were retaliated against when you
7    were RIF'd?
8            MR. ATCHISON:  Objection.  The document
9    speaks for itself.
10       Q.  Well, I want to -- you can go ahead and
11   answer the question because I want to make sure I
12   understand.  Where in there do you tell the Department
13   of Agriculture that you think you were retaliated
14   against because of the earlier letters that you had
15   written to the Department of Agriculture and/or to
16   Mr. Horn?
17       A.  Can you repeat?
18       Q.  Okay.  Where in there, if at all, do you tell
19   the Department of Agriculture that you believed you
20   were being RIF'd -- I don't know how to say the
21   word -- that you lost your job at the agency in
22   retaliation for the earlier letters that you had
23   written?
24       A.  My document states all the facts I was
25   complaining about, the discrimination against me

Page 123

1    because of my color.
2        Q.  Okay.  Let me just understand.  And I don't
3    mean to -- there's two different things happening
4    here.  One is I understand you contend you were RIF'd,
5    you know, that you were let go from your employment,
6    because of your race.  And I understand that you
7    contend that you were harassed while you were employed
8    because of your race.
9        A.  I also state in here to them after the RIF
10   took place, Arlesa Hunter, which is a black employee,
11   and myself, which is a black employee, was not placed
12   on the repriority list.
13       Q.  Okay.  But the point is, do you tell them
14   anywhere in that letter that part of the reason you
15   think that didn't happen was because of the earlier
16   complaints of discrimination that you had filed -- and
17   when I'm talking about earlier complaints, I'm talking
18   about the earlier letters written.  What are the
19   numbers?  #14 -- #13, #14, #15, #16, #17 -- excuse
20   me.  #13, #14, #15, and #16.
21       A.  Can you rephrase that?
22       Q.  Let me -- did anywhere in this letter -- and
23   to some degree, it speaks for itself; but I want to
24   give you the opportunity to explain something maybe
25   I'm not understanding.  Okay?

Page 124

1        A.  Okay.
2        Q.  I don't see in this letter anywhere that you
3    told them, Because I wrote those earlier letters
4    complaining of discrimination, I was RIF'd; I was not
5    placed on the RPL.  Okay?
6        A.  No.  I didn't say it in those terms or words,
7    but I stated to them that I was RIF'd and I was not
8    placed on the repriority list inside this letter.  The
9    statement is in there.
10       Q.  And you stated because of your race?
11       A.  I didn't state my race or anything on the
12   letter.
13       Q.  Okay.  On any other filings, any other
14   letters that you sent to the Department of Agriculture
15   or to the office -- that being the Office of Civil
16   Rights, to the Department of Agriculture, to the
17   Secretary, to the EEO counselors, any other
18   correspondence that you sent to them that says I was
19   treated differently because I had previously made
20   complaints regarding harassment or discrimination?
21       A.  Other than the ones that I sent?
22       Q.  Right.  Any others that we've not seen here?
23       A.  No.
24       Q.  Okay.
25       A.  Because I wasn't aware that there was another

Page 125

1    way that I can do it.  I did the letters to the best
2    of my knowledge.
3        Q.  And I understand that.  Now, the first letter
4    to -- and the first time that you ever complained to
5    anybody -- and let me ask you this, too, about #19 --
6    excuse me -- #12, #15, #16 -- #12, #15, #16, #14.
7    Now, do you have a word processor at home, a computer,
8    that you use?
9        A.  Now I do, but back then I didn't.
10       Q.  Okay.  Are these photocopies or did you
11   reprint these from a disk, a computer disk, that you
12   may have had to provide to me?
13       A.  No.
14       Q.  In other words, where did these come from
15   exactly?
16       A.  Those copies?  When I typed that up, I
17   printed an extra copy because I wasn't -- have any
18   access to a computer.  At that time, I didn't have
19   access to a printer, a copier, anything.  I was using
20   a friend's computer.  And I typed it up and printed
21   the letter out because I didn't have access to make
22   copies.
23       Q.  So this particular one that you gave --
24   again, it's just -- it's not that you've done
25   anything -- would have done anything wrong; I'm just

Page 126

1  trying to understand the source of documents. Okay?
2     A.  Yes.
3     Q.  Because I've got a computer and I store stuff
4  on the hard -- you know, in it all the time and print
5  it up later. And the reason I was asking that,
6  because these are not signed.
7     A.  No, they're not. Because the signed copies I
8  had mailed.
9     Q.  And you sent those?
10    A.  And I -- yes. And I didn't have a copier to
11  make copies on, so I just printed two letters.
12    Q.  Okay. So these copies that I have, say, here
13  in my hand today would have been produced --
14    A.  On that date.
15    Q.  -- the date that you say the letter was
16  written?
17    A.  Yes.
18    Q.  Okay. Again, I'm not implying you did
19  anything wrong; I'm just trying to understand the
20  source. Okay? And I want to make sure that we're
21  clear. The first time -- the first letter that you
22  ever wrote to the Department of Agriculture or to
23  Mr. Horn or to anybody within the state or federal
24  structure of the Department of Agriculture --
25    A.  Yes.

Page 127

1     Q.  -- wherein you complained or brought to their
2  attention that you thought you may be being
3  discriminated against would be this letter dated
4  October the 29th of 1996; is that --
5     A.  That's correct.
6     Q.  That's right? Okay. I think I asked you
7  this, and I just want to make sure. As of the date
8  this was written, this letter fairly contained all the
9  complaints that you had against Mr. Powers and/or his
10  superiors within the Department of Agriculture, all
11  the complaints you had regarding what you thought was
12  different treatment you were receiving because of your
13  race?
14    A.  Yes. Yes.
15    Q.  Okay. And I guess it would be fair to say at
16  this time, April the 20th, 1998, you had been gone for
17  a year, right?
18    A.  Yes.
19    Q.  Okay. So nothing had happened. I understand
20  not getting another position and the RPL issue; but in
21  terms of you had no direct contact with Mr. Powers --
22    A.  No, sir.
23    Q.  -- from April to April, '97 to '98?
24    A.  No.
25    Q.  Okay. And I'm going to try to do this

Page 128

1  quick. Okay? I know you're tired. I am, too. Gary
2  is. Mallory is. This is one worn-out bunch. I'm
3  trying to find some afternoon energy. And I'll try to
4  do it quick.
5     Okay. I'm going to go through that letter, all
6  right, the April '98 letter. And I'm just going to
7  try to flesh out some more detail that you may have
8  already given me in other spots, but we've been going
9  at this off and on for two days, so I may have
10  forgot. Okay. So just bear with me.
11    All right. Number one, you say that -- let's get
12  this work off. I've got a another copy. You can hold
13  that one. Okay. Now I've got the same copy you've
14  got, so we're working off the same sheet of music.
15    Now, the first instance that you complained of,
16  the type of harassment that you brought to their
17  attention, that being number one, being assigned
18  Ms. Williams' duties because she does not want to
19  perform them. Now, you're saying that Mr. -- is it
20  your contention that Mr. Powers was assigning you
21  duties Ms. Williams should have done? Is that right?
22    A.  Yes.
23    Q.  Okay. What were those duties?
24    A.  We had -- it was certain duties with files
25  that had to be sent to the finance office in

Page 129

1  St. Louis, Missouri, that Ms. Williams did not do.
2  And Mr. Powers called to the office and he -- on the
3  phone and talked to me. I answer the phone. And he
4  stated, you are the one I want to speak to, with a
5  hostile voice. And he stated that he wanted me to get
6  the files from Ms. Williams' desk and send them to the
7  state office.
8     Q.  Now, Ms. Williams, that's Patsy?
9     A.  Patsy Williams, yes.
10    Q.  The names are -- I'm so tired, the names are
11  running together now. Patsy Williams.
12    A.  Yes.
13    Q.  And one more time for clarity. She was a
14  white female?
15    A.  Yes.
16    Q.  Okay. GS, what, 6?
17    A.  She was a 6.
18    Q.  And was she the one that moved from
19  Hayneville?
20    A.  Yes.
21    Q.  Okay. So this was the Ms. Williams who had
22  come with you from Hayneville, the GS-6.
23    A.  That's correct.
24    Q.  Now, and he asked you to do something with
25  the files. Were these files that had been brought

LISA McCALL v. MIKE JOHANNS                                              3/26/2007
DEPOSITION OF LISA McCALL

34 (Pages 130 to 133)

---

Page 130

1  with y'all from the Hayneville office when it was
2  closed?
3      A. Yes.
4      Q. All right. And so those files, if I
5  understand you correctly, from the Hayneville office
6  needed to be, say, closed out, packaged up, and sent
7  to a central records place in St. Louis?
8      A. Yes.
9      Q. St. Louis? Is that what you said?
10     A. St. Louis, Missouri.
11     Q. Okay. Now, was this a one-time thing?
12     A. No.
13     Q. Okay. How many times did he ask you to do
14 this?
15     A. Things that she didn't want to do?
16     Q. Well, no. You said the files. And I'm
17 assuming it was a one time --
18     A. Yeah.
19     Q. Not one time, but I mean -- okay. Let's
20 start over a little bit. The duties. Okay. We
21 talked about the files. What other duties?
22     A. Okay. Like filing the -- integrating the
23 files from Lowndes County in with Luverne files.
24     Q. Doing what with them? I'm sorry,
25     A. Integrating them into the county file

---

Page 131

1  cabinet.
2      Q. Okay. integrating -- oh, Lowndes --
3      A. And Luverne.
4      Q. -- and Crenshaw records into one filing
5  system?
6      A. Yes.
7      Q. Is that a fair way of stating it?
8      A. Yes.
9      Q. Okay. I guess you would. You would have to
10 put them all together because y'all are servicing all
11 that from Lowndes County as well as that from
12 Crenshaw. Was that the only two counties as best you
13 recall?
14     A. I don't know.
15     Q. Well, for our purposes, that works. Okay.
16 So we were trying to get it all into one master file?
17     A. Yes.
18     Q. Okay. What else are you referring to? Other
19 duties that Ms. Williams you thought --
20     A. I can't recall anything else.
21     Q. Okay. So for right now we can say, then, the
22 two -- there were two duties that we're primarily
23 discussing; and that was the integration of the files
24 into one system, one big file system, as well as
25 mailing or -- packaging and shipping to the records

---

Page 132

1  center those files from Lowndes County that needed to
2  be sent.
3      A. That's correct.
4      Q. And, again, that was, I would assume, to save
5  some space so we didn't have to put them in a bigger
6  filing system than we're going to keep in the office?
7      A. Well, they sit in the office until a certain
8  period of time.
9      Q. Yeah, they met their -- what's the word --
10 retention?
11     A. Like four or five years. Yes.
12     Q. Okay. Now, was there any particular
13 reason -- I mean, as far as you know, was there any
14 prohibition against Mr. Powers asking you to do that
15 work?
16     A. Yes. By the way I just -- I determined that
17 it was a reason with the way he treated me.
18     Q. Okay. It wasn't so much -- and, again, I'm
19 paraphrasing, and you tell me if I'm wrong. This is
20 not about tricking you, I promise. My paraphrasing is
21 it wasn't so much that you were asked did you perform
22 the task or the task that were asked to perform --
23 follow me? -- as it was the manner in which you were
24 asked to do them?
25     A. It was the manner that I was asked and the

---

Page 133

1  tone that he gave me of asking.
2      Q. Okay. Okay. And that's a fair statement.
3  It wasn't so much asking you to do work or doing the
4  work, it was the way in which he asked you to do the
5  work.
6      A. The way he asked me, yes.
7      Q. Okay. Fair enough. We go down to number
8  two. And it's again duties that other white employees
9  besides Ms. Williams did not show an interest in
10 performing. What duties particularly are you
11 referring to there?
12     A. The filing.
13     Q. Okay. Is it a fair statement -- again, tell
14 me if I'm wrong. Is it a fair statement that this
15 filing work was something one, two, three of y'all --
16 I got to do it this way -- three of you from Luverne
17 and three people were there when you got there, or
18 two?
19     A. It was three there, three clerks there when I
20 got there.
21     Q. And three more came in?
22     A. Yes.
23     Q. So now we got six clerks in this office. And
24 was there anything wrong or improper about Mr. -- a
25 violation of regulation or workplace rules or

Page 134

1  something of that nature when I say wrong -- about him
2  asking you to do that integration system of files, or
3  was it yet again the manner in which he asked you to
4  do it?
5      A. It was the manner, the way he asked me to do
6  things in the office.
7      Q. Okay. I would take it -- and let me ask you
8  this. Did you feel that Mr. Powers was asking you to
9  do a disproportion -- asking you personally to do an
10 unfair portion of the work, or again is it just the
11 manner in which he asked you to do it? You follow me?
12     A. No.
13     Q. Okay. I'm trying to say -- I just want to
14 make sure I understand what your contention is. Is it
15 that he was asking you to do what you thought was an
16 unfair amount of work, say, of this integration and
17 shipping; or was it the manner -- again, was it the
18 manner in which he asked you to do it?
19     A. It was the manner and the way that he asked
20 he me.
21     Q. Okay.
22     A. And regarding to the way he asked me was like
23 he was only going to make me do it, me or the other
24 black, Arlesa.
25     Q. Well, did other people -- did the other

Page 135

1  people in the office assist y'all in doing it?
2      A. No.
3      Q. So it fell on the two of y'all to integrate
4  this file system as well as to ship and move the old
5  files?
6      A. Integrate the files together. And then the
7  files was already in a filing cabinet, so we had to
8  take them from one file cabinet and put them into --
9  integrate with the other file cabinet.
10     Q. And the other file cabinet -- and to the
11 degree that those filing cabinets -- I think I
12 understand their order. You got all the filing
13 cabinets from Hayneville, correct?
14     A. That's correct.
15     Q. Okay. And you had to go through those filing
16 cabinets?
17     A. And integrate them by alphabetical order.
18     Q. Into the existing Lowndes --
19     A. Into Crenshaw County.
20     Q. -- or Luverne files. And as we went through
21 those file cabinets from Hayneville --
22     A. We had to take files from file cabinets and
23 put into correct order.
24     Q. Yeah. Yeah, I got that. And I was going to
25 say as well as if you found some that their retention

Page 136

1  period had expired --
2      A. Yes. We had to take those out and file them
3  in a different file cabinet.
4      Q. And that --
5      A. And they stayed there for like four or five
6  years.
7      Q. Okay.
8      A. Then they got sent to state office.
9      Q. Okay. the ones that he was asking you to
10 ship to the state office or to St. Louis?
11     A. To St. Louis.
12     Q. Were those primarily records from
13 Lowndes County?
14     A. I don't remember.
15     Q. Okay. It doesn't really matter. I was just
16 really curious.
17     Okay. Now, as to all that work, do you believe
18 that, again, Mr. Powers asked you to do a
19 disproportionate or unfair amount of that work, or was
20 it the manner in which he asked you to do it?
21     A. It was in the manner in which he asked me to
22 do it.
23     Q. Okay. I know you're thinking, man, doesn't
24 he get it. I hear you. I'm just asking the questions
25 because I want to make sure. Okay?

Page 137

1      A. Yeah.
2      Q. And I want to give you the opportunity to put
3  out there whatever it is you're feeling.
4      A. Okay.
5      Q. Because -- well, that's just the way it
6  should be done. Okay. Let's go on to -- I think I
7  understand number three, being placed in an
8  environment where there was insufficient work space,
9  no desk. I think I've got all that from the record,
10 and you tell me if I'm missing something. Okay? This
11 may speed it up some. One, three more people were
12 added to an office that already housed three people,
13 correct?
14     A. Yes.
15     Q. So there were six people now.
16     A. There were seven with Art.
17     Q. With Art, plus a supervisor. And we'll just
18 kind of take Art out of the mix in that since he's the
19 supervisor, I assume he had his own office.
20     A. That's correct.
21     Q. Okay. So now there's six of you to divide
22 up. How many offices were in that building in the space
23 that y'all had to work out of?
24     A. They had three office that was closed off,
25 which was the supervisor's office, Sandra Welch

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

36 (Pages 138 to 141)

---

Page 138

1  office, and Patsy Williams.
2      Q.  Okay.  Sandra -- excuse me.  Patsy Williams
3  came from Hayneville?
4      A.  Yes.
5      Q.  Sandra Welch was in Luverne?
6      A.  Yes.
7      Q.  Sonya Johnson slash Davenport, Davenport
8  slash Johnson --
9      A.  She was in the Luverne --
10        COURT REPORTER:  I'm sorry?
11      A.  She was in Luverne.
12      Q.  Yeah.  She was in Luverne when y'all got
13  there?
14      A.  Yes.
15      Q.  She didn't have an independent office?
16      A.  She didn't have an office with a closed door.
17      Q.  Okay.
18      A.  But she had a space, office space.
19      Q.  Okay.  And there were some cubicles?  I mean
20  dividers.
21      A.  Between her and Betty, yes.
22      Q.  Yeah.  Yeah.  So you had three offices with
23  doors?
24      A.  Yes.
25      Q.  Okay.  Three offices with doors that went to

---

Page 139

1  the supervisor and the two, say, 6s.  Is that right?
2  Both Ms. Williams and Ms. Welch were 6s?
3      A.  Yeah.  Ms. Williams was a 6.  I don't know
4  what Ms. Welch was.
5      Q.  But Sandra was there anyway when you got
6  there.
7      A.  Yeah, she was there.
8      Q.  So we didn't move her out of her office.
9      A.  No.
10      Q.  So what was left was, as I understood, say a
11  big room.
12      A.  Yes.
13      Q.  Not big, but just an open room.
14      A.  It was an open area that was left where they
15  had the file cabinets there.  Then they had the
16  cubicles where they had Sonya and Ms. Blackman
17  separated.
18      Q.  Okay.
19      A.  And the other area was where they had two
20  tables.
21      Q.  For you and Arlesa?
22      A.  Yes.
23      Q.  Now, Ms. Blackman was there when y'all got
24  there?
25      A.  Yes.

---

Page 140

1      Q.  Okay.  So, essentially, is it a fair
2  statement that Ms. Davenport and Ms. Blackman just
3  kept the same space they had before y'all moved in?
4      A.  Yes.
5      Q.  Okay.  Now, they put two -- they put tables
6  out for you, two tables, one each for you and Arlesa?
7      A.  Yes.
8      Q.  And you had a chair?
9      A.  And a chair.
10      Q.  As I understand.  And a tele --
11      A.  A typewriter.
12      Q.  A typewriter.  No telephone?
13      A.  No telephone.  No computers.
14      Q.  No computer.
15      A.  No access to anything.
16      Q.  Okay.  Now, if you needed a telephone or a
17  computer, I'm assuming you -- particularly, say, the
18  phone, for example, you could take a phone call at
19  Ms. Blackman's or Ms. Davenport-Johnson's desk, right?
20      A.  I had to wait until a phone get available,
21  but yeah.
22      Q.  Sure.  I understand that.  And the same
23  probably for the computer.  If you needed to use the
24  computer for some reason, you could use theirs when
25  available.

---

Page 141

1      A.  Yes.
2      Q.  And did you find them to be -- what's the
3  word I'm looking for -- accommodating?  I mean, in
4  other words, the four of y'all -- is it a fair
5  statement that the four of y'all worked, as best you
6  could, to work out the limited space and equipment
7  y'all had?  The four of y'all, now.
8      A.  Yes.
9      Q.  I don't include Art, and I'm not talking --
10  okay.  So they worked with you to make it work as
11  smoothly as they could?
12      A.  Yes, they did.
13      Q.  All right.  Now --
14      A.  Except when it got crowded and everybody had
15  to have a person that they worked with.
16      Q.  Yeah.  I understand that.  And as I think you
17  testified or Sonya testified earlier, all of y'all had
18  responsibilities to meet with customers.
19      A.  Yes.
20      Q.  Borrowers.
21      A.  Yes.
22      Q.  And to assist them if you could.
23      All right.  Now, to the degree that the situation
24  was as it was with the office space, why is it that
25  you think that -- for what reason do you think that

LISA McCALL v. MIKE JOHANNS                                    3/26/2007
DEPOSITION OF LISA McCALL

Page 142

1    was done by virtue of your race?
2        A.  What carried me?
3        Q.  Why do you think it was that way because of
4    your race is what I'm asking?  What evidence?  Did you
5    hear something?  Read something?
6        A.  In regarding to what carried me to think it
7    had something to with my race?
8        Q.  Yeah.
9        A.  Because when we got to the office, everybody
10   had equipment to work with except me and Arlesa, which
11   we both was black.
12       Q.  But y'all weren't -- there were three blacks
13   in the office.
14       A.  Two.
15       Q.  Just the two of y'all?
16       A.  Yes.
17       Q.  Okay.  Patsy?
18       A.  Patsy was white.
19       Q.  White.  Yeah.  I'm sorry.  Okay.  I'm trying
20   to get -- yeah, I got it now.  Three of y'all came,
21   one white, two blacks --
22       A.  Two black.
23       Q.  -- into an office.
24       A.  White.
25       Q.  Plus Art --

Page 143

1        A.  Yes.
2        Q.  -- your supervisor.  Okay.  So for that
3    reason.  Are there any other reasons that you believed
4    that it was set up this way because of your race?
5        A.  I can't recall.
6        Q.  Okay.  Then going on to number four, you
7    refer to the verbal abuse by Mr. Powers.  I know we
8    talked about this some yesterday and maybe a little
9    bit already today.
10       A.  Right.
11       Q.  You've made -- I think you testified that you
12   found it offensive, his usage of the phrase "you
13   people" --
14       A.  Yes.
15       Q.  -- on more than one occasion when speaking to
16   you individually.
17       A.  Yes.
18       Q.  Did I also understand you to say that you
19   witnessed him speak that way individually to
20   Ms. Hunter?  Is that right?
21       A.  No.  It was John Sasser that I witnessed it.
22       Q.  Okay.  Other than -- I need to -- but by
23   Mr. Powers, any other -- you know, any other instances
24   of verbal abuse in terms of, say, using racially
25   derogatory terms?

Page 144

1        A.  No other.
2        Q.  Okay.  And tell me about -- and we talked
3    about the term some, and you can tell more about that
4    if you'd like, but I've heard that.  In what other
5    ways was he verbally abusive, or is that the only way?
6        A.  It was basically the way that he present
7    himself talking to me, like it was some reason he
8    didn't like me.
9        Q.  Okay.
10       A.  He didn't want me to be in the office with
11   him.
12       Q.  And again just for clarity, he never directly
13   stated that to you; that was what you felt based upon
14   his manner and tone?  I mean, he never said, I don't
15   want you in here with me?
16       A.  No, he didn't say it out that way, but the
17   expression and his tone gave me that appearance.
18       Q.  That's what you felt based upon the way he
19   addressed you?
20       A.  Yes.
21       Q.  Okay.  I just want to make sure.  Again, are
22   there any other specific incidents of verbal abuse by
23   Mr. Powers that you can recall?
24       A.  No.
25       Q.  Okay.  Number five, official correspondences

Page 145

1    are not shared regarding leave position, vacancies,
2    meetings, other important matters.  Now, are you
3    referring to the time in the Luverne office?  Were
4    things done differently in Hayneville and Luverne when
5    it came to the sharing of information?
6        A.  Regarding to that statement, I was referring
7    to, like, back when we was in the Hayneville office.
8    Certain announcement would come open.  We wasn't
9    notified until after those positions were already
10   closed out.
11       Q.  Okay.  Would that be -- would that be not
12   notified by -- by whom?  Say by the state office?
13       A.  The state office.
14       Q.  Okay.  Can you identify any particular
15   announcements?  I know it's been a long time, but
16   maybe there's one that really struck in your craw
17   because you wanted -- once you found out about it, I
18   really wanted that job, but can you remember?  Just by
19   example, can you remember any specific instances of
20   correspondence that did not arrive?
21       A.  I can't remember.
22       Q.  Okay.  I know it's been a long time.  It's
23   not a trick.
24       A.  I can't remember.
25       Q.  I just want to make sure there's not

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

38 (Pages 146 to 149)

---

Page 146

1  something out there. And I read in some of this stuff
2  somewhere -- and I hate to say it so vaguely; but for
3  some reason, I got the idea that maybe it was in
4  Luverne or maybe in Hayneville. Let me just ask you
5  this. Were there ever weekly meetings in, say,
6  Hayneville? Did y'all have weekly meetings with the
7  whole staff, be it with Carnell McAlpine or Mr. --
8      A.  Yes, we did with Mr. McAlpine.
9      Q.  Or Mr. Powers?
10     A.  No, not with Art. The only -- we had one
11  meeting with Art, was during the time when he made
12  some changes in certain jobs, which me and Arlesa was
13  doing the timekeeping and the payroll together.
14     Q.  Okay.
15     A.  And he told me he didn't want me to do that
16  position anymore. He gave it to Patsy Williams. And
17  I asked why, but he never responded.
18     Q.  Had Patsy -- again, at the time, Patsy was a
19  6, I'm assuming.
20     A.  Yes.
21     Q.  Okay. Had Patsy been working -- when did
22  Patsy come into the Hayneville office? Was she there
23  when you got there?
24     A.  Yes.
25     Q.  So she had been there longer than you?

---

Page 147

1      A.  In the Hayneville office, yes.
2      Q.  Okay. I'm just trying -- she wasn't somebody
3  that he brought in is what I'm trying to get at.
4      A.  No. She was there when I got there, but she
5  also left and went to the state office and worked a
6  while, and then she came back to the Hayneville
7  office.
8      Q.  Okay. Was it after that, that he assigned
9  these duties to her?
10     A.  She had came back before Art got there.
11     Q.  Okay. How long was it after, say, Art -- and
12  again there's -- how long was it after Art came to the
13  Hayneville? Or Mr. Powers, Art. How long was it
14  after he came that he reassigned these duties from
15  y'all to Ms. Williams?
16     A.  I can't remember how many months. I can't
17  remember the month.
18     Q.  Let me ask you this. If it appears -- and I
19  think Art, Mr. Powers -- is it your recollection that
20  Mr. Powers came to Hayneville about a year before
21  y'all moved to Luverne?
22     A.  Yes.
23     Q.  Is that about right --
24     A.  Yes.
25     Q.  -- give or take some months? Okay. Would it

---

Page 148

1  have been something that he did at the first, when he
2  first got there, or about midway or towards the end?
3      A.  It was more closer to the end.
4      Q.  Okay. And I'm asking without knowing. I
5  have no -- were there any -- had any problems
6  developed about the timekeeping or the payroll? I
7  mean, had there been any instances where he thought
8  maybe y'all had messed it up?
9      A.  No.
10     Q.  And I really need to talk about you, not so
11  much Arlesa Hunter. I mean, there had been no claims
12  that you had -- you were the timekeeper. You were
13  timekeeper, right?
14     A.  I was timekeeper. Arlesa was doing payroll.
15     Q.  Okay. There hadn't -- had there been any
16  concerns expressed by Art to you that, hey, you're --
17  you're really not keeping these time books very well?
18     A.  No.
19     Q.  He had never complained to you about your
20  performance in that role?
21     A.  No.
22     Q.  Okay. There was a bulletin board in both
23  offices, I assume, where certain things would be
24  posted?
25     A.  There was a bulletin board, yes.

---

Page 149

1      Q.  Okay. What would typically be -- let's say
2  in Hayneville. And if it was different, tell me.
3  Okay. Hayneville, Luverne, both places, there were
4  bulletin boards, correct?
5      A.  Yes.
6      Q.  Where certain things would be posted; is that
7  right?
8      A.  Yes.
9      Q.  What were the nature of the things posted on
10  the bulletin boards?
11     A.  They had posted the harassment form that was
12  posted.
13     Q.  Okay.
14     A.  Posted -- that's all I remember was posted on
15  there.
16     Q.  Okay. And again tell -- I think you
17  previously said number five, the official
18  correspondence, that's directed more towards, if I
19  understood you correctly, that the information wasn't
20  getting, say, from Montgomery to y'all --
21     A.  Yes.
22     Q.  -- out in the districts timely.
23     A.  Yes.
24     Q.  Any evidence that you can point me to that
25  was occurring because of race?

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

39 (Pages 150 to 153)

Page 150

1    A. Rephrase that.
2    Q. Yeah.
3    A. I'm not understanding.
4    Q. Yeah, that wasn't a good question. Anything
5    that you can point me to that indicates that, say --
6    I'm using Montgomery generally. State office,
7    Montgomery, wasn't getting this information out to
8    y'all because of your race as opposed to just it
9    wasn't getting there in time; somebody didn't do their
10   job right. You know, I'm just thinking of other
11   reasons that it might not have gotten there timely.
12   A. I don't know.
13   Q. Okay. We'll go on to number six. That's
14   lifting and moving heavy office equipment within the
15   office, which the whites are not required to do. Now,
16   tell us. If there could be some specific examples,
17   what would those be?
18   A. Like an example was lifting files that was --
19   like had four case loads to them that was real thick
20   and heavy.
21   Q. Okay. Again, this would go back -- and that,
22   for example --
23   A. They would go back to integration of files.
24   Q. Okay. Any other equipment, for example?
25   Desk? I was just thinking desk.

Page 151

1    A. Didn't have a desk.
2    Q. Filing cabinets, just anything big, any one
3    particular incident, for example, that you can
4    recall.
5    A. Just when we had to integrate the files, we
6    had to move the files in the right order. And then
7    there was a certain spot they had us to move them
8    until -- on the opposite side of the area where we
9    were sitting.
10   Q. Okay.
11   A. We had to move them from the middle aisle of
12   the floor where they was placed when they were brought
13   there into the direct area where they was supposed to
14   go.
15   Q. Where they would ultimately filed?
16   A. Yes.
17   Q. In the neighborhood of the filing cabinet in
18   which they would go?
19   A. Yes.
20   Q. Okay. Again, what leads you to believe that
21   you were asked to do those particular tasks because of
22   your race?
23   A. The reason, because of the manner of the tone
24   that Art gave me of telling me to do those things.
25   Q. Okay. We go down from there to under number

Page 152

1    6, Mr. Powers on several occasions has exhibited a
2    dislike for black applicants and visitors who would
3    come into the office. Can you recall specific
4    instances to which you're referring when you wrote
5    that?
6    A. Yes.
7    Q. Okay. Which -- what were those?
8    A. In the Lowndes County office, we had black
9    borrowers that could not read, could not write. And
10   there was several black borrowers that he -- he gave
11   them the way that he didn't want to be bothered with
12   them. He would turn them off to someone else to work
13   with them rather than he does the job with them. If
14   he had to do an interest credit review with someone
15   like that, he would pass the job over to somebody else
16   to do it.
17   Q. Did you see him in Lowndes County -- that's
18   primarily a Lowndes County, so to speak, thing?
19   A. Yes.
20   Q. Were you -- did you see him treat blacks in
21   Luverne the same way, or was this primarily focused in
22   the Hayneville area?
23   A. Basically in Hayneville.
24   Q. Okay. I would assume based -- I'm assuming
25   that you had a higher number of black applicants in

Page 153

1    Lowndes County than you did in Crenshaw.
2    A. Yes.
3    Q. I mean, because Lowndes is -- am I right?
4    It's predominantly a black county, isn't it?
5    A. Yes.
6    Q. And Crenshaw is not that way, right?
7    A. That's correct.
8    Q. Okay. Can you recall a time where he treated
9    a -- did he seem to treat -- do you recall any white
10   people coming into the Lowndes County office that
11   couldn't seem to read or write very well?
12   A. No.
13   Q. Okay. Did y'all have my white applicants --
14   and I know that's a very vague question. I'm trying
15   to think of a better way to ask it. Give me a
16   second.
17   Try it this way. And this is just a best guess.
18   Okay? This isn't a matter of holding your feet to the
19   fire in terms of exact. Say out of every ten
20   borrowers that would come into the Hayneville office,
21   say take just any given ten borrowers that would come
22   in, approximately how many of those would be white, as
23   best you recall? Again, I'm not holding you. This
24   isn't a matter I'm going to look up, hold you to the
25   fire on. I'm just trying to get an idea.

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

40 (Pages 154 to 157)

Page 154

1    A.  Very little.
2    Q.  Maybe two out of ten?  Again, this is just a
3  guesstimation.
4    A.  Yeah.  Maybe two or three.
5    Q.  Okay.  And say those two or three, tell me
6  what you saw Art do that would demonstrate that he --
7  what, would Art treat them better?
8    A.  Yes.  He would do the interest credit review
9  with them.  He would not pass over if it was a white
10 borrower.  He would go into his office and he would do
11 the interest credit review.  But if it's a black
12 borrower that can't read and write, he'll tell one of
13 us to do it.
14   Q.  Okay.  And I would assume the second part of
15 that little paragraph, refuse to help or give them
16 appropriate forms needed to apply for a house loan, in
17 the same vein, that's your general recollection of
18 that would happen?
19   A.  Yes.
20   Q.  All right.  Can you remember any specific
21 instances where he just wrongfully denied an
22 application or form to somebody specifically, if you
23 can recall?
24   A.  I can't recall it.
25   Q.  All right.  The next paragraph is, he was

Page 155

1  often rude and impolite in a cold and harsh voice.
2  This was shown when asked information, especially when
3  asked to explain questions on the loan applications.
4  In that regard, was it your perception that he treated
5  black applicants differently than the white ones?
6    A.  Yes.
7    Q.  And that, again, is primarily focused in
8  Lowndes County?
9    A.  Yes.
10   Q.  Okay.  The next one was about the black
11 applicants, had to remind them, being most -- your
12 statement is Ms. Williams and Mr. Powers.
13   A.  That's correct.
14   Q.  -- that they weren't going -- that they
15 weren't -- that they were adults and would not be
16 talked to in any kind of way.  Do you recall any
17 specific instances there?
18   A.  Yes.  There was a black borrower.  She was an
19 older lady.
20   Q.  Okay.
21   A.  I think her name was Johnnie.  I can't
22 remember.  Bailey, the last name.
23   Q.  Okay.  Great.
24   A.  And she was one of the blacks that couldn't
25 read nor write.  And she was one -- she was the

Page 156

1  borrower that yelled at him and expressed to him that
2  she wasn't -- she was not a child.
3    Q.  She let him have it.
4    A.  Yes.
5    Q.  What had gone on before that, though?  Did
6  you see all of this happen?
7    A.  She came in for an interest credit review.
8    Q.  Okay.
9    A.  And I don't know what words were said between
10 him and her in -- in his office; but after the yelling
11 start, you could hear it out in the area where I was
12 sitting.
13   Q.  And she told him this?
14   A.  Yes.
15   Q.  Okay.  Any other specific ones that you can
16 recall?
17   A.  No, I can't recall any of them.
18   Q.  I was just looking there at the rest of it.
19 I think a lot of this we've already covered, but one
20 second, let me look.  Yeah.  Number two down there
21 towards the bottom, blacks are often told they do not
22 have the qualifications and the applications are not
23 accepted.  And then you go on to state, And they've
24 been denied the opportunity to apply for positions
25 within the state office.

Page 157

1    A.  Yes, that's correct.
2    Q.  Is that -- the first sentence there, is all
3  of that -- let me ask it this way.  Is all of that
4  number two regarding employment activities at the
5  state office?
6    A.  Yes, in the state office.
7    Q.  Okay.  And I just want to make sure.  Can you
8  give me some particular examples of this having
9  occurred?
10   A.  Yes.  There was positions that came open in
11 the state office that we in the county office was told
12 that we could not apply for them because of the area
13 of the district area that we was in.  It had to be in
14 our commuting area.
15   Q.  Okay.  Really, Hayneville and Luverne are
16 within the commuting area, aren't they, of Montgomery?
17   A.  Hayneville was, but Luverne wasn't.
18   Q.  Now, you heard of jobs in Montgomery
19 particularly or jobs at the state office that may have
20 been in other places?
21   A.  The state office.  State office.
22   Q.  In Montgomery?
23   A.  Yes.
24   Q.  Okay.  That's it primarily.  The rest of
25 those, we've pretty much covered in other times.  I'm

Page 158

1  really -- believe it or not, I'm getting dangerously
2  close.
3        MR. ATCHISON:  You want to take a break where
4  you can make sure?
5        MR. NEELEY:  No.  You're not that lucky.
6     Q.  I've got a little ways to go.  It won't be
7  too long.  We probably can be done without taking
8  another break, other than about a two-minute one to
9  let me go outside and just take a break to review
10  notes; but I'm kind of going slow anyway, doing that
11  as we go.  Let me -- I want to turn to just some
12  housekeeping matters, and then I'll go back and
13  review, and I think we'll be close.  Okay?
14     Gary, Mr. Atchison, reminded me of something I
15  didn't -- I had not asked you about.  And that's your
16  relatives within the district.  And I see you've
17  stated a couple of other people he deposed.  That's --
18  we're really just trying to determine if you've got
19  any relatives that may potentially, if this thing were
20  to go to trial, end up in our pool of jurors, you
21  know, from which we could draw actual jury members.
22  He doesn't want my people's friends on it, and I don't
23  want your people's friends on it.  Okay?
24     A.  Does that include Lowndes County?
25     Q.  Yeah.  Lowndes County is within the Middle

Page 159

1  District of Alabama.  Yeah.  As far as west as Lowndes
2  County and say over as far north as Randolph County or
3  Roanoke down to Dothan, all the way over to, what,
4  Geneva?  I guess in that funky kind of square.  But
5  Lowndes County.  You got a lot of folks in Lowndes, I
6  take it.
7     A.  My whole family is there.
8     Q.  Let's see.  What all you got over there?
9  Grandparents, parents, children?
10     A.  Grandmother.
11     Q.  Grandmother.  How old is your grandmother :
12     A.  92.
13     Q.  Okay.  She won't -- she'll be excused.  I
14  assume she wouldn't want to come, not even for you,
15  not at 92.  You probably figure you're on your own,
16  right?  Okay.  Your mother.  And her name, please?
17     A.  Susie Mae McCall.
18     Q.  And I assume she's under the age of 70 or
19  75-ish?
20     A.  She's 60.  Late 60s.
21     Q.  Yeah, she could end up in there.  Okay.  Your
22  mother.
23     A.  My father.
24     Q.  Okay.
25     A.  Roosevelt McCall.

Page 160

1     Q.  Okay.  Brothers?  Sisters?
2     A.  Brothers.
3     Q.  All right.  How many?
4     A.  Three.
5     Q.  Oh, my goodness.  Three.  All right.  All in
6  Lowndes County?
7     A.  Yes.
8     Q.  I take it y'all farm.
9     A.  No.
10     Q.  All right.  I was just wondering, with
11  everybody staying in the county like that.  Okay.  Go
12  ahead.  What's your first brother's name?
13     A.  Robert.
14     Q.  Robert McCall?
15     A.  McCall.
16     Q.  All right.
17     A.  Abraham McCall.
18     Q.  All right.
19     A.  Antonio.
20     Q.  Antonio McCall?
21     A.  McCall.
22     Q.  All right.  Sisters?
23     A.  Three,
24     Q.  Oh, my goodness.  Are they all in Lowndes
25  County, too?

Page 161

1     A.  No.
2     Q.  Okay.
3     A.  One in Lowndes County, two in Montgomery.
4     Q.  Okay.  Well, they all three count.  Give them
5  to me.
6     A.  The one in Lowndes County is Teresa Baity.
7     Q.  Baity?
8     A.  Baity, B-A-I-T-Y.
9     Q.  Okay.  And the second one?
10     A.  Christine Barnett.
11     Q.  And the last one?
12     A.  Denise Dunning.
13     Q.  D-U-N-N-I-N-G?
14     A.  Yes.
15     Q.  I'm going to try to make this simple.  Let's
16  go through the nieces and nephews.  With six siblings,
17  I'm sure there's more than one, I'm sure.
18     A.  Nieces and nephew.
19     Q.  Any of them over 18?
20     A.  No.
21     Q.  Okay.  Thank goodness.
22     A.  The ones over 18 are not here.
23     Q.  They've moved on?
24     A.  Yes.
25     Q.  All right.  Grandparents, parents, siblings,

LISA McCALL v. MIKE JOHANNS                          3/26/2007
DEPOSITION OF LISA McCALL

42 (Pages 162 to 165)

---

Page 162

1  no nieces and nephews. I think that probably covers
2  it. Well, I better ask you. Aunts and uncles over
3  there, too?
4      A. Yes. The ones that are living. I have an
5  aunt.
6      Q. One aunt?
7      A. One.
8      Q. Okay. And she's in Lowndes County?
9      A. Yes.
10     Q. And her name?
11     A. Mae Bell Stewart.
12     Q. All right. Uncle?
13     A. No.
14     Q. Is she married?
15     A. No. She's divorced.
16     Q. Okay. This might be safe. Cousins over the
17  age of 18 that are in the district? Lots?
18     A. There's a lot of them.
19     Q. Okay. Man, we won't worry about it. I mean,
20  because we -- if this actually goes to trial, we'll
21  ask a question to all the people that are there if any
22  of them are kin.
23     A. Right. And that's the majority of them.
24     Q. And I tell you, they're supposed to disclose
25  themselves. And I've never found anybody that

---

Page 163

1  doesn't. But this gives me a little heads up. I'll
2  be looking for them. No, I'm kidding. That's all
3  those questions are about, though. We're not trying
4  to pry into your family affairs any more than
5  necessary; it's just in case they show up on a list,
6  just like Mr. Atchison did on your behalf and I do it
7  on behalf on my client. We can ask that they be
8  stricken or taken off the list for cause.
9      A. Yes.
10     Q. And that cause being your relationship.
11  That's all.
12     A. Yeah.
13     O. Okay. Another segment I need to ask you a
14  few questions about would be damages. Now, I know
15  there's a claim for -- there would be some -- there's
16  a back pay issue involved. That's kind of -- that's
17  really a matter of law as to how much you would be
18  entitled to there were you to be successful; but in
19  that regard, the one thing I do need to ask you. Now,
20  you told me yesterday about your employment with UPS.
21     A. Yes.
22     Q. And I think you told me about when you
23  started and your rate of pay.
24     A. Yes.
25     Q. And I think we kind of got all that covered.

---

Page 164

1  Now, one thing I'm going to need -- I will need you to
2  do for us, if possible -- and I'm asking Gary, too.
3      MR. NEELEY: If we could get -- I guess
4  income tax. The safest way to do it is income tax.
5  Gary, can we get her 1040s for the last -- I guess we
6  need your 1040 for your last period -- last full year
7  of employment for us.
8      MR. ATCHISON: Just get up whatever he's
9  asking, give it to me, and I'll get to him.
10     Q. Your tax returns for '90 -- your last full
11  year. Yeah, your last full year would have been '95,
12  right, that you worked for the Department of
13  Agriculture? No. '96?
14     A. '96.
15     Q. '96. Okay. If I could get your tax return
16  for 1996. What this is about is the easiest way for
17  me to look and see how much money you made in '96, the
18  last time when you worked with us. Then I can take
19  your tax returns for the -- and Gary would need these
20  as well -- for the other years to determine how much
21  income you had on those years. And then if there's a
22  difference when it comes to calculating back pay that
23  we might would owe you --
24     A. Yes
25     Q. -- that's a good way to go about doing it.

---

Page 165

1  And there's some legal things that Gary and I would
2  probably have to fight about regarding all that, but
3  that's why I need those. I'm not just trying to pry
4  needlessly.
5      A. That's fine.
6      Q. So if you would get those for me. You know,
7  there's no rush on that. 30 days. Okay?
8      A. Yes.
9      Q. So I know there would be back pay. Any other
10  financial damages, like money that you claim that you
11  lost other than say that difference in pay. Any other
12  money that you contend that you lost because of our
13  alleged misconduct?
14     A. I can't remember right offhand.
15     Q. Okay. If I know Gary, he'll help you get all
16  that together at the appropriate time. Let me ask you
17  this. I assume you're -- well, tell me this. Talking
18  about any physical ailments -- well, let's start over
19  this way. Mentally. Let's go up here, mentally.
20  Tell me about how the actions, the perceived
21  discrimination of the Department of Agriculture, how
22  that affected you emotionally and mentally.
23     A. Stressful.
24     Q. Stressful. And I'm sure facing a RIF and
25  figuring out where you're going to go from there was

Case 2:06-cv-00039-MHT-SRW    Document 26-11    Filed 04/16/2007    Page 43 of 46
LISA McCALL v. MIKE JOHANNS                                3/26/2007
DEPOSITION OF LISA McCALL

43 (Pages 166 to 169)

Page 166

1  stressful. Since the time of the RIF, have you had to
2  see -- and a lot of people are funny about admitting
3  this, but a lot more people out there do it than you
4  know. Have you had to seek any assistance from any
5  counselors or see a psychologist or psychiatrist for
6  any type of emotionally related disturbances?
7      A. No. No.
8      Q. Okay. Any physical ailments? Sometimes
9  people think that -- rightfully, wrongfully -- I don't
10 pass judgment -- may think that a physical ailment
11 they have is a result of the stress or the emotional
12 turmoil in an event like this. Any physical ailments
13 that you contend were caused in part --
14     A. Could cause me stress? It's a lot. The
15 things that I went through.
16     Q. Okay.
17     A. And then the things I went through after the
18 RIF trying to be reinstated.
19     Q. Okay. Let me ask physically, though. And
20 I'm not belittling the emotional stuff. Don't get me
21 wrong. That's not what I'm -- what I'm specifically
22 trying to get to, though, are there any -- and I don't
23 want to be suggestive. I trust you to tell me. I
24 mean, have you had a blood pressure problem since
25 then?

Page 167

1      A. No.
2      Q. Okay. That's what I'm asking. Any type of
3  physical ailments.
4      A. No more than stress. And I did go to one --
5  I think it was Med One during the time. Med One. It
6  was a doctor office called Med One. I went there for
7  stress.
8      Q. Okay.
9      A. And they gave me some Motrin muscle relaxers
10 to take.
11     Q. Where was this doctor? Are they located here
12 in Montgomery?
13     A. They was here in Montgomery. When I went,
14 they was on the Southern Bypass. It was Med One.
15     Q. Med One?
16     A. Yes.
17     Q. I'm sorry. I didn't understand you.
18 Approximately when was that?
19     A. It was --
20     Q. Soon after? Years later? I'm not trying --
21 just trying to help.
22     A. It was kind of in between the time that I
23 left Rural development and --
24     Q. Do you know -- let me ask you this. Do you
25 know if that office is still there? Things change,

Page 168

1  so -- have changed so out there, who knows.
2      A. I have no idea. I don't know.
3      Q. Do you have -- and let me ask you this, and
4  this will be -- you said they prescribed some Motrin?
5      A. It was some Motrin. The name of it was
6  Motrin muscle relaxer. They was muscle relaxer
7  tablets.
8      Q. And you got one prescription of those?
9      A. Yes.
10     Q. Did you have to have it refilled?
11     A. No.
12     Q. So you got a little better?
13     A. Yes.
14     Q. All right. As a result of all of this, did
15 the -- did it come that you faced a -- you were how
16 long without any income? What, a couple of months
17 anyway?
18     A. Yes.
19     Q. Is that what I recall?
20     A. Yes.
21     Q. Did that cause you to have -- anybody go into
22 foreclosure on your home or repossess a vehicle or
23 anything like that?
24     A. Well, my vehicle almost got repossessed.
25     Q. Okay. When was that, about?

Page 169

1      A. In the later part -- it was in the mid part
2  of '97.
3      Q. Okay.
4      MR. ATCHISON: Can we go off the record a
5  moment?
6      MR. NEELEY: Yes.
7          (Off-the-record discussion)
8      Q. We were discussing you were concerned your
9  car might get repossessed. Tell me about that, if you
10 would, please. What happened?
11     A. It was financed through the bank. And I
12 didn't have enough income to meet the payments of the
13 car.
14     Q. Right.
15     A. And they was telling me that they could
16 repossess the car, come and get it. So, I had to go
17 out and make ends meet, to get another job. I worked
18 two jobs during that time to make ends meet to catch
19 up the difference that was on the car to keep from
20 letting them repo'ing it.
21     Q. Okay.
22     A. They worked with me on it, though.
23     Q. Yeah. I'd say if you've got any records that
24 would help us. Say, for example, if you had to pay
25 extra interest or finance charges, that type stuff,

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

44 (Pages 170 to 173)

| Page 170 |
| --- |

1  any expenses beyond the normal car payment because of
2  that. And you can -- you need to give that
3  information to Mr. Atchison as well so he can get to
4  me, if you've got it available. Again, theoretically,
5  we could be responsible for that, you know, that --
6  whatever amount of additional monies that cost you,
7  theoretically, if we were found liable. And I just
8  need to know before we get there if that's a
9  potential.
10     Let's see. Any other -- no foreclosures? No
11  other repo's?
12     A. No.
13     Q. Any other particular -- I'll ask one more
14  time. Any other particular financial damages you
15  claim were caused by our actions or inactions,
16  whichever the case may be?
17     A. No more than trying to make ends meet to take
18  care of me and my child.
19     Q. And, therein, some stress, too, right?
20     A. Yes.
21     Q. Okay. Again, I think we went through all
22  this yesterday. It didn't take you too long to find
23  some employment anyway. And you're still with UPS?
24     A. Yes.
25     Q. I assume been there long enough, satisfied

| Page 171 |
| --- |

1  with that employment?
2     A. Yes.
3     Q. Always want something better.
4     A. Yes.
5     Q. We all do.
6     A. Want a full-time job.
7     Q. Okay. Well, since the time -- have you been
8  offered any -- you're still on a part-time status with
9  UPS; is that correct?
10     A. That's correct.
11     Q. Have you been offered any full-time
12  positions --
13     A. No.
14     Q. -- by any other company since you left our
15  employ?
16     A. Through -- have I worked any?
17     Q. Yes. I guess what I'm saying is you --
18     A. Since I left, yes, I worked -- I worked -- I
19  was working a full-time job plus my part-time job at
20  UPS.
21     Q. Okay. Where was that full-time employment?
22     A. The last one was OSI.
23     Q. What is OSI? That sounds very familiar?
24     A. It's Outstanding Resource Department for
25  BellSouth telephone company.

| Page 172 |
| --- |

1     Q. Okay. How long did you work full-time with
2  them?
3     A. I think three years, three or four years.
4     Q. Three to four years. And at the same time,
5  you're still working UPS?
6     A. Yes.
7     Q. Okay. So this other will be shown on your
8  tax records as well, right?
9     A. Yes.
10     Q. So OSI. Anybody else?
11     A. Max Federal Credit Union.
12     Q. Max. All right. How long were you with
13  them?
14     A. I worked there I'm thinking three years. I'm
15  not sure. Because I had to leave there because of my
16  illness when I was pregnant with my last child.
17     Q. All right. Is that it? Any other full-time
18  positions? That's six or seven years' worth.
19     A. No. No.
20     Q. And it's been ten -- well, ten years.
21     A. No. Those are the only two.
22     MR. NEELEY: Okay. Y'all just give me a
23  second. I think I'll be done.
24        (Brief pause)
25     MR. NEELEY: All right. I do believe I will

| Page 173 |
| --- |

1  stop. Yeah, I don't have anything else. Thank you.
2  You're done?
3     MR. ATCHISON: No. What is our last number?
4     MR. NEELEY: #19.
5     MR. ATCHISON: This is #19 and this is #20 so
6  that will be #21.
7     MR. NEELEY: What's #20?
8     MR. ATCHISON: #20 is this big --
9     MR. NEELEY: Okay.
10     MR. ATCHISON: I offer the two the other day,
11  but I again -- I think the court reporter is not clear
12  that we've offered them, but we will offer #19 and
13  #20, the two reports of investigation. I would like
14  to mark this as #21.
15        (Off-the-record discussion)
16           EXAMINATION
17  BY MR. ATCHISON:
18     Q. All right. Ms. McCall, let me show you
19  this. I'm going to follow up a little bit from what
20  Rand had asked you. I have just found in my file a
21  document that I think was provided to us by opposing
22  counsel during the administrative process. Okay?
23     A. Yes.
24     Q. And it's entitled Personnel RIF Effective
25  4/27/97.

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

45 (Pages 174 to 177)

Page 174

1    A.  Yes.
2    Q.  Okay.  Now, I see that the document does not
3  have names.
4    A.  Okay.
5    Q.  Yes.  But it has racial and gender
6  descriptions, positions, effective dates, and the
7  counties where these people are located.
8    A.  That's correct.
9    Q.  Okay.  As far as you know, is this document
10  correct as to who was RIF'd by the USDA on 4/27/97?
11    A.  I would not know.
12    Q.  Well, let's look at the one that I've got an
13  arrow.  There's an arrow pointing to a position.  And
14  it says black female, Community Development Assistant
15  GS-4, and the SCD is 72976, Crenshaw County, Alabama.
16  Would I be correct in my assumption that that would be
17  a description of your being RIF'd during that time
18  period?
19    A.  Yes.
20    MR. ATCHISON:  All right.  Thank you.
21    MR. NEELEY:  I guess we need to do this on
22  the record.  I'm just trying to clean up our exhibits
23  a little bit for you.  To the degree that I may have
24  previously offered Defendants' Exhibit #7, I want to
25  delete that and cross-reference.  I now call it

Page 175

1  Defendant's Exhibit #18 in accordance with the
2  plaintiff numbers.  Okay.  And go off the record just
3  a second.
4    (Off-the-record discussion)
5    Q.  (Mr. Atchison continuing:)  Ms. McCall, do
6  you recall when you retained an attorney in this
7  case?  Was it October 18th, 2001?
8    A.  Yes.
9    Q.  And you retained who, please?
10    A.  Mr. Gary Atchison.
11    Q.  And also Robert Rash?
12    A.  Robert Rash.
13    Q.  And Mr. Rash is no longer assisting you in
14  this case, right?
15    A.  No, sir.
16    Q.  Okay.  And this was -- did you retain counsel
17  that you just mentioned at a late stage in your
18  administrative case?
19    A.  No, no counsel other than the counsel that I
20  appointed in 2001.
21    Q.  Okay.  But you had been trying to represent
22  yourself a long time before you actually retained me;
23  is that correct?
24    A.  Yes.
25    Q.  Several months, if not years; is that --

Page 176

1    A.  Years.
2    Q.  All right.  Have you had any training as a
3  lawyer?
4    A.  No.
5    Q.  Okay.  Know anything about employment law?
6    A.  No.
7    Q.  Or the language of employment law?
8    A.  No.
9    Q.  Okay.  Did the EEOC or MSPB investigators
10  ever tell you the difference between harassment or
11  discrimination or retaliation, those fine points of
12  those --
13    A.  No.
14    MR. NEELEY:  Object to the form.
15    MR. ATCHISON:  All right.  That's all
16    (The deposition concluded at
17    4:32 p.m.)
18    * * * * * * * * * * *
19    FURTHER DEPONENT SAITH NOT
20    * * * * * * * * * * *
21
22
23
24
25

Page 177

1    REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  MONTGOMERY COUNTY
4    I, Mallory M. Johnson, Court Reporter and
5  Commissioner for the State of Alabama at Large, hereby
6  certify that on Monday, March 26, 2007 and Tuesday,
7  March 27, 2007, I reported the deposition of LISA
8  McCALL, who was first duly sworn or affirmed to speak
9  the truth in the matter of the foregoing cause, and
10  that pages 5 through 176 contain a true and accurate
11  transcription of the examination of said witness by
12  counsel for the parties set out herein.
13    I further certify that I am neither of kin nor of
14  counsel to any of the parties to said cause, nor in
15  any manner interested in the results thereof.
16    This 9th day of April, 2007.
17
18
19
20
21
    _____
    MALLORY M. JOHNSON, COURT REPORTER
22    And Commissioner for the
    State of Alabama at Large
23
    MY COMMISSION EXPIRES: 2/24/09
24
25

LISA McCALL v. MIKE JOHANNS                    3/26/2007
DEPOSITION OF LISA McCALL

46 (Page 178)

```
                                    Page 178
 1              SIGNATURE OF WITNESS
 2         I, LISA McCALL, hereby certify that I have
 3    read the transcript of my deposition consisting of
 4    pages 5 through 175, and except for the corrections
 5    listed below, certify that it is a true and correct
 6    transcription.
 7
 8    _____  _____
             LISA McCALL
 9
10    SWORN TO AND SUBSCRIBED before me
      this _____ day of _____, 2007.
11
12    _____
      NOTARY PUBLIC
13
14            * * * * * * * * * *
15    Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25
```