# EXHIBIT 32

Case 2:06-cv-00039-MHT-SRW   Document 26-17   Filed 04/16/2007   Page 1 of 9

STATE OF ALABAMA

COUNTY OF MONTGOMERY

## AFFIDAVIT OF BARBARA PRICE

I, Barbara Price, make the following statement freely and voluntarily to Romaine L. White, who had identified herself to me as a Contract EEO Investigator for the following federal agency: U.S. Department of Agriculture (USDA), investigating a complaint of discrimination filed by Lisa McCall, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

1. I am employed as a Personnel Management Specialist, GS-12, with the USDA, Rural Development, Administrative Program Division, Human Resources Section. My immediate supervisor is Barbara Bennett, Administrative Program Director. My race and color are white. In 1996-1997 I was a GS-11 in the same position.

2. I have no knowledge of any alleged harassment of Lisa McCall by Art Powers.

3. I was involved with the Reduction in Force carried out by the USDA in 1997. The RIF was precipitated by budget ceiling cuts at the agency. To my knowledge, Rural Development was affected in all states. I first received notice of the RIF at a meeting in St. Louis where we were told that a RIF was coming based upon budget and staffing cuts. In the early part of 1996, our office carried out a mock RIF in which we

Page 1 of 7                                                                                   Initials _____

sent all employees the notices and paperwork that they would receive in a real RIF. The purpose of the mock RIF was to give employees plenty of notice of the upcoming RIF and to allow us to correct any errors in the RIF process. Mock RIF notices went to every employee, not just those likely to be subject to the RIF.

4. During the mock RIF process, Horace Horn, the State Director, Barbara Bennett, my supervisor, Mickey Boyd, another personnel specialist, and myself conducted training sessions all over the state explaining the RIF procedure and the reemployment opportunities available for employees. Every employee received a copy of the Restructuring Agreement dated March 20, 1996 from Jill Long Thompson, Undersecretary, and the State Restructuring Plan. Numerous pieces of correspondence were sent to employees regarding the RIF. Additionally, employees were encouraged to call the state staff if they had questions. Vacancies were announced at the lowest possible entry level in order to ensure that more employees would have an opportunity to apply.

5. There were three types of reemployment programs involved in the RIF. First we maintained a Reemployment Priority List (RPL). The RPL is a USDA wide list used as a mechanism to give priority consideration for employment to individuals who were RIF'd. To be placed on the RPL, an employee subject to the RIF had to return an RPL registration form to me. Once this form was returned, they would immediately be placed on the RPL list. The employee would not be placed on the list until the RPL registration form was returned. The RPL gave a RIF'd employee priority for jobs for a

Page 2 of 7                                                                                                         Initials _____

two year period after the RIF. Therefore, for the RIF in April 1997, the two-year priority period expired in April of 1999. The priority also only extended to jobs in the USDA. An employee on the UDSA RPL would not have priority for jobs at another agency. Once an employee was placed on the RPL, the agency had the obligation to contact the RIF'd employee and give them priority if certain types of jobs came open. Specifically, we had to notify the employee if jobs came open in the same commuting area from which they had been RIF'd and which were at the same grade from which they were RIF'd. If the position has promotion potential above the level held by the RIF'd employee, they do not have to be contacted. The commuting area is generally determined as a sixty-mile radius from the office where the RIF'd employee had been employed. For example, if a GS-4 employee was RIF'd from the Luverne office and placed on the RPL list, we would be obligated for a two year period after the RIF to notify them of any GS-4 or lower vacancies occurring within a sixty mile radius of Luverne. If a vacancy came open in a different area, or if the position was higher than GS-4 or could be promoted to a level higher than a GS-4, we would not be required to notify the RIF'd employee. Also, we were not required to notify RIF'd employees on the RPL of temporary vacancies.

  6. RIF'd employees were also eligible for the Career Transition Assistance Program (CTAP). This program gave employees who were expected to be RIF'd priority consideration for vacancies at all USDA agencies

Page 3 of 7                                    Initials _____

Employees who received RIF notices were automatically eligible for CTAP; they did not have to fill out any forms or applications. The RIF'd employee was obligated to provide a copy of their RIF notice to show that they were to be RIF'd and if they met all of the qualifications for the job and are considered well qualified, then they would receive priority consideration for a similar position. CTAP priority also only extends until the actual RIF date.

7. RIF'd employees are also eligible for placement under the Interagency Career Transition Assistance Program (ICTAP), with all federal agencies, not just USDA. This program is similar to CTAP except that it applies after the RIF rather than before. There was no ICTAP list of employees and the agency did not have an obligation to notify RIF'd employees of vacancies under ICTAP. Instead, it was the employee's obligation to locate vacancies (such as from the OPM bulletin board) and apply for the position. The RIF'd employee was required to provide a copy of their SF 50.

8. The actual RIF took place in April of 1997. The Restructuring Plan, which determined which positions would be kept, was developed by a committee including State Director Horace Horn, Barbara Bennett, Program Directors, Rural Development Directors, and others. The plan divided the state into competitive areas. Most county offices were their own competitive area. Crenshaw County (Luverne) was its own competitive area. The restructuring plan identified the positions to be kept in the Luverne/Crenshaw County office. These positions were one Community Development Manager, GS-11; one Community Development Technician, GS-6/7; and one

Page 4 of 7                                                                                         Initials ___

Community Development Assistant, GS-4/5. The employees in each competitive area were placed on a Retention list in order determined by their service comp. date ( the date they started with the agency) with years added for performance, based upon an average of their last three-year performance appraisals. Betty Blackmon was highest on the retention list among the GS 4/5s so she was retained in the Community Development Assistant position. Lisa McCall was lowest on the retention list. Her race and color had nothing to do with her placement on the RIF list.

9.  The necessary form to be placed on the Reemployment Priority List was attached to all RIF notification letters. The procedure for being placed on the RPL was thoroughly discussed at the briefings conducted across the state. Before the final RIF date, a Career Transition Seminar was conducted for employees who were being RIF'd and the RPL was discussed once again. Lisa McCall did not attend the seminar. The RPL registration form was sent to Ms. McCall several times. On 2/9/98 the form was sent to her after a telephone request to me. On 3/2/98 Ms. McCall contacted Ms. Boyd, Personnel Specialist, with a complaint about her W-2 form and stated that she still had not received the RPL form, which was mailed on Feb. 9th. I mailed the form to her again on March 10th to a new address. The form was signed by Ms. McCall on April 27, 1998 and received by me on May 26, 1998. Ms. McCall's name was placed on the Agency RPL list on May 27, 1998. Ms. McCall's race and color had nothing to do with her placement on the RPL.

Page 5 of 7                                                                                     Initials _____

10. Even though Ms. McCall did not return her RPL form until over a year after the RIF and therefore was not placed on the Agency RPL until that time, her name was on an informal reemployment list that we maintained in the office. No permanent GS-4 positions within her commuting area have been available since the RIF. We would not have to call Ms. McCall if a temporary position was available. I did send Ms. McCall a vacancy notice regarding a secretarial position with the Homebuilders Association that I came across.

11. Sonya Davenport, who was employed as a GS-5 in the Luverne office and also lost her job in the RIF, was recently reemployed in a temporary position a few months ago. The agency did not contact her about the position. She heard that an employee in Covington County had gotten married and was moving and called the Covington County office to find out if the job would be available. She was rehired in a temporary position. She was originally located in Covington County but was recently detailed to the State office in Montgomery.

12. There was not an office located in Mobile in 1996. I believe that Ms. McCall was referring to an office in Bay Minette AL (near Mobile). Ms. McCall applied for a GS-5 position in Bay Minette. The Vacancy Announcement was opened 5/31/96 and closed 6/14/96. Lisa McCall and Lisa Hardy were the only applicants. Lisa Hardy was selected for the position. Horace Horn, State Director, was the selecting official for the position. He usually made selections based on the applications submitted and did not

Page 6 of 7                                                                Initials ___

interview for positions. Horn is no longer with the agency and is not willing to be interviewed. Lisa McCall's race and color had nothing to do with her non-selection.

13. A later vacancy became available in Bay Minette on 3/17/97. This vacancy was advertised to give the GS-4/5 employees who were being RIF'd an opportunity to apply for another position. Lisa McCall did not apply. There were no applications for the position. It was later filled with a worker-trainee, GS-1, on 1/4/98.

14. Vacancy announcements were always sent out to all offices across the state. We did not distribute vacancy announcements only to white employees.

15. I do not believe that Lisa McCall was discriminated against on the basis of her race and color.

I have read this statement, consisting of 7 pages, and it is true, complete, and correct to the best of my knowledge and belief.

_Barbara Price_
Signature

_1-26-01_
Date


Signed and sworn to before me on this
_26_ day of _January_, 2001,
at Montgomery, Alabama.

_[signature]_
Neutral witness, notary, or Investigator


Page 7 of 7                                                                 Initials _____

# PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES
# (OTHER THAN COMPLAINANT)
# FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____          _____
Signature of Interviewer                              Signature of Affiant

_1/25/01_____          _Montgomery, AL_____
Date                                                                Place