EXHIBIT 39

Transcript of the Testimony of

# Arthur Powers

# Lisa McCall
# VS
# Mike Johanns

## Case No: 2:06cv39-MHT

March 29, 2007

Boggs Reporting & Video
Phone: 334.264.6227
Fax: 334.285.0448
Email: boggsreporters@aol.com
Internet: www.boggsreporters.com

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE MIDDLE DISTRICT OF ALABAMA

2                  NORTHERN DIVISION

3

4    LISA MCCALL,

5              Plaintiff,

6          V.          CIVIL ACTION NO. 2:06CV39-MHT

7    MIKE JOHANNS, SECRETARY,

     DEPARTMENT OF AGRICULTURE,

8

9              Defendant.

10

11

12

13          * * * * * * * * * * * * * * *

14

15

16      THE DEPOSITION OF ARTHUR POWERS was taken

17   pursuant to stipulation and agreement before

18   Shannon P. Yost, Certified Court Reporter and

19   Commissioner for the State of Alabama at Large,

20   at the United States Attorney's Office, One Court

21   Square, Montgomery, Alabama, on the 29th

22   day of March, 2007, commencing at 9:00 a.m.

23

Lisa McCall                                    V.                                    Mike Johanns
Arthur Powers                                                                        March 29, 2007



**Page 2**

1    APPEARANCES:
2    FOR THE PLAINTIFF:
3    GARY ATCHISON, ESQUIRE
     492 South Court Street
4    Montgomery, Alabama 36104
5
6    FOR THE DEFENDANT:
7    H. RANDOLPH NEELEY, ESQUIRE
     Office of United States Attorney
8    One Court Square
     Montgomery, Alabama 36104
9
10            INDEX
11
12   Examination by Mr. Atchison * * * * * * * 5
13
14   (There were no exhibits marked during the course
15   of this deposition.)
16
17
18
19
20
21
22
23

**Page 4**

1    manner by either party hereto provided for by the
2    Statute, regardless of the waiving of the filing
3    of the same.
4        It is further stipulated and agreed by and
5    between the parties hereto and the witness that
6    the signature of the witness to this deposition
7    is hereby waived.
8
9        * * * * * * * * * * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 3**

1            STIPULATIONS
2
3        It is hereby stipulated and agreed by and
4    between counsel representing the parties that the
5    deposition of
6            ARTHUR POWERS
7    is taken pursuant to the Alabama Rules of Civil
8    Procedure and that said deposition may be taken
9    before Shannon P. Yost, Certified Shorthand
10   Reporter, and Commissioner for the State of
11   Alabama at Large, without the formality of a
12   commission; that objections to questions other
13   than objections as to the form of the question
14   need not be made at this time but may be reserved
15   for a ruling at such time as the said deposition
16   may be offered in evidence or used for any other
17   purpose, by either party, provided for by the
18   Statute.
19       It is further stipulated and agreed by and
20   between counsel representing the parties in this
21   case that the filing of said deposition is hereby
22   waived and that said deposition may be introduced
23   at the trial of this case or used in any other

**Page 5**

1            ARTHUR POWERS
2        The witness, after having first been
3    duly sworn to speak the truth, the whole
4    truth, and nothing but the truth, testified
5    as follows:
6            EXAMINATION
7    BY MR. ATCHISON:
8    Q   Mr. Powers, like I say, I want to give you
9        an apology that you went to my office. We
10       changed our plans because of what we hoped
11       to be the convenience for the deponents, and
12       obviously, it didn't work for you. So I am
13       Lisa McCall's attorney, and you've got a
14       right to read and sign your deposition. Do
15       you want to do that, or do you want to waive
16       that right?
17   A   I'll waive it.
18   Q   Okay. And if there's any question that I
19       ask that you do not understand, you've got a
20       right to ask for me to repeat it, which at
21       the point that you do that, at that point,
22       I'll turn around and ask my Court Reporter
23       to read it back to you.

2 (Pages 2 to 5)

Lisa McCall                                        V.                                        Mike Johanns
Arthur Powers                                                                              March 29, 2007



Page 6

1  A   Okay.
2  Q   If, then, you don't still understand the
3       question, I'll be happy to either rephrase
4       the question or withdraw it depending on the
5       circumstance.
6  A   Okay.
7  Q   Do you have any questions, sir?
8  A   No, sir.
9  Q   Have you ever had your deposition taken
10      before?
11 A   I've never done a deposition other than, you
12      know, what the investigator did four or five
13      years ago.
14 Q   Okay.
15 A   I don't think that was a deposition.
16 Q   Okay. All right. Well, very well. And if
17      you would, for the Record, tell us your
18      full, legal name, sir.
19 A   Arthur Lee Powers.
20 Q   L-E-E?
21 A   L-E-E, right, Powers.
22 Q   And where do you live, sir?
23 A   You want the physical address?

Page 7

1  Q   Yes, sir.
2  A   134 Rountree, R-O-U-N-T-R-E-E, one word,
3       Drive, Valley Grand, Alabama, 36703.
4  Q   3-6...
5  A   703.
6  Q   Rountree does not have a D in it?
7  A   No.
8  Q   Okay. And where is this town? I'm not
9       familiar with Valley Grand.
10 A   It adjoins Selma to the north.
11 Q   Okay. Nearby Selma.
12 A   Right.
13 Q   Dallas County.
14 A   Uh-huh.
15 Q   Okay. You was asking about physical
16      address. Do you have any other addresses
17      that someone can find you through?
18 A   No, other than work.
19 Q   Okay. Where do you presently work?
20 A   I work with the USDA Rural Development in
21      Camden.
22 Q   Do you expect to be at that location for
23      sometime now in the future?

Page 8

1  A   Expect to be.
2  Q   Okay.
3  A   They're talking about reorganization, but
4       other than that...
5                (At which time, there was an
6                off-the-Record discussion.)
7  Q   Mr. Powers, if you would, give us your
8       Social Security number, please, sir.
9  A   Okay. 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.
10 Q   Date of birth, please, sir.
11 A   9/26/1956.
12 Q   Okay. And you currently work with the USDA
13      in what capacity?
14 A   I'm an area specialist.
15 Q   And what in the world is that, please, sir?
16 A   We work the community, business programs,
17      the multi-family housing program, basically.
18 Q   When did you acquire that job with the USDA?
19 A   I believe it was '95, '96, somewhere in
20      there.
21 Q   What position did you hold before becoming
22      an area specialist?
23 A   I was a county supervisor.

Page 9

1  Q   What county, please, sir?
2  A   Well, I was working -- my duty station was
3       in Camden, and I think out of that office, I
4       worked Dallas and Wilcox and Perry, I
5       believe. You know, part of the time, I was
6       also working Lowndes County. It's been so
7       long ago it's hard for me to remember all,
8       but at one point in time, I was acting in
9       Lowndes County.
10 Q   So this would have been the time period of,
11      say, '95 through '96, maybe even into '97.
12 A   I really don't remember the exact dates.
13 Q   Well, I'm not asking for exact dates. I'm
14      just talking about in that time frame
15      approximately.
16 A   Yes, sir, I guess it was. It was somewhere
17      in that range.
18 Q   Okay.
19 A   I was thinking it was a little earlier than
20      that, but maybe it wasn't.
21 Q   Off the Record, you mentioned something
22      about an -- that you may be going through,
23      in the future, another reorganization with

3 (Pages 6 to 9)

Page 10

1  the USDA. Do you recall a reorganization
2  that took place in the time frame of
3  '96-'97?
4  A   Yes, sir.
5  Q   Okay. And part of that reorganization was
6  closing certain offices and merging those
7  offices with other offices.
8  A   That's correct.
9  Q   And do you know if the Lowndes office,
10  Lowndes County office, that was located in
11  Hayneville, Alabama, was closed?
12  A   Yes, sir, it was.
13  Q   Okay. At the time of its closing, do you
14  know if you were the county supervisor?
15  A   I believe I was, yes, sir.
16  Q   Okay. And do you know if the personnel that
17  was left and remaining in that office were
18  assigned or transferred to the Luverne
19  office? I think that's Crenshaw County.
20  A   That's correct.
21  Q   Okay. At some point, did you have county
22  supervisor responsibilities or duties at
23  Crenshaw County?

Page 11

1  A   For a few months, yes, sir.
2  Q   For a few months. Okay. All right. How
3  long do you think you served as the county
4  supervisor at Lowndes County office?
5  A   Six months to a year, somewhere in that time
6  period.
7  Q   And when you were doing the Lowndes County
8  office supervision duties as a county
9  supervisor, you were also supervising what
10  counties?
11  A   Wilcox, Dallas, and --
12  Q   Perry?
13  A   I think it was Perry.
14  Q   Okay.
15  A   It could have been -- yes. Maybe it was
16  just Wilcox and Dallas at that time. I
17  don't remember if Perry was in there.
18  Q   Do you recall who was your predecessor at
19  Lowndes County as a county supervisor?
20  A   Carmel McAlpine.
21  Q   Okay. Do you recall a Quinton Harris being
22  involved in that county as a county
23  supervisor?

Page 12

1  A   In Lowndes? No, sir.
2  Q   Was he ever involved in the Crenshaw office
3  as county supervisor?
4  A   He was, I think, for -- well, he was there
5  at the time, I think, that they closed the
6  Lowndes and combined it. I believe he was
7  there. If I remember right, I think he got
8  a position in the state office, and I was
9  there for two or three months.
10  Q   So if I understand the scenario, you were
11  the county supervisor after Mr. McAlpine,
12  and then the Lowndes County office closed
13  and was merged with the Crenshaw County
14  office Luverne. And at that time,
15  Mr. Quinton Harris was the county
16  supervisor, and then you were reassigned
17  again to be the county supervisor over the
18  same people that merged from Lowndes.
19  A   That's correct.
20  Q   In other words, you supervised these same
21  people again or some of the same.
22  A   Plus some additional, yes.
23  Q   Yeah, some of the same people, including

Page 13

1  Lisa McCall; correct?
2  A   That's correct.
3  Q   When she was transferred to Luverne,
4  Crenshaw County office; correct?
5  A   That's correct.
6  Q   Okay. When were you first hired with the
7  USDA?
8  A   April of 1980.
9  Q   And at the point you were hired in 1980, did
10  you have a degree or degrees?
11  A   I've got a degree from Auburn University.
12  Q   When did you get it, sir?
13  A   1979.
14  Q   What was it in, sir?
15  A   Ag Business and Economics.
16  Q   Have you, since that date, acquired any
17  other degrees?
18  A   No, sir.
19  Q   Okay. And that was a four-year BS degree?
20  A   Correct.
21  Q   And so, basically, upon graduating from
22  college, am I correct you've been
23  continuously employed by the USDA?

4 (Pages 10 to 13)

Lisa McCall
Arthur Powers

V.

Mike Johanns
March 29, 2007

Page 14

1  A  No. I worked for eight or ten months for
2     the Alabama Co-op System.
3  Q  And then acquired the job with the USDA.
4  A  That's correct.
5  Q  Have you been continuously employed since
6     April 1980 with the USDA?
7  A  Yes, sir.
8  Q  Have you ever had any disciplinary action
9     against you, ever, in any position you've
10    ever held?
11 A  No, sir.
12 Q  And when I say disciplinary action, I'm
13    talking about write-ups, particularly,
14    suspensions, threats of termination,
15    anything.
16 A  No, sir.
17 Q  No. Other than Ms. McCall raising questions
18    about your treatment of her, have you ever
19    had any EEOC charges that directly involved
20    you, sir?
21 A  No, sir.
22 Q  How did you take it when you found out that
23    Ms. McCall had alleged that you had treated

Page 15

1     her poorly, et cetera, because of her race?
2  A  I was surprised.
3  Q  Were you upset?
4  A  No, sir.
5  Q  Not upset?
6  A  Uh-uh.
7  Q  Why not, sir?
8  A  It's nothing to be upset about.
9  Q  When did you first learn that Ms. McCall had
10    raised issues of you treating her because of
11    her race differently or badly because of her
12    race, and we'll go into the specific
13    charges. I'm just generalizing now.
14 A  I actually learned that she mentioned me
15    specifically about two or three weeks ago
16    when I found out about this deposition.
17 Q  Are you telling the Court that you didn't
18    know about it before then?
19 A  I knew she had a suit, but I didn't know it
20    alleged me specifically.
21 Q  You've had training in EEO matters as a
22    supervisor, have you not?
23 A  That's correct.

Page 16

1  Q  And you understand that it's illegal under
2     the Federal statutes for an individual
3     that's an employee to be treated
4     differently, disciplined, et cetera, because
5     of his or her race. You know that as the
6     law.
7  A  I do.
8  Q  And you knew that for many years, I'm sure.
9  A  Yes, sir.
10 Q  You knew that in the early '90s, I'm sure,
11    didn't you?
12 A  Yes, sir.
13 Q  Okay. And you've been in a supervisory
14    position since what date with the USDA?
15 A  Probably 1986, I would think.
16 Q  Okay. What was that position, please?
17 A  It was county supervisor.
18 Q  And I'm sure since 1986 you've been aware of
19    what we call title seven that you can't
20    discriminate against blacks because of their
21    race or anybody because of their race.
22    You've been aware of that, haven't you,
23    since you've been a county supervisor?

Page 17

1  A  Yes, sir.
2  Q  And I'm assuming, and I'm pretty sure you've
3     had training by the USDA or training that
4     USDA sent you to that would explain to you
5     some of the basics and fundamentals of that
6     law.
7  A  Yes, sir.
8  Q  To help you not to do that; right?
9  A  That's correct.
10 Q  Okay. All right. And you understand that a
11    Federal employee doesn't file a lawsuit
12    immediately upon any allegations that he or
13    she may have of race discrimination. They
14    have to go through administrative process;
15    correct?
16 A  Yes, sir.
17 Q  And I assume that you learned about this
18    case long before this lawsuit was filed, am
19    I correct?
20 A  I learned about it whenever they were doing
21    the investigation, yes, sir.
22 Q  Okay. Well, that's not -- okay. That's
23    some time ago; right?

Boggs Reporting & Video
334.264.6227/www.boggsreporters.com

Lisa McCall
Arthur Powers

V.

Mike Johanns
March 29, 2007

---

Page 18

1  A  Right.
2  Q  And, in fact, some time ago, you gave an
3     affidavit to an EEO investigator, years ago.
4  A  That's right.  Yes, sir.
5  Q  Okay.  And, in fact, did you not know about
6     her allegations even long before that;
7     months, if not years, before that?
8  A  I didn't know about them specifically
9     concerning me.
10 Q  Okay.  Did you know about them generally
11    concerning you, that she and -- as early as
12    1996 had complained about you specifically
13    naming you as an individual who had
14    discriminated against her?
15 A  No, sir, I did not know that.
16 Q  You didn't know about that.
17 A  Uh-uh.
18 Q  Let me show you an exhibit that's been
19    marked 14.
20        (The referred-to document was
21         previously marked as
22         Plaintiff's Exhibit No. 14.)
23 Q  If you'd read through that, please, sir...

---

Page 19

1  A  You want me to just start with the text?
2  Q  Not aloud, just to yourself so you can
3     become familiar with it.
4  A  Okay.  Okay.
5  Q  Okay, sir.  Have you had a chance to review
6     that document, Plaintiff's 14?
7  A  Yes, sir.
8  Q  Mr. Powers, this is a letter to the USDA
9     Office of Civil Rights, employment
10    complaints division, dated December 20,
11    1996.  And you see in this document that
12    Ms. McCall has sent to this office, it
13    directly names on the front page your name.
14    And I'm quoting, it says, here we encounter
15    constant discriminatory harassment from
16    Mr. Arthur L. Powers.  Would she be
17    referencing you?  That would be Arthur Lee
18    Powers, wouldn't it?
19 A  That's correct.
20 Q  Okay.  And, sir, do you know, or do you
21    recall in a time frame related to this
22    document whether or not you learned about
23    this document?

---

Page 20

1  A  Can you ask that again, please?
2        (At which time, the Reporter
3         read the requested portion.)
4  A  Like I said, it was two or three weeks ago.
5  Q  The first time you learned about, okay --
6     about this document.
7  A  Yes, sir.
8  Q  Without having you to testify about what was
9     said back and forth between you and the US
10    Attorney's Office counsel, did you first
11    learn about this document at a process of
12    meeting with this office?
13 A  With the US Attorney's Office?
14 Q  Yes.
15 A  Yes, sir.
16 Q  Okay.  Do you know a Romaine L. White, an
17    EEO person that worked with the USDA?
18 A  If I'm not mistaken, she was the employee
19    that investigated it four or five years ago,
20    whenever that was.
21 Q  Okay.  She was the EEO investigator assigned
22    to this case that Ms. McCall started.
23 A  I believe she was, yes, sir.

---

Page 21

1  Q  The administrative case before the lawsuit
2     was filed.
3  A  Correct.
4  Q  Okay.  And she, I think, came out of or
5     lived in Gray, Louisiana.  Do you recall?
6  A  I'm in the sure where she lived.
7  Q  Okay.  All right.  We've got her address at
8     308 Melanie Lane, Gray, Louisiana.  Well,
9     you don't recognize having seen Plaintiff's
10    Exhibit 14 before, what, a couple of weeks
11    ago or several weeks ago when you started
12    talking to the US Attorney's Office or
13    seeing it in your office.
14 A  No, sir.
15 Q  You're agreeing with me, you haven't seen it
16    before.
17 A  I haven't seen it before.
18 Q  Okay.  Well --
19        MR. ATCHISON:  Let's go off
20    the Record for a second.
21        (At which time, there was an
22         off-the-Record discussion.)
23 Q  Mr. Powers, what I'm doing now is I've got a

---

6 (Pages 18 to 21)

Lisa McCall                                    V.                                    Mike Johanns
Arthur Powers                                                                        March 29, 2007

Page 22

1    document that I'm having you to look at now
2    that's in as an exhibit more than once in
3    our case. The first time it's an exhibit,
4    it's Exhibit A-1, which is within
5    Plaintiff's Exhibit 20, which is the
6    investigative record, and your counsel has
7    just given you a copy of that. I also have
8    it in my hand as previously marked as
9    Exhibit 17, Plaintiff's Exhibit 17. And,
10   basically, what I'd like for you to do is,
11   again, with this document, review this
12   document and read it to yourself so you will
13   be familiar with this document.
14   A    Okay.
15   Q    Okay. Now, comparing the exhibit that
16   you're looking at, Exhibit A-1 -- and I'm
17   going to give you Plaintiff's Exhibit 17,
18   which I'm sure is the identical document,
19   just different markings for the exhibit
20   number. If you would compare that document
21   to Plaintiff's Exhibit 14, please, sir, and
22   particularly look at the headings entitled
23   harassment included or harassments include.

Page 23

1    There's a one through three. Do you see
2    overlapping these charges that Ms. McCall
3    has raised?
4    A    Well, I mean, one and two are the same.
5    Three is not the same.
6    Q    Okay. Number three is the same as number
7    four. Fourteen's three is the same as
8    number four or 17?
9    A    That's correct.
10   Q    Okay. Certainly, you would agree on the
11   Record, would you not, that Plaintiff's
12   Exhibit 17's complaints, albeit they may be
13   numbered differently, raise the same or
14   similar issues by Ms. McCall against you?
15   A    Yes, sir.
16   Q    Okay. And at some point in the official
17   investigation of this Exhibit A-1, and we've
18   also marked it as Plaintiff's 17, an
19   investigation started ensuing, am I correct,
20   EEOC investigation started; correct?
21   A    There was an investigation.
22   Q    So, certainly, by the time that Exhibit A-1
23   and Plaintiff's Exhibit 20 -- and we've also

Page 24

1    marked it 17, Plaintiff's 17, you were
2    familiar with the fact that Ms. McCall had
3    substantial complaints of race
4    discrimination against you; correct?
5    A    No, sir. I wasn't aware that it was
6    directly against me.
7    Q    Okay. All right. Let's do this. Once
8    Ms. McCall had sent in to the USDA this
9    Exhibit A-1, which is also Plaintiff's
10   Exhibit 17, you would agree that an
11   investigation started formally at that
12   point, at least at that point; right?
13   A    Yes, sir.
14   Q    Okay. And, in fact, you have the US
15   Attorney's copy of the binder of the exhibit
16   20 that we have, the big, thick,
17   investigative file. You have that there in
18   front of you.
19   A    Yes, sir.
20   Q    Okay. Your affidavit was taken, your
21   statement was taken in this case.
22   A    Yes, sir.
23   Q    Okay. Are you testifying under Oath today

Page 25

1    that you did not know about Ms. McCall's
2    allegations of race discrimination, et
3    cetera, racial harassment, et cetera,
4    against you until after the date of
5    April 20th, 1998, the date of this letter
6    that she sent in?
7             MR. NEELEY: Object to the
8    form, but you may answer. Go
9    ahead. You can answer.
10   A    I wasn't aware of it until they did the
11   investigation, whatever date that was.
12   Q    Okay. All right, sir. And in the
13   investigative process, did you talk to
14   Ms. Barbara Price?
15   A    No.
16   Q    She never talked to you.
17   A    No, sir.
18   Q    In the investigative process, did you ever
19   talk to Mr. Horne --
20   A    No, sir.
21   Q    -- the state director?
22   A    No, sir.
23   Q    In the investigative process, who did you

Lisa McCall                                    V.                                    Mike Johanns
Arthur Powers                                                                        March 29, 2007

Page 26

1   talk to?
2   A   I talked to the investigator.
3   Q   Okay.  And was that the Romaine White woman
4       that I mentioned her name earlier?
5   A·  Yes, sir.
6   Q   Ms. White was the EEO investigator that
7       talked to you.
8   A   I believe she was, yes.
9   Q   Okay.  Well, regardless of the investigative
10      process, did you ever talk to anyone other
11      than Ms. White about any allegation that you
12      ever heard or knew or thought that
13      Ms. McCall had made against you regarding
14      race?
15  A   I don't recall talking to anybody, no, sir.
16  Q   All right, sir.  Looking at Exhibit A-1 of
17      Plaintiff's 20, and, like I say, there's
18      also Plaintiff's 17 -- it's the same
19      document -- look at paragraph one.  It says,
20      quote, being assigned Ms. Williams' duties
21      because she did not want to perform them.
22      This is under the harassments.  Do you see
23      that statement?

Page 27

1   A   Yes, sir.
2   Q   Okay.  Who is Ms. Williams that Ms. McCall
3       is referencing?
4   A   That would be Patsy Williams.
5   Q   Okay.  Patsy Williams is white or black?
6   A   She's white.
7   Q   Would you deny that allegation by
8       Ms. McCall?
9   A   Yes.
10  Q   Would you tell the Court what was your
11      version of that scenario?
12  A   I don't remember assigning her any of
13      Ms. Williams' duties.
14  Q   Okay.  Sir, I've looked at your affidavit,
15      and your affidavit has a lot of I don't
16      recall, I don't remember statements in it.
17      During this time frame of 1996, 1997
18      involving these allegations by Ms. McCall
19      against you of race discrimination, racial
20      harassment, et cetera, do you have a very
21      clear recollection of that time period?
22  A   It was a long time ago.
23  Q   So the answer would be no, you do not have a

Page 28

1   very clear recollection of it.
2   A   It's not perfectly clear, no.  I mean, it's
3       been ten years.
4   Q   Okay, sir.  And I believe your affidavit was
5       taken, I want to say, in 2001.  Let me get
6       to it if I could.  On 1/30/2001, at that
7       time, that was closer in time to the
8       1996/'97 time period where you supervised
9       Ms. McCall.  Did you have a very clear
10      recollection of the allegation time period
11      that Ms. McCall alleged you racially
12      discriminated against her at that time?
13  A   It would have probably been better than it
14      is now, yes, sir.
15  Q   Well, let's go through your affidavit first.
16      I believe you testified in paragraph two in
17      your affidavit that you were only in the
18      office with Ms. McCall a few days a week.
19  A   That's correct.
20  Q   That's paragraph two of your affidavit.
21  A   That's correct.
22  Q   That's Exhibit F-3 of the investigative
23      report that we've marked Exhibit 20.  Okay.

Page 29

1       And look at paragraph three, please, sir.
2   A   Okay.
3   Q   It says the investigator has advised me that
4       Lisa McCall contends that I harassed her by
5       using a different tone of voice when I spoke
6       to her and Arlesa Hunter as compared to the
7       way I spoke to white employees.  Do you see
8       that statement, quote, unquote?
9   A   Yes, sir.
10  Q   And the next thing you say is I do not
11      remember a different tone of voice.
12  A   Yes, sir.
13  Q   Okay.  So your memory was not real clear
14      then, am I correct about this scenario?
15          MR. NEELEY:  Object to the
16      form.
17  A   What do you mean my memory wasn't clear?
18  Q   Well, you didn't remember using a different
19      type.  If you remember, you would have
20      stated either you used a different tone of
21      voice, or you didn't.
22          MR. NEELEY:  Object to form.
23      Argumentative.

8 (Pages 26 to 29)

Lisa McCall                                  V.                      Mike Johanns
Arthur Powers                                                       March 29, 2007

Page 30

1   Q   Okay. All right. The next sentence in
2       paragraph three says, I did raise my voice
3       once to Lisa McCall in the Hayneville office
4       when she was ranting and raving about a
5       borrower, and saying that she, McCall, was
6       going to beat the borrower up. Do you see
7       that statement?
8   A   Yes, sir.
9   Q   Did you discipline Ms. McCall for that?
10  A   No, sir.
11  Q   Wouldn't you agree that to threaten to beat
12      up a borrower would be a serious infraction
13      that would be deserving of discipline?
14  A   If I felt it was very serious, yes, sir.
15  Q   Well, you're not to treat the consumers, the
16      borrowers, with disrespect, are you, in the
17      offices of the USDA, am I correct?
18  A   You're correct.
19  Q   And an employee is not to threaten a
20      borrower in the USDA office, am I correct?
21  A   That's correct.
22  Q   And would you not consider beating up a
23      borrower a threatening scenario to that

Page 31

1       borrower?
2   A   The borrower was not present at the time she
3       was making these statements.
4   Q   Okay. All right. Well, certainly you
5       consider this to be very unprofessional
6       conduct on Ms. McCall's part if this,
7       indeed, had happened.
8   A   Yes, sir.
9   Q   Okay. All right. Did you do an
10      investigation about this matter against
11      Ms. McCall?
12  A   No, I didn't.
13  Q   Okay. Did you do any write up whatsoever or
14      do any memos, memos to the record, et
15      cetera, about this incident.
16  A   I don't remember doing any.
17  Q   Okay. All right. Did you report it to your
18      supervisor that one of your employees had
19      threatened to beat up a borrower?
20  A   I may have talked with him about it. I
21      don't --
22  Q   Don't recall?
23  A   I don't recall specifically that I did.

Page 32

1   Q   You never got any memo back from him, did
2       you, about it, did you?
3   A   I don't think so.
4   Q   Okay. And Mr. Sasser is no longer with us.
5       So we can't ask him about it, can we?
6   A   No, sir.
7   Q   Okay. Did you call human resources and talk
8       to Barbara Price or anybody in her office
9       about this allegation here?
10  A   No.
11  Q   So there's no paper trail or e-mails or
12      anything to prove this statement, am I
13      correct, on your part?
14  A   That's correct.
15  Q   And when you admitted in here that you did
16      raise your voice, when you say raise your
17      voice, what do you mean in that respect,
18      sir? The tone and the --
19  A   The tone was just raised.
20  Q   And the volume was raised beyond a
21      conversational volume and tone.
22  A   Yes.
23  Q   Was that an unprofessional act on your part,

Page 33

1       sir?
2   A   It could have been.
3   Q   Okay. And you make the next statement,
4       quote, she, meaning Ms. McCall, was flying
5       off the handle, and I told her to shut up,
6       that she wasn't going to do anything,
7       period, end of quote. You've got that
8       statement in front of you.
9   A   Yes, sir.
10  Q   Did you consider it professional on your
11      part to tell an employee to shut up?
12  A   It wouldn't be professional, but at the
13      time, under the circumstances...
14  Q   All right. The next statement says, I do
15      not remember telling her if she talked to
16      the borrower she would be sorry, end of
17      quote. Do you see that statement?
18  A   Yes, sir.
19  Q   So wouldn't you agree that since you do not
20      remember that, that if her testimony was
21      that you did say that and you threatened her
22      about that, that she'd be sorry, you would
23      have no way of proving her side of that

9 (Pages 30 to 33)



Page 34

1    scenario; correct?
2              MR. NEELEY: Object to form.
3    A    That's correct.
4    Q    Okay. The next statement in paragraph three
5         it says, I may have had more conversations
6         with the white employees, but I never
7         verbally harassed or used an angry tone
8         toward Lisa McCall or Arlesa Hunter, end of
9         quote. Now, you did know then and, of
10        course, you know now that both of those
11        employees were black individuals.
12   A    Yes, sir.
13   Q    What do you mean by the fact that you said I
14        may have had more conversation with white
15        employees? What do you mean by that, or
16        what did you mean by that when you did your
17        affidavit?
18   A    They talked to me more than Lisa and Arlesa
19        did.
20   Q    Did it ever make you wonder why the white
21        employees were talking to you more than
22        these two black employees?
23   A    No.

Page 35

1    Q    Let me ask you a question. When was this?
2         Was this in the Luverne office, or was this
3         in the Hayneville office that you're making
4         reference to in this statement?
5    A    It would probably have been in both.
6    Q    Okay. And what was the ratio of whites to
7         blacks in those offices? Were they the only
8         two blacks, or were there other blacks?
9    A    Well, they were the only two.
10   Q    Okay. Did it ever occur to you that you
11        made them feel discriminated against?
12   A    No.
13             MR. NEELEY: Object to the
14         form.
15   Q    Did it ever occur to you that they didn't
16        talk as much with you because --
17             MR. NEELEY: Object to form.
18   Q    -- they felt like they were being
19        discriminated against by you?
20             MR. NEELEY: Object to form.
21   A    It didn't occur to me, no, sir.
22   Q    Did it ever occur to you that they felt that
23        you were treating them differently because

Page 36

1    of the color of their skin?
2    A    No.
3              MR. NEELEY: Object to form.
4         And my objections are based on the
5         they reference. Arlesa Hunter is
6         not a party to this lawsuit.
7         Questions are very restricted to
8         those related to Ms. McCall, the
9         named Plaintiff.
10   Q    I'll ask the same questions regarding
11        Ms. McCall. Did it ever occur to you that
12        she had less conversations with you because
13        you were discriminating against her --
14   A    No.
15   Q    -- in the work place.
16             MR. NEELEY: Object to the
17         form again. It assumes facts not
18         in evidence.
19   Q    Look at paragraph four, sir, if you would.
20        You say, quote, I do not remember telling
21        Ms. McCall or Arlesa Hunter to move heavy
22        furniture or heavy files, end of quote. If
23        Ms. McCall stated that she remembered quite

Page 37

1         clearly that you required her to do that,
2         would you have any proof to the contrary?
3    A    No, sir.
4    Q    Okay. You further state in paragraph four,
5         quote, if the work needed to be done, I
6         would have told whomever was available to do
7         it. Was it your mind set during that time
8         frame that Ms. McCall was available to do
9         it?
10   A    Well, she was an employee. I assume she
11        was.
12   Q    Okay. And was she the only person available
13        to do the moving of heavy furniture or heavy
14        files?
15   A    No.
16   Q    Let me ask you a question: When Ms. McCall
17        was transferred to the Luverne office, would
18        it be correct that she did not have a
19        computer?
20   A    I believe that's correct.
21   Q    And I believe you were not initially there
22        at the Luverne office when the transfer was
23        made from the Hayneville office to the

Boggs Reporting & Video
334.264.6227/www.boggsreporters.com

Lisa McCall                              V.                                Mike Johanns
Arthur Powers                                                          March 29, 2007

Page 38

1   Luverne office of the employees that were
2   formerly at the Hayneville office, am I
3   correct?
4   A   That's correct.
5   Q   Was that Mr. Quinton Harris that was there?
6   A   I believe it was.
7   Q   And how long was he there before you came
8   back to supervise these employees?
9   A   Four or five months, I would think.
10  Q   Okay. All right. And you came in, and they
11  did not have computers, the two black
12  individuals; correct?
13  A   That's correct.
14  Q   What efforts did you make to remedy the
15  situation that was occurring where they did
16  not have computers?
17  A   I didn't make any effort to do anything.
18  Q   Okay. There was a white employee that came
19  from Hayneville, wasn't there?
20  A   Yes, sir.
21  Q   And what was her name?
22  A   Patsy Williams.
23  Q   I assume that she got a computer, didn't

Page 39

1   she?
2   A   I believe she had one, yes, sir.
3   Q   Okay. Did that not strike you that that was
4   a problem that needed to be remedy, that the
5   only two black employees in that office
6   didn't have computers, but, yet, the white
7   employee that was transferred somehow or
8   another got a computer.
9            MR. NEELEY: Object to form.
10  A   It didn't occur to me, no, sir.
11  Q   That that was a problem.
12  A   Uh-uh.
13  Q   Would you agree that Ms. McCall needed a
14  computer to do her work at the USDA in
15  Luverne?
16  A   Yes, she probably -- to do everything, yes.
17  Q   Okay. Well, how many people shared her job
18  description at the Luverne office?
19  A   I don't really remember what their specific
20  job descriptions were.
21  Q   Weren't there several?
22  A   Right.
23  Q   Half a dozen or so people.

Page 40

1   A   Right.
2   Q   And the line up was all the whites had
3   computers, but none of the blacks did, am I
4   right?
5   A   That's correct.
6   Q   Okay.
7   A   They could have had use of them, but they
8   didn't have any specifically.
9   Q   The whites had their own computers to
10  accomplish their work, and none of the
11  blacks. The two black women didn't have
12  computers, but all the whites had computers,
13  am I correct about that?
14  A   That's correct.
15  Q   And, in fact, the whites had desks or
16  workstations.
17  A   That's correct.
18  Q   And I believe, if I'm not correct, the two
19  blacks had temporary tables or whatever to
20  sit at.
21  A   That's correct.
22           MR. NEELEY: Object to form.
23  Q   All the whites had telephones, did they not?

Page 41

1   A   I believe they did, yes.
2   Q   And neither of the two blacks had telephones
3   to accomplish their jobs, am I correct about
4   that?
5   A   I'm not sure about that.
6            MR. NEELEY: Object to form.
7   Q   And at some point, didn't you complain about
8   Ms. McCall not doing her work?
9   A   I don't believe I complained about it. I
10  may have acknowledged that she wasn't.
11  Q   Without a telephone and without a computer,
12  it's pretty hard for her to get her work
13  accomplished, wasn't it, in hindsight?
14  Would you agree with that?
15           MR. NEELEY: Object to form.
16  A   Yes.
17  Q   Okay. Now, I know -- I understand that you
18  were not at the Luverne office when the
19  initial transfer was made from Hayneville to
20  the Luverne office of these employees, but
21  once you got there, you were aware that the
22  black employees did not have computers and
23  did not have telephones and did not have

11 (Pages 38 to 41)

Page 42

1  permanent workstations. What efforts did
2  you make to get them computers and
3  telephones?
4          MR. NEELEY: Object to form.
5          Asked and answered.
6  Q  What effort did you make?
7          MR. NEELEY: Object to form.
8  A  I don't recall making any effort to do that.
9  Q  Did you ever call Ms. Price about that
10  matter, whether you were making an effort to
11  or not? Did you ever call and say that we
12  have a problem here?
13          MR. NEELEY: We'll stipulate
14          they were not given equipment.
15          They were not given a phone. They
16          had work tables -- and you tell me
17          if I state it incorrectly -- by
18          Mr. Powers. We'll stipulate that
19          you came into that office in
20          approximately March; is that
21          correct?
22          THE WITNESS: That's correct.
23          MR. NEELEY: Okay. And that

Page 43

1  you were there for approximately
2  six to eight weeks prior to the
3  RIF; is that correct?
4          THE WITNESS: That's about
5          right.
6          MR. NEELEY: And we'll
7          stipulate as well at the time you
8          came there, you were aware of the
9          RIF; is that correct?
10          THE WITNESS: That's correct.
11          MR. NEELEY: Okay.
12  Q  Let me ask you a question, Mr. Powers.
13  There's been allegations by Ms. McCall that,
14  not only you treated the black employees
15  differently, but you treated borrow
16  applicants and visitors that came in the
17  office differently based on their skin
18  color. Do you deny that?
19          MR. NEELEY: Object to the
20          form.
21  A  I don't believe I did.
22  Q  Okay. Do you recall specifically whether
23  you ever mistreated or was unprofessional to

Page 44

1  black borrowers that came in at either of
2  those offices, the Hayneville office or the
3  Luverne office?
4  A  I don't believe I was, no.
5  Q  She alleges specifically, quote, he was
6  often rude and impolite, which was shown
7  through his cold and harsh voice. It was
8  shown when blacks asked information,
9  especially when they asked to explain
10  questions on loan applications. Do you deny
11  that, sir, or do you just not recall?
12  A  Well, I mean, I don't consider it cold and
13  harsh. She may have.
14  Q  Okay. Did you ever raise your voice against
15  black applicants at either of those two
16  locations, the Luverne or the Hayneville
17  office?
18  A  Not to my knowledge.
19  Q  Not to your recollection.
20  A  Right.
21  Q  Did you ever have any black borrowers or
22  applicants that stated to you, in essence,
23  that they were adults and were not to be

Page 45

1  talked to in a rude or impolite manner?
2  A  I don't recall ever hearing that.
3  Q  Okay. All right.
4          MR. ATCHISON: Can we take a
5          short break?
6          (At which time, a break was
7          held.)
8  Q  Can you say that you're absolutely sure you
9  have never treated black borrowers with
10  disrespect, raised your voice, or said rude,
11  mean, hurtful things to black borrowers in
12  the course of your supervision at the USDA
13  offices in Luverne or Hayneville? Can you
14  testify under Oath that you've never --
15  A  I have never done that.
16  Q  You can testify under Oath that you have
17  not.
18  A  Uh-huh.
19  Q  Okay. Do you ever recall any borrowers
20  being so upset with you that they raised
21  their voice or cursed or yelled at you at
22  either of those offices? Do you recall
23  anything like that?

12 (Pages 42 to 45)



Page 46

1   A   No, sir.
2   Q   Look at paragraph 11 of your affidavit, sir.
3       In it, you said when Lisa McCall worked at
4       Hayneville, she was prompt and came to work
5       as she was supposed to, but she had problems
6       calculating and tracking payments and
7       writing letters, end of quote. Do you see
8       that statement?
9   A   Yes, sir.
10  Q   Did you ever write her up for any of that?
11      Did you ever discipline her for any of that,
12      any problems that she had calculating and
13      tracking payments and writing letters?
14  A   I don't recall any discipline.
15  Q   All right. Do you recall on any performance
16      appraisals if you ever addressed those
17      issues regarding her?
18  A   I may have discussed them with her.
19  Q   I'm talking about written performance
20      appraisals.
21          MR. NEELEY: Do you recall
22      ever doing any written, official
23      performance reviews of

Page 47

1       Ms. McCall's work?
2           THE WITNESS: I would have
3       probably done one, but I don't --
4       you know, those were not really
5       addressed specifically unless they
6       were unsatisfactory. So I don't
7       think it would have been --
8           MR. ATCHISON: Let me keep
9       on, Rand.
10          MR. NEELEY: Give me one
11      second, if you would.
12          MR. ATCHISON: Sure.
13          MR. NEELEY: I'm sorry,
14      y'all. Go ahead, Gary. Thank
15      you.
16          MR. ATCHISON: Let's go off
17      the Record.
18          (At which time, there was an
19          off-the-Record discussion.)
20  Q   Sir, look at paragraph 12 of your affidavit.
21      Do you see it? It says, quote, after the
22      transfer to Luverne, Lisa McCall did not do
23      anything but sit at her table all day,

Page 48

1       quote, unquote. Sir, can that be a truthful
2       statement? Today, upon reflection, you know
3       that she did work.
4           MR. NEELEY: Object to form.
5   A   If she did, it was very little. That was
6       after she got to Luverne.
7   Q   You know that she did work. It's not if.
8   A   She was at work, yes.
9   Q   She did work. So that statement is
10      incorrect and false.
11          MR. NEELEY: Object to form.
12  A   She was at work. As far as doing physical
13      work...
14  Q   Okay. So that would be work, and that would
15      be contrary to this statement in your
16      affidavit on paragraph 12; correct?
17          MR. NEELEY: Object to form.
18  A   There's a difference between actually
19      working and being at work.
20  Q   Your statement, quote, after transfer to
21      Luverne, Lisa McCall did not do anything but
22      sit at her table all day, quote, end quote;
23      correct?

Page 49

1   A   That's correct.
2   Q   She did work while she was at Luverne.
3           MR. NEELEY: Object to form.
4       Argumentative.
5   Q   Did she not?
6           MR. NEELEY: Object to form.
7           MR. ATCHISON: I want to find
8       out what work she did.
9           MR. NEELEY: Well, ask him
10      what work did she do.
11          MR. ATCHISON: Rand, I'm
12      going to conduct my questions the
13      way I want to.
14          MR. NEELEY: I apologize, but
15      I'm tired of the argumentative,
16      repetitive questions.
17          MR. ATCHISON: I'm not.
18      That's the next question, Rand.
19      I'm not arguing with this client.
20      I'm trying to ascertain the facts.
21  Q   What work did she do, sir, during the time
22      that you observed her working at Luverne
23      when you were her supervisor?

13 (Pages 46 to 49)

Page 50

1   A   I'm not aware that she did any.
2   Q   You're not aware. Well, as a supervisor,
3       you were due to observe and supervise
4       employees at each county office that you
5       were assigned during that time period;
6       right?
7   A   Yes, sir.
8   Q   That included the Luverne office.
9   A   Yes, sir.
10  Q   Are you testifying that when you observed
11      her, she never was doing anything during the
12      Luverne time period?
13  A   That's correct.
14  Q   Did you ever write her up for not doing
15      anything?
16  A   No.
17  Q   Did you ever call human resources and say
18      this woman is not doing anything. I need to
19      take some action?
20  A   No.
21  Q   Did you ever talk to any supervisors of
22      yours about Lisa McCall and whether or not
23      she was accomplishing the mission assigned

Page 51

1       to her?
2   A   If I did, it would have been John Sasser.
3   Q   Did you ever talk to her about the work she
4       was accomplishing?
5   A   Not that I recall.
6   Q   Why not, sir? You're her supervisor.
7   A   Because everybody knew that there was going
8       to be a RIF, and that they were going -- her
9       and Arlesa were going to be separated and
10      one of the other employees.
11  Q   What other employee is going to be
12      separated?
13  A   I can't recall her name.
14  Q   Was it Ms. Davenport, Sonya Davenport?
15  A   That's correct.
16  Q   Okay. You used an example here. For
17      example, I asked Lisa McCall and Arlesa
18      Hunter to integrate Lowndes County files
19      into the existing files. They did not do
20      any of the work while I was there, end of
21      quote.
22  A   Correct.
23  Q   Were there any other examples other than

Page 52

1       that example that you know of referencing
2       the work that you allege that Ms. McCall did
3       not accomplish at Luverne, at that office?
4   A   I don't know of any others.
5   Q   I see paragraph 13 it says I do not
6       discriminate against Lisa McCall on the
7       basis of her race and color. Do you see
8       that?
9   A   Yes, sir.
10  Q   Can you make the same statement that you did
11      not harass Lisa McCall on the basis of her
12      race and color?
13  A   I did not harass her on the basis of her
14      race or color.
15  Q   Can you also testify that you did not
16      involve yourself in any -- under Oath, that
17      you did not involve yourself in any act of
18      retaliation against Lisa McCall due to the
19      fact that she had made complaints, one of
20      which you've seen in this file, excuse me,
21      the letter of April 20th, 1998, that is
22      Exhibit A-1 attached to the investigative
23      report.

Page 53

1   A   I didn't do any retaliation. I mean, I
2       wasn't aware of it at the time until after
3       she was separated.
4   Q   Did you involve yourself at any ranking of
5       Ms. McCall for her re-employment purposes?
6   A   No.
7   Q   Do you recall how the people who were
8       separated by the RIF in your Luverne and
9       Hayneville offices received their notice of
10      separation, their RIF letter?
11  A   I assume it would have been by mail, but I'm
12      not sure.
13  Q   Do you recall if Ms. Price's office sent to
14      you a bundle or a package of notices of the
15      RIF, and that you would have distributed
16      those letters to the individuals?
17  A   I don't remember how that was done. I don't
18      recall that.
19  Q   If she testified that such a bundle went to
20      you or the county supervisor, would you
21      disagree with Ms. Price?
22  A   No, I wouldn't disagree with her.
23  Q   Okay. Do you remember specifically handing

14 (Pages 50 to 53)

Lisa McCall                                    V.                              Mike Johanns
Arthur Powers                                                                 March 29, 2007

Page 54

1    to Ms. McCall a RIF letter or notice of
2    reduction in force?
3    A    I don't remember that.
4    Q    Okay.  Do you recall handing out such
5    letters to other employees that were being
6    RIF'd?
7    A    No, sir.
8    Q    You don't recall that either?
9    A    Uh-uh.
10   Q    Do you recall sending any letters out
11   showing a reduction in force to these
12   employees?
13   A    Not me specifically, no.
14   Q    Okay.
15   A    I know there was some that was sent out.
16   Q    Let me show you a document that has been
17   previously marked Defendant's Exhibit 3 and
18   Plaintiff's Exhibit 3.
19              (The referred-to document was
20              previously marked as
21              Plaintiff's Exhibit No. 3 and
22              Defendant's Exhibit No. 3.)
23   Q    It's a document with attachments.  It's

Page 55

1    dated February 23, 1997.
2    A    Do you want me to read this?
3    Q    Just read through it, sir, to yourself.
4              (At which time, there was an
5              off-the-Record discussion.)
6    Q    Mr. Powers, you've had a chance to review --
7    I believe that's Defendant's Exhibit 3,
8    Plaintiff's Exhibit 3 -- the document of
9    January 23, 1997?
10   A    Yes, sir.
11   Q    And that document is regarding a RIF
12   procedure?
13   A    That's correct.
14   Q    It is addressed to Ms. McCall.
15   A    That's correct.
16   Q    Mr. Powers, you have now reviewed
17   Plaintiff's Exhibit 3, Defendant's Exhibit
18   3, which is the same document.
19   A    Yes.
20   Q    And that document is regarding notice of a
21   reduction in force or RIF of my client, Lisa
22   McCall, am I correct?
23   A    That's correct.

Page 56

1    Q    To your recall or remembrance, do you
2    remember receiving that document from
3    Ms. Barbara Price's office in human
4    resources of the USDA and then forwarding it
5    to my client, Ms. Lisa McCall?
6    A    No, sir, I do not remember that.
7    Q    Okay.  Do you recall receiving a package of
8    documents like that and forwarding those to
9    the RIF'd employees that were in your
10   Luverne office that you supervised?
11   A    I don't recall it.
12   Q    Okay.  What was your involvement in the
13   notice procedure of the RIF that occurred
14   during that time frame of 1997?
15   A    I didn't have any involvement in it.
16   Q    Okay.  Ms. Sonya Davenport, and her name now
17   is Johnson, but her name was Sonya Davenport
18   at the time you supervised her in Luverne
19   and in Hayneville, has testified that she
20   has now been re-employed with the USDA.
21   Were you ever consulted about her
22   re-employment with the USDA?
23   A    No, sir.

Page 57

1    Q    Do you know what office she went to work
2    back with after she was RIF'd in a similar
3    RIF scenario to Ms. McCall as per the
4    Exhibit 3 there?
5    A    Well, I think she's in the office in
6    Andalusia now.  I'm not sure if she started
7    there.
8    Q    Okay.
9    A    I don't know exactly where.
10   Q    All right.  Did you ever talk to the county
11   supervisor over the Andalusia office
12   regarding her re-employment?
13   A    No, sir.
14   Q    In the reduction in force procedure, was
15   there a ranking of the employees that were
16   RIF'd as part of that procedure?
17   A    I'm sure it was.  I don't know the specifics
18   of it.
19   Q    Did you participate in that ranking
20   procedure?
21   A    No, sir.
22   Q    Did Ms. Price's office of human resources,
23   USDA in Montgomery, ever seek to talk to you

15 (Pages 54 to 57)

Lisa McCall                                    V.                        Mike Johanns
Arthur Powers                                                           March 29, 2007

---

Page 58

1  about the ranking procedure? Did she ever
2  call you or talk to you or meet with you
3  about the ranking procedure?
4  A  They may have had, you know, a general
5  meeting or something at one time that
6  explained how it was done, but as far as the
7  specifics of it, no.
8  Q  Would you agree that based on Ms. McCall's
9  complaints of race discrimination or racial
10 harassment that she could not legally be
11 retaliated against? Did you understand that
12 to be the law?
13 A  That's the law, yes.
14 Q  And the procedure that the USDA must operate
15 under.
16 A  Yes.
17 Q  Okay. Would you agree that after her
18 complaints, if she did not become reemployed
19 because of her complaints, that would be a
20 violation --
21        MR. NEELEY: Object to the
22        form.
23 A  Yes.

Page 59

1  Q  -- of the law?
2        MR. NEELEY: Object to form.
3  Q  Okay. All right.
4        MR. ATCHISON: Let's go off
5        the Record.
6        (At which time, a break was
7        held.)
8  Q  Today, I'd like to do what Mr. Neeley has
9  done in the past, if I ask you some
10 questions that have previously been asked,
11 I'm sorry. I hope I have not or will not,
12 but I do want to go over a few more areas
13 that may overlap with what you talked about
14 before. Would you deny that you used an
15 angry voice when you spoke to Ms. McCall on
16 occasions, from time to time? Would you
17 deny that, sir?
18 A  I would deny that with that one exception,
19 and it wasn't angry. It was just a raised
20 voice.
21 Q  And what was that exception?
22 A  When she was talking about the borrower.
23 Q  And, specifically, what was she talking

Page 60

1  about the borrower?
2  A  About beating the borrower up.
3  Q  Okay. And you would deny where she stated
4  in her affidavit that you did not speak that
5  way to white employees. She's alleging that
6  you used an angry tone when you spoke to her
7  and the black employee, Ms. Arlesa Hunter,
8  but you would also deny you never spoke that
9  way to anyone else, am I correct?
10 A  That's correct.
11 Q  Okay. In November of 1996 in Hayneville, do
12 you recall an incident that a female
13 borrower had failed to report that she had
14 gotten married? Do you remember a scenario
15 involving Ms. McCall involving such a
16 matter?
17 A  If I'm not mistaken, that was the incident
18 that we were talking about earlier where she
19 threatened to beat that borrower up. I
20 believe it's the same.
21 Q  All right. Do you recall the borrower had
22 called you, I believe, on the telephone?
23 A  I believe so.

Page 61

1  Q  And she complained that she separated from
2  her husband.
3  A  I don't remember the details.
4  Q  You don't remember that detail?
5  A  I do remember the borrower calling.
6  Q  The borrower was Caucasian, was she not?
7  A  I don't remember.
8  Q  Okay. Did you ever meet the borrower?
9  A  I don't remember whether I did or not.
10 Q  Do you recall, quote, Art Powers told me
11 that I should not have asked her about her
12 husband's income, and that if I did, I would
13 be, quote, sorry, end of quote?
14 A  I don't remember saying that.
15 Q  Do you recall being hostile to Lisa McCall
16 regarding that incident?
17 A  Not hostile. I had a raised voice.
18 Q  Okay. And what, specifically, did you say
19 to Ms. McCall in that scenario?
20 A  Basically just told her to shut up because
21 she was, I thought, out of control at the
22 time.
23 Q  Did you understand that Ms. McCall felt that

Boggs Reporting & Video
334.264.6227/www.boggsreporters.com

Lisa McCall                                    V.                              Mike Johanns
Arthur Powers                                                                 March 29, 2007

Page 62

1    you were treating a white borrower
2    differently than you've treated black
3    borrowers, and that upset her?
4    A    I didn't realize that, no.
5    Q    Do you recall on November 1996 that
6    Ms. McCall was the office timekeeper?
7    A    I don't know. She could have been.
8    Q    What is the office timekeeper in a USDA
9    office?
10   A    They keep up with the employees in that
11   office's time, the time that they worked.
12   Q    Okay. During that time frame, do you recall
13   whether or not Arlesa Hunter was the payroll
14   keeper or payroll clerk?
15   A    I really don't recall.
16   Q    Okay. Ms. McCall alleges in her affidavit
17   two days after you, Art, called a staff
18   meeting, you said you did not want her to be
19   a timekeeper anymore. Do you recall that?
20   A    I don't recall that.
21   Q    Do you recall that, nonetheless, that you
22   placed Ms. Patsy Williams in the position as
23   timekeeper during November or thereabouts of

Page 63

1    '96?
2    A    I could have. I mean, I don't remember the
3    specifics.
4    Q    Do you recall if there was ever an issue
5    about Ms. McCall keeping time and that Patsy
6    Williams had gotten upset or mad, that her
7    complaint against Ms. McCall was that
8    Ms. McCall was keeping track of Patsy
9    Williams' time and that Ms. Williams had
10   abused her time?
11   A    I don't recall that.
12   Q    Do you recall in November '96 in the
13   Hayneville office when it was closed and
14   then moved to Luverne -- in January to
15   Luverne, you called Ms. McCall in to file
16   all the annual statements in the file
17   cabinet and to send some files from Patsy
18   Williams' desk to the St. Louis office. Do
19   you recall that?
20   A    What date was that, now?
21   Q    That was over a period of the transition
22   between the Hayneville office and Luverne
23   office. And in January of 1997, you called

Page 64

1    Ms. McCall in and told her that she was to
2    file annual statements in the file cabinet
3    and send some files from Patsy Williams'
4    desk to St. Louis.
5    A    I don't believe it would have been in
6    January because I don't believe I was
7    working there in January.
8    Q    Okay. After you came on board, then.
9    A    It's likely, yes.
10   Q    Okay.
11   A    I don't remember it specifically.
12   Q    And you recall that was actually duties that
13   were required of Patsy Williams.
14   A    No, I don't.
15   Q    You don't recall. Do you recall an incident
16   in which a black borrower, an older black
17   lady, who could not read and write came in,
18   and you failed to explain things to her
19   about the process? Do you recall that?
20   A    No, sir.
21   Q    Do you recall during the time you were at
22   Luverne or Hayneville that several black
23   borrowers got mad and yelled and cursed at

Page 65

1    you because of your treatment of them?
2    A    I don't recall that.
3    Q    That's all.
4         MR. NEELEY: No questions.
5    Q    Thank you, sir.
6         (At which time, the
7         deposition concluded at
8         approximately 11:50 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

17 (Pages 62 to 65)

Lisa McCall
Arthur Powers

V.

Mike Johanns
March 29, 2007



Page 66

1        REPORTER'S CERTIFICATE
2
3    STATE OF ALABAMA,
4    ELMORE COUNTY,
5
6        I, Shannon P. Yost, Certified Shorthand
7    Reporter and Commissioner for the State of
8    Alabama at Large, do certify that I reported the
9    deposition of:
10            ARTHUR POWERS
11    who was first duly sworn by me to speak the
12    truth, the whole truth, and nothing but the truth
13    in the matter of:
14        IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
15            NORTHERN DIVISION
16    LISA MCCALL,
17        Plaintiff,
18        V.    CIVIL ACTION NO. 2:06CV39-MHT
19    MIKE JOHANNS, SECRETARY,
        DEPARTMENT OF AGRICULTURE,
20
21        Defendant.
22    On March 29, 2007.
23        The foregoing 65 computer-printed pages

Page 67

1    contain a true and correct transcript of the
2    examination of said witness by counsel for the
3    parties set out herein.
4    The reading and signing of same is hereby waived.
5        I further certify that I am neither of kin
6    nor of counsel to the parties to said cause, nor
7    in any manner interested in the results thereof.
8        This 10th April of July, in the year of our
9    Lord, 2007.
10
11
12
13
            _____
            Shannon P. Yost,
14        Certified Shorthand Reporter
            and Commissioner for the
15        State of Alabama at Large
16        Commission Expires 6/1/09
17
18
19
20
21
22
23

18 (Pages 66 to 67)