In The United States District Court
For The Middle District of Alabama
Northern Division

Lisa McCall,

  Plaintiff,

v.

Mike Johanns,
Secretary, Department of Agriculture,

  Defendant.

)
)
)
)
)
)
)
)
)
)

Civil Action No.2:06cv39-MHT

Jury Demand

**Plaintiff's Memorandum Brief
In Opposition to Defendant's
Motion for Summary Judgment**

  Comes now Plaintiff Lisa McCall, by and through counsel, and files Plaintiff's Memorandum

Brief in Opposition to Defendant's Motion for Summary Judgment, stating as follows:

**Statement of Facts**

  Plaintiff McCall was employed by the United States Department of Agriculture, Rural

Development Bureau starting in July 1990.  In 1996 she held the position of Community

Development Assistant, GS 4/4 in the Hayneville, Alabama, office.  When that office closed in

December of 1996, Plaintiff was transferred to the Luverne, Alabama, office. (Plaintiff's Affidavit

para. 1).

  Horace Horn, State Director (White), and the deciding official as per four June 21, 1996,

letters sent to the Plaintiff, selected four White employees for positions for which Plaintiff McCall

was qualified to fill. (Plaintiff's Exhibits 8,9,10,11).

  On October 29, 1996, Plaintiff    wrote a letter to Horace Horn complaining about a

1

"harassment problem" that she had with her county office supervisor, Arthur L. Powers (White). Horace Horn, who was over all of the Agency's personnel decisions in the state, responded back to Plaintiff but in his response he otherwise ignored her complaint of harassment, and he never later addressed these issues. (Plaintiff's Exhibits 12, 13).

Barbara Price (White), was at material times, the Agency's Personnel Management Specialist, Human Resource Manager and Personnel Specialist during the Agency's Reduction in Force or RIF that terminated the Plaintiff and others. (Price depo. p. 11, ll. 7-12).

Ms. Price stated that the normal, state-office procedure, when State Director Horace Horn received a harassment charge, was for his office to contact her office for assistance. (Price depo. p. 48, ll. 13-17).

Ms. Price, without explanation, stated that Mr. Arthur Powers, Plaintiff's White supervisor, would have been provided a copy of Mr. Horn's reply letter (Plaintiff's Exhibit 13) but that Mr. Powers would have not been aware of Plaintiff's letter (Plaintiff's Exhibit 12) alleging "harassment." (Plaintiff's Exhibit 12, 13; Price depo. p. 53). However, Ms. Price did admit that "one lady" from the Civil Rights Division, Washington, D.C. named Romaine [White] interviewed her and Mr. Powers about Plaintiff's complaints of harassment as per Plaintiff's Exhibit 12. (Price depo. p. 54).

Ms. Price stated that if an EEO complaint had been filed in the national office in Washington, D.C. that her office would have co-operated with that matter. (Price depo. p.16, ll. 13-18). She testified that it was her office that investigated  Title VII complaints, to gather together documents. (Price depo. p. 41-42).

Ms. Price testified as per her EEO Investigative Affidavit that Mr. Horace Horn, the selecting official and State Director (now retired) was "not willing to be interviewed" in Ms. McCall's EEO

case. (Price Affidavit para. 12).

The Agency discriminated against the Plaintiff on the basis of her race (Black) and color (black) when she was separated from employment as a result of a reduction in force (RIF) in April of 1997. Her name was not placed on the re-employment priority list (RPL) for many months, and she was subjected to a pattern of discrimination and or retaliation prior to her RIF separation which included the assignment of duties; insufficient work space; lack of a desk, telephone and computer; and the verbal abuse by her supervisor. (Plaintiff's Affidavit para. 2).

Plaintiff's initial, first line supervisor in the Hayneville office was Carnell McAlpine (Black), the County Supervisor. Toward the end of her time in Hayneville and after, she transferred to the Luverne, Alabama, office where Arthur L. Powers, a Caucasian, became her first line supervisor. His title was County Supervisor and it was later changed to Community Development Manager. Plaintiff's second line supervisor over Mr. Powers in Luverne was John Sasser, District Director, a Caucasian, who had his office in Mobile. (Plaintiff's Affidavit para. 3).

Plaintiff was subjected to discrimination by her supervisor, Arthur Powers, from November 1996 until the date of the Reduction in Force (RIF) in April 1997. He treated Plaintiff and her co-worker, Arlesa Hunter ( Black), differently from the way he treated White employees. (Plaintiff's Affidavit para. 4).

Arthur Powers used an angry tone when he spoke to Plaintiff and Arlesa Hunter. He did not speak that way to White employees. He would tell Arlesa Hunter and Plaintiff McCall to do things that he would not tell White employees to do, such as move heavy office furniture around and put heavy files into file cabinets. Arthur Powers was also rude and used a harsh tone when he spoke to Black borrowers. He did not speak that way to White borrowers. Once an older Black lady, who

could not read and write, came in, and Mr. Powers did not explain things to her like he did with White borrowers. He appeared not to want to be bothered with her and other Black borrowers. Several Black borrowers, after his abusive treatment, got mad, yelled and cursed at him. (Plaintiff's Affidavit para. 5).

Arlesa Hunter and the Plaintiff were not provided office furniture or a phone or computer at the Luverne office. They each had just a table, chair and typewriter. They however needed a phone and a computer to do their jobs properly. White employees with the same positions had been given necessary office furniture and telephones and computers. (Plaintiff's Affidavit para. 6).

When Plaintiff was assigned the Hayneville office in December of 1996, she did an interest credit review on a White female, delinquent borrower. Plaintiff found out that the borrower had failed to report that she had gotten married so Plaintiff gave her a form for verification of her husband's income. The borrower then called Arthur Powers to complain that she was separated from her husband when she was not actually separated. Arthur Powers told Plaintiff that she should not have asked the borrower about her husband's income and that if Plaintiff did she would be sorry. After that encounter involving the White borrower, Arthur Powers was often hostile to the Plaintiff. (Plaintiff's Affidavit para. 7).

In December 1996, Plaintiff was the office timekeeper in the Hayneville office, and Arlesa Hunter was the payroll keeper. Later Arthur Powers called a staff meeting and said that he did not want Plaintiff to be the time keeper anymore and that he wanted Patsy Williams (White) to be the timekeeper. He did not give any reason for the change. Plaintiff nonetheless still informally kept track of the time on her calendar, and Patsy Williams got mad, saying that Arthur Powers told her to be the timekeeper, and Plaintiff was not supposed to keep track of the time any more. Patsy Williams

4

appeared mad after Plaintiff had noted she was abusing her time, and had informed Mr. Powers of this. However, Mr. Powers took no action against Patsy Williams. (Plaintiff's Affidavit para. 8).

During December 1996, the Hayneville office was closed, and Plaintiff was transferred to the Luverne, Alabama, office. In February 1997, Arthur Powers called Plaintiff and told her to file all of the annual statements in the file cabinet and send some files from Patsy Williams' desk to the St. Louis finance office. Patsy Williams had been assigned to do this task but had failed to do it, and no action was taken against her by Arthur Powers. (Plaintiff's Affidavit para. 9).

John Sasser, District Director, stated that Arlesa Hunter would have to drive back and forth to the Andalusia office for one week to fill in for a clerk who was out. He directed Arlesa Hunter to drive back and forth because a White employee had refused to go. Only after Ms. Hunter's protests of unfairness, did she not get forced by Mr. Sasser to drive back and forth. (Plaintiff's Affidavit para. 10).

The Luverne office did not receive the RIF consideration notice until after other counties had received it. Furthermore, only after office personnel called the state office, did Barbara Price of Human Resources send copies to Plaintiff's office in Luverne. (Plaintiff's Affidavit para. 11).

Ms. Price admitted that though Ms. McCall and others were RIFed in April 1996 that it was finally on May 27, 1998, when Ms. McCall's name was finally placed on the re-employment list. (Price Affidavit para. 8-9). However, despite the fact Ms. McCall was not on the re-employment list until May 27, 1998, Ms. Price claimed, "her name was on an informal re-employment list that we had maintained in the office." (Emphasis added)(Price Affidavit para. 10).

The discriminatory actions by the Agency made Plaintiff feel like she did not want to work with the Agency. Arthur Powers' actions made her uncomfortable, and she felt like he did not want

5

her there. Plaintiff felt that if she were going to have a career there she would have to go through this type of discrimination or retaliation every day at that office in Luverne. (Plaintiff's Affidavit para. 12).

Plaintiff's race and color were a factor in her workplace environment because of the way Mr. Powers would tell Blacks to do things versus the way he would tell Whites. (Plaintiff's Affidavit para. 12).

Plaintiff applied for a job in Mobile prior to the RIF. Lisa Hardy also applied. Ms. Hardy is of mixed race, White and Indian. The job was virtually the same as the one Plaintiff was doing in Luverne. Plaintiff submitted an application but did not get an interview or letter of rejection. Everyone who was a GS-4 had been subject to the RIF. John Sasser was the selecting official. Plaintiff's race and color were a factor in her non-selection because John Sasser had no Blacks in his office and as shown by the way he spoke to Arlesa Hunter racially identifying her as one of "you people" when he harshly spoke to her in Plaintiff's presence in the Luverne office. Lisa Hardy, a White, who was selected, had a year less experience than Plaintiff did and was less qualified than she was. (Plaintiff's Affidavit para. 14).

Race was a factor in the RIF because some people in lower grades who were White were not RIFed; Whites who included Lisa Hardy and Camilla Meeks. (Plaintiff's Affidavit para. 14).

After the RIF Plaintiff started applying for secretarial jobs at Maxwell Air Force Base in Montgomery, Alabama. Plaintiff kept applying for other federal jobs, and she kept hearing that she was not eligible for priority because she was not on the Re-employment Priority List (RPL). Plaintiff called the Office of Personnel Management and spoke to Lee Howardstead and asked him what the RPL was supposed to look like. Barbara Price of Human Resources at the Agency state office told

Plaintiff that she was on the RPL list, but Plaintiff kept getting turned down for other Agency positions because she was not actually on the list. Barbara Price never gave Plaintiff a copy of the RPL. (Plaintiff's Affidavit para. 16).

All of the White people who were RIFed in the Luverne office went back to work at the Agency, some in temporary jobs. Arlesa Hunter and Plaintiff, Black employees, have not been contacted about any potential jobs at the Agency to this date. (Plaintiff's Affidavit para. 17).

The Agency discriminated against Plaintiff by not placing Plaintiff's name on the RPL list or helping her to get re-employed. A job came open in Wilcox County after the RIF, but Arlesa Hunter and Plaintiff were not called. (Plaintiff's Affidavit para. 18).

That after Plaintiff's EEO case began to be investigated, Mr. Horace Horn refused and failed to respond to Plaintiff's EEO charges with any statement as per the investigation. (Plaintiff's Affidavit para. 18; Price Affidavit para. 12).

That because Mr. Powers and the Agency continued to discriminate and or retaliate against Plaintiff and because Mr. Horn, the deciding official refused to respond to Plaintiff's EEO complaints, she wrote a series of letters detailing and factually setting forth racial discrimination facts, etc., which she felt was "harassment," to the Agency's Washington, D.C. Office of Civil Rights. Said letters were dated December 20, 1996; February 25, 1997, and follow-up, complaint letters dated April 30, 1997, and April 20, 1998, were sent to the Agency's Secretary of Agriculture. (Plaintiff's Affidavit para. 21).

That Plaintiff continued to place the Agency on notice of her EEO complaints by a further follow-up letter dated August 24, 1999. (Plaintiff's Affidavit para. 22).

That earlier in 1996, Mr. Horace Horn had been the deciding official in denying her placement

7

in four positions. Plaintiff was well qualified for all positions that were given to White individuals. (Plaintiff's Affidavit para. 23).

That during 1996 Mr. Horace Horn was the State Director when the Agency was in litigation involving Black farmers who alleged race discrimination involving farm loans with the Agency. (Plaintiff's Affidavit para. 24).

Ms. Price testified that after Ms. McCall and others were RIFed in April 1996, it was on May 27, 1998, when Ms. McCall's name was placed on the re-employment list. (Price Affidavit para. 8-9). However, despite the fact Ms. McCall was not placed on the re-employment list until May 27, 1998, Ms. Price alleged:

> "her name was on an informal re-employment list that we had maintained in the office." (Emphasis added)(Price Affidavit para. 10).

## Procedural History

Plaintiff McCall on several occasions over a course of many months exercised her Title VII rights to make complaints of discrimination, harassment, etc. They included inter alia:

(1) Letter of October 29, 1996 to State Director Horace Horn complaining of harassment by Plaintiff's supervisor Arthur Powers (Plaintiff's Exhibit 12).

(2) Letter of December 20, 1996, to USDA Office of Civil Rights detailing harassment [discrimination] by Arthur Powers of Plaintiff and other Blacks. (Plaintiff's Exhibit 14).

(3) Letter of February 25, 2997, to USDA Office of Civil Rights detailing harassment [discrimination] by Arthur Powers of Plaintiff and other Blacks. (Plaintiff's Exhibit 15).

(4) Letter of April 30, 1997, to Secretary of Agriculture detailing harassment [discrimination] by Arthur Powers, etc. of Plaintiff and other Blacks. (Plaintiff's

Exhibit 16).

(5) Letter of formal complaint, April 20, 1998, to Secretary of Agriculture detailing harassment [discrimination] by Arthur Powers, etc. of Plaintiff and other Blacks. (Plaintiff's Exhibit 17).

(6) Letter of August 24 1999, to USDA Employment Complaints Division, Washington, D.C. by Plaintiff which details her effort to get her April 30, 1997, etc. EEO complaints reviewed. (Plaintiff's Exhibit 18).

(7) Letter of August 15, 2000, to Assistant Secretary of Agriculture by Plaintiff which detailed her criticism of the EEO investigation delays and of discrimination of Blacks. (Plaintiff's Exhibit 30).

(8) EEO Affidavit of Plaintiff dated February 4, 2001, detailing facts and allegations against the Defendant. (Plaintiff's Exhibit 20, F2).

As per MSPB Order dated October 29, 2001, in Plaintiff's case At-3443-0020-1-1 (re-employment rights claims) the Administrative Judge held that the MSPB "Board" did not have "jurisdiction over non selections" and thus dismissed the MSPB appeal. (Plaintiff's Exhibit 31).

Within permissible time frames Plaintiff simultaneously filed on November 30, 2001: (1) A MSPB "Petition for Review and Motion to Transfer Appellant's Discrimination Case to the Equal Employment Opportunity Commission (Plaintiff's Exhibit 32) and (2) An EEOC "Petition for Review to the EEOC" (Plaintiff's Exhibit 33).

Subsequent to November 30, 2001, the EEOC took up jurisdiction in Plaintiff's case as shown inter alia by EEOC "Acknowledgment and Order" dated October 8, 2003 (Plaintiff's Exhibit 34).

In the interim on September 27, 2002, the MSPB reversed on its own motion its January 10, 2001; an Order, heavily relied upon by the Defendant in its arguments in favor of an application of a res judicata bar to Plaintiff's claims. (Emphasis added). Said September 27, 2002 Order re-opened

9

the MSPB case and vacated the January 10, 2001, decision which had dismissed Plaintiff McCall's

MSPB case.  (Plaintiff's Exhibit 35).

Pertinent issues raised at the MSPB were considered by the EEOC throughout its hearing

procedures as shown by the EEOC's October 27, 2005 Decision which stated that on September 2,

2003,

> "The [EEOC] Commission found that 'the dismissal with prejudice bars
> with prejudice the adjudication' of complainant's claim she was separated
> from the agency due to an RIF.
> The Commission remanded to the agency complainant's remaining claims
> (that she was not placed on the RPL and was subjected to harassment."
> (Plaintiff's Exhibit 36).

### Summary Judgment

### Standard of Review

Under Rule 56( c) of the Federal Rules of Civil Procedure, summary judgment is proper

"(i)f the pleadings, depositions, answers to interrogatories, and admissions on file,  together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Celotex Corp. v Catrett, 477 U.S. 317, 322, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party or movant asking for summary judgment "always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those [admissible]

portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact."  Id. at 323, 106 S.Ct. 2548.  The movant can meet this burden by presenting admissible

evidence showing there is no dispute of material fact, or by showing, or pointing out, to the district

10

court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. 2548.  To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed. 2d 538 (1986).  On the other hand, the evidence of the non movant must be believed and all justiciable inferences must be drawn in its favor. Anderson v Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56( c).

### Argument

### I. The Res Judicata Defense is Not Available to Defendant As a Procedural Bar to Plaintiff.

As per MSPB Order dated October 29, 2001, in Plaintiff's case At-3443-0020-1-1 (re-employment rights claims) the Administrative Judge held that the MSPB "Board" did not have "jurisdiction over non selections" and thus dismissed the MSPB appeal. (Plaintiff's Exhibit 31).

Within permissible time frames Plaintiff simultaneously filed on November 30, 2001: (1) A MSPB "Petition for Review and Motion to Transfer Appellant's Discrimination Case to the

Equal Employment Opportunity Commission (Plaintiff's Exhibit 32) and (2) An EEOC "Petition for Review to the EEOC" (Plaintiff's Exhibit 33).

Subsequent to November 30, 2001, the EEOC took up jurisdiction in Plaintiff's case as shown inter alia by EEOC "Acknowledgment and Order" dated October 8, 2003 (Plaintiff's Exhibit 34).

In the interim on September 27, 2002, the MSPB reversed on its own motion its January 10, 2001 Order; an Order, heavily relied upon by the Defendant in its arguments in favor of an application of a res judicata bar to Plaintiff's claims. (Emphasis added). Said September 27, 2002 Order re-opened the MSPB case and vacated the January 10, 2001, decision which had dismissed Plaintiff McCall's MSPB case. (Plaintiff's Exhibit 35).

In seeing that res judicata is not applicable, the Court should consider several factors.

First, it can clearly be seen that at no time did the MSPB ever reach a decision regarding the merits of Plaintiff's claims. See e.g. (Plaintiff's Exhibit 31).

Secondly, during the period case was pending, and not final, before the MSPB, Plaintiff simultaneously filed on November 30, 2001, two motions, one before the MSPB and one before the EEOC. Said motions were:

(1)     [MSPB] Petition For Review And Motion To Transfer Appellant's Discrimination Case To The Equal Employment Opportunity Commission (Plaintiff's Exhibit 32), and
(2)     [EEOC] Petition For Review To The EEOC (Plaintiff's Exhibit 33)

Thirdly, pertinent issues raised at the MSPB were considered by the EEOC throughout its hearing procedures as shown by the EEOC's October 27, 2005 Decision which stated that on September 2, 2003:

12

"The [EEOC] Commission found that 'the dismissal with prejudice bars with prejudice the adjudication' of complainant's claim she was separated from the agency due to an RIF.
The Commission remanded to the agency complainant's remaining claims (that she was not placed on the RPL and was subjected to harassment." (Plaintiff's Exhibit 36)

Fourthly, no evidence shows any stipulation that would end Plaintiff's case, since the November 30, 2001 motions clearly were an effort to get the EEOC to pick up the investigation, etc., of her case and have the EEOC make determinations of her claims on the merits.

Thus there is no argument that can be made than any claims other than possibly her RIF claims can be subject to bar by res judicata. However, the MSPB's September 27, 2002 Opinion And Order (on its own motion) even calls that res judicata claim of the Defendant into question. (Plaintiff's Exhibit 35). Again in the interim Plaintiff's claims were being addressed by the EEOC at that time.

## II.  Plaintiff's Hostile Work Environment Claims

The Defendant in its brief's statement of facts pages 9-11 and its argument pages 24-29, etc. have understandably raised defenses to Plaintiff's alleged "harassment" or hostile environment claims.

Plaintiff, acting pro se, represented herself initially through much of the earlier EEO proceedings, and the record reflects she had no legal training.  Her "harassment" claims, while not meeting Harris v. Forklift, Inc., 510 US 17, 114 S.Ct. 367 (1993) criteria for hostile environment or harassment claims, nonetheless met the requisites for Title VII discrimination or retaliation claims, as briefed herein.

13

A plaintiff acting pro se, having alleged a "harassment" scenario, should be afforded as a pro se litigant a liberal interpretation of her "harassment" allegations vis a vis a more accurate assessment that her same alleged facts comprised allegations of discrimination and or retaliation. Said factual allegations made under the theory of harassment by the Plaintiff, pro se, were "stated facts sufficient to trigger an [EEOC] investigation into their discriminatory classifications." see Mullins v. Crowell, 228 F3d 1305, 1312 (11th Cir. 2000).

Therefore Plaintiff concedes any and all claims of harassment or hostile work environment; however, she states her underlying stated facts of said harassment allegations should have been and must be viewed in more accurate averments of discrimination and or retaliation.

### III. Plaintiff's Discrimination Claims

As per the discussion above regarding Plaintiff's pro se allegations of "harassment," said pro se factual (non RIF, non RPL) allegations were due to have been considered by the EEOC as discrimination claims rather than harassment claims. (See e.g. claims raised in Plaintiff's Exhibits 12, 14-18).

The Defendant failed to defend those allegations of discrimination in its brief. Once a plaintiff establishes a prima facie case of discrimination by facts, those facts, if unexplained, give rise to an inference of discrimination, i.e. that a prohibited consideration was a factor in an adverse employment action. See McDonnell Douglas Corporation v Green, 411 U.S. at 802 (1973); Furnco Construction Corporation v Waters, 438 U.S. 567 (1978).

The burden then shifts to the Agency to articulate a legitimate nondiscriminatory reason for its actions. Texas Department of Community Affairs v Burdine, 450 U.S. 248, 253 (1981).

14

Regarding Plaintiff's discrimination claims, (Plaintiff's Exhibits 12, 14, 15, 16, 17, and 18) the Defendant has not presented nondiscriminatory reasons for actions taken against the Plaintiff and has failed to meet its burden under <u>McDonnell</u>, etc. and has as a result of not raising said defense it has abandoned said defense at the summary judgement stage and as a result, such discrimination claims survive summary judgement.

### IV. Plaintiff's Retaliation Claims

As with other retaliation claims, a plaintiff may set forth a prima facie case of retaliation by showing that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. See e.g. <u>Stavropoulous</u> v <u>Firestone</u>, 361 F3d 610, 616 (11th Cir. 2004). See also <u>Burlington Northern and Sante Fe Railway Co.</u> v <u>White</u> 126 S. Ct 2405, 2415 (U.S. 2006) where the Supreme Court held that the anti-retaliation provision of Title VII protects an employee not from all retaliation but from retaliation that produces harm or injury (<u>Id.</u>).

It is undisputed that Plaintiff McCall on several occasions over a course of many months exercised her Title VII rights to make complaints of discrimination, harassment, etc. They included <u>inter</u> <u>alia</u>:

(1) Letter of October 29, 1996 to State Director Horace Horn complaining of harassment by Plaintiff's supervisor Arthur Powers (Plaintiff's Exhibit 12).

(2) Letter of December 20, 1996, to USDA Office of Civil Rights detailing harassment [discrimination] by Arthur Powers of Plaintiff and other Blacks. (Plaintiff's Exhibit 14.

(3) Letter of February 25, 2997, to USDA Office of Civil Rights detailing harassment [discrimination] by Arthur Powers of Plaintiff and other Blacks.

15

(Plaintiff's Exhibit 15).

(4) Letter of April 30, 1997, to Secretary of Agriculture detailing harassment [discrimination] by Arthur Powers, etc. of Plaintiff and other Blacks. (Plaintiff's Exhibit 16).

(5) Letter of formal complaint, April 20, 1998, to Secretary of Agriculture detailing harassment [discrimination] by Arthur Powers, etc. of Plaintiff and other Blacks. (Plaintiff's Exhibit 17).

(6) Letter of August 24 1999, to USDA Employment Complaints Division, Washington, D.C. by Plaintiff which details her effort to get her April 30, 1997, etc. EEO complaints reviewed. (Plaintiff's Exhibit 18).

(7) Letter of August 15, 2000, to Assistant Secretary of Agriculture by Plaintiff which detailed her criticism of the EEO investigation delays and of discrimination of Blacks. (Plaintiff's Exhibit 30).

(8) Affidavit of Plaintiff dated 2 February 4, 2001, detailing facts and allegations against the Defendant. (Plaintiff's Exhibit 20, F2).


### Causal Connection

Defendant in its brief on pp. 30-32 argues that since a notice of the RIF was sent out and signed by Mr. Horn of July 8, 1996, there was no causal connection involving the RIF, since Plaintiff's first instance of protected activity occurred on October 29, 1996 in her letter to Mr. Horn which alleged "harassment" by Mr. Powers.

The Defendant fails to raise or to brief any causal connection, more importantly involving the time span after the RIF notice in 1996 through the time period of Plaintiff's EEO investigation from 1998 through 2005, at which time Plaintiff was making every effort to become re-employed through the Agency through the Re-employment Priority List (RPL) procedures.

Ms. Price, while making excuses for not placing Plaintiff McCall on the re-employment

16

register due to her having an improper address, etc., nonetheless explained (in a time period when Plaintiff on a continuing basis exercised her protected activity) that:

> [H]er name was on an informal re-employment list that we maintained in the office. (Price Affidavit para. 10).

Ms. Price also admitted that she had "informal communications with other employees about re-employment and their getting other jobs. (Price depo. p. 58, ll. 10-20).

In any instance Ms. Price's pattern and practice was, by her own admission, to ignore or bend the Re-employment rules and this goes to evidence of animus and credibility as to the Re-employment scenario facing the Plaintiff.

Of those that were RIFed, 7 of the 12 were White with Whites comprising 55% of those RIFed. (Plaintiff's Exhibit 19, Bates MC000113).

However, after the RIF only 1 Black as compared to 6 Whites were listed on the Re-employment Priority List (RPL) and that sole Black individual was Plaintiff McCall, whose name was placed on the RPL list almost a year later, after her persistent and repeated efforts to be on the list. (Plaintiff's Exhibit 19, Bates MC000118).

The suggestion that Mr. Horn, Ms. Price or Mr. Powers were unaware of the Plaintiff's repeated and continuing instances of exercising her protected activity, runs counter to the evidence.

During the continuing instances of her exercise of her protected activity, Ms. Price stated she would have been forwarded, for her assistance to Director Horn's office, a complaint of harassment that had originally been sent by the Plaintiff to Mr. Horn's office [on October 29, 1996]. (Price depo p. 48, ll. 13- 18).

Next, regarding the several letters, etc. sent to the Agency in Washington, D.C. by the

Plaintiff setting forth EEO complaints, Ms. Price remembered an EEO "lady" named "Romaine"

who contacted her about the Plaintiff's EEO charges and:

> "came down and interviewed us, I believe she interviewed Mr.Powers at
> the same time." (Price depo. p. 54, ll. 13-22).

In addition to Investigator Romaine White, EEO Investigator Schelagh Keleyhers also took

statements from Barbara Price,Arthur Powers,etc. During the period of April 16-19, 2000. (Plaintiff's

Exhibit 19, Bates MC00012).

The record leaves little question that Horn, Price, and Powers were aware of Plaintiff's EEO

protected activity efforts at all material times, especially through her re-employment priority time

frames.

The Defendant's argument that it did not know about Plaintiff's efforts to exercise her

protected rights are without merit based on circumstantial evidence.

In the present scenario, while it may be argued that Horace Horn, State Director, Barbara

Price, Human Resources, and Arthur Powers may have not been unaware of Plaintiff's repeated

efforts to have her EEO complaints heard leading up to April 1998 they simply cannot argue that they

were unaware after the EEO procedure got underway in May 1998.

The retaliation argument the Plaintiff was continuing past May 1998 afterwards which Horn,

Price, and Powers were undeniably aware of Plaintiff's EO complaints. Such retaliation left her

without ever getting any sort of re-employment with the Agency, etc. See e.g. Shields v England,

Sec. of Navy 428 F. Supp 2nd 453, 462 (2006) where the court found that it must assume that the

Defendant "knew of prior EEO complaints" because that information was included in a reviewed

18

report. (Id.).

### That it is Pretextual Where Defendant
### States it Had a Legitimate Non Discriminatory Reason
### for Not Placing Plaintiff on the RPL Until May 1998

Plaintiff first learned of the RIF in 1996 and from that time frame until May 1998 Plaintiff was never placed on the RPL list despite  numerous efforts by Plaintiff to be placed on the list. Also, importantly, regardless of the list status, she has never been re-employed due to discrimination and retaliation.

Plaintiff McCall made several efforts to get on the RPL and be considered for re-employment, after finding out she was not on the RPL list due to applying for other federal agency  positions and not being considered. She made contact with the USDA Agency about being on the RPL, including contact with Barbara Price of Human Resources, on June 8, 1997; June 11, 1997; July 11, 1997; July 14, 1997; July 21, 1997; February 3, 1998; March 3, 1998 and July 13, 1998 (Plaintiff's Exhibit 19, Bates MCOO140-144).

At no time had Plaintiff ever been told by Barbara Price of Human Resources, or anyone  from her office, or anyone from the Agency that she had been "informally" placed on the RPL,  as Ms. Price had alleged in her Affidavit, etc. that Ms. McCall had been placed on an "informal"  RPL list.

The Agency alleges that "the Plaintiff's failure to return her RPL registration form was the legitimate non discriminatory reason for the delay in placing her on the RPL." (Defendant's Brief, pp.34-35).

This statement is clearly pretextual.

First, the pattern and practice of Barbara Price, according to her, was to "informally" place

19

employees on the RPL list, "anyone that had asked me for help." (Price depo. p58, 11. 10-20).

Secondly, in the end only one African-American who was RIFed, the      Plaintiff, ever ended

up on the RPL. (Plaintiff's Exhibit 19, MC00018 Bates 1).

Thirdly, the EEO Investigator Keleyhers in her EEOC Report of Investigation determined and

found pretext:

> There is testimony from a white employee who was rifed that she had
> forms missing in her RIF packet. This means we cannot credit or be
> sure that the Complainant was given the form in question. (Emphasis
> added).
>
> All people who were placed on the RPL were white until the
> Charging Party pursued the matter. And three people placed on the list
> in January/February of 1997 ended up not being rifed at all. One of the
> individuals, Tamara Martin was one of the people to be chosen over the
> Complainant in one of her applications. This tends to support the
> Complainants allegation of in (sic) internal buddy system that could
> and did impact on minorities. (Emphasis added).
>
> Kimberly Lawrence a black rifed employee was interviewed by a
> different District Director. She was accorded a lot of time and
> explanation and she said she filled out everything she was given. Yet
> there was no RPL form in her name.
>
> It seems that there is a great deal of evidence to show the Agency's
> defense is pretextual. (Emphasis added)(Plaintiff's Exhibit 19, Bates
> MC00129-130).

### Conclusion

Based upon the foregoing, Defendant's Motion for Summary Judgment  is due to be denied

as to all areas briefed by the Defendant, except for those areas briefed by the Defendant which

involved Plaintiff's pro se allegations of harassment or hostile environment.

20

Respectfully submitted,

_____
Gary E. Atchison (ATC004)
Attorney for Plaintiff Lisa McCall

**Of Counsel:**
P.O. Box 2002
492 South Court Street
Montgomery, AL 36102-2002
(334) 262-7232

## Certificate of Service

I hereby certify that a copy of the foregoing pleading has been properly addressed, with postage prepaid and placed in the US Mail on this the _____ day of May 2007, to the following:

    R. Randolph Neeley, Esq.
    Assistant U.S. Attorney
    PO Box 197
    Montgomery, Alabama 36101-7280

_____
Gary E. Atchison