**In The United States District Court**
**For The Middle District of Alabama**
**Northern Division**

| | | |
|---|---|---|
| Lisa McCall, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.2:06cv39-MHT |
| | ) | |
| Mike Johanns, | ) | |
| Secretary, Department of Agriculture, | ) | Jury Demand |
| | ) | |
| Defendant. | ) | |

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

### Affidavit of Plaintiff Lisa McCall

I, Lisa McCall, do hereby solemnly swear or affirm, depose and state as follows:

(1)     I was employed by the United States Department of Agriculture, Rural Development

Bureau starting in July 1990.  In 1996 I held the position of Community Development Assistant, GS

4/4 in the Hayneville, Alabama, office.  When that office closed in December of 1996, I was

transferred to the Luverne, Alabama, office.

(2)     The Agency discriminated against me on the basis of my race (Black) and color

(black) when I was separated from employment as a result of a reduction in force (RIF) in April of

1

1997. My name was not placed on the re-employment priority list (RPL) for many months, and I was subjected to a pattern of discrimination and or retaliation prior to my separation which included the assignment of duties; insufficient work space; lack of a desk, telephone and computer; and the verbal abuse by my supervisor.

(3)     My first line supervisor in the Hayneville office was Carnell McAlpine (Black), the County Supervisor. Toward the end of my time in Hayneville I was transferred to the Luverne, Alabama, office where Arthur L. Powers, a Caucasian, was my first line supervisor. His title was County supervisor and later it was changed to Community Development Manager. My second line supervisor over Mr. Powers in Luverne was John Sasser, District Director, a Caucasian, who had his office in Mobile, Alabama.

(4)     I was subjected to discrimination by my supervisor, Arthur Powers, from 1996 until the date of the RIF in April 1997. He treated me and my co-worker, Arlesa Hunter    ( Black), differently from the way he treated White employees.

(5)     Arthur Powers used an angry tone when he spoke to me and Arlesa Hunter. He did not speak that way to White employees. He would tell Arlesa Hunter and me to do things that he

2

would not tell White employees to do, such as move heavy office furniture around and put heavy files into file cabinets. Arthur Powers was also rude and used a harsh tone when he spoke to Black borrowers. He did not speak that way to White borrowers. Once an older Black lady, who could not read and write, came in, and Mr. Powers did not explain things to her like he did with White borrowers. He appeared not to want to be bothered with her and other Black borrowers. Several Black borrowers as a result of his biased, abusive treatment, got mad, yelled and cursed at him.

(6)    Arlesa Hunter and I were not provided office furniture or a phone or computer at the Luverne office. We each had just a table, chair and typewriter. We however needed a phone and a computer to do our jobs properly. White employees with the same title had been given necessary office furniture and telephones and computers.

(7)    When I was at the Hayneville office in December of 1996, I did an interest credit review on a White female, delinquent borrower. I found out she had failed to report that she had gotten married so I gave her a form for verification of her husband's income. The borrower called Arthur Powers to complain that she had been separated from her husband when she was not actually separated. Arthur Powers told me that I should not have asked the borrower about her husband's

3

income and that if I did I would be sorry. After that encounter involving the White borrower, Arthur

Powers  was often hostile to me.

(8)    In December 1996, I was the office timekeeper in the Hayneville office, and Arlesa

Hunter was the payroll keeper. Later Arthur Powers called a staff meeting and said that he did not

want me to be the time keeper anymore and that he wanted Patsy Williams (White) to be the

timekeeper. He did not give any reason for the change. Nonetheless, I still informally kept track of

the time on my calendar, and Patsy Williams got mad, saying that Arthur Powers told her to be the

timekeeper, and I was not supposed to keep track of the time any more. I had noted she was abusing

her time, and had informed Mr. Powers of this. However, Mr. Powers took no action against Patsy

Williams.

(9)    At the end of December 1996, the Hayneville office was closed, and I was transferred

to the Luverne, Alabama, office. In February 1997, Arthur Powers called me and told me to file all

of the annual statements in the file cabinet and send some files from Patsy Williams' desk to the St.

Louis finance office. Patsy Williams had been assigned to do this task but had failed to do it, and

no action was taken against her by Arthur Powers.

4

(10)    John Sasser, District Director, stated that Arlesa Hunter would have to drive back and forth to the Andalusia office for one week to fill in for a clerk who was out. He directed Arlesa Hunter to drive back and forth because a White employee had refused to go. Only after Ms. Hunter's protests of unfairness, she was not forced by Mr. Sasser to drive back and forth.

(11)    The Luverne office did not receive the RIF consideration notice until after other counties had received it. Only after we called the state office, did Barbara Price of Human Resources send copies to our office in Luverne.

(12)    The discrimination by the Agency made me feel like I did not want to work with the Agency. Arthur Powers' actions made me uncomfortable, and I felt like he did not want me at the office. I felt that if I was going to have a career there I would have to go through this type of discrimination or retaliation every day at the Luverne office.

(13)    I believe that my race and color were a factor in my work place environment because of the way Mr. Powers would tell Blacks to do things versus the way he would tell Whites.

(14)    I applied for a job in Mobile prior to the RIF. Lisa Hardy also applied. Ms. Hardy is of mixed race, White and Indian. The job was virtually the same as the one I was doing in

5

Luverne. I submitted an application but did not get an interview or letter of rejection. Everyone who was a GS-4 had been subject to the RIF. John Sasser was one of the selecting officials. I believe that my race and color were a factor in my non-selection because John Sasser had no Blacks in his office and as shown by the way he spoke to Arlesa Hunter racially identifying her as one of "you people" when he harshly spoke to her in my presence in our Luverne office. Lisa Hardy, a White, who was selected, had a year less experience than I did and was less qualified than I was.

(15)    Race was a factor in the RIF because some people in lower grades who were White were not RIFed, Whites who included Lisa Hardy and Camilla Meeks.

(16)    After the RIF I started applying for secretarial jobs at Maxwell Air Force Base in Montgomery, Alabama. I kept applying for federal jobs, and I kept hearing that I was not eligible for priority because I was not on the Re-employment Priority List (RPL). I called the Office of Personnel Management and spoke to Lee Howardstead and asked him what the RPL was supposed to look like. Barbara Price of Human Resources at the Agency state office told me that I was on the RPL list, but I kept getting turned down because I was not actually on the list. Barbara Price never gave me a copy of the RPL.

6

(17)    All of the White people who were RIFed in the Luverne office went back to work at

the Agency, though some were placed in temporary jobs. Arlesa Hunter and I, Black employees,

have not been contacted about any potential jobs at the Agency to this date.

(18)    The Agency discriminated against me by not placing my name on the RPL list or

helping me to get re-employed. A job came open in Wilcox County after the RIF, but Arlesa Hunter

and I were not called.

(19)    On October 29, 1996, I first wrote a letter to the Agency complaining about a

"harassment problem" that I had with county office supervisor Arthur L. Powers. State Director

Horace Horn who is over all personnel decisions in the state wrote back to me but in his response,

he ignored my direct complaint of harassment and never would address this issue.

(20)    After my EEO case was being investigated, Mr. Horace Horn refused to respond to

my EEO charges with any statement as per the investigation.

(21)    Because Mr. Powers and the Agency continued to discriminate and or retaliate against

me and because Mr. Horn, the deciding official refused to respond to my complaints, I wrote a series

of letters detailing and factually setting forth racial discrimination, etc., what I felt was harassment,

7

to the Agency's Washington, D.C. Office of Civil Rights. Letters dated December 20, 1996;

February 25, 1997, with follow-up, complaint letters dated April 30, 1997, and April 20, 1998, were

sent to the Agency's Secretary of Agriculture.

(22)    I continued to place the Agency on notice of my EEO complaints by a further follow-

up letter dated August 24, 1999.

(23)    Earlier in 1996, Mr. Horace Horn had been the deciding official in denying me

placement in four positions for which I was well qualified and all positions that were given to White

individuals.

(24)    During 1996, Mr. Horace Horn was the State Director when the Agency was in

litigation involving Black farmers who alleged race discrimination involving farm loans with the

Agency.

Further the affiant saith not.

8

Lisa McCall
Affiant


**Notary**

Before me appeared Lisa McCall who first being sworn, deposes and states that the foregoing affidavit is true to the best of her knowledge and belief.
Done this _____day of May 2007 at Montgomery, Alabama.

_____
Notary Public

My commission expires _____

9

Lisa McCall
Affiant


**Notary**

Before me appeared Lisa McCall who first being sworn, deposes and states that the foregoing affidavit is true to the best of her knowledge and belief.

Done this ___10___ day of May 2007 at Montgomery, Alabama.

Notary Public

My commission expires _____    **My Commission Expires 1/22/2011**

9

EXHIBIT F2

STATE OF ALABAMA

COUNTY OF MONTGOMERY

### AFFIDAVIT OF LISA MCCALL

I, Lisa McCall, make the following statement freely and voluntarily to Romaine L. White, who has identified herself to me as a Contract EEO Investigator for the following federal agency: U.S. Department of Agriculture (USDA), investigating a complaint of discrimination filed by me, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

1.   I was employed by the USDA Rural Development starting in July of 1990. In 1996 I held the position of Community Development Assistant, GS 4/4 in the Hayneville, Alabama office. When that office closed in November of 1996, I was transferred to the Luverne, Alabama office.

2.   I believe that the Agency discriminated against me on the basis of my race (black) and color (black), when I was separated from employment as result of a reduction in force (RIF) in April of 1997[1]; my name was not placed on the reemployment priority list (RPL); and I was subjected to a pattern of harassment prior to my separation which included the assignment of duties; insufficient work space and verbal abuse by my supervisor.

Page 1 of 6                                          Initials _LM_

---

[1]The accepted issue says April of 1998 but the RIF actually took place in 1997.

3. My first line supervisor in the Hayneville office was Carnell McAlpine, the county Supervisor, and my second line supervisor was Fred Callison, District Director. Toward the end of my time in Hayneville and after I transferred to Luverne, Art Powers was my first line supervisor. His title was County Supervisor and was later changed to Community Development Manager. My second line supervisor in Luverne was John Sasser, District Director.

4. I was subjected to harassment by my supervisor, Art powers, for November of 1996 until the date of the RIF in April of 1997. He treated me and my co-worker, Arlesa Hunter (race and color black), differently from the way he treated white employees.

5. Art Powers used an angry tone when he spoke to me and Arlesa. He did not speak that way to white employees. He would tell me and Arlesa to do thing that he would not tell white employees to do, such as move office furniture around and put heavy files into file cabinets.

6. Arlesa and I did not have office furniture or a phone or computer. We each had just a table, chair and typewriter. We needed a phone and a computer for our job. White employees with the same title had office furniture and/ or offices.

7. When I was in Hayneville in November of 1996, I did an interest credit review on a delinquent borrower. I found out she had failed to report that she had gotten married so I gave her a form for verification of her husband's income. She called Art Powers to

Page 2 of 6                                          Initials _LM_

complain that she was separated from her husband when she was not. Art Powers told me that I should not have asked her about her husband's income and that if I did I would be sorry. After that, he was hostile to me.

8. In November of 1996, I was the office timekeeper and Arlesa was the payroll keeper. Two days later Art called a staff meeting and said that he did not want me to be the time keeper anymore, he wanted Pasty Williams to be the timekeeper. He did not give any reason for the change. I still kept track of the time on my calendar and Patsy got mad, saying that Art told her to be the timekeeper and I was not supposed to keep the time any more. Patsy was mad because I was keeping track of her time and she was abusing her time.

9. At the end of November 1996 the Hayneville office was closed and I moved to Luverne. In January, Art called and told me to file all of the annual statements in the file cabinet and send some files from Patsy's desk to St. Louis. Patsy was supposed to do this.

10. John Sasser, district director, was going to make Arlesa drive back and forth to the Andalusia office for one week to fill in for a clerk who was out. He was going to make Arlesa go because another white employee refused to go. Ultimately nobody went.

11. I did not complain of this harassment prior to filing my formal complaint with the Agency.

Page 3 of 6                                        Initials _LM_

12. The state office would send job announcements out by e-mail or fax to the county offices but by the time this information got out, the state office already knew who they were going to select for the job. Sometime the notices got to Luverne later than other offices. The announcements were put in a book that was available to any employee. The announcements were not distributed differently to black and white employees.

13. The Luverne office did not receive the RIF consideration notice until after other counties had it. Someone in another county called us and that is how we found out about it. We called the state office and Barbara Price sent copies.

14. Art Powers was rude and used a harsh tone when he spoke to black borrowers. He did not speak that way to white borrowers. Once an older black lady who could not read and write came in and he did not explain things to her like he should have. He did not want to be bothered with those type of people. Several borrowers got mad and yelled and cursed at him. I did not hear what they may have said to each other before they were yelling at each other.

15. The harassment made me feel like I did not want to be there. Art Powers made me uncomfortable. I felt like he did not want me there. I felt that if I was going to have a career there I would have to go through this every day.

16. I believe that my race and color were a factor in the harassment because of the way he would tell blacks to do things versus the way he would tell whites.

Page 4 of 6                                           Initials  LM

17.    I applied for a job in Mobile prior to the RIF. Lisa Hardy also applied. She is of mixed race; white and Indian. I don't know who else applied. The job was the same as the one I was doing in Luverne. I submitted an application but did not get an interview or letter of rejection. Everyone who was a GS-4 was subject to the RIF. The position in Mobile was a GS-5 and therefore exempt from the RIF. John Sasser was the selecting official. I believe that my race and color were a factor in my non-selection because John Sasser had no blacks in his office and because the way he spoke to Arlesa made me think that he did not want to have any blacks in the office. Lisa Hardy, who was selected, had a year less experience than I did.

18.    I believe that race was a factor in the RIF because some people in lower grades who were white were not RIF'd.

19.    After the RIF I started applying for secretarial jobs at Maxwell Air Force base. I kept applying for federal jobs and I kept hearing that I was not eligible for priority because I was not on the reemployment priority list. I called OPM and spoke to Lee Howardstead and asked him what the RPL was supposed to look like. Barbara Price at the state office told me that I was on the list but I kept getting turned down because I was not on the list. Barbara Price has never given me a copy of the RPL.

20.    All of the white people who were RIF'd are back working at the agency, some in temporary jobs. Arlesa and I have not been contacted about any jobs.

Page 5 of 6                                        Initials  LM

21. I believe that the agency discriminated against me by not placing my name of the RPL list or helping me to get reemployed. A job came open in Wilcox County after the RIF but Arlesa and I were not called.

22. I am seeking reemployment, back pay from the date of the RIF, and damages for humiliation. I filed my complaint earlier and was told that it had been lost. I filed it again on April 20, 1998.

I have read this statement, consisting of 6 pages, and it is true, complete, and correct to the best of my knowledge and belief.

*Lisa McCall*
_____
Signature

*2-4-2001*
_____
Date

Signed and sworn to before me on
this 4th day of _February_, 2001,
at _____

*Debra M. William*
_____
Neutral witness, notary, or Investigator

Page 6 of 6.                              Initials _LM_

## ADDENDUM TO AFFIDAVIT OF LISA MCCALL

I, Lisa McCall, add the following information to my affidavit in response to statements made by Art Powers in his affidavit:

1. I disagree with the statements made in Mr. Powers' affidavit about my lack of a desk. If they knew that they were going to RIF us, they should have left the Hayneville office open and not moved us to the Luverne office where there was not enough space to work or have a desk and we had to drive farther. It was a fire hazard for us to be so cramped in the Luverne office.

2. I disagree with Mr. Powers' statement that he and Patsy Williams filed the Lowndes county files and the annual statements. Arlesa and I did all of that work, he and Patsy did not touch those files.

3. I disagree with the statement that I did not return the form to be placed on the RPL list until May 1998. I called Barbara Price the day after the RIF and she told me I was on the list. I kept calling and she kept telling me I was on the list but I am still not on the list four years after the RIF. Arlesa and I never got called about any jobs.

Page 1 of 2                                                      Initials _LM_

4.  Art Powers statement that I was yelling about beating up a borrower is a lie.

I have read this statement, consisting of 2 pages, and it is true, complete, and correct to the best of my knowledge and belief.

_____
Signature

_____
Date         *Feb. 4, 2001*

Signed and sworn to before me on
this 4th day of February , 2001 ,
at _____.

_____
Neutral witness, notary, or Investigator

Page 2 of 2                                    Initials _LM_

## PRIVACY ACT NOTICE TO COMPLAINANT
## FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, sections 5.2 and 5.3; Title 29, Code of Federal Regulations, section 1613/1614; Title 5, United States Code, sections 1303-1304; Title 42, United States Code, section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data you supplied previously and information developed by investigation to resolve your equal employment opportunity discrimination complaint. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve your equal employment opportunity discrimination complaint. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary. However, failure to furnish the information will result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

_____
Signature of Interviewer

_____
Signature of Complainant

_1-25-01_____
Date

_Montgomery ALA_____
Place

## RIGHT TO REMEDIES

You have the right to provide documentation in support of your requested remedy. Evidence on the question of remedies may include evidence in support of make whole relief or compensatory damages.

Make whole relief is recoverable under Title VII of the Civil Rights Act and is defined as relief that would place you in the position in which you would have been had the discrimination never occurred. Examples of such relief may include back pay, interest on back pay, or restitution of leave.

Compensatory damages are available under the Civil Rights Act of 1991 and may be claimed for monetary losses, such quantifiable out-of-pocket expenses. Damages may also be claimed for non-monetary losses, such as emotional distress and mental anguish.

Compensatory damages are not recoverable for actions occurring before November 21, 1991. They also do not apply to allegations regarding the improper processing of a complaint or cases brought solely under the Age Discrimination in Employment Act. Compensatory damages do not include relief already recoverable under Title VII of the Civil Rights Act.

Should you seek compensatory damages, you must provide proof that the damages were caused by the alleged discrimination. In order to substantiate the claim, you must provide copies of any and all objective evidence indicating that you have incurred compensatory damages, as well as evidence that the damages are related to the alleged unlawful discrimination. Receipts, records, bills, canceled checks and statements from others (such as health care providers) describing how you were affected and the extent of the damages are some of the examples of evidence which may be used to support your claim.

Should you choose to submit documentation for inclusion in this report, it must be received by the investigator by October 16, 2000.

If such documentation is not made available by this date, you may submit the documentation to the alleged discriminatory agency or you may present this documentation to an Administrative Judge should you elect to go to hearing.

_____
Complainant

_____
Date
1-25-01

STATE OF ALABAMA

COUNTY OF MONTGOMERY

### AFFIDAVIT OF BARBARA PRICE

I, Barbara Price, make the following statement freely and voluntarily to Romaine L. White, who had identified herself to me as a Contract EEO Investigator for the following federal agency: U.S. Department of Agriculture (USDA), investigating a complaint of discrimination filed by Lisa McCall, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

1.      I am employed as a Personnel Management Specialist, GS-12, with the USDA, Rural Development, Administrative Program Division, Human Resources Section. My immediate supervisor is Barbara Bennett, Administrative Program Director. My race and color are white. In 1996-1997 I was a GS-11 in the same position.

2.      I have no knowledge of any alleged harassment of Lisa McCall by Art Powers.

3.      I was involved with the Reduction in Force carried out by the USDA in 1997. The RIF was precipitated by budget ceiling cuts at the agency. To my knowledge, Rural Development was affected in all states. I first received notice of the RIF at a meeting in St. Louis where we were told that a RIF was coming based upon budget and staffing cuts. In the early part of 1996, our office carried out a mock RIF in which we

Page 1 of 7                                              Initials _____

sent all employees the notices and paperwork that they would receive in a real RIF. The purpose of the mock RIF was to give employees plenty of notice of the upcoming RIF and to allow us to correct any errors in the RIF process. Mock RIF notices went to every employee, not just those likely to be subject to the RIF.

4.    During the mock RIF process, Horace Horn, the State Director, Barbara Bennett, my supervisor, Mickey Boyd, another personnel specialist, and myself conducted training sessions all over the state explaining the RIF procedure and the reemployment opportunities available for employees. Every employee received a copy of the Restructuring Agreement dated March 20, 1996 from Jill Long Thompson, Undersecretary, and the State Restructuring Plan. Numerous pieces of correspondence were sent to employees regarding the RIF. Additionally, employees were encouraged to call the state staff if they had questions. Vacancies were announced at the lowest possible entry level in order to ensure that more employees would have an opportunity to apply.

5.    There were three types of reemployment programs involved in the RIF. First we maintained a Reemployment Priority List (RPL). The RPL is a USDA wide list used as a mechanism to give priority consideration for employment to individuals who were RIF'd. To be placed on the RPL, an employee subject to the RIF had to return an RPL registration form to me. Once this form was returned, they would immediately be placed on the RPL list. The employee would not be placed on the list until the RPL registration form was returned. The RPL gave a RIF'd employee priority for jobs for a

Page 2 of 7                                             Initials _____

two year period after the RIF. Therefore, for the RIF in April 1997, the two-year priority period expired in April of 1999. The priority also only extended to jobs in the USDA. An employee on the UDSA RPL would not have priority for jobs at another agency. Once an employee was placed on the RPL, the agency had the obligation to contact the RIF'd employee and give them priority if certain types of jobs came open. Specifically, we had to notify the employee if jobs came open in the same commuting area from which they had been RIF'd and which were at the same grade from which they were RIF'd. If the position has promotion potential above the level held by the RIF'd employee, they do not have to be contacted. The commuting area is generally determined as a sixty-mile radius from the office where the RIF'd employee had been employed. For example, if a GS-4 employee was RIF'd from the Luverne office and placed on the RPL list, we would be obligated for a two year period after the RIF to notify them of any GS-4 or lower vacancies occurring within a sixty mile radius of Luverne. If a vacancy came open in a different area, or if the position was higher than GS-4 or could be promoted to a level higher than a GS-4, we would not be required to notify the RIF'd employee. Also, we were not required to notify RIF'd employees on the RPL of temporary vacancies.

6.      RIF'd employees were also eligible for the Career Transition Assistance Program (CTAP). This program gave employees who were expected to be RIF'd priority consideration for vacancies at all USDA agencies

Page 3 of 7                                                        Initials_____

Employees who received RIF notices were automatically eligible for CTAP; they did not have to fill out any forms or applications. The RIF'd employee was obligated to provide a copy of their RIF notice to show that they were to be RIF'd and if they met all of the qualifications for the job and are considered well qualified, then they would receive priority consideration for a similar position. CTAP priority also only extends until the actual RIF date.

7.    RIF'd employees are also eligible for placement under the Interagency Career Transition Assistance Program (ICTAP), with all federal agencies, not just USDA. This program is similar to CTAP except that it applies after the RIF rather than before. There was no ICTAP list of employees and the agency did not have an obligation to notify RIF'd employees of vacancies under ICTAP. Instead, it was the employee's obligation to locate vacancies (such as from the OPM bulletin board) and apply for the position. The RIF'd employee was required to provide a copy of their SF 50.

8.    The actual RIF took place in April of 1997. The Restructuring Plan, which determined which positions would be kept, was developed by a committee including State Director Horace Horn, Barbara Bennett, Program Directors, Rural Development Directors, and others. The plan divided the state into competitive areas. Most county offices were their own competitive area. Crenshaw County (Luverne) was its own competitive area. The restructuring plan identified the positions to be kept in the Luverne/Crenshaw County office. These positions were one Community Development Manager, GS-11; one Community Development Technician, GS-6/7; and one

Page 4 of 7                                                      Initials _____

Community Development Assistant, GS-4/5. The employees in each competitive area were placed on a Retention list in order determined by their service comp. date ( the date they started with the agency) with years added for performance, based upon an average of their last three-year performance appraisals. Betty Blackmon was highest on the retention list among the GS 4/5s so she was retained in the Community Development Assistant position. Lisa McCall was lowest on the retention list. Her race and color had nothing to do with her placement on the RIF list.

9. The necessary form to be placed on the Reemployment Priority List was attached to all RIF notification letters. The procedure for being placed on the RPL was thoroughly discussed at the briefings conducted across the state. Before the final RIF date, a Career Transition Seminar was conducted for employees who were being RIF'd and the RPL was discussed once again. Lisa McCall did not attend the seminar. The RPL registration form was sent to Ms. McCall several times. On 2/9/98 the form was sent to her after a telephone request to me. On 3/2/98 Ms. McCall contacted Ms. Boyd, Personnel Specialist, with a complaint about her W-2 form and stated that she still had not received the RPL form, which was mailed on Feb. 9th. I mailed the form to her again on March 10th to a new address. The form was signed by Ms. McCall on April 27, 1998 and received by me on May 26, 1998. Ms. McCall's name was placed on the Agency RPL list on May 27, 1998. Ms. McCall's race and color had nothing to do with her placement on the RPL.

Page 5 of 7                                                                    Initials _____

10.     Even though Ms. McCall did not return her RPL form until over a year after the RIF and therefore was not placed on the Agency RPL until that time, her name was on an informal reemployment list that we maintained in the office. No permanent GS-4 positions within her commuting area have been available since the RIF. We would not have to call Ms. McCall if a temporary position was available. I did send Ms. McCall a vacancy notice regarding a secretarial position with the Homebuilders Association that I came across.

11.     Sonya Davenport, who was employed as a GS-5 in the Luverne office and also lost her job in the RIF, was recently reemployed in a temporary position a few months ago. The agency did not contact her about the position. She heard that an employee in Covington County had gotten married and was moving and called the Covington County office to find out if the job would be available. She was rehired in a temporary position. She was originally located in Covington County but was recently detailed to the State office in Montgomery.

12.     There was not an office located in Mobile in 1996. I believe that Ms. McCall was referring to an office in Bay Minette AL (near Mobile). Ms. McCall applied for a GS-5 position in Bay Minette. The Vacancy Announcement was opened 5/31/96 and closed 6/14/96. Lisa McCall and Lisa Hardy were the only applicants. Lisa Hardy was selected for the position. Horace Horn, State Director, was the selecting official for the position. He usually made selections based on the applications submitted and did not

Page 6 of 7                                             Initials _____

interview for positions. Horn is no longer with the agency and is not willing to be interview. Lisa McCall's race and color had nothing to do with her non-selection.

13.     A later vacancy became available in Bay Minette on 3/17/97. This vacancy was advertised to give the GS-4/5 employees who were being RIF'd an opportunity to apply for another position. Lisa McCall did not apply. There were no applications for the position. It was later filled with a worker-trainee, GS-1, on 1/4/98.

14.     Vacancy announcements were always sent out to all offices across the state. We did not distribute vacancy announcements only to white employees.

15.     I do not believe that Lisa McCall was discriminated against on the basis of her race and color.

I have read this statement, consisting of 7 pages, and it is true, complete, and correct to the best of my knowledge and belief.

_Barbara Price_
Signature

_1-26-01_
Date


Signed and sworn to before me on this
_26_ day of _January_ 2001,
at Montgomery, Alabama.

_Omax X. White_
Neutral witness, notary, or Investigator


Page 7 of 7                                           Initials _____

# PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_Roman L. Whit_
Signature of Interviewer

_1/25/01_
Date

_Barbara Price_
Signature of Affiant

_Montgomery, AL_
Place