1        IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF ALABAMA
2                    NORTHERN DIVISION

3

4   LISA MCCALL,

5            Plaintiff,

6            V.        CIVIL ACTION NO. 2:06CV39-MHT

7   MIKE JOHANNS, SECRETARY,
    DEPARTMENT OF AGRICULTURE,

8

9            Defendant.              **COPY**

10

11

12

13            *  *  *  *  *  *  *  *  *  *  *  *  *  *

14

15

16        THE DEPOSITION OF BARBARA PRICE was taken

17   pursuant to stipulation and agreement before

18   Shannon P. Yost, Certified Court Reporter and

19   Commissioner for the State of Alabama at Large,

20   at the United States Attorney's Office, One Court

21   Square, Montgomery, Alabama, on the 26th

22   day of March, 2007, commencing at 1:00 p.m.

23

```
 1                        APPEARANCES:

 2     FOR THE PLAINTIFF:

 3     GARY ATCHISON, ESQUIRE
       492 South Court Street
 4     Montgomery, Alabama   36104

 5


 6     FOR THE DEFENDANT:

 7     H. RANDOLPH NEELEY, ESQUIRE
       Office of United States Attorney
 8     One Court Square
       Montgomery, Alabama   36104
 9

10                          INDEX

11

12     Examination by Mr. Atchison * * * * * * *  6, 151

13     Examination by Mr. Neeley * * * * * * * * * 120

14

15                      EXHIBIT INDEX

16

17     Plaintiff's Exhibit                    Page

18            2                               103

19            3                               142

20            4                                31

21            8                                71

22            9                                71

23           10                                71
```

Boggs Reporting & Video
334.264.6227/800.397.5590/www.boggsreporters.com

| | | |
|---|---|---|
| 1 | 11 | 71 |
| 2 | 12 | 47 |
| 3 | 13 | 49 |
| 4 | 14 | 19 |
| 5 | 15 | 21 |
| 6 | 16 | 26 |
| 7 | 17 | 40 |
| 8 | 18 | 46 |
| 9 | 20 | 166 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |

```
1                      STIPULATIONS

2

3       It is hereby stipulated and agreed by and

4   between counsel representing the parties that the

5   deposition of

6                     BARBARA PRICE

7   is taken pursuant to the Alabama Rules of Civil

8   Procedure and that said deposition may be taken

9   before Shannon P. Yost, Certified Shorthand

10  Reporter, and Commissioner for the State of

11  Alabama at Large, without the formality of a

12  commission; that objections to questions other

13  than objections as to the form of the question

14  need not be made at this time but may be reserved

15  for a ruling at such time as the said deposition

16  may be offered in evidence or used for any other

17  purpose, by either party, provided for by the

18  Statute.

19      It is further stipulated and agreed by and

20  between counsel representing the parties in this

21  case that the filing of said deposition is hereby

22  waived and that said deposition may be introduced

23  at the trial of this case or used in any other
```

1   manner by either party hereto provided for by the

2   Statute, regardless of the waiving of the filing

3   of the same.

4        It is further stipulated and agreed by and

5   between the parties hereto and the witness that

6   the signature of the witness to this deposition

7   is hereby waived.

8

9              * * * * * * * * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

<u>**BARBARA PRICE**</u>

1

2      The witness, after having first been

3   duly sworn to speak the truth, the whole

4   truth, and nothing but the truth, testified

5   as follows:

6                    EXAMINATION

7   BY MR. ATCHISON:

8   Q   Ms. Price?  If I may call you Ms. Price,

9       what is your full legal name?

10  A   Barbara Ann, A-N-N, Price.

11  Q   Are you married?

12  A   Yes.

13  Q   Husband's name?

14  A   Arthur Thomas Price.

15  Q   Do you have any adult children in this area?

16  A   Yes.  Roxanne Ray, R-A-Y, and Jeffrey Price.

17  Q   And where does Roxanne live, please, ma'am?

18  A   She lives with us, 104 Gail Street.

19  Q   Montgomery?

20  A   Prattville.  It's 104 Gail, yeah.

21  Q   Okay.  And where does Jeffrey, your son,

22      live?

23  A   He just moved.  He lives in Prattville.

```
1   Q    Okay.

2   A    I don't remember the address.

3   Q    If you could supply counsel with that

4        number --

5   A    Okay.

6   Q    -- street address, I'd appreciate it.

7   A    All right.

8   Q    This is for jury selection purposes if we

9        have to deal with that.  Okay.  Any other

10       relatives in this area; that's Montgomery

11       area or extended area, really looking at

12       middle district.  So...

13  A    A granddaughter.

14  Q    Adult?

15  A    Uh-huh, 25.

16  Q    Her name?

17  A    Okay.  Brandie, B-R-A-N-D-I-E, Glynn Price.

18       Oh, gosh.  I forgot her address.

19  Q    Does she live in Montgomery or this area?

20  A    Uh-huh, Montgomery.  Blushing Groom is the

21       street.

22  Q    Is she listed in the telephone directory?

23  A    I doubt it.  I've got it if you want to hang
```

```
 1        on.
 2   Q    No.  Just give it to your counselor, if you
 3        could.
 4   A    Okay.
 5   Q    Okay.  That's fine.  Any other relatives,
 6        uncles, aunts, parents, adults?
 7   A    No.
 8   Q    Okay.  All right.  Off the record, I
 9        introduced myself as Gary Atchison.  I'm the
10        attorney for the plaintiff in this case,
11        Ms. Lisa McCall.  And if you don't
12        understand my questions, you can ask me to
13        restate them, which the Court Reporter, I'm
14        sure, will assist us with.  Or even then, if
15        you don't understand them, I'll try to
16        rephrase them.
17   A    Okay.
18   Q    Okay?  And, of course, you have a right to
19        read and sign your deposition, which I
20        stated off the record just a few minutes ago
21        to you.  Okay?
22   A    Uh-huh.
23   Q    Do you understand that?
```

```
 1   A    Right.

 2   Q    Okay.  And I assume you do not wish to waive

 3        your right to read and sign it; is that

 4        correct?

 5                   MR. NEELEY:  Do you want to

 6                   waive it?  We had talked about

 7                   that the other day, remember?

 8                   THE WITNESS:  I don't know

 9                   what that means.  You mean, I'd

10                   have to read it and sign it today?

11                   MR. ATCHISON:  Not today.

12                   MR. NEELEY:  It would be

13                   prepared in the course of about 10

14                   days.  They'd send you a copy, and

15                   you'd have to read it to approve

16                   it.  We talked about, you know,

17                   the inconsistencies that may or

18                   may not be there, and that we

19                   could generally resolve them if

20                   they were there, but it's your

21                   absolute right.

22   A    Well...

23   Q    If you'd like to think about that and give
```

|    |   |                                                        |
|----|---|--------------------------------------------------------|
| 1  |   | us an answer at some point in time through             |
| 2  |   | your attorney, it's fine with me.  I'll need           |
| 3  |   | to take a time with you --                             |
| 4  | A | Okay.                                                  |
| 5  | Q | -- and the Court Reporter in case on this              |
| 6  |   | right now.  Think about it and get with your           |
| 7  |   | attorney, and your attorney will tell us --            |
| 8  | A | Okay.                                                  |
| 9  | Q | -- and the Court Reporter what you intend to           |
| 10 |   | do.  It's fine with me.  I don't care one              |
| 11 |   | way or the other.                                      |
| 12 | A | Okay.                                                  |
| 13 | Q | Okay?  I just have to advise you of your               |
| 14 |   | right to do that.                                      |
| 15 | A | All righty.                                            |
| 16 | Q | Okay?  All right.  I understand that you               |
| 17 |   | worked with the Department of Agriculture.             |
| 18 | A | That's true.                                           |
| 19 | Q | Okay.  When you worked with the Department             |
| 20 |   | of Agriculture, what was your address?  Was            |
| 21 |   | it the Gail Street address in Prattville?              |
| 22 | A | Yes.                                                   |
| 23 | Q | Okay.  And that's been your address for                |

| | | |
|---|---|---|
| 1 | | sometime. |
| 2 | A | Well, let's see.  Yeah.  Let's see.  We've |
| 3 | | lived at that address since 1995. |
| 4 | Q | Okay.  All right.  And that ZIP code there |
| 5 | | is? |
| 6 | A | 36066. |
| 7 | Q | Okay.  And what position did you hold with |
| 8 | | the Department of Agriculture? |
| 9 | A | Personnel management specialist and human |
| 10 | | resource manager.  I was the human resource |
| 11 | | manager when I retired, and a personnel |
| 12 | | specialist during the RIF. |
| 13 | Q | Okay.  I have a big, thick set of documents |
| 14 | | here that are bound together in a blue |
| 15 | | binding, hard binding, and it's called a |
| 16 | | complaint file, United States Department of |
| 17 | | Agriculture, Lisa McCall, and it's got the |
| 18 | | case number final copy on the front of that. |
| 19 | | Do you see that? |
| 20 | A | Yes. |
| 21 | Q | Have you seen these before in cases?  Do you |
| 22 | | understand what this is? |
| 23 | A | Oh, no.  I've never seen a book -- you mean |

| | | |
|---|---|---|
| 1 | | a blue book like that? |
| 2 | Q | Yes, ma'am. |
| 3 | A | No. |
| 4 | Q | An EEOC file.  Okay.  Well, let's do this. |
| 5 | | Whether or not you've seen it or not, I'm |
| 6 | | going to flip to a flow chart, if you don't |
| 7 | | mind.  And it's Exhibit F-1-A. |
| 8 | A | Uh-huh. |
| 9 | Q | What was your position as of April '97? |
| 10 | A | Personnel management specialist. |
| 11 | Q | Okay.  And that's shown here in that flow |
| 12 | | chart, Exhibit F-1-A, of the complaint file. |
| 13 | | Now, you see the flow chart shows that above |
| 14 | | you as of April '97 was Horace Horne, the |
| 15 | | state director of the Department of |
| 16 | | Agriculture. |
| 17 | A | Well, yeah, I see that. |
| 18 | Q | Okay.  Is that correct? |
| 19 | A | No, that's not correct.  Above me was the |
| 20 | | administrative officer, and she -- I |
| 21 | | reported to her. |
| 22 | Q | Okay. |
| 23 | A | And she reported to the state director. |

```
 1   Q    Okay.  Well, certainly, Horace Horne was
 2        ultimately your supervisor behind several
 3        people.
 4   A    Yeah.  That's true.  Yeah.
 5   Q    That would be correct.
 6   A    Yeah.
 7   Q    And that's all I need to ascertain.  In
 8        other words, if Horace Horne sent you a
 9        directive, you would have had to obey the
10        directive.
11   A    That's true.
12   Q    Okay.  As of April '97.
13   A    Uh-huh.
14   Q    Okay.  And who were your supervisors as of
15        April '97?
16   A    Barbara Bennett.
17   Q    Spell her last name, please.
18   A    B-E-N-N-E-T-T.
19   Q    Okay.  What was her position?
20   A    She was the administrative program director.
21   Q    All right.  Was there anybody in the
22        supervisory line between you and Mr. Horne
23        other than her as of '97?
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay.  All right.  And in 1996, '97, did you |
| 3 | | hold the same position? |
| 4 | A | Yes. |
| 5 | Q | How about in 1998? |
| 6 | A | Yeah.  I think it was the same position. |
| 7 | Q | And 1999? |
| 8 | A | I can't remember -- somewhere along the |
| 9 | | line, I got promoted to the human resource |
| 10 | | manager, and I don't remember for sure when |
| 11 | | that was. |
| 12 | Q | Would you agree that the term human |
| 13 | | resources and personnel management are |
| 14 | | oftentimes the same or overlapping terms? |
| 15 | A | Yes.  That's true. |
| 16 | Q | We use them interchangeably. |
| 17 | A | That's true.  And it was actually the same |
| 18 | | job. |
| 19 | Q | Okay.  So you won't be confused if I say |
| 20 | | personnel management or human resources |
| 21 | | alternately in this deposition. |
| 22 | A | That's true.  That's fine. |
| 23 | Q | Okay.  In 1997, what were your job duties as |

```
 1          personnel management specialist?  I see
 2          that's a GS-12 position; correct?
 3     A    Uh-huh.
 4     Q    What were your job duties?
 5     A    Well, I handled all of the employee benefits
 6          and all of the personnel actions such as new
 7          hires, reassignments, retirements, position
 8          descriptions for all employees, vacancy
 9          announcements, and recruitment.  That's
10          probably about it.
11     Q    Okay.  What was your office's involvement
12          whenever EEO matters came about?  We're
13          talking about as Rand would use the term
14          Title Seven, are you conversant with what
15          Title Seven means?
16     A    No, I'm not.  Actually, EEO matters was
17          pretty much handled with the administrative
18          program director.
19     Q    Who was that?
20     A    That was Barbara Bennett.  It's kind of hard
21          to explain, but Barbara and I would work
22          together but, ultimately, she would be the
23          one that would talk with -- you know, I
```

```
 1        would, like, gather information and, you

 2        know, start a file, keep the file going.

 3   Q    For an EEO investigation?

 4   A    When we first would get an EEO complaint,

 5        you know, I would give Barbara all the

 6        information, you know, that I had --

 7   Q    Okay.

 8   A    -- and start a folder on it, a file.  And

 9        then -- usually, Barbara would be the one

10        working with employee relations in St. Louis

11        to try to resolve it or the national office,

12        equal opportunity staff.

13   Q    All right.  Where is the national office?

14   A    Washington, D.C.

15   Q    Okay.  Would that be the employee complaints

16        division of your office?

17   A    Yes.

18   Q    The USDA?

19   A    Yeah, uh-huh.

20   Q    Okay.  And if someone corresponded with the

21        employee complaints division, I assume that

22        that office would correspond with you and

23        bring you to attention that their complaints
```

1    have been raised?

2  A    Right.

3  Q    That would be a protocol.

4  A    That's true.  They would notify either the

5        state director or Barbara Bennett.

6                    MR. NEELEY:  Object to the

7                form on the previous question.

8                That's fine.  Go ahead.

9  Q    Okay.  Did you ever know of the employee

10       complaints division to not correspond with

11       your office when there's a complaint raised

12       with them, an EEO complaint?

13                   MR. NEELEY:  Object to the

14               form, but you may answer.  Go

15               ahead.

16                   THE WITNESS:  What?

17                   MR. NEELEY:  Go ahead.

18 A    I don't recall any time.

19 Q    Any instances where they failed to

20       correspond with your office when they would

21       receive the complaints first?

22 A    No.  I really don't remember, never knowing

23       about one.

```
 1   Q    Okay.  In which they failed to contact your

 2        office if someone in your area -- now, what

 3        was your area coverage?

 4   A    It was all of Alabama.

 5   Q    Alabama.  So if someone had -- an employee

 6        of the Department of Agriculture had written

 7        them or complained to them directly, you

 8        don't know ever where they failed to contact

 9        your office and put you on notice -- when I

10        say you, I mean, your office --

11   A    Right.

12   Q    -- on notice of an EEO complaint of a State

13        of Alabama Department of Agriculture

14        workman?

15   A    No, I don't remember a time that they failed

16        to notify us.

17   Q    Okay.

18   A    I mean, it could have happened, but I don't

19        recall.

20   Q    Okay.  All right.  But the protocol was if

21        there was one made directly to them, they

22        should contact your office and put you on

23        notice so you could help gather the
```

| | | |
|---|---|---|
| 1 | | documents together. |
| 2 | A | That's true, get the information together. |
| 3 | Q | Okay.  So it could be defended or settled; |
| 4 | | correct? |
| 5 | A | So what? |
| 6 | Q | So that that case could be defended by the |
| 7 | | Department of Agriculture -- |
| 8 | A | Right. |
| 9 | Q | -- or else resolved, settled. |
| 10 | A | Right.  That's true. |
| 11 | Q | Okay.  All right.  Ma'am, I want to show you |
| 12 | | what is now marked Plaintiff's Exhibit |
| 13 | | No. 14, a letter dated December 20th, 1996. |
| 14 | | (At which time, the |
| 15 | | referred-to document was |
| 16 | | marked as Plaintiff's Exhibit |
| 17 | | No. 14 by the Reporter.) |
| 18 | A | Uh-huh. |
| 19 | Q | Now, ma'am, this is an unsigned copy, but my |
| 20 | | question will be having reviewed this copy, |
| 21 | | have you ever been seen this document before |
| 22 | | to your recollection? |
| 23 | A | No.  To my recollection, I do not remember |

| | | |
|---|---|---|
| 1 | | seeing it. |
| 2 | Q | Okay. All right. Did you ever have any |
| 3 | | discussion with anybody about this document, |
| 4 | | to your knowledge, or a document that had |
| 5 | | the contents of these statements in it? |
| 6 | A | I vaguely remember something about Lisa |
| 7 | | complaining about Art Powers. |
| 8 | Q | You're talking about Lisa McCall, the |
| 9 | | plaintiff that's sitting here with us. |
| 10 | A | Yeah, yeah. |
| 11 | Q | Okay. And her complaints were involving Art |
| 12 | | Powers and race discrimination, harassment. |
| 13 | | MR. NEELEY: Object to form. |
| 14 | A | What I remember is the way he talked to her, |
| 15 | | her complaint about the way he talked to |
| 16 | | her. But I never saw anything in writing. |
| 17 | | I just remember -- I don't even remember how |
| 18 | | I heard about it, probably either Barbara |
| 19 | | or -- |
| 20 | Q | Lisa herself? |
| 21 | A | Excuse me? |
| 22 | Q | Did Lisa, herself, ever tell you about this? |
| 23 | A | I don't believe she did, no. |

```
 1   Q    Is your memory clear on that?

 2   A    It's pretty clear.  I'd say 90% clear.

 3   Q    Okay.  All right.  If Lisa McCall testified

 4        under Oath that she had told you, would you

 5        have any proof overwise that she, indeed,

 6        had not discussed this with you?

 7   A    Well, no.  I mean, what proof would I have?

 8   Q    Okay.  All right.  Well, let me show you

 9        what has been marked as Plaintiff's Exhibit

10        15.

11                        (At which time, the

12                        referred-to document was

13                        marked as Plaintiff's Exhibit

14                        No. 15 by the Reporter.)

15   Q    And it's a letter dated February 25, 1997,

16        to Mrs. Lincoln of the Employee Complaints

17        Division, USDA Office of Civil Rights.  Take

18        a moment and review that document, please,

19        ma'am.

20   A    Okay.

21   Q    Okay.  Plaintiff's Exhibit 15 is addressed

22        to Barbara Lincoln at the Civil Rights

23        Complaints Division of -- excuse me -- the
```

```
1        Employment Complaints Division of the USDA
2        Office of Civil Rights.  Have you seen that
3        document before?
4    A   No, I don't think so.
5    Q   Okay.  Similar question as the last
6        document.  Do you recall discussing with
7        anyone the matters contained in this
8        document?
9    A   I recall talking with Mr. Powers about --
10       but it wasn't, you know, because of this
11       letter.
12   Q   What did you talk with Mr. Powers about?
13   A   Mr. Powers, during the RIF -- during the RIF
14       process, when Lisa and Arlesa were there,
15       Mr. Powers complained that -- Mr. Powers
16       complained of -- about Lisa, Lisa McCall.
17       She wouldn't do any work in the office.  He
18       said, you know, she would just come in and
19       just sit around and refuse to do her job.
20   Q   Okay.  But that's got nothing to do with any
21       of this.
22   A   No, that doesn't have anything to do with
23       this letter.
```

| | | |
|---|---|---|
| 1 | Q | But I do want to follow up. |
| 2 | A | Yeah. |
| 3 | Q | And was this when she was working under |
| 4 | | Mr. Powers at the Hayneville, Alabama |
| 5 | | office? |
| 6 | A | No, sir.  This was when she was working in |
| 7 | | the Luverne office. |
| 8 | Q | Luverne office.  Okay. |
| 9 | A | And, you know, she knew that she would be |
| 10 | | RIF'd.  And so he said she just refused, you |
| 11 | | know, to do any work.  They were trying |
| 12 | | to -- well, the office wasn't moving.  I |
| 13 | | don't know what they were trying to do, but |
| 14 | | they had a lot of stuff in the office, |
| 15 | | office equipment, and all that, from what I |
| 16 | | understand, and I think they were pretty |
| 17 | | much piled on top of each other. |
| 18 | Q | All right. |
| 19 | A | But, any way, he said Lisa just would not |
| 20 | | cooperate and wouldn't work. |
| 21 | Q | And at the time he said that, he was under |
| 22 | | requirement to issue either disciplines or |
| 23 | | recommend disciplinary action be taken for |

```
 1          workers who were not doing their job;
 2          correct?
 3     A    Well, he could have, yeah.  I mean, with his
 4          position, he could have.
 5     Q    Well, if she's being paid, she's being paid
 6          to do work; right?
 7     A    That's true.
 8     Q    And he's being paid to supervise her to make
 9          sure she did work.
10     A    That's true.
11     Q    So he was under requirement by the Federal
12          government to attend to someone who was not
13          allegedly doing work and either issue a
14          disciplinary action or seek one through a
15          higher up; is that correct?
16     A    I don't know if that's correct or not.
17     Q    Okay.  Well, did you recommend that he seek
18          disciplinary action against her?
19     A    No, I did not.
20     Q    Why not?
21     A    Because she was going to be RIF'd.
22     Q    So just give her a free ride for how long?
23     A    Just a few months.
```

```
 1   Q    A few months.  Just so that she --

 2   A    But I wouldn't say it was a free ride.

 3   Q    Well, if she didn't do any work, it was a

 4        free ride.  She was getting paid for

 5        nothing.

 6   A    Well, that's true.

 7                     MR. NEELEY:  Object to the

 8             form.

 9   Q    Okay.  All right.  So that's what you

10        recommended that he do, just to let her

11        work --

12   A    No.  I didn't make any recommendations.  I

13        just listened to him complain about it.

14   Q    Okay.  But you didn't make any

15        recommendations --

16   A    No, I didn't.

17   Q    -- that she should get paid for doing no

18        work.

19   A    No.

20   Q    Okay.

21   A    I never would have said that.

22   Q    Okay.  You made no recommendation that he

23        take disciplinary action against her, did
```

```
 1           you?

 2    A      No.

 3    Q      Okay.  All right.  Would you agree that your

 4           position was a management position?

 5    A      No, it wasn't.

 6    Q      Would you agree that your position advised

 7           the management?

 8    A      No.

 9    Q      Would you agree that your position was a

10           labor position?

11    A      No, it wasn't labor.

12    Q      Okay.  Okay.  In fact, your position dealt

13           with the hirings and firings of labor, did

14           it not?

15    A      Yes.

16    Q      Okay.  Let me show you, ma'am, please, if I

17           could, Plaintiff's Exhibit 16.

18                            (At which time, the

19                             referred-to document was

20                             marked as Plaintiff's Exhibit

21                             No. 16 by the Reporter.)

22    Q      It's been just now marked.  Have you seen

23           this letter before, please, ma'am?
```

```
1   A   No.

2   Q   Okay.  Have you ever talked to anyone

3       regarding the contents of this letter, to

4       your knowledge.

5   A   I haven't -- pretty much, I think.

6   Q   I think there's an overlap between these

7       letters, ma'am.

8   A   I swear, I just -- I'm not trying to be

9       difficult.  You know, I remember talking to

10      a lady.  I believe she was an EEO -- you

11      know, contracted by EEO to come down and

12      talk to us about Lisa's complaint.  And I

13      just don't remember if it was this letter or

14      not.  The lady's name was -- I think Romaine

15      something.  I remember talking to her about

16      the vacancy announcements.

17  Q   Did she come down from the Washington

18      office, please, ma'am, to talk to you about

19      this matter?

20  A   I believe that's where she was from, or else

21      she was hired by the Washington office.  You

22      know, they would contact their EEO

23      investigations out sometimes.  She may have
```

```
 1        been contracted out.

 2   Q    So would it be your recollection that she

 3        came down from the Office of Civil Rights of

 4        the USDA office, or else she -- if she is

 5        not in their office, she was retained to

 6        represent their office.

 7   A    Right, uh-huh, to get information.

 8   Q    About Lisa McCall.

 9   A    Right, uh-huh.

10   Q    Okay.  And I do remember -- of course, that

11        would refer back to these two about the

12        vacancy announcement you're holding right

13        now in talking about this matter involving

14        Exhibit 16, and you're referencing also 14

15        and 15, exhibits for the plaintiff.

16   A    Uh-huh.

17   Q    That her discussion with you was regarding

18        some of these complaints as you're now

19        recalling.

20   A    Yeah.

21   Q    Okay.  And approximately what time frame?

22        Would it have been the time frame no

23        later than, say, this document of -- this
```

| | | |
|---|---|---|
| 1 | | time frame, I should say -- April 30th, |
| 2 | | 1997, sometime in April or May.  Certainly |
| 3 | | by then, she would have talked to you? |
| 4 | A | Yeah, I guess it would have been after that. |
| 5 | Q | After April 30, 1997. |
| 6 | A | Yeah. |
| 7 | Q | Okay.  Do you recall taking any notes about |
| 8 | | your meeting with her, this Romaine woman? |
| 9 | A | No.  I believe I probably signed a |
| 10 | | statement, but I didn't take any notes. |
| 11 | Q | What statement did you sign? |
| 12 | A | Of whatever she would have -- you know, the |
| 13 | | statements I made to her. |
| 14 | Q | What statements did you make to Ms. Romaine? |
| 15 | A | I can't remember.  I don't remember. |
| 16 | Q | Do you know if they had anything to do with |
| 17 | | -- were they in response to the allegations |
| 18 | | that Ms. McCall made in Plaintiff's 14, 15, |
| 19 | | or 16?  Would that likely have been what it |
| 20 | | was? |
| 21 | A | Yeah, it likely was.  I'm pretty sure it was |
| 22 | | about vacancy announcements. |
| 23 | Q | Okay.  But, also, there's other very |

```
 1        specific allegations of race discrimination

 2        by Mr. Powers too; correct?

 3   A    Yeah.  But I don't remember being asked

 4        about it.  I mean, perhaps she did.

 5   Q    Okay.  And, at the time of this document,

 6        April 30th, 1997, had the RIF just occurred,

 7        just a few days before that?

 8   A    Yes.

 9   Q    Okay.  All right.  So I have a copy of an

10        EEOC decision in this case, and it's Lisa

11        McCall versus Mike Johanns, I guess that's

12        how you pronounce it, hearing number 130

13        2004 08002X.  And it recounts certain facts

14        in this case, and it says that the

15        complainant; that is, Lisa McCall, signed a

16        re-employment -- an RPL registration sheet

17        on or about -- well, it says on -- April 27,

18        1998, okay, and received by PL -- I guess

19        that's the agency -- on May 26, 1998.  Do

20        you have any facts that would show otherwise

21        that she received an RPL registration sheet

22        and signed it on April 27th, 1998?

23   A    Well, I mean, how would I have --
```

1   Q    Were you still with the agency then?

2   A    Yeah.

3   Q    Okay.  What is an RPL registration sheet,

4        please, ma'am?

5   A    That's the re-employment priority list, and

6        everybody who was RIF'd had the opportunity

7        to be placed on the RPL.  There's the form.

8   Q    Okay.  All right.  Well, okay.  Thank you.

9        That's helpful.  I will also mark this as

10       Plaintiff's Exhibit 4, presently marked as

11       Defendant's Exhibit 4.

12                        (At which time, the

13                        referred-to document was

14                        marked as Plaintiff's Exhibit

15                        No. 4 by the Reporter.)

16  Q    You just pointed out what it was.  So that

17       helps us move on.

18  A    Okay.

19  Q    Is this the RPL registration sheet that you

20       just referenced, ma'am, in this case?

21  A    Yes.

22  Q    Okay.  And that, indeed, is signed on the

23       27th of 1998?

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | Now, the RIF occurred approximately a year |
| 3 | | before that. |
| 4 | A | Yes, it did. |
| 5 | Q | Okay.  And how do you account for Ms. McCall |
| 6 | | signing this sheet approximately a year |
| 7 | | later? |
| 8 | A | That was Lisa's fault. |
| 9 | Q | Her fault. |
| 10 | A | And I definitely remember that. |
| 11 | Q | Well, how was it her fault? |
| 12 | A | Because we went around and around. |
| 13 | Q | How was it her fault, please, ma'am? |
| 14 | A | Well, she had the form.  Everybody got the |
| 15 | | form.  When we first informed our employees |
| 16 | | that there was going to be a RIF -- |
| 17 | Q | When you say everybody got the form, how did |
| 18 | | everybody get the form? |
| 19 | A | What we did, we sent out a package to all |
| 20 | | employees. |
| 21 | Q | To their home addresses? |
| 22 | A | Yes. |
| 23 | Q | Okay. |

| 1 | A | And in that package was this form. |
|---|---|---|
| 2 | Q | And that's Plaintiff's Exhibit 4. |
| 3 | A | Uh-huh. But, also, Mr. Horne, the state |
| 4 | | director, and Barbara Bennett, the |
| 5 | | administrative officer, and myself went |
| 6 | | around to every -- at the time, we had -- I |
| 7 | | want to say four area offices. And each |
| 8 | | area office had so many counties under them. |
| 9 | | So each area office had all employees come |
| 10 | | to a meeting for their area, and we went |
| 11 | | over everything. And -- |
| 12 | Q | Well -- go ahead. |
| 13 | A | And explained about the RPL at that time. |
| 14 | | That was one of my jobs -- |
| 15 | Q | Okay. |
| 16 | A | -- was getting up there and explaining about |
| 17 | | the RPL, telling them they would not go on |
| 18 | | the RPL until they signed the form and |
| 19 | | returned it. And they were eligible for |
| 20 | | re-employment with another USDA agency for |
| 21 | | two years after they were RIF'd. |
| 22 | Q | Okay. Let's go back to -- |
| 23 | A | Okay. |

1  Q    You said it was her fault that she did not

2       receive Plaintiff's Exhibit 4 until

3       approximately a year later when she signed

4       it; right?

5  A    Uh-huh.

6  Q    That's what your statement was.

7  A    Yeah.   That's what I'm saying.

8  Q    You said also that packages were mailed out

9       to the employees.

10 A    Uh-huh.

11 Q    Okay.  Am I correct in my understanding --

12      and I've reviewed these EEO files -- that 11

13      people were RIF'd; is that correct?

14 A    I believe it was either 11 or 12.

15 Q    Okay.  We'll in that range, 11 or 12.

16 A    Right.

17 Q    Okay.   Did you have certified mail used to

18      make sure those 11 or 12 employees got these

19      re-employment lists?  Do you have any return

20      receipts or anything to show that they got

21      them?

22 A    Let's see.   No.

23 Q    Why did you not do that?

| | | |
|---|---|---|
| 1 | A | I guess the expense.  I don't know.  That |
| 2 | | wasn't my decision. |
| 3 | Q | Okay.  Well, it's $4 per person or $5 per |
| 4 | | person.  It's not to terribly expensive. |
| 5 | A | Yeah.  Well, that wasn't my decision. |
| 6 | Q | Okay. |
| 7 | A | I'm sorry. |
| 8 | Q | All right.  So you didn't have the return |
| 9 | | receipts of certified mailing; is that |
| 10 | | correct? |
| 11 | A | But, you know, Mr. Atchison, what I'm |
| 12 | | thinking is -- I'm thinking we sent -- you |
| 13 | | know, like, Lisa worked in the Crenshaw |
| 14 | | office at the time.  I'm thinking we could |
| 15 | | have sent the package to all employees in |
| 16 | | one certified envelope, and the supervisor |
| 17 | | passed out the letters.  And we would have |
| 18 | | sent, you know, the package certified.  In a |
| 19 | | way, I'm thinking that -- |
| 20 | Q | And the supervisor would have been Art |
| 21 | | Powers; is that correct? |
| 22 | A | Uh-huh. |
| 23 | Q | Okay. |

```
 1    A     And then he would have signed.  Because I
 2          remember the supervisors notifying us when
 3          all employees had received their packages.
 4    Q     Okay.  All right.
 5    A     So I kind of back track on that.  Sorry.
 6    Q     Okay.  Well, do you know -- you're not
 7          really sure how it went out, but do you know
 8          if you had Ms. McCall's proper mailing
 9          address when you sent out Plaintiff's
10          Exhibit 4 packages?
11    A     When the RIF started, I did, but then she
12          had called and asked for another copy
13          because -- said she had never received it.
14          And so I mailed her another one, and then,
15          like, weeks or a few months later, she
16          called, said she still hadn't got it, and
17          come to find out she had moved and had not
18          given me her new address.
19    Q     She had moved twice?
20    A     No.  Just once that I know of.  When she
21          asked for the RPL form -- the first, she
22          should have got it in her package, which she
23          did.
```

1   Q   How do you know that she got that in her

2       package?  What was that, please, ma'am?

3   A   The first package?  In the package.

4   Q   Oh, in the package.

5   A   Yeah.

6   Q   I'm sorry.

7   A   In the package.

8   Q   How do you know she received that one?

9   A   Because that's the one I'm talking about the

10      supervisor notified us when every employee

11      had received their package.  They had to

12      sign for it.

13  Q   The supervisor had to sign for it?

14  A   The employee had to sign with the

15      supervisor.

16  Q   Uh-huh.  In this investigation, did you ever

17      provide to the EEOC any proof that she had

18      received the package that included

19      Plaintiff's Exhibit 4?

20  A   I don't know if I did or not.

21  Q   Okay.  But you should have because this was

22      a matter of the EEOC complaint involving the

23      re-employment of Ms. Lisa McCall.  So if you

```
 1        had been doing your job, you would have;
 2        correct?
 3   A    No, I wouldn't say that.  I did my job.  I
 4        did a good job.
 5   Q    Okay.  All right.  You would have fully
 6        cooperated with the EEOC investigator in
 7        giving him or her anything that possibly
 8        would relate to this case that Ms. McCall
 9        had filed, this EEOC case that she had
10        filed.
11   A    Yes.
12   Q    Okay.  Now, how would Mr. Powers informed
13        you that he had distributed the equivalent
14        to Plaintiff's Exhibit 4 to Ms. McCall?
15        Would he have just told you orally or sent
16        you in a --
17   A    No.  I believe they sent us something.
18   Q    A written memo?
19   A    Uh-huh.
20   Q    Okay.
21   A    Yeah.
22   Q    Okay.  Okay.  All right.  Do you recall how
23        many times Ms. McCall called your office
```

```
 1        between, say, the first of 1997 and the

 2        middle of 1998 about being re-employed or

 3        the re-employment package, et cetera?

 4   A    Okay.  She called -- the first time she

 5        calls, and I mailed it to her at the address

 6        we had when she left us, when she was RIF'd.

 7        Okay.  I mailed it to that address.  And

 8        then she called and said she had never

 9        gotten that one.  So I mailed it again to

10        that same address.  And then she called,

11        said she never got that one.  So that was

12        when she told me she had moved.  So I mailed

13        it to her new address.  So that was three

14        times.

15   Q    Okay.  Did she have any other discussions

16        with your calls?

17   A    No.  I think that's pretty much all we

18        talked about.

19   Q    Did she ever visit your office?

20   A    Oh, she did tell me one time when she

21        called, she was upset because she had been

22        out to Maxwell, and they said she was not on

23        the list.  But I explained to her, no, she
```

```
 1            wasn't on the list, but that was because of
 2            her.  But even if she would have been on the
 3            list, Department of Defense is separate from
 4            us.  This RPL only was for USDA employment.
 5            So it wouldn't have mattered if she was on
 6            that list or -- on the RPL or not as far as
 7            DoD was concerned.  Do you understand?
 8       Q    I've heard your testimony, yes, ma'am.  It's
 9            on the record now.  All right.  I'd like to
10            show you what has been marked previously as
11            Plaintiff's Exhibit 17 and ask you if you've
12            seen this document before.
13                         (The referred-to document was
14                          previously marked as
15                          Plaintiff's Exhibit No. 17.)
16       A    Okay.
17       Q    Have you seen that document before, ma'am?
18       A    I don't recall seeing it.
19       Q    Okay.  Doesn't that document mirror many of
20            the complaints that Ms. McCall had made in
21            the prior Exhibits 14, 15, 16?
22       A    Yes, it does.
23       Q    Okay.
```

1    A    And, actually, I may have seen it because --

2         I don't know.

3    Q    Okay.

4    A    You know, I had to gather information for an

5         EEO case that Lisa brought, and it could

6         have been this letter.

7    Q    Okay.  Between the dates of April 30th,

8         1997, which would be Plaintiff's 16, and

9         April 20th, 1998, which both documents have,

10        basically, much of the same complaint

11        information.

12   A    Yes, sir.

13   Q    Between those dates, what did your office do

14        to investigate any race discrimination,

15        racial harassment, retaliation, et cetera,

16        Title Seven type EEO.  Let's just say EEO

17        since you're not familiar with Title Seven.

18        What did your office do in that time period

19        of approximately a year there to investigate

20        or attend to defending any EEO complaint or

21        complaints that Ms. McCall had done?

22   A    It would have been up to us to do the

23        investigating into it.  You know, once it

```
1          was up there, it was up to them.

2    Q     You say up in Washington, D.C.?

3    A     Uh-huh.

4    Q     But the question I guess I'm asking is, and

5          I'm not asking it very well, what

6          involvement did your office have in

7          gathering together documents?  I mean, you

8          said that's what you do.

9    A     Yes, sir.

10   Q     In the processing of the EEO complaint, your

11         office gathers together documents.

12   A     Right.

13   Q     Okay.  And what effort did your office make,

14         if any, to gather together documents in this

15         time period between April 30th, 1997, and

16         another EEO complaint a year later, April

17         20th, 1998?

18   A     Well, I mean, I just remember gathering up

19         documents that they would ask me for.

20   Q     At any point, did your supervisor ever

21         suggest that this matter needed to be

22         formally carried through the EEO process?

23                    MR. NEELEY:  Object to the
```

```
 1              form.
 2   A   That what, now?
 3   Q   This matter, these complaints represented in
 4       14, 15, 16, 17.
 5   A   Uh-huh.
 6   Q   At any point, did your supervisor,
 7       Ms. Bennett, ever recommend that this case
 8       be carried through an EEO process?
 9               MR. NEELEY:   Object to form.
10               You can answer.
11   A   No, not that I know of.
12   Q   Do you consider matters of race
13       discrimination complaints -- of race
14       discrimination by employees of the USDA to
15       be serious matters?
16   A   Yes, sir.
17   Q   Okay.  And do you see that if someone writes
18       into the national office and you become
19       familiar with it, their complaint, or
20       knowledgeable of their complaint, that
21       someone in your office would or should
22       recommend that it be handled through the EEO
23       process.
```

| | | |
|---|---|---|
| 1 | | MR. NEELEY:  Object to form. |
| 2 | A | But Lisa didn't go through us.  If she would |
| 3 | | have complained, you know, to Ms. Bennett, |
| 4 | | then Ms. Bennett probably would have |
| 5 | | referred her to the EEO staff. |
| 6 | Q | Okay. |
| 7 | A | But Lisa did not go through us with her |
| 8 | | complaint. |
| 9 | Q | Do you know, having become aware of these |
| 10 | | documents, if Ms. Bennett or yourself ever |
| 11 | | referred her case to the EEO, as you say, |
| 12 | | staff? |
| 13 | A | No. |
| 14 | Q | You didn't know? |
| 15 | A | I mean, once we're ware of them, they're |
| 16 | | already up there.  So why would we refer it? |
| 17 | Q | Okay.  Did you ever see the normal course of |
| 18 | | investigation procedure; that is, gathering |
| 19 | | together documents?  Did you ever see that |
| 20 | | process start before this last document of |
| 21 | | April 20th, 1998? |
| 22 | A | I don't believe so. |
| 23 | Q | Okay.  Ms. McCall has testified this morning |

1    that she wrote the Washington Office of

2    Civil Rights complaint division or whatever

3    it's called -- yeah.  It's employment

4    complaints division -- because she saw a

5    notice posted in, I believe, the office that

6    she was working in, either the Hayneville

7    office or the Luverne office.  Do you know

8    if there's such postings in those offices

9    that if you're an employee and you have a

10   civil rights complaint, you can go and

11   complain to the Washington office?

12   A    Yes, sir.

13   Q    And you understood that was a complaint

14   procedure for anyone with an EEO employment

15   complaint.

16   A    Right.

17   Q    Okay.  So there was nothing wrong with her

18   having written to those offices --

19   A    No, sir.

20   Q    -- in Washington, D.C., is that correct, for

21   the EEO procedure?

22   A    Nothing wrong at all.  That's true.

23   Q    Okay.  In fact, that was the proper

```
 1          procedure for her to go through if she had a

 2          race discrimination, racial harassment, or a

 3          retaliation claim; is that correct?

 4    A     Uh-huh.  Yes, sir.

 5    Q     Okay.  And at some point, your office,

 6          during these series of four documents,

 7          became aware that she indeed had an EEO

 8          complaint.

 9    A     Yes, sir.

10    Q     Okay.  Let me show you what has been

11          previously marked Plaintiff's Exhibit 18.

12                        (The referred-to document was

13                         previously marked as

14                         Plaintiff's Exhibit No. 18.)

15    A     Okay.

16    Q     Have you ever seen that document?

17    A     No, I have not.

18    Q     Okay.  But, again, that document is clearly

19          regarding the efforts of Ms. McCall to make

20          known her EEO complaints against the USDA,

21          would you agree?

22    A     Yeah.

23    Q     And these are the same complaints that you
```

```
1        understood that were referenced in

2        Plaintiff's Exhibits 14, 15, 16, 17, and 18;

3        correct?

4    A   Yeah.

5    Q   Okay.  All right.  Now, let's go back in

6        time a little bit, if we could.

7                        MR. ATCHISON:  Off the

8                Record.

9                        (At which time, there was an

10                       off-the-Record discussion.)

11                       MR. ATCHISON:  Let's take a

12               break.

13                       (At which time, a break was

14                       held.)

15   Q   Ms. Price, we've had a few moments to go

16       through and take a break, and I would like

17       to show you what has been previously marked

18       Defendant's Exhibit 12 and Plaintiff's

19       Exhibit 12 and ask you if you recall this

20       earlier letter that Ms. McCall sent to

21       Mr. Horace Horne, director of the state

22       office, Department of Agriculture.  And

23       that's marked Plaintiff's Exhibit 12 and
```