*Horace Horn* (handwritten)

```
 1        Defendant's Exhibit 12.

 2                        (The referred-to document was

 3                        previously marked as

 4                        Plaintiff's Exhibit No. 12

 5                        and Defendant's Exhibit No.

 6                        12.)

 7   Q    We, counsel, are trying to keep our numbers

 8        for the same exhibits the same so not to

 9        create so much confusion for the Court.

10   A    Okay.  Actually, I don't remember this.

11   Q    You don't recall seeing that?

12   A    Uh-uh.

13   Q    Okay.  Would Mr. Horne, in his receipt of

14        something regarding a harassment charge or

15        racial harassment charge, something to that

16        effect -- would he have normally contacted

17        your office to get assistance?

18   A    Yeah.

19   Q    Okay.

20   A    Normally, he would have -- not me, but

21        Ms. Bennett.

22   Q    Okay.  But nonetheless, your office normally

23        would have been contacted had Mr. Horne
```

| 1 | | received a letter like this; correct? |
|---|---|---|
| 2 | A | Uh-huh. |
| 3 | Q | So you don't know whether or not that letter |
| 4 | | actually came into your office. |
| 5 | A | No, I don't. |
| 6 | Q | Okay. |
| 7 | A | I mean, you know, his secretary signed for |
| 8 | | it, but I don't know -- I sure don't |
| 9 | | remember seeing it. |
| 10 | Q | Okay.  That's fair. |
| 11 | | MR. ATCHISON:  Let's go off |
| 12 | | the record again. |
| 13 | | (At which time, there was an |
| 14 | | off-the-Record discussion.) |
| 15 | Q | Let me show you what is apparently a reply |
| 16 | | that's been previously marked Defendant's 13 |
| 17 | | and Plaintiff's 13, and ask you if you can |
| 18 | | recall seeing this letter, a reply to |
| 19 | | Plaintiff's and Defendant's 12.  This |
| 20 | | document is marked Plaintiff's and |
| 21 | | Defendant's 13. |
| 22 | | (The referred-to document was |
| 23 | | previously marked as |

```
 1              Plaintiff's Exhibit No. 13

 2              and Defendant's Exhibit No.

 3              13.)

 4   A   This was just our normal letter of response

 5       regarding outside employment.  Usually, an

 6       employee would ask permission to work.

 7   Q   May I see that document, please, ma'am?

 8   A   And we would respond as long as there was no

 9       conflict of interest, but I don't remember

10       seeing that letter either.  And I see

11       Barbara has signed it.  So I don't know if

12       she's the one that did the letter.  It's

13       possible I did.

14   Q   Did you draft letters for Ms. Barbara

15       Bennett?

16   A   Uh-huh, a lot of times I did, yes.

17   Q   Okay.

18   A   But then Barbara, a lot of times, did her

19       own.  So it's just hard to say if she did it

20       or I did it.

21   Q   Now, let me ask you about these CCs.  What

22       are all these CCs that are --

23   A   Those are carbon copies to the --
```

```
 1   Q    What's RDM?

 2   A    Rural Development Manager, Area 4.

 3   Q    And that would have been Mr. Powers.

 4   A    No, he was the next one, the CDM.

 5   Q    CDM.  What's CDM?

 6   A    That's the Community Development Manager.

 7   Q    0166?

 8   A    Uh-huh.

 9   Q    And that would have been Mr. Powers?

10   A    Yes, uh-huh.

11   Q    Okay.  What's OPF?

12   A    The official personnel folder.

13   Q    Okay.

14   A    And 2045 BB was -- that was where outside

15        employment regulations was.  That was the

16        file for outside employment.

17   Q    Okay.  Would this normally have come

18        through -- this letter or this reply

19        normally come through your desk or your work

20        area?

21   A    Normally, they would.  Uh-huh.

22   Q    In fact, you explained to me at the starting

23        off of the deposition, I believe, that your
```

```
 1        involvement was this area of work.
 2   A    Yes, it was.
 3   Q    So the likelihood, you would have been
 4        familiar with this letter and this scenario,
 5        would you not?
 6   A    I should have been.  Uh-huh.
 7   Q    Okay.  Let's go back to 12.  Let's go back
 8        to 12.  All right.  In the letter that
 9        Ms. McCall sent to Mr. Horne, she says,
10        quote, I am notifying you regarding to
11        harassment problems that I have had with the
12        county office with supervisor Arthur L.
13        Powers.  Please consider this to be -- on
14        the complaint against the community
15        development manager, Arthur L. Powers, who
16        is located in Hayneville, Alabama.
17   A    Uh-huh.
18   Q    And once you became aware of that, what did
19        you do with that knowledge?  You should have
20        been aware of that or was aware of that, one
21        or the other; right?
22   A    If I would have seen that many letter, but I
23        don't know.  I can't explain it.  I really
```

```
 1          have no idea.
 2    Q     But there's no question that Mr. Powers was
 3          notified of this complaint and this reply
 4          because he's CCed on Plaintiff's Exhibit 13;
 5          correct?
 6    A     Well, Mr. Powers would have got this letter,
 7          but he probably was not aware of this
 8          letter.
 9    Q     He would have gotten Plaintiff's 13, but you
10          say he was probably was unaware of 12?
11    A     Uh-huh.
12    Q     Why would that have been, ma'am, if this
13          issue came up and it was addressed where
14          there was a very clear statement that
15          Ms. McCall was being harassed by Mr. Powers
16          and that she wanted this to be considered
17          her complaint against him?  Why would he
18          have not have been notified of this, ma'am,
19          of Plaintiff's 12?
20    A     Well, Mr. Horne may have notified him.
21          That, you know, I don't know, sir.
22    Q     Do you know if receiving 12 or doing 13 you
23          ever sought to get from Mr. Powers any
```

```
1        documents regarding Ms. McCall's complaint

2        of harassment against him?

3   A    I don't recall getting any documents from

4        him.

5   Q    Well, let me ask you this:  Do you know if

6        there was any investigation made whether or

7        not your office did it or EEO office did it

8        or Mr. Horne's office did it?  Do you know

9        if there ever was any type of investigation

10       whatsoever done regarding Ms. McCall's

11       complaint of harassment by Arthur Powers as

12       per Plaintiff's 12, Defendant's 12?

13  A    Well, you know, like I said, that one lady

14       that came down and interviewed us, I believe

15       she interviewed Mr. Powers at the same time

16       too.

17  Q    From the Civil Rights Division, Washington,

18       D.C.

19  A    Right, uh-huh.  That lady, you know, I said

20       her name was --

21  Q    Romaine.

22  A    Right.

23  Q    Do you remember her last name, per chance?
```

1 A No, I'm sorry.

2 Q Was that her first name or last name?

3 A I think it was her first name.

4 Q Okay. Okay. Now, I have gone through --

5  and I may have missed it, but I've gone

6  through the investigative file in this case

7  in the blue bindings, the final copy of Lisa

8  McCall, Case No. 99052. I read it wrong

9  every time. Let me back up again. Lisa

10  McCall's complaint file, final copy,

11  990582/RD. I have not seen anything

12  regarding the Civil Rights Division of

13  Washington, C.D. regarding her complaints

14  that are set forth in Plaintiff's Exhibits

15  14, 15, 16, 17, 18, or 12, any of these

16  documents. When you assisted in putting

17  together this investigative file report, did

18  you ever see any documents from the

19  complaints division? Did you keep any

20  yourself and offer them to the EEO

21  investigator for this blue file that I'm

22  talking about? It's as thick as a New York

23  telephone book here.

```
1   A    I know.

2                     MR. NEELEY:  Hold on.

3                     MR. ATCHISON:  Off the

4              Record.

5                     (At which time, there was an

6                     off-the-Record discussion.)

7                     MR. ATCHISON:  I'm talking

8              about earlier ones, the ones that

9              came in 1996, '97.

10                    MR. NEELEY:  Well, they're

11             all the same thing.  It's not a

12             fair statement to say it's not in

13             there because that's what they

14             investigated were these things.

15                    MR. ATCHISON:  Okay.  Well,

16             let's see if I can rephrase is if

17             that's an objection as to form.

18                    MR. NEELEY:  Yeah, objection

19             as to form.

20  Q    Okay.  All right.  I understand that this

21       investigative file may well have talked

22       about items that are set forth in

23       Plaintiff's Exhibits 12, 14, 15, 16, 17.
```

```
1          Okay?  Did we go into 18?  But, anyway,
2          those early documents, 1996, 1997, what I'm
3          asking is, did your office ever put the EEOC
4          on notice that such documents existed, or
5          alternate, did your office ever put them on
6          notice, the EEOC investigator on notice,
7          that somebody from the Civil Rights Division
8          had come down and met with you and talked to
9          you about Ms. McCall's complaint regarding
10         those documents?
11                     MR. NEELEY:  Object to the
12                form.
13    A    Okay.  You mean did we ever notify the
14         national office that somebody from the
15         Office of Civil Rights had been down to talk
16         to us?
17    Q    All right.
18    A    Well, I don't know.  I'm sure we did.
19    Q    Okay.  All right.
20    A    But, I mean, the Office of Civil Rights and
21         EEO, they work together.
22    Q    Okay.  They work together; right?
23    A    Yeah.  I mean, they -- right.
```

```
 1   Q   All right.  I think it's safe to say that

 2       Ms. McCall was never hired pursuant to

 3       Plaintiff's 4 when she signed up on the

 4       re-employment register; correct?

 5   A   She what, now?

 6   Q   Never re-employed.

 7   A   She was not re-employed, no.

 8   Q   You're agreeing with me.

 9   A   Right.

10   Q   Okay.  And I believe you have previously

11       admitted in this investigative file, that

12       you had informal communications with

13       employees about re-employment and getting

14       other jobs.  You formally assisted other

15       employees who were RIF'd; correct?

16   A   Uh-huh.

17   Q   And those were white employees, am I

18       correct?

19   A   I assisted everybody -- anybody that asked

20       me for help.

21   Q   Do you know of any blacks that you ever

22       assisted informally without having

23       Plaintiff's Exhibit 4 written out and signed
```

```
1         and all that stuff?

2    A    On the RPL?

3    Q    Uh-huh.

4    A    There were not very many employees that

5         actually filled out the RPL form as best as

6         I remember.  Gloria Rooks was a black

7         female, but she got a job through CTAP.

8         That's the Career --

9    Q    Go ahead.  Go ahead.

10   A    Okay.  It was called the Career Transition

11        Assistance Program, and Gloria was going to

12        be RIF'd.  And after she received her RIF

13        letter but prior to the RIF, she was

14        eligible -- employees were eligible for the

15        CTAP transition program.  And Gloria got a

16        job before she was actually --

17   Q    The notice that went out about the RIF, was

18        it not this notice that's been previously

19        marked as Plaintiff's Exhibit 3 -- excuse

20        me, Defendant's 3 and now marked Plaintiff's

21        Exhibit 3, a letter dated January 23, 1997?

22   A    Uh-huh, and I believe this letter doesn't

23        have the RPL and the CTAP information.
```

| | | |
|---|---|---|
| 1 | Q | Now, the RPL, as you've talked about, you're |
| 2 | | pointing at Plaintiff's Exhibit 4; correct? |
| 3 | A | Yes. |
| 4 | Q | Okay.  And Gloria Rooks received a job |
| 5 | | having been noticed by an equivalent |
| 6 | | document to Plaintiff's Exhibit 3, and |
| 7 | | before her actual RIF date, which I'm sure |
| 8 | | also would have been equivalent to the RIF |
| 9 | | date set forth in Plaintiff's Exhibit 3, |
| 10 | | which is what date, please, ma'am? |
| 11 | A | April 27th. |
| 12 | Q | Okay.  So she got a job under this Career |
| 13 | | Transition Assistance Program, CTAP? |
| 14 | A | Yes, sir. |
| 15 | Q | Okay.  And how did an employee get a job |
| 16 | | under that? |
| 17 | A | They would look at vacancy announcements. |
| 18 | | Actually, it was up to each employee under |
| 19 | | the CTAP to -- they could go on the OPM web |
| 20 | | site and look up vacancies. |
| 21 | Q | Within the Department of Agriculture. |
| 22 | A | No, sir. |
| 23 | Q | Within what? |

```
 1    A    Office of Personnel Management issues

 2         vacancy announcements for all government

 3         agencies.

 4    Q    Okay.  But what type of agency did she get a

 5         job with?  Did she get a job with the

 6         Department of Agriculture?

 7    A    Social Security.

 8    Q    Okay.  All right.  So she transitioned into

 9         Social Security.

10    A    Right.

11    Q    All right.  Did she have to sign an

12         equivalent document to Plaintiff's Exhibit 4

13         before she could exercise that option of

14         CTAP, or do you remember?

15    A    No, sir, she did not have to.  They did

16         not -- this would not go into effect until

17         after the effective date of the RIF.

18    Q    Okay.  All right.  Now, there's also another

19         program aside from CTAP, C-T-A-P, and it's

20         called Inner Agency Career Transition

21         Assistance Program, I-C-T-A-P.

22    A    Right.

23    Q    What program was that, please, ma'am?
```

1    A    That was -- it was basically the same thing

2         as CTAP except you were not eligible for

3         ICTAP until after the effective date of the

4         RIF, and that gave the employees priority

5         consideration.  It didn't mean they would

6         get the job, but they were to be considered

7         first for any vacancy, and it was up to the

8         individuals to find those vacancies.

9    Q    Okay.  Were those vacancies in the

10        Department of Agriculture or outside?

11   A    Anywhere.  They were on the OPM web site.

12   Q    Okay.  Any other agency other than the

13        Department of Agriculture, that person could

14        also apply to get the jobs.

15   A    Yes, sir.  Uh-huh.

16   Q    Okay.  And did the person before he or she

17        exercise that option -- did he or she have

18        to sign a re-employment register sheet as in

19        Plaintiff's Exhibit 4?

20   A    No, sir.

21   Q    Okay.  All right.  Do you know the names of

22        the employees who were RIF'd, or do you have

23        those?

| | | |
|---|---|---|
| 1 | A | Actually, I have them in my purse. |
| 2 | Q | Please do.  Please get those, if you could. |
| 3 | A | Jean Ash. |
| 4 | Q | J-E-A-N? |
| 5 | A | Yes. |
| 6 | Q | A female? |
| 7 | A | Yes. |
| 8 | Q | Okay.  And Jean Ash was a white female? |
| 9 | A | She was white, white female. |
| 10 | Q | All right. |
| 11 | A | Camilla Meeks. |
| 12 | Q | Do you know how to spell that? |
| 13 | A | C-A-M-I-L-L-A.  She was white female. |
| 14 | Q | Okay. |
| 15 | A | Willene, W-I-L-L-E-N-E, Atkins.  She was a |
| 16 | | white female.  And Doris -- I think her name |
| 17 | | was Davis.  I believe it was Doris Davis. |
| 18 | | She was white female. |
| 19 | Q | Okay.  Keep on going, please. |
| 20 | A | Liz Lockett. |
| 21 | Q | Could it be Elizabeth? |
| 22 | A | Yes, sir.  L-O-C-K-E-T-T.  She was a black |
| 23 | | female. |

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | Sarah Thorn. |
| 3 | Q | Is that with an H? |
| 4 | A | Uh-huh. |
| 5 | Q | S-A-R-A-H? |
| 6 | A | Yeah, Thorn, T-H-O-R-N, white female. |
| 7 | | Rhonda Lee. |
| 8 | Q | L-E-E? |
| 9 | A | Yes, white female.  Ella Webb.  She was |
| 10 | | black, female.  Sonya Davenport, white |
| 11 | | female. Sandra Welch. |
| 12 | Q | Is that S-A-N? |
| 13 | A | S-A-N-D-R-A, Welch, white female.  Arlesa |
| 14 | | Hunter.  She was a black female.  Lisa -- |
| 15 | | well, Lisa McCall. |
| 16 | Q | Arlesa here. |
| 17 | A | Yeah, uh-huh. |
| 18 | Q | Anybody else? |
| 19 | A | No, sir.  Is that 11? |
| 20 | Q | I think it's 12, if my counts correct. |
| 21 | | Twelve, yes, ma'am. |
| 22 | A | Okay.  Well, I think, possibly, Camilla |
| 23 | | Meeks may have taken early retirement. |

```
 1        Yeah.  I kind of had a question after her.
 2   Q    Okay.  So either 11 or 12, depending on Ms.
 3        Meeks.
 4   A    Right.
 5   Q    Now, in any capacity, how many of these
 6        women were re-employed ultimately by the
 7        Department of Agriculture?
 8   A    Let's see.
 9   Q    Whether part time, full time, temporary,
10        whatever.
11   A    Ella Webb.
12   Q    Okay.  Just a moment.  I'm sorry.  All
13        right.
14   A    And at the time I left, she was the only
15        one, but I understand Sonya's working there
16        now.  Oh, I'm sorry.  Gloria Rooks.
17   Q    Did you give her name to us earlier as one
18        of the original ones that were RIF'd?  I
19        don't believe you did.
20   A    No, I didn't because Gloria is the one that
21        got a job through CTAP before the RIF.
22   Q    All right.  She was re-employed by another
23        agency.
```

```
 1   A    Yeah.

 2   Q    She's white?

 3   A    No.  she's black female.

 4   Q    Okay.  I'm sorry.

 5   A    But she is working for the -- she was back

 6        with the agency.

 7   Q    Oh, she's back with the USDA now.

 8   A    Uh-huh.  She was back before I left.

 9   Q    But she originally got a job with another

10        agency and transferred back into the USDA?

11   A    Actually, that is what happened.  Well,

12        yeah, she did transfer back in eventually.

13   Q    All right.  Let's do this.  Ms. Jean Ash, do

14        you know what GS level she was?

15   A    Jean was a five.

16   Q    So the fives got RIF'd too.  Fours and fives

17        got RIF'd.

18   A    Fours were definitely RIF'd and some fives.

19   Q    All right.  Camilla Meeks.

20   A    Was a five.

21   Q    Willene Atkins.

22   A    I'm pretty sure Willene was a four.

23   Q    Doris Davis.
```

```
 1   A    Uh-huh.  She was a four.

 2   Q    Lisa or Elizabeth Lockett.

 3   A    Yeah.  I'm thinking she was a five.

 4   Q    Sarah Thorn.

 5   A    I believe she was a five.

 6   Q    Rhonda Lee.

 7   A    She was a four.

 8   Q    Ella Webb.

 9   A    A four.

10   Q    Sonya Davenport.

11   A    A five.

12   Q    Sandra Welch.

13   A    A five.  Oh, I believe Sandra was a six.

14   Q    So you changed it to six.  Okay.  Arlesa

15        Hunter.

16   A    Yeah.  I believe she was the five in that

17        office.

18   Q    Lisa McCall.

19   A    She was a four.

20   Q    And Gloria Rooks.

21   A    I believe Gloria was a four.

22   Q    Now, were any of these women given part-time

23        jobs, temporary jobs or whatever, after the
```

```
 1        RIF, and who were they?
 2   A    They were Ella Webb.  It was after the RIF
 3        but a long time after the RIF.  She was
 4        given a temporary job.
 5   Q    All right.  Just a moment.  Let's see here.
 6        All right.  Is that the same position that
 7        you just earlier referenced that she got
 8        back?
 9   A    Yes, uh-huh.
10   Q    What year was that that she was re-employed,
11        please, ma'am?
12   A    Let's see.  The RIF was '97.  Let's see.  I
13        think '99.
14   Q    Now, she was GS-4; right?
15   A    Uh-huh.
16   Q    She never filed any EEOC charges against the
17        agency, did she?
18   A    No, sir.
19   Q    What was your involvement in getting her
20        this part-time temporary job?
21   A    She -- she went to work for a bank, and she
22        just -- she had so many years in with the
23        government, and I don't remember how many,
```

| | | |
|---|---|---|
| 1 | | but she wanted to come back, finish up, you |
| 2 | | know, get full retirement.  What was my |
| 3 | | involvement, you said? |
| 4 | Q | Yes, ma'am.  Yeah. |
| 5 | A | I'm sorry. |
| 6 | Q | Did she contact you, or you contact her? |
| 7 | A | Yeah.  She contacted -- |
| 8 | Q | You? |
| 9 | A | Me.  Uh-huh.  There would have been a |
| 10 | | vacancy announcement put out, and, you know, |
| 11 | | she would have submitted an application. |
| 12 | Q | Uh-huh.  And when that vacancy announcement |
| 13 | | occurred, did you also contact Lisa McCall |
| 14 | | and inform Lisa McCall that such a vacancy |
| 15 | | announcement was out there? |
| 16 | A | No, not that one.  No, I did not because -- |
| 17 | | in fact, I didn't contact Ella.  Ella |
| 18 | | contacted me.  What Ella would do would go |
| 19 | | by the office -- this was up in Huntsville, |
| 20 | | and she would, you know, keep in touch with |
| 21 | | the office and ask them if they had anything |
| 22 | | coming up.  You know, when she found out |
| 23 | | about it, then -- I don't even know if I |

```
 1          sent her the vacancy announcement or just

 2          told her, you know, it was on the web site.

 3          I can't remember.

 4     Q    But it's clear that Ms. McCall had contacted

 5          you and announced to you or told you or made

 6          you aware that she was wanting to be

 7          re-employed.

 8     A    Uh-huh.

 9     Q    And when that announcement came up, did it

10          occur to you to contact also Lisa McCall so

11          she could compete for that job?

12     A    No, no, because it was in Huntsville, and we

13          had had one in Bay Minette that I contacted

14          her about, and she was not interested.

15     Q    Let's talk about the one in Bay Minette.

16          When did you contact Lisa McCall about a Bay

17          Minette position?  Was that after her

18          signing Plaintiff's Exhibit 4?  I believe

19          that was in April of 19 -- excuse me.

20     A    It was just right before the RIF that we had

21          one opening in Bay Minette at a four level.

22     Q    So then right before Plaintiff's Exhibit 3

23          was issued; is that correct?  Tell us, if
```

```
 1        you can --
 2   A    No.  It would have been after that.
 3   Q    Plaintiff's Exhibit 3 is in January of 1997.
 4   A    Uh-huh.
 5   Q    So it would have been after the issuance of
 6        this letter but before the actual RIF was
 7        done.
 8   A    It would have been before April 27th.
 9   Q    Okay.  Okay.  Very good.  Of 199 --
10   A    Seven.
11   Q    Seven.  Okay.  All right.  Let me ask you,
12        if you could -- let's direct ourselves to
13        several other positions going back in time.
14        I'm kind of going back and forth.  I hope
15        you don't mind that.  I'm going to show you
16        a series of letters, 8, 9, 10, and 11.  I'm
17        going to mark these all correspondingly for
18        us with the same numbers.  Take a few
19        moments and look at these, please, ma'am.
20                      (At which time, the
21                       referred-to documents were
22                       marked as Plaintiff's Exhibit
23                       No. 8, 9, 10, and 11 by the
```

```
1                            Reporter.)

2      A    Okay.

3      Q    Have you had an opportunity to review those,

4           please, ma'am?

5      A    Yes, sir.

6      Q    Okay.  Plaintiff's Exhibit Number 8 is also

7           marked Defendant's Exhibit 8.  I take it,

8           based on your job description, you would

9           have been aware of this document.

10     A    Yes.

11     Q    Even though it's signed by Mr. Horne, you

12          would have been aware of this document.  Did

13          you prepare this document for Mr. Horne?

14     A    I probably did, yes.

15     Q    Okay.  All right.  Do you know why Debra

16          Yates was hired or selected for this

17          position that's in Plaintiff's Exhibit 8?

18     A    No, sir.

19     Q    Did you review Debra Yates' employment file

20          to see her credentials before Mr. Horne

21          signed off on this?

22     A    No, sir.  All I would do was review their

23          application to make sure that they met the
```

```
 1        qualifications and to -- we had they were

 2        called KSAs that they had to address.

 3   Q    What's a KSA, please, ma'am, for the Court?

 4   A    Knowledge, skills, and abilities.  For the

 5        secretary, for instance, it might say

 6        ability to use the word processor.  And then

 7        they would have to describe, you know, how

 8        they met that -- the criteria.

 9   Q    Who would be they -- you mean, the

10        applicant?

11   A    The applicant, yeah.

12   Q    And you would review the, quote, KSAs of

13        each applicant for each position that goes

14        through your hands.

15   A    Uh-huh.  I would review them, and then I

16        would determine if they were eligible for

17        the position.  And then their names would go

18        on a promotion certificate if they were

19        eligible, and Mr. Horne would make the

20        selection.

21   Q    Okay.  Regarding Plaintiff's Exhibit Number

22        8, did you review Ms. McCall's application?

23   A    Yes, sir, I'm sure I did.
```

```
 1   Q   Did you find her KSA evaluation to be

 2       lacking so that Mr. Horne would have

 3       recommended Debra Yates as per what he says

 4       here, that she was selected for the

 5       position?

 6                       MR. NEELEY:  Object to form.

 7   A   No, it wouldn't have been up to me to

 8       determine if they were lacking.  I would

 9       just determine if she met the -- if she met

10       them enough to be eligible for the position.

11   Q   Did Ms. McCall meet the KSAs, as you've

12       termed them, enough to be selected for the

13       position that's set forth in Plaintiff's

14       Exhibit 8?

15   A   Yes.

16   Q   Okay.  Do you know if Yates had any better

17       qualifications than Ms. McCall in reference

18       to this application that's set forth in

19       Plaintiff's Exhibit 8.

20                       MR. NEELEY:  Object to the

21           form.

22   A   No, I don't know.

23   Q   Okay.  The next document is Plaintiff's
```

1     Exhibit 9 and also Defendant's Exhibit 9.

2     It's a vacancy announcement in which Tammy

3     Martin was selected for the position.  And

4     did you find in reviewing Ms. McCall's

5     application for this position that she was

6     qualified to hold the position?

7  A    Yes, sir.

8  Q    All right.  And did you see anywhere that

9     Ms. Tammy Martin was better qualified in

10     reviewing --

11  A    No, sir.

12  Q    Okay.  Let's go back and ask that same

13     question regarding Plaintiff's Exhibit 8.

14     Did you find anything in evaluating the

15     documents submitted by Ms. Yates or Ms.

16     McCall that Ms. Yates was better qualified

17     to have the position that's set forth in

18     Plaintiff's Exhibit 8?

19  A    No, sir.

20  Q    All right.  Thank you.  Let's look at

21     Plaintiff's Exhibit Number 10 now, the

22     position that is also marked Plaintiff's

23     Exhibit -- excuse me -- the document which

```
 1          is also marked Plaintiff's Exhibit 10 and a

 2          position that was given to Nancy Balldog.

 3          How do you pronounce that?

 4   A      Balldog.

 5   Q      Balldog.  Okay.  Did you find that

 6          Ms. McCall was qualified in her application

 7          for this position?

 8   A      Yes, I did.

 9   Q      Did you find in reviewing Ms. Balldog's

10          application that she was any better

11          qualified for this position than Ms. McCall.

12   A      No.

13   Q      Okay.  And the next one is Lisa Hardy, and

14          this is Plaintiff's Exhibit Number 11, was

15          selected for a position.  And the same sort

16          of question is did you review Ms. McCall's

17          application for this position?

18   A      Yes.

19   Q      Did you find that she was qualified to hold

20          that position?

21   A      Yes.

22   Q      Did you find anything that would show

23          Ms. Hardy to be better qualified for this
```

```
 1        position than Ms. McCall?

 2   A    No.

 3   Q    All right.  Let's go back through all these

 4        exhibits once again, if we could, for one

 5        simple fact.  The fact is, am I correct,

 6        that all these women that got these

 7        positions were white individuals or

 8        Caucasian?  That's Plaintiff's Exhibits 8

 9        through 11.

10   A    Exhibit 11, Lisa Hardy was Indian.

11   Q    Native American --

12   A    Yes, sir.

13   Q    -- or from the country of India?

14   A    No.  Native American.

15   Q    Okay.  All right.  But, certainly, you had

16        no evidence that she was also black or black

17        in heritage.

18   A    No.

19   Q    Okay.  Now, let's go back through these.  Do

20        you know if any of these women had ever

21        filed EEOs against the agency?

22   A    Not to my knowledge.

23   Q    Okay.  All right.  And let's go back through
```

| | | |
|---|---|---|
| 1 | | each one of them with this last remaining |
| 2 | | question.  What -- as per Plaintiff's |
| 3 | | Exhibit 8, what was the GS level of Debra |
| 4 | | Yates before she got the position? |
| 5 | A | I believe Debra was a five. |
| 6 | Q | Okay.  But you're not certain? |
| 7 | A | No, I'm not. |
| 8 | Q | Plaintiff's Exhibit No. 9 shows Tammy Martin |
| 9 | | got the position that's set forth in that |
| 10 | | document.  Do you know what her GS level was |
| 11 | | before she got that position? |
| 12 | A | A four, I'm pretty sure. |
| 13 | Q | Okay.  Plaintiff's Exhibit Number 10, |
| 14 | | Ms. Balldog. |
| 15 | A | Uh-huh. |
| 16 | Q | What was her GS level before she got this |
| 17 | | position as set forth in Plaintiff's Exhibit |
| 18 | | 10? |
| 19 | A | A five, I think. |
| 20 | Q | Okay.  And Lisa Hardy, what was her |
| 21 | | position, please, ma'am, before she got the |
| 22 | | position that's set forth in Plaintiff's 11? |
| 23 | A | A four. |

```
 1   Q    Okay.  All right.  What communication did
 2        you have with Mr. Powers at any time
 3        regarding the plaintiff, Lisa McCall, say,
 4        between 1996 and through '99.  Did he ever
 5        have any communications with you about her?
 6   A    Very little.
 7   Q    What did he ever say to you about her?
 8   A    The only thing I remember him saying -- and
 9        I don't remember the occasion or why, but
10        was what I said earlier about her just not
11        working in the office prior to the RIF.
12   Q    You're in the position of seeing the
13        employment cases throughout the entire
14        state, or you were then, between '96 and
15        '99, for all the USDA employees.  Am I
16        correct about that?
17   A    Yes.
18   Q    Okay.  And I'm certain, am I not correct on
19        this, that you saw disciplinary actions come
20        your way regarding employees who just sit
21        down on their behinds and didn't work?
22        Their supervisors wrote them up, didn't
23        they?
```

```
 1   A   Yes.

 2   Q   And that was not an uncommon matter.  They

 3       were disciplinary actions, whether it's

 4       reprimands orally, write ups of reprimands;

 5       correct?

 6   A   Yes.

 7   Q   Suspensions; correct?

 8   A   (Witness nods head affirmatively.)

 9   Q   And even recommendations for terminations.

10   A   Yes.

11   Q   You used to commonly see that.  But, yet,

12       you had this conversation with Mr. Powers,

13       and he never, to your knowledge, disciplined

14       her; correct?

15              MR. NEELEY:  Object to form.

16   A   That's correct.

17   Q   Okay.  Did you ever ask him why he didn't

18       discipline her under those circumstances?

19   A   No.  Let me tell you probably why.  If he

20       would have started disciplinary action, we

21       would have sent the state director -- the

22       letter would have come from the state

23       director, and Lisa would have had 30 days to
```

```
 1          respond.  You know, time wise, she would

 2          have been RIF'd before we could have

 3          completed the action.

 4    Q     I understand that.  But, still, there's a

 5          requirement.  If you work for the Federal

 6          government, you have to do the work; right?

 7                    MR. NEELEY:  Object to the

 8                    form.  Asked and answered.

 9                    Argumentative.

10    Q     You can't get just free pay for not doing

11          the work; right?

12                    MR. NEELEY:  Object to form.

13                    Argumentative.  Ask and answered.

14                    You can answer.

15    Q     Go ahead and answer if you can.

16    A     Did you say answer if I can?

17    Q     Yes, ma'am.  If you know an answer.

18    A     Actually, I've never seen in the regulations

19          that you're required to.

20    Q     Okay.  That's fair.  Do you know who Betty

21          Blackmon is?

22    A     Yes.

23    Q     Who's Betty Blackmon?
```

| | | |
|---|---|---|
| 1 | A | She worked in the Crenshaw County office. |
| 2 | Q | Was she one of the ones that was RIF'd? |
| 3 | A | No.  Let me think.  No.  I believe Betty -- |
| 4 | | Betty stayed. |
| 5 | Q | Okay.  I'm looking at your affidavit, and |
| 6 | | I'm going to show it to you unless your |
| 7 | | counsel has a copy of it.  Exhibit 4-F in |
| 8 | | the investigative file, please, ma'am. |
| 9 | | Okay.  Page 5 of your affidavit, please, |
| 10 | | ma'am.  It starts at the top of the page, it |
| 11 | | says, the employees in each competitive area |
| 12 | | were placed on a retention list and order |
| 13 | | determined by the service comp date, the |
| 14 | | date they started with the agency, with |
| 15 | | years added for performance based on the |
| 16 | | average of their last three years |
| 17 | | performance appraisals. |
| 18 | A | Yes, sir. |
| 19 | Q | Okay.  Is that the system in which you |
| 20 | | ranked who should be on the retention list? |
| 21 | A | That was one of the ways, yes, uh-huh. |
| 22 | Q | Well, you say one of the ways.  Was that the |
| 23 | | way, or were there alternate ways? |

```
1   A   No.  It was -- I'm trying to think.  No.  It
2       went by their service comp date.  And their
3       service comp dates were determined by their
4       years in service, plus they got added years
5       for their performance appraisals.
6   Q   Okay.
7   A   And the higher your performance ratings
8       were, the more points you got for the last
9       three years.
10  Q   All right.  Then it says Betty Blackmon was
11      the highest on the retention list among the
12      GS 4s and 5s, so she was retained in the
13      community development assistant position.
14  A   Uh-huh.
15  Q   So, actually, she was never RIF'd.  Is that
16      what I'm understanding from that statement?
17  A   Right.  She got to stay.
18  Q   And she is the only one -- everybody under
19      her got RIF'd, everybody with less scores
20      got RIF'd.
21  A   Yes.
22  Q   And all these people you've already given
23      me, Ms. Ash, Ms. Meeks, Atkins, Davis,
```

```
 1        Lockett, Thorne, Lee, Webb, Davenport,

 2        Welch, Hunter, McCall, and Rooks all had

 3        scores less than Ms. Blackmon.  Is that what

 4        you're telling me?

 5   A    Ms. Blackmon was ranked with Sandra Welch or

 6        Lisa Hunter.  It was just in the Crenshaw

 7        office.  It wasn't, you know, by the --

 8   Q    Okay.

 9   A    See, we were divided into competitive areas.

10   Q    All right.  For the Record, Ms. Blackmon was

11        white.

12   A    Yes.

13   Q    Okay.  And for the Record, Ms. Blackmon

14        would have been ranked as far as performance

15        scores by Art Powers, the very person that

16        Ms. --

17   A    Well, not --

18   Q    Wait, wait, wait a second.  The very person

19        that Ms. McCall had made complaints of

20        harassment and race discrimination against.

21                    MR. NEELEY:  Object to the

22              form.

23   A    I actually don't think Mr. Powers ever --
```

```
 1          now, I could be wrong.  I'm not sure he ever

 2          did performance ratings on the Crenshaw

 3          employees because he was acting supervisor

 4          there.  Quinton Harris -- I don't know who

 5          rated them.

 6   Q     Okay.  But the Crenshaw employees, though,

 7          at Luverne were a combination of the

 8          employees who came from where?

 9   A     Lowndes.

10   Q     Lowndes, Hayneville -- Lowndes County,

11          Hayneville.

12   A     Yes.

13   Q     And the previous Crenshaw, Luverne

14          employees.

15   A     Yes.

16   Q     It was combined.

17   A     Yes, sir.

18   Q     And those earlier Hayneville, Lowndes County

19          employees had also been supervised for some

20          period of time by Mr. Powers, including

21          Ms. McCall; correct?

22   A     I don't remember Mr. Powers ever -- I don't

23          know, but I'm sure two years of their
```

```
 1           ratings would have been done by, probably,
 2           Mr. McAlpine, who was the supervisor of
 3           Lowndes.
 4    Q      Do you know whether or not Mr. Arthur Powers
 5           did any ratings or rankings, evaluations, et
 6           cetera, performance appraisals of Ms. McCall
 7           while she was at Hayneville?
 8    A      No, sir.
 9    Q      Okay.  That's fair.  That's fair.  Okay.
10           All right.  In the discussion you had with
11           Mr. Art Powers about his allegations that
12           Ms. McCall was not doing work or doing her
13           work, did he ever express what he felt about
14           it, whether he liked her or not?
15    A      No, he did not.
16    Q      Okay.
17    A      No.
18    Q      Okay.  Once he told you that she was not
19           doing her work, did you report it to your
20           supervisor?
21    A      I didn't report it.  I mean, we discussed
22           it, I believe.
23    Q      With your supervisor, Ms. Bennett.
```

```
 1   A    I think I did, but I can't say for sure.  I
 2        probably did.
 3   Q    And do you recall what type of discussion
 4        occurred there?
 5   A    No, sir, I don't recall.
 6   Q    Okay.  All right.  If you would, look at
 7        your affidavit.  Look at paragraph nine.  It
 8        says before the final RIF date, a career
 9        transition seminar was conducted for
10        employees who had been RIF'd, and the RPL
11        was discussed once again, quote, unquote.
12        Do you see that statement?  It's the third
13        sentence in paragraph nine.  Do you see
14        that?
15   A    Yes.
16   Q    Okay.  And then it says Lisa McCall did not
17        attend the seminar.
18   A    Right.
19   Q    Okay.  Do you know how it occurred that such
20        a seminar was conducted but, yet, she did
21        not attend?
22   A    Well, we called all the employees.  There
23        was another lady in the office at the time,
```

```
 1        Ms. Boyd, and she called everybody that was
 2        going to be RIF'd and asked them if they
 3        were going to attend, and Lisa did not come.
 4   Q    Do you have any proof that Ms. McCall
 5        received such a call to attend that seminar?
 6   A    We had a note somewhere.  It should be
 7        somewhere in the file where she called them.
 8   Q    Where who called whom?
 9   A    Huh?
10   Q    Where who called whom?
11   A    Where Ms. Boyd called everybody.
12   Q    What's her first name, please, ma'am?
13   A    Mrs. Mickey Boyd.
14   Q    And she worked in your office.
15   A    Yes, uh-huh.
16   Q    And you understand that it was her duty to
17        call everybody to attend that career
18        transition seminar?
19   A    It wasn't her duty.  They were notified by
20        letter, and we were just following up to
21        make sure that -- and I may have been the
22        one that called, and Mickey might have been
23        the one that kept the list.
```

1    Q    Do you know if that letter to attend the
2         career transition seminar went out to the
3         same address that these other letters went
4         to that apparently Ms. McCall never
5         received?
6    A    Oh, no, sir.  They went to the office, to
7         the employees in the office that they were
8         working in.
9    Q    So they would have gone to the supervisor
10        like this other package would have so that
11        the supervisor would distribute those
12        letters?
13   A    I don't know who distributed their mail, but
14        they would have gone to the office.
15   Q    Okay.  Do you know if they were bundled?  As
16        you said, that, I think, the packages that
17        would have included Plaintiff's Exhibit 4
18        was bundled?
19   A    They would have been bundled, but they would
20        have been -- Arlesa and Lisa and Sandra and
21        Sonya would have each had an envelope open
22        by addressee only, a separate envelope for
23        each one.

1    Q    It says, in the next sentence, the RPL

2         registration form was sent to Ms. McCall

3         several times.  Now, I think we've been over

4         all that.

5    A    Yes, sir.

6    Q    Is there anything else you can add to

7         clarify that statement or that scenario?

8         Well, I'm just in this one sentence.  I

9         read, quote, the RPL registration form was

10        sent to Ms. McCall several times, end of

11        quote.  Is there anything else you can add

12        about that matter that we have not already

13        covered today.

14   A    No, sir.

15   Q    The next sentence says on 2/9/98, the form

16        was sent to her after a telephone request to

17        me.  And my question is:  That telephone

18        request to you was made by whom?  Was it

19        Ms. McCall?

20   A    Yes, sir.

21   Q    Okay.  All right.  The next sentence says,

22        quote, on 3/2/98, Ms. McCall contacted Ms.

23        Boyd.  Now, that's the same Ms. Boyd that

```
 1        you've been talking about earlier; correct?
 2   A    Yes, sir.
 3   Q    Okay.  Personnel specialist with a complaint
 4        about a W-2 form and stated she still had
 5        not received the RPL form which was mailed
 6        on February 9, and that would have been
 7        February 9 of 1998.
 8   A    Yes, sir.
 9   Q    Okay.  Do you know anymore about that
10        sentence other than what's stated in that
11        sentence?
12   A    Well, I'm sure that's when we found out that
13        her address had changed.
14   Q    Okay.  That Ms. McCall's address had
15        changed?
16   A    Yes.
17   Q    All right.  Can you state under Oath, for
18        the Record, that this is the first instance
19        on or about 3/2/98, that you recalled
20        learning that Ms. McCall's address had
21        changed?
22   A    Yes, sir.
23   Q    That was the first time that you had learned
```

```
 1        in this whole scenario about the
 2        re-employment form.
 3   A    Yes, sir.
 4   Q    That would be the form that we've already
 5        marked Plaintiff's Exhibit 4.
 6   A    Yes.
 7   Q    Okay.  The next sentence says I mailed a
 8        form to her, and that would be equivalent to
 9        the form in Plaintiff's Exhibit 4; correct,
10        is the referencing.
11   A    Yes.
12   Q    To her again on March 10th to a new address.
13        The form was signed by Ms. McCall on
14        April 27, 1998, and that is as of this date
15        right here that's on Plaintiff's Exhibit 4.
16   A    Yes, sir.
17   Q    And received by me on May 26, 1998.
18   A    Yes.
19   Q    All right.  Now, my question to you is
20        Ms. McCall signed it on April 27, 1998, as
21        it's shown on the document.  Why is it that
22        you received that document as of May 26,
23        1998?
```

| | | |
|---|---|---|
| 1 | A | Because she never mailed it until -- I only |
| 2 | | received it -- that was when it came in the |
| 3 | | mail was the day I received it.  So, |
| 4 | | evidently, she delayed mailing it. |
| 5 | Q | If she testifies that she hand brought -- |
| 6 | | excuse me, Plaintiff's Exhibit 4 signed by |
| 7 | | her on 4/27/98, on or about that date, would |
| 8 | | you have a dispute with that? |
| 9 | A | Yes, I would. |
| 10 | Q | Okay.  All right.  And then it says |
| 11 | | Ms. McCall's name was placed on the agency |
| 12 | | RPL list on May 27, 1998; correct? |
| 13 | A | Yes. |
| 14 | Q | Okay.  Now, I've got a final agency decision |
| 15 | | that's on USDA letterhead.  Do you know what |
| 16 | | a final agency decision is regarding a EEO |
| 17 | | complaint? |
| 18 | A | Yes. |
| 19 | Q | Okay.  The USDA stated in the factual |
| 20 | | background that complainant, here, Ms. Lisa |
| 21 | | McCall, because she's the complainant right |
| 22 | | here, quote, initially contacted EEO |
| 23 | | counselor on May 14, 1998.  Do you see that? |

```
 1   A    Uh-huh.

 2   Q    Okay.  Do you have any dispute with that

 3        date?

 4   A    No.

 5   Q    Okay.  All right.  Now, let's look back, if

 6        you could, at paragraph nine of your

 7        affidavit that's in the investigative file,

 8        page five of seven of your affidavit.  It

 9        says, quote, Ms. McCall's race and color had

10        nothing to do with her placement on the RPL.

11        Do you see that?

12   A    Yes, sir.

13   Q    All right.  I understand you said that under

14        Oath, but there's nothing in here about

15        retaliation or reprisal.  Under Oath, can

16        you testify today that there was no

17        retaliation or reprisal that had nothing to

18        do with her placement on the RPL?

19                   MR. NEELEY:  Object to form.

20   A    That's true.

21   Q    So it is your opinion and belief that she

22        was not reprised or retaliated against

23        whatsoever regarding her re-employment with
```

```
 1          the agency, Department of Agriculture.

 2     A    That's true.

 3     Q    You saw nothing involving retaliation or

 4          reprisal.

 5     A    No.

 6     Q    You're agreeing with me.

 7     A    I'm agreeing with you, yes.

 8                    MR. ATCHISON:  Can we take a

 9               short break again?

10                    MR. NEELEY:  Yeah.  Thank

11               you.

12                    (At which time, a break was

13               held.)

14     Q    Ms. Price, thank you very much.  We just

15          took a break, and I'd like to get back going

16          on your deposition.  If I could ask you,

17          during this time period with Ms. McCall

18          going through this RIF process and this

19          re-employment process, she never got

20          re-employed; right?

21     A    That's right.

22     Q    With the USDA.  And she was never offered a

23          position, to your knowledge, by the USDA
```

```
 1         after this RIF occurred; correct?
 2    A    Correct.
 3    Q    Okay.  That she turned down or something;
 4         right?
 5    A    Right.
 6    Q    She never got even an offer; right?  All
 7         right.  Now, if you'll look at paragraph 10
 8         of your affidavit -- that's page six of
 9         seven in the EEO investigative file, the
10         big, thick, blue book that I've referenced.
11         Do you have that page in front of you?
12    A    Yes.
13    Q    Okay.  All right.  It says even though
14         Ms. McCall did not return her RPL form until
15         over a year after the RIF and therefore was
16         not placed on the agency RPL until that
17         time, her name was on an informal
18         re-employment list that we maintained in the
19         office.
20    A    Uh-huh.
21    Q    Okay.  Why do you say that, please, ma'am,
22         that her name was on an informal
23         re-employment list that was maintained in
```

```
 1        the office?
 2   A    It was -- it was just a list I kept, you
 3        know, of the employees who had been RIF'd.
 4        And if something would come up that I
 5        thought they might be interested in, you
 6        know, I could call them, or I would call
 7        them.
 8   Q    In the course of 1996 when there was rumors
 9        about -- or more than just rumors -- that
10        there was going to be a RIF, 1997 when there
11        was notice of a RIF in January that took
12        place, I think, in April or May of '97, and
13        1998, '99, in the course of those years, did
14        you ever call up Ms. McCall through this
15        so-called employment -- informal
16        re-employment list?  Did you ever call her
17        up and say, hey, there's a job opening at
18        such and such place and such and such
19        position?
20   A    No, because we had very few openings after
21        the RIF.  They would have had been GS-4s for
22        her to be re-employed, and most of our
23        positions were at the 5 level.
```

```
 1   Q    Well, didn't you reference to her at some
 2        point in communications with her in those --
 3        in that time frame of '96 through '99 that
 4        there were no GS-4 positions open?
 5   A    I don't believe I were.  If I said it at the
 6        time, it would have been true.
 7   Q    Okay.
 8   A    But I don't remember now.
 9   Q    Okay.  Well, didn't Sonya Davenport take a
10        GS-4 position?
11   A    I don't know if she did or not.
12   Q    Wasn't she offered a GS-4 position?
13   A    Does it say she did?
14   Q    You're looking at paragraph 11.
15   A    Yeah.
16   Q    Wasn't she offered a GS-4 position?
17   A    I don't know.
18   Q    Okay.  It says that she was recently
19        re-employed.  I'm looking at paragraph 11 of
20        your affidavit.
21   A    Okay.
22   Q    She was recently re-employed in a temporary
23        position a few months ago.  Okay?
```

1   A    Okay.

2   Q    All right.

3   A    And when is that dated?

4   Q    Well, your affidavit was dated --

5   A    January --

6   Q    -- January 26, 2001.  So at some point while

7        this case has been pending as an EEO case,

8        she was re-employed in a temporary position.

9   A    Sometime in 2000.

10  Q    Okay.  And it say the agency did not contact

11       her about the position.  But my question is

12       once that position became open, whether it's

13       GS-4 or 5, did you ever pick up the phone

14       and call Ms. McCall and tell Ms. McCall or

15       write her or otherwise contact her to inform

16       her of this position that was open?

17  A    No, I did not.

18  Q    Okay.  And if Ms. McCall would testify or

19       Ms. Davenport would testify that that was a

20       GS-4 position, would you have any evidence

21       to dispute that?

22  A    No, I would not.

23  Q    Okay.

1  A    It probably was a 4.

2  Q    Okay.  Weren't there other 4 positions

3       filled during the time that all this has

4       been pending?

5  A    Gosh, I just don't remember.  Ella Webb --

6       most anything we did fill could have been,

7       like, a worker trainee.  That's a beginning

8       position, like a GS-1, starting off position

9       with the government or a 3 or a 4.  I

10      believe Ella Webb came back as a 4 in

11      Huntsville.

12 Q    Okay.  And I take it that even though as you

13      say in paragraph 10 you had an informal

14      re-employment list that you maintain in the

15      office, you never called Ms. McCall about

16      that position opened in Huntsville.

17 A    No, sir, because she only called them.  The

18      RPL had to be within their -- they were

19      eligible on the RPL within their commuting

20      area, and Covington was down --

21 Q    Let's talk ability Sonya Davenport now.  Was

22      Sonya Davenport re-employed in the same

23      area?

1  A    She was, yes, but Sonya was not notified of

2       the job.  She found out -- she heard.

3  Q    I'm not questioning how she found out about

4       it.  What I'm asking is she had previously

5       been involved in a job in Luverne office

6       before she lost her job in the RIF; is that

7       correct, as per paragraph 11 of your

8       affidavit?

9  A    Yes.

10 Q    What I'm asking is when she was re-employed

11      in this temporary position, where was she

12      detailed?  State office in Montgomery;

13      right?

14 A    Oh, yeah, she was, yes.

15 Q    Okay.  Okay.  All right.  All right.  And

16      that's actually where Ms. McCall lived is

17      Montgomery.

18 A    That's true.

19 Q    Okay.  And there's no reason why Ms. McCall

20      could not have been informed of that

21      position opening informally as you state in

22      paragraph 10 that there was an informal

23      re-employment list that was maintained in

1     your office.  There's no reason that

2     Ms. McCall could not have been informed of

3     this position in Montgomery that Sonya

4     Davenport accepted.

5             MR. NEELEY:  Object to form.

6  Q  Specifically, if it were -- it may have

7     been -- if it had been a 4.

8  A  Yes, but neither of them were informed of

9     the job.

10  Q  Okay.  Okay.  I understand Ms. Sonya

11     Davenport learned of it on her own.

12  A  Right.

13  Q  But you state in paragraph 10 that there was

14     an informal re-employment list that you

15     maintain in the office.

16  A  Yes.

17  Q  Okay.  Meaning that you could informally

18     tell somebody about job openings; correct?

19  A  Yes.

20  Q  Okay.

21  A  If it was in a 40-mile radius --

22  Q  Oh, 40 miles.

23  A  -- of where she was RIF'd from.

103

```
1    Q    Where is that 40-mile rule?

2    A    It's in the RIF procedure.

3    Q    Okay.  Where is that procedure, please,

4         ma'am?

5    A    Oh, Lord, I don't know.

6    Q    All right.  Let's do this.  Rather than

7         having you try to answer that question, let

8         me ask you what is marked Plaintiff's

9         Exhibit No. 2 and Defendant's Exhibit No. 2.

10                        (The referred-to document was

11                         previously marked as

12                         Plaintiff's Exhibit No. 2 and

13                         Defendant's Exhibit No. 2.)

14   Q    What is this document, please, ma'am?

15   A    Okay.

16   Q    Does that help you with my prior questions?

17   A    It probably will help.

18   Q    All right.

19                        (At which time, there was an

20                         off-the-Record discussion.)

21   Q    Now, is there any reference in that document

22        about the 40-mile rule?

23   A    Not 40 miles but the local commuting area.
```