```
 1   Q   Okay.  And what is the local commuting area
 2       defined as?
 3   A   That was the 40-mile radius.
 4   Q   Okay.  Does that -- is the 40-mile radius
 5       referenced in that document?
 6   A   No, it isn't.
 7   Q   Well, I believe Ms. McCall has -- in her EEO
 8       and maybe otherwise, has complained about
 9       having to commute in 100-mile radius.  And I
10       believe also that she has complained that
11       another black individual that was
12       transferred from Hayneville to Luverne had
13       to do this 100-mile radius.  Was there a
14       problem with her having to do that commute
15       when she was transferred from Hayneville to
16       Luverne in '96, '97?
17   A   That was -- well, I didn't know there was a
18       problem if there was, but it was not -- that
19       was 100-miles round trip.  That wasn't
20       100-miles from Lowndes to Crenshaw.
21   Q   To be considered to be in this 40-mile
22       radius for re-employment purposes, did the
23       agency give the employee an option to waive
```

```
 1        that since that would be, really, a hardship

 2        on the employee?

 3   A    No, sir.  That was not only the agency

 4        rules, that was OPM regulations.

 5   Q    Okay.  And that reference would be a commute

 6        between the person's home and his or her

 7        job?

 8   A    Yes.

 9   Q    Is that the 40-mile radius?

10   A    Oh, for the 40-mile radius, if I recall

11        correctly, it was from the office they were

12        separated from to the office where there was

13        a vacancy.

14   Q    Well, okay.  And you would agree that

15        Luverne to Montgomery is over 40-miles.

16   A    It's close.

17   Q    Okay.  Well, was Ms. Davenport separated

18        from Luverne?

19   A    Yes.

20   Q    Was Ms. McCall separated from Luverne?

21   A    Yes, sir.

22   Q    Okay.  And now, how could Ms. McCall be

23        excluded for consideration of working in
```

```
 1        Montgomery when she was separated from the

 2        very same office Ms. Sonya Davenport was

 3        separated from?

 4                    MR. NEELEY:  Object to form.

 5                You may answer.

 6  Q     You expressed earlier that Ms. McCall was

 7        not called or given an informal

 8        re-employment consideration that you've

 9        talked about in paragraph 10 because of the

10        40-mile rule, but now you've testified that

11        they were both separated from the Luverne

12        office.

13  A     They were both separated from Luverne.

14        Sonya got her job in Covington County, which

15        was outside the 40-mile radius.  Then we

16        needed somebody in the computer section, and

17        Sonya had worked there previously.  So Sonya

18        was detailed to the computer section of the

19        state office since she was familiar with the

20        programs.

21  Q     Okay.  Well, let's go back to paragraph 11

22        and see how the mechanics of this scenario

23        works.  You say in your affidavit that Sonya
```

```
 1        Davenport was rehired in a temporary
 2        position, and where was that temporary
 3        position that she was rehired after her
 4        being RIF'd in the Luverne office?
 5   A    The temporary position was in Covington
 6        County.
 7   Q    Is that in the Luverne office?  Where was
 8        that?
 9   A    No.  Andalusia.
10   Q    Andalusia.  Okay.  And how far was that
11        office from the Luverne office?
12   A    It's quite aways.
13   Q    Is it more than 40 miles?
14   A    I believe it is, yes.
15   Q    Okay.  So the 40-mile rule didn't apply to
16        her in that scenario.
17   A    It is more than 40 miles.
18   Q    From Luverne to Andalusia.
19   A    Uh-huh, because Sonya stayed with another
20        lady that worked in the office down there.
21   Q    Okay.  And then at some point -- and how
22        much time transpired between the time she
23        was rehired in a temporary position in
```

```
 1        Andalusia to the time that she was, quote,

 2        recently detailed to the state office in

 3        Montgomery?  How much time expired there?

 4   A    I don't remember.  I'm sorry.

 5   Q    When did you retire, please, ma'am?

 6   A    January 2002.

 7   Q    Okay.  So I take it that as per your

 8        affidavit, you were working when all this

 9        regarding Sonya Davenport occurred as set

10        forth in your affidavit in paragraph 11.

11   A    Yes, sir.

12   Q    Okay.  And I take it the paperwork that made

13        all this happen for Sonya Davenport went

14        across your desk.

15   A    Yes, sir.

16   Q    Okay.  And the question I'm trying to

17        understand was, she was detailed to

18        Andalusia when she was rehired in a

19        temporary position, and when was that,

20        please, ma'am?

21   A    I'm sorry.  I just don't remember.

22   Q    Okay.  Well, approximately how much time

23        between that and she was recently detailed
```

```
 1         to the state office in Montgomery, Alabama?

 2   A     I'm sorry.  I just don't know.

 3   Q     Okay.

 4   A     I mean, all this happened 12, 13 years ago

 5         or longer.

 6   Q     Well, I submit that I believe you testified

 7         that Sonya was re-employed in 2000 or 2001.

 8         Did you testify to that earlier, Sonya

 9         Davenport?

10   A     Did I --

11   Q     I may be wrong.  I mean, the record will

12         reflect when it was.  I'm not trying to

13         trick you, ma'am, but I'm just trying to

14         recall your prior testimony today.  Okay.

15         All right.  Well, let's just keep on going

16         here.  If you look to the last page of your

17         affidavit, it says, Mr. Horne, meaning

18         Horace Horne, the former state director.

19   A     Uh-huh.

20   Q     He was a selecting official for the position

21         in 1996.  Was he the selecting official,

22         ultimately, on all these positions?

23   A     Yes, he was.
```

```
 1   Q   Okay.  And at some point, wasn't Mr. Horace

 2       Horne beset with a lot of litigation

 3       involving black farmers who had sued the

 4       State of Alabama for race discrimination and

 5       loans?

 6                    MR. NEELEY:  Object to form.

 7   A   No, that wasn't -- well, Mr. Horne happened

 8       to be the state director.

 9   Q   During that time period.

10   A   Yeah.

11   Q   And he was brought into that case, was he

12       not?

13   A   No.  These cases went back to, like, the

14       '80s.

15   Q   Okay.

16   A   And Mr. Horne was not there at the time.

17   Q   Was he ever working as a manager in the

18       State of Alabama during the time that this

19       litigation occurred -- underlying facts of

20       this litigation occurred -- that blacks

21       claimed they were being discriminated

22       against regarding farm loans?

23   A   Farm loans?
```

```
 1   Q    Yes, ma'am.

 2   A    He was state director when it all came to a

 3        head, yes, sir.

 4   Q    Okay.  Okay.  And your next paragraph, 12,

 5        continues on the next page of seven.  And it

 6        says Horne is no longer with the agency.  Do

 7        you know when he left the agency, the USDA?

 8   A    I think it was, like, the beginning of 2001.

 9   Q    Okay.  And you say Lisa McCall's race and

10        color had nothing to do with her

11        non-selection.  Are you referencing her

12        non-selection after the RIF, the

13        re-employment matter?  Is that what you're

14        referencing there?

15   A    No.  I believe the vacancy -- I'm

16        referencing the vacancy that she applied for

17        in Baldwin County.

18   Q    In 1996.

19   A    Right.

20   Q    Well, let me ask you a question.  I believe

21        we read a prior statement that was similar

22        to this, that Lisa McCall's race and color

23        had nothing to do.  Would you say that that
```

```
 1        had nothing to do with any personnel action

 2        taken by the agency against her?

 3                    MR. NEELEY:  Object to the

 4              form.

 5   Q    Or any personnel action that the agency

 6        failed to take?

 7                    MR. NEELEY:  Object to form.

 8   A    Yeah.

 9   Q    Okay.

10   A    Yes.

11   Q    Can you make, for the Record, an emphatic

12        statement that her having exercised her EEO

13        rights starting in 1996, making EEO

14        complaints, had nothing to do with her being

15        not re-employed by the agency?

16                    MR. NEELEY:  Object to form.

17   A    Yes, it did not have anything to do with her

18        not being re-employed.

19   Q    Okay.  Of all the people who were RIF'd -- I

20        think you gave me 11 or 12 names depending

21        on whether or not Ms. Camilla Meeks wasn't

22        one of them.

23   A    Right.
```

```
 1   Q   Of all the people who were RIF'd, did

 2       anybody else file an EEOC case or EEO case

 3       regarding not being re-employed or being

 4       placed on the re-employment register and

 5       being contacted?

 6   A   No, sir.

 7   Q   She was the only one; right?

 8   A   Yes.

 9   Q   Of all the people that were RIF'd, did

10       anyone else allege race discrimination

11       regarding the RIF or the re-employment

12       register?

13   A   No, sir.

14   Q   Of all the people who were RIF'd, did

15       anybody else complain about hostile

16       environment or harassment by employees or

17       supervisors within the USDA?

18   A   No, sir.

19   Q   Of all the people RIF'd, did anybody else on

20       this RIF list that you've read into the

21       Record complain of race discrimination?

22   A   No, sir.

23   Q   Okay.  Did anybody else ever -- and I take
```

```
 1        it that they did not.  But did anybody else

 2        ever make any race complaints against Art

 3        Powers other than Ms. McCall, to your

 4        knowledge?

 5   A    No, sir.

 6   Q    Okay.  Of all the people that worked under

 7        Mr. Powers, did anybody else ever make any

 8        retaliation claims about him --

 9   A    No, sir.

10   Q    -- or about the agency?

11   A    No, no.

12   Q    Okay.  You state in your affidavit that

13        Horne is no longer with the agency.  That's

14        Horace Horne; correct?

15   A    Yes.

16   Q    And is not willing to be interviewed, quote,

17        unquote.  Why did you make that statement

18        that he's not willing to be interviewed?

19                   MR. NEELEY:  Object to the

20              form.  You may answer.

21   A    Because I was asked to contact him.

22   Q    By who?

23   A    The EEO people before this lady came -- gave
```

| | | |
|---|---|---|
| 1 | | us a list of who to contact. |
| 2 | Q | Before which lady came, the EEO |
| 3 | | investigator? |
| 4 | A | Yes. |
| 5 | Q | Okay. |
| 6 | A | To see if they would be available, and I |
| 7 | | remember I talked with Mr. Horne, and he |
| 8 | | said, no, he didn't recall anything about |
| 9 | | it, and he did not want to be interviewed. |
| 10 | Q | Okay.  Was he still employed with the agency |
| 11 | | at the time? |
| 12 | A | No. |
| 13 | Q | He had just retired? |
| 14 | A | He didn't retire.  He went -- he just took |
| 15 | | another job. |
| 16 | Q | Another job where, please, ma'am? |
| 17 | A | Oh, it was -- actually, I don't remember |
| 18 | | where. |
| 19 | Q | Was it with the USDA? |
| 20 | A | No, no, it wasn't with the government.  It |
| 21 | | was private. |
| 22 | Q | Okay.  All right.  Number 13, it says, a |
| 23 | | later vacancy that came available in Bay |

| | |
|---|---|
| 1 | Minette on 3/7/97.  This vacancy was |
| 2 | advertised to get a GS-4, 5 employees who |
| 3 | were being RIF'd an opportunity to apply for |
| 4 | another position.  Lisa McCall did not |
| 5 | apply.  Do you see that statement? |
| 6 | A    Yes. |
| 7 | Q    Okay.  Now, do you have any proof that she |
| 8 | ever got notice of that position? |
| 9 | A    No, sir, I don't have proof. |
| 10 | Q    Okay.  All right. |
| 11 | A    I feel sure she did. |
| 12 | Q    All right.  And then it says there were no |
| 13 | applications for the position.  It was later |
| 14 | filled by worker trainee, a GS-1 on 1/4/98. |
| 15 | A    Yes, sir. |
| 16 | Q    Okay.  Who was the worker trainee? |
| 17 | A    I'm sorry.  I don't remember her name. |
| 18 | Q    Do you remember whether or not she is a |
| 19 | Caucasian or white? |
| 20 | A    She was either a white or an American |
| 21 | Indian, but I cannot remember for sure. |
| 22 | Q    All right.  Well, let's do this.  Going back |
| 23 | to your paragraph 10 where you said there |

```
 1        was an informal re-employment list that you

 2        maintained in the office, did you make any

 3        effort to call Ms. Lisa McCall based on an

 4        informal employment register scenario

 5        regarding this paragraph 13 vacancy that

 6        occurred in Bay Minette on 3/17/97?

 7   A    No, sir, because the RPL didn't go into

 8        effect until after the RIF, and this vacancy

 9        was before the RIF.

10   Q    Well, this vacancy was before the RIF, but

11        this position appears that it was open for a

12        long time.  It was open between 3/17/97 and

13        finally filled on 1/4/98.  That's months,

14        would you not agree?

15   A    With the worker trainee.

16   Q    Yeah.  It was finally filled months down the

17        road.

18   A    Oh, you mean, did I call --

19   Q    Lisa and say, Ms. McCall, there is a

20        position here open that you would be

21        qualified for.  Would you consider it?  Did

22        you ever call her and tell her that or

23        attempt to call her and tell her that?
```

```
 1   A   No, sir, because it was going to be a GS-1.

 2   Q   Well, when it was filled as a GS-1, but it

 3       was advertised to give the GS-4 and 5

 4       employees who were being RIF'd an

 5       opportunity to apply for another position.

 6       That's what you say in your --

 7   A   Right.  March 17, '97.

 8   Q   Right.

 9   A   Okay.  That was before the RIF.

10   Q   I understand.

11   A   No, I did not call anybody and ask them if

12       they were interested because every office

13       got the vacancy announcement.  So there was

14       no reason for me to call anybody and say are

15       you interested because everybody knew about

16       the job.

17   Q   Do you have any proof that Lisa McCall did

18       receive that vacancy announcement?

19   A   I don't have any proof that anybody received

20       it, but I'm sure they did because it went

21       out of -- it went to the OPM web site.  It

22       went to every office, and it would have also

23       been posted in employment offices.  I'm sure
```

```
 1        they had a copy.

 2   Q    Have you heard the term good ole boy

 3        network?

 4   A    Heard what?

 5   Q    Heard the term good ole boy network?

 6   A    I've heard of it, yes.

 7   Q    What's your definition of that term, that

 8        colloquial term?

 9   A    It's where you have, like, a little click,

10        and everybody works together to take care of

11        everybody else.

12   Q    White folks taking care of white folks;

13        right?

14                    MR. NEELEY:  Object to the

15             form.

16   A    No, sir.

17   Q    No?  Okay.

18   A    No, I don't think of it that way.

19   Q    Okay.  You don't think Mr. Powers is taking

20        care of white individuals?

21                    MR. NEELEY:  Object to the

22             form.

23   A    I don't, no.
```

```
 1   Q    Not black individuals?
 2                        MR. NEELEY:  Object to the
 3                  form.
 4   Q    Especially those who file EEOs against him.
 5                        MR. NEELEY:  Object to the
 6                  form.
 7   A    I really don't, no, sir.
 8                        MR. ATCHISON:  If you could
 9                  give me just a moment, we're
10                  almost finished, I think.
11                        (At which time, a break was
12                  held.)
13   Q    That's it.  Thank you.
14                        MR. NEELEY:  I've got a few
15                  questions.
16                        EXAMINATION
17   BY MR. NEELEY:
18   Q    I just want to clarify a few points if I
19        could, Ms. Price.  Again, I'm Rand Neeley.
20        We met sometime last week, didn't we?
21   A    Yes.
22   Q    Okay.  I really just want to go over a few
23        points that it felt like we kind of left
```

```
 1           dangling.  I wanted to make sure they were

 2           actively reflected in the Record.  Okay?  In

 3           fact, I'm going to start right here with

 4           the -- there was a great deal of talk about

 5           your paragraph Number 10, that there were --

 6           regarding any assistance that you may have

 7           provided Ms. McCall in securing other

 8           employment.  Now, as I understand it, your

 9           affidavit correctly, you were unable to

10           provide her or did not assist her with

11           finding any employment within the agency; is

12           that right?

13    A      That's true.

14    Q      Okay.  What efforts, if any, did you make as

15           a human being to assist Ms. McCall in

16           securing other employment from any source?

17    A      Well, I sent her a copy of a notice for a

18           secretarial position with the Home Builders

19           Association that was in Montgomery.

20    Q      That was in Montgomery?

21    A      Uh-huh.

22    Q      What type of regulatory requirement were you

23           under to send her that?
```

```
 1   A    There wasn't any requirement.  I just did
 2        it.
 3   Q    For what reason did you do that?
 4   A    Just trying to help her find a job.
 5   Q    All right.  Although -- now, let me ask you
 6        this:  Within the agency, again, talking in
 7        Number 4, during the period from 1997, April
 8        of 1997, until April of 1999, did there ever
 9        come an occasion that you were required by
10        the applicable federal regulations to notify
11        Ms. McCall of any position available within
12        the United States Department of Agriculture?
13   A    No, there was never a vacancy that I was
14        required to notify her of.
15   Q    You heard some talk regarding a temporary
16        position that was filled by a Ms. Davenport;
17        correct?
18   A    Right.
19   Q    Now, I think you stated clearly, and I want
20        to make sure it's clearly understood, you
21        made no contact with Ms. Davenport about the
22        availability of that temporary position; is
23        that right?
```

| | | |
|---|---|---|
| 1 | A | That's exactly right. |
| 2 | Q | What obligation, if any, did you have to |
| 3 | | notify any former employee of the United |
| 4 | | States Department of Agriculture of any |
| 5 | | temporary position? |
| 6 | A | No obligation at all because they -- I was |
| 7 | | only obligated for permanent positions. |
| 8 | Q | Now, in accordance with the RIF regulations, |
| 9 | | you said permanent positions; is that right? |
| 10 | A | Yes. |
| 11 | Q | I'm asking were there any other criteria |
| 12 | | that had to be met about the position that |
| 13 | | triggered your obligation to advise, for |
| 14 | | example, Ms. McCall? |
| 15 | A | Okay.  The position would have had to been a |
| 16 | | permanent position at the same grade level |
| 17 | | from which the employee was RIF'd and within |
| 18 | | the commuting area, which was a 40-mile |
| 19 | | radius from the office the employee was |
| 20 | | RIF'd from. |
| 21 | Q | So in this case, applying that criteria, the |
| 22 | | only jobs that you were required to notify |
| 23 | | Ms. McCall of would have been a GS-4 |

```
 1          position within the commuting area of

 2          Luverne, Alabama.

 3   A      Right and permanent position.

 4   Q      And permanent.

 5   A      Grade 4.

 6   Q      Between April of 1997 and April of 1999,

 7          just how many of those jobs, those jobs that

 8          met the criteria you have just identified,

 9          become available?

10   A      I believe the answer is zero.

11   Q      Therefore, how many times were you required

12          by statute in order to protect the rights of

13          all employees to notify Ms. McCall?

14   A      Zero.

15   Q      Okay.  Just because it's dangling as well,

16          regarding Plaintiff's Exhibit 12,

17          Defendant's Exhibit 12, the October 29th

18          letter from Ms. McCall to Mr. Horne

19          regarding harassment, anywhere within that

20          letter is the type harassment that she's

21          complaining of described?

22   A      No.

23   Q      Is there anything in that letter that
```

```
 1        indicates to you that she was complaining of

 2        harassment prohibited by any act of

 3        Congress?

 4   A    No, sir.

 5   Q    Okay.  That letter makes no reference to

 6        race.

 7   A    No.

 8                      MR. ATCHISON:  The document

 9                 speaks for itself.  Objection.

10   Q    Now, the second paragraph to that letter,

11        would you read that into the Record, please?

12        Well, we know what it says.  It's regarding

13        part-time employment at Lerner New York in

14        Montgomery; correct?

15   A    Right.

16   Q    And you understand this to have been

17        seasonal employment, say, Christmas

18        employment.

19   A    That's what it sounds like, yes.

20   Q    Okay.  Is it or is it not a requirement of

21        federal employees who seek outside

22        employment on a part-time basis that it be

23        cleared by their supervisors?
```

```
1   A    It's supposed to be cleared at that time.  I

2        don't know if it still is.

3   Q    Okay.  And that's what I meant.

4   A    At that time, it had to be approved by the

5        state director.

6   Q    And for what reasons, if any, are you aware

7        of that the state director was required?

8   A    Just -- he wanted to make sure that any

9        outside employment was not a conflict of

10       interest with anything to do with the

11       agency; for instance, selling real estate or

12       something like that.

13  Q    Okay.  You were in government service for

14       how many years?

15  A    Twenty.

16  Q    And that 20 years, I'm assuming, correct me

17       if I'm wrong, that was 20 years spent in the

18       human resources function of the federal

19       government.

20  A    Yes, sir.

21  Q    Have you ever heard of the term appearance

22       of impropriety during the course of your

23       employment?
```

```
 1   A    Yes.

 2   Q    And what does the appearance of impropriety

 3        mean to you?

 4   A    It's just where somebody outside the agency

 5        could get the impression that somebody was

 6        doing something that would conflict with

 7        their agency job.

 8   Q    In other words, I think you gave the example

 9        a second ago of selling real estate, for

10        example.

11   A    Right.

12   Q    Now, the business of rural development,

13        farmers' home, whichever term you use was to

14        finance real estate purchases for low income

15        buyers; is that correct?

16   A    Yes, that was one of them.

17   Q    And, for example, and we know that's not the

18        case, but for example, had Ms. McCall Chosen

19        to sell real estate on a part time basis,

20        based upon your 20 years of service to the

21        federal government in the HR function, or

22        human resources function, would you consider

23        her selling real estate part time while also
```

```
 1        involved in a federal function that financed

 2        low income buyer mortgages, would you

 3        consider that to give the appearance of

 4        impropriety?

 5   A    Yes, sir.

 6   Q    And would you have also considered that

 7        based upon your 20 services in the HR

 8        function of the Federal government, would

 9        you also consider that a potential conflict

10        of interest?

11   A    Yes.

12   Q    So, therefore, based upon your 20 years of

13        service in the HR function of the Federal

14        government, did you have any qualms

15        whatsoever with Mr. Horne's authority to

16        review the outside employment activities of

17        his full-time employees?

18   A    No, did not.

19   Q    I want to talk about CTAP and ICTAP for a

20        second.

21   A    Okay.

22   Q    I want to make sure that this is perfectly

23        understood as well.  And please correct me
```

```
 1           if I'm wrong because I just want to make
 2           sure the Record is clear.
 3    A      Okay.
 4    Q      CTAP.  The CTAP program provided for -- and
 5           correct me if I'm wrong -- provided for
 6           preference points, shall we say, to be given
 7           to employees prior to the RIF with other
 8           Federal agencies.
 9    A      USDA only.
10    Q      Within the USDA.
11    A      Right.
12    Q      So if somebody participating in CTAP,
13           whether they were all participating in CTAP.
14           Is that a fair statement?
15    A      Uh-huh.
16    Q      If they made an application for any other
17           job within USDA, they would have gotten,
18           say, a preference point or a leg up on that
19           job.
20    A      Yeah, a leg up.  Priority consideration.
21    Q      Okay.  But that did not guarantee them that
22           particular job, did it?
23    A      That's true.  It did not.
```

```
 1   Q   And they would still be required to go
 2       through the regular employment process.
 3   A   Yes.
 4   Q   They would have had to have submitted an
 5       application, if that's what it called for.
 6   A   Uh-huh.
 7   Q   And if the position required an interview,
 8       would they have had to gone to the
 9       interview?
10   A   Yes.
11   Q   Would they have had to demonstrate their
12       knowledge, skills, and abilities to perform
13       the tasks advertised?
14   A   Yes.
15   Q   So, in fact, the CTAP program simply as we
16       stated earlier gave a -- say, if you had two
17       people, for example, who were equally
18       qualified, equally KSA able to perform their
19       function, equally interviewed just as well
20       if an interview was involved, the selecting
21       official would have to give -- only then
22       would the selecting official have to give
23       that leg up to the person involved in CTAP;
```

```
 1        is that right?
 2   A    That is correct.
 3   Q    Okay.  So it was no guarantee of any job.
 4   A    No, no, sir.
 5   Q    ICTAP.  Now, ICTAP applied to positions
 6        within or without USDA or both?
 7   A    Well, it was both.  It was USDA and all
 8        agencies.
 9   Q    All agencies that chose to participate; is
10        that a fair statement?
11   A    Uh-huh.  DoD did not participate.
12   Q    And particularly in Montgomery, we have
13        several DoD facilities, don't we?
14   A    Right.
15   Q    Okay.  So DoD did not participate in the
16        ICTAP program.
17   A    That's true.
18   Q    I would assume reciprocity was the rule;
19        therefore, y'all didn't have to give their,
20        say, RIF employees any benefits, did you?
21   A    No.
22   Q    Okay.  Back to the case in point.  ICTAP,
23        then, a job became available at, say, the
```

```
 1        Veterans Affairs, and Ms. McCall had
 2        applied.  This is hypothetically.  She and
 3        another person KSAd out the exact same
 4        equally qualified.  They both go to an
 5        interview equally qualified after the
 6        interview.  Is it a fair statement that
 7        ICTAP would only have applied in that
 8        scenario to provide Ms. McCall the position
 9        ahead of the other equally qualified
10        applicant; is that fair?
11   A    That's fair.
12   Q    So ICTAP like CTAP was a mere leg up in the
13        employment hiring process.
14   A    Yes.
15   Q    Okay.  Again, ICTAP, like CTAP, did not
16        guarantee or provide anyone with a position
17        in and of itself.
18   A    That's right.
19   Q    Okay.  It merely provided a preference point
20        giving all else being equal.
21   A    Yes.
22   Q    People who utilized the ICTAP program, like
23        the CTAP program, would have been required
```

```
 1            to conform with the application procedures

 2            of the hiring agency; is that right?

 3    A       Yes.

 4    Q       Such as filling out an application; is that

 5            right, a 171?

 6    A       Yes.

 7    Q       If it required an interview, attending the

 8            interview; if it required them demonstrating

 9            their abilities to fulfill the KSAs of the

10            position; the ICTAP participant would have

11            to do all of those things; is that right?

12    A       Yes, that's right.

13    Q       Okay.  And I apologize.  My mind drifted for

14            one second.  Ms. Ella Webb, what was

15            Ms. Webb's race?

16    A       She was black.

17    Q       A black female.

18    A       Yes.

19    Q       Okay.  And Ms. Webb was a resident -- was

20            within the commuting area -- as far as you

21            knew, was in the commuting area, as that

22            term is used in the regs, of Huntsville,

23            Alabama.
```

```
1    A    Right.
2    Q    Okay.  I think you mentioned as well,
3         Ms. Webb was somewhat proactive as far as
4         you knew in trying to secure some other
5         employment; is that right?
6    A    She was.
7    Q    Okay.  Now, the position that she went into,
8         was that a full-time, permanent position?
9    A    No, sir.
10   Q    It was not?
11   A    No.  She came back as a temporary.
12   Q    Okay.  She came back as a temporary.  So, in
13        fact, she did not come back into the USDA
14        employment by virtue of the re-employment
15        priority list.
16   A    That's true.  She did not.
17   Q    She did not come back into service by virtue
18        of the CTAP.
19   A    That's true.
20   Q    Obviously, not by virtue of the ICTAP.
21   A    That's true.
22   Q    In fact, she came back in because she stayed
23        on top of it and found that position.
```

```
 1   A    That's exactly right.
 2   Q    Okay.  Now, for clarification as well, the
 3        RPL, the Re-employment Priority List, now,
 4        correct me if I'm wrong, please.  Again for
 5        understanding, the RPL would come into play
 6        in a position involving the United States
 7        Department of Agriculture --
 8   A    That's true.
 9   Q    -- and only the United States Department of
10        Agriculture.
11   A    And only USDA.
12   Q    All right.  I think it's been clearly
13        established in order for a former RIF'd
14        employee of the USDA to be on that RPL, they
15        had to ensure that they filled out the
16        appropriate form that's been identified in
17        the record.
18   A    That's true.  It's the employee's
19        responsibility.
20   Q    To send that in.
21   A    Yes.
22   Q    Okay.  Now, that was not the case with CTAP
23        or ICTAP, though, was it?  They were
```

1         automatically on those lists; is that right?

2   A     Yes, uh-huh.  There wasn't a list for CTAP

3         or ICTAP.  The employee, if they were

4         interested in a job, they just had to show

5         their personnel action form showing that

6         they had been RIF'd.

7   Q     So using the hypothetical earlier that Ms.

8         McCall applied for a position at the

9         Veterans Administration.

10  A     Uh-huh.

11  Q     And, again, using the hypothetical, all

12        things were equal, KSAs, everything checked

13        out equal, interview.  The selecting

14        official has to pick between two equally

15        qualified persons.  In order for -- if I

16        understand you correctly, in order for Ms.

17        McCall to have received the benefit of her,

18        as we said, leg up, preference point,

19        whatever term, she would have been required

20        to produce to that selecting official a copy

21        of her SF 50 or notice of personnel action.

22  A     Right.

23  Q     And that notice of personnel action would

1        indicate that she was a previous employee of

2        the Department of Agriculture who was no

3        longer employed there by virtue of a

4        reduction in force as authorized in

5        appropriate Federal regulations.

6    A   Yes.

7    Q   Okay.  The 3/17/1997 position that became

8        open in Bay Minette, I think you attempted

9        to explain your understanding of why you

10       would not have, perhaps, notified Ms. McCall

11       of it.  I want to make sure that's clear on

12       the Record.  For what reasons did you not

13       notify Ms. McCall of the March 17th, 1997,

14       opening in Bay Minette, Alabama?

15   A   Because that was prior to the RIF, and it

16       was handled like all vacancy announcements,

17       just a regular vacancy announcement that

18       went to every office in the state.

19   Q   Okay.  And, in fact, is it a fair statement

20       that you're particularly taking time to

21       notify her versus other employees?  Could

22       that have been viewed as racially

23       discriminatory, perhaps, to white employees

```
 1        who weren't notified?
 2   A    You mean, if I would have contacted --
 3   Q    Right.
 4   A    Yes.  That's true.  And another -- you know,
 5        I was so busy at the time.  I was the only
 6        one doing all the personnel work.  And I
 7        didn't have time to call everybody.  You
 8        know, it went to every office.  So there was
 9        no reason to call people.
10   Q    Okay.  Y'all spent some time with the four
11        letters from Mr. Horne whereas Ms. McCall
12        was not selected for four positions that
13        came open prior to the RIF.
14   A    Uh-huh.
15   Q    The four letters that were all dated June
16        21, 1996.  Do you recall that?
17   A    Yeah.
18   Q    Okay.  It's regarding Ms. Martin -- it's an
19        odd name -- Balldog.
20   A    Oh, Nancy.
21   Q    Nancy Balldog.  Those 4 letters.  Do you
22        recall those?
23   A    Yes.
```

```
 1   Q   Okay.  Let me ask you this:  I think in

 2       response to some of Mr. Atchison's

 3       questions, you stated, essentially, that

 4       Ms. McCall as well as the four ladies who

 5       were ultimately selected those positions

 6       were qualified.

 7   A   Yes.

 8   Q   Now, I need -- correct me if I'm wrong.

 9       Well, let me ask you this:  When you said

10       they were qualified, all four of those

11       ladies as well as Ms. McCall -- when you

12       said they were qualified, what exactly did

13       you mean they were qualified?

14   A   It means that they met the time in grade for

15       the position, that they had submitted the

16       application with the proper documentation

17       attached, which were the KSAs, and that they

18       had addressed each KSA showing their

19       knowledge, skills and ability.  And it just

20       means that I looked at them, and they were

21       qualified before I sent them to the state

22       director for his selection.

23   Q   And, ultimately, he was the selecting
```

```
 1         official; correct?
 2    A    Yes.
 3    Q    Now, so the qualified that you referred to,
 4         is it a fair statement to say that that
 5         was -- they were technically qualified on
 6         the basis the application their --
 7         descriptions of their skills and abilities
 8         and knowledge.
 9    A    Right.
10    Q    They were technically qualified to meet the
11         requirements of that position.
12    A    That's true.
13    Q    They could do the work called for in the job
14         description.
15    A    Yes.
16    Q    All right.  However, let me ask you this:
17         Does that mean that they would be -- any
18         particular one was the best qualified?
19    A    Would be less qualified?
20    Q    Let me ask you this:  When you said that,
21         say, Ms. Martin and Ms. McCall, for example,
22         were both qualified, were you making any
23         statements to who was the best qualified?
```

```
1   A    No, I would not, no.

2   Q    Okay.  Would you have any basis for

3        determining who was the, quote, best

4        qualified?

5   A    I would, but, you know, Mr. Horne never

6        asked me.

7   Q    Were there other steps that you were aware

8        of that Mr. Horne took in these situations

9        to make his selections?

10  A    Yes.

11  Q    Do you know any of these particularly?

12  A    In these, I don't know.

13  Q    Okay.  Well, would it be unusual for

14       Mr. Horne to have taken steps beyond just

15       simply reviewing the applications and the

16       KSAs?

17  A    Yes.  A lot of times, he would call the

18       employee's supervisors or the rural

19       development manager that was over, you know,

20       the county office and ask them what they

21       knew about each employee to help him make a

22       decision.

23  Q    Okay.  So as to these four, do you or do you
```

```
 1          not have any judgment as to the best
 2          qualified selectee for those jobs?
 3   A      Personally --
 4   Q      Well, let me ask you this:  Based upon the
 5          function that you had to perform
 6          professionally, was any one better qualified
 7          than the other?
 8   A      The applications were better than the ones
 9          that -- I particularly remember the one for
10          Baldwin County, Ms. -- the other Lisa.  Her
11          application was a lot better than this Lisa.
12   Q      Okay.
13   A      But I don't know that Mr. Horne, you know,
14          took that into consideration or not.
15   Q      Would it be fair to say it was his view that
16          mattered?
17   A      Excuse me?
18   Q      It was his opinion that mattered?
19   A      Yes.
20   Q      Okay.  Okay.
21   A      That's true.  I wasn't asked.
22   Q      Okay.  I'm referring to Plaintiff's Exhibit
23          Number 3, Defendant's Exhibit Number 3.
```

```
1                          (At which time, the

2                          referred-to document was

3                          marked as Plaintiff's Exhibit

4                          No. 3 and Defendant's Exhibit

5                          No. 3 by the Reporter.)

6    Q    Now, this appears to be the package of

7         information that would have been given to

8         Lisa McCall at the time of the specific

9         reduction in force; correct?

10   A    Yes, correct.

11   Q    And within this, you also would have

12        included a sheet -- retention information --

13        well, I'll just go to it.

14   A    Okay.

15   Q    Attachment one being the retention

16        information, and that would be particular as

17        to Ms. McCall; is that correct?

18   A    Yes.

19   Q    Okay.  Now, I think in your affidavit, you

20        stated somewhere of the persons within the

21        competitive area for Ms. McCall's

22        position -- competitive area here is

23        indicated as Number 10; correct?
```

```
 1   A    Yes.
 2   Q    And the competitive area that had been
 3        determined in accordance with the RIF plan,
 4        Number 10, is all persons in the Crenshaw
 5        County office.
 6   A    That's true.
 7   Q    Okay.  Now -- and below that it says
 8        competitive level; right?
 9   A    Uh-huh.
10   Q    So 6s, for example, within the Crenshaw
11        County office, GS-6s would have been
12        compared to GS-6s.
13   A    Right.
14   Q    Okay.  And GS-5s to 5s and so forth and so
15        on.  Or in case in point, 4s to 4s.
16   A    Yeah.
17   Q    All right.  Now, this is an objective --
18        well, I'm assuming from what I see, and you
19        correct me if I'm wrong, this is an
20        objective way to measure the performance or
21        the value to any employee to the agency; is
22        that a fair statement?
23   A    Yes.
```

```
 1   Q   And it will determine their retention rights

 2       is a better statement.

 3   A   Yes, uh-huh.

 4   Q   Now, if I'm reading this right, the service

 5       computation date -- it says for Ms. McCall

 6       was 7/29 of 1990.  Is that the date she

 7       actually physically entered into Federal

 8       service?

 9   A   Yes, sir.

10   Q   Okay.  So she started work for the USDA on

11       July 29, 1990.

12   A   Yes.

13   Q   Now down here it says, adjusted service

14       computation, July 29th, 1976.  There's a

15       discrepancy there -- a difference of 14

16       years; is that right?

17   A   Right.

18   Q   Do I understand this chart right to say that

19       that 14 year difference is the result of her

20       performance ratings at fully successful,

21       fully successful, and superior.

22   A   Yes.

23   Q   And those added up -- a formula that was
```

```
 1        used as to all the employees?
 2   A    Yes, uh-huh.
 3   Q    Okay.  To give her 14 additional years.
 4   A    That's right.
 5   Q    Okay.  The same process would have been
 6        done, for example, for Ms. Hunter.
 7   A    Yes.
 8   Q    And Ms. Davenport.
 9   A    Yes.
10   Q    And Ms. Welch.
11   A    Uh-huh.
12   Q    And those numbers would just crunch and come
13        out like they come out; is that a fair
14        statement?
15   A    That's true.  That's right.
16   Q    Okay.  So in your affidavit where you state
17        that Ms. McCall came in -- I can't remember
18        exactly how you stated it.  I think you said
19        came in last or lowest.
20   A    Uh-huh.
21   Q    Is that a statement that's stating when you
22        take that -- when you just crunch these
23        numbers and compare it to the other people
```

```
 1         within areas --
 2    A    Well, not exactly because Ms. McCall was a
 3         GS-4, and all GS-4 positions were being
 4         eliminated.
 5    Q    Okay.
 6    A    So there were not going to be any 4s left.
 7    Q    Okay.  For her --
 8    A    After the RIF.
 9    Q    Would that have been an additional objective
10         factor that hindered her chances for
11         retention?
12    A    Yes, uh-huh, being a 4.
13    Q    As opposed to a 5 or a 6.
14    A    Right.
15    Q    Okay.  Now, you stated -- I want to make
16         sure I understand you -- something about
17         these performance ratings as well.  You
18         stated that -- I think it's understood in
19         the Record that at some point in time just
20         prior to the RIF, say, 1996, mid-'96, maybe
21         early '96, Art Powers became the supervisor
22         for what was Hayneville and, at the time,
23         the Hayneville and Luverne offices; correct?
```

```
 1   A   Right.
 2   Q   Now, with that being the case, would he have
 3       done Ms. McCall's performance review for the
 4       year 1995?
 5   A   I don't believe he did, but I just can't say
 6       for sure.
 7   Q   Let's state it this way.  If the record
 8       shows that he did not become her supervisor
 9       until 1996, would he have written her
10       appraisal of her performance for the 1995
11       year?
12   A   No, no, he would not.
13   Q   Okay.  How about 1994?
14   A   No.
15   Q   How about 1993?
16   A   No.
17   Q   Now, her supervisor for those three years in
18       the Hayneville office was who, as far as you
19       know?
20   A   Carnell McAlpine --
21   Q   Okay.
22   A   -- was in the Hayneville office.
23   Q   So all three of the performance ratings that
```

1    were utilized in determining her retention

2    information, as best you understand and the

3    records will clarify it, but as far as you

4    understand, were prepared by and approved by

5    and signed off by, based upon the

6    observations of Carnell McAlpine.

7  A    That's what I think.

8  Q    Okay.  I understand.  That's your best

9    understanding and recollection.  The records

10    will take care of that issue for us.

11  A    Okay.  That's good.

12  Q    Let me make sure this is absolutely

13    understood as well.  Fair is fair.  I may

14    have asked you this, and if I did, please

15    forgive me.  And Mr. Atchison may as well.

16    We know Ms. Davenport has since come back

17    into the employment of the Department of

18    Agriculture.

19  A    Right.

20  Q    What steps, if any, did you take or that

21    you're aware of anyone at the agency taking

22    to notify officially Ms. Davenport of the

23    vacancy which she occupied?  Are you ware of

```
1          any assistance?

2    A     No, I'm not.

3    Q     Okay.  For clarification, this is a

4          housekeeping matter.  I know you and Mr.

5          Atchison and we've talked about your

6          declaration, and we talked about you talked

7          with somebody named Romaine.

8    A     Right.

9    Q     I just want to show you this signature page.

10         That declaration that we've talked about, do

11         you see the name of the neutral witness

12         Notary investigator?

13   A     Oh, okay.  Yeah.

14   Q     Does that read Romaine L. White or Romaine

15         White any way?

16   A     Yes, uh-huh.

17   Q     Okay.  So as best you can recall at this

18         point in time, this was the statement that

19         you provided to an EEO investigator named

20         Romaine White.

21   A     Yes.

22   Q     And this is the one statement that you

23         recall making.
```

```
 1   A    Yeah.

 2   Q    Okay.

 3   A    I vaguely remember it.

 4   Q    Okay.  Do you remember having conversations

 5        with any other type investigator regarding

 6        Ms. McCall's claims?

 7   A    I don't, no.

 8   Q    Okay.  Just one second.  Let me scan my

 9        notes.  I think I'm done.  That's all I

10        have, Ms. Price.  Thank you.

11   A    Oh, okay.

12                    FURTHER EXAMINATION

13   BY MR. ATCHISON:

14   Q    Ms. Price, I have some more questions to

15        kind of follow up from the questions that

16        Agency counsel have asked.  You sent to

17        Ms. McCall a copy of a Home Builders

18        secretary position or something.  Was that

19        your testimony?

20   A    Yes.

21   Q    Was it some sort of application or notice of

22        job posting?

23   A    It was just a job posting that came through
```

```
 1        the state office.
 2   Q    Okay.  And the reason you sent it to her,
 3        was it not to get her employed by another
 4        agency or another employer rather than her
 5        continue with the USDA?
 6   A    No, sir.
 7                   MR. NEELEY:  Object to form.
 8   Q    That was your motivation, wasn't it?
 9   A    No, not at all.
10                   MR. NEELEY:  Object to form.
11   A    The reason I sent it to her was, you know,
12        she felt that, you know, she had been placed
13        on the RPL.  So I took that to mean she
14        really wanted a job.  So I thought I was
15        being nice and notifying her of the job that
16        she might be interested in.
17   Q    You were questioned about the time period
18        between April 1997 and April 1998 by Agency
19        counsel and asked about applicable regs that
20        would have required or not require you to
21        notify her during that time period.  What
22        are those applicable regs, please, ma'am?
23   A    I don't recall the regs, but they would be
```

```
1          in RIF regulations.
2    Q    What are the RIF regulations, please, ma'am?
3    A    I'm sorry.  They're in five CFR or
4          something.  I just don't know.
5    Q    Are you very familiar with those
6          regulations?
7    A    Well, I was at the time.  That's the code of
8          Federal regulations.
9    Q    Well, what do they say, please, ma'am?  What
10         does this five CFR say regarding --
11   A    It has all of the RIF regulations.
12   Q    But what do the regulations say.  I know it
13         has all the regulations.  I'm familiar
14         with --
15   A    What do they say about what?
16   Q    Riffs and the question that you were asked
17         about requirements to notify Ms. McCall
18         during that time period.
19   A    The regulations stated that employees are
20         only required to be notified of a vacant
21         position at the same grade level that are
22         permanent and that are in the commuting area
23         as the position from which they were RIF'd.
```

```
 1          Now, that was in the code of regulations in
 2          the CFR, but OPM also had regulations.
 3     Q    You were asked about the time period of
 4          April '97 to April '99, and you said zero
 5          jobs were available, but that's not really
 6          true.  Temporary positions were available,
 7          and those were filled; right?
 8     A    Temporary.
 9     Q    Yeah.  Okay.  And those temporary positions
10          were, basically, touch tones or ways that
11          those employees were able to get back into
12          the full-time positions.  Ms. Sonya
13          Davenport was an example of that; right?
14     A    I don't know when she was employed.  I know
15          for quite some time after the RIF -- I don't
16          believe we did any hiring for at least -- I
17          really can't remember.
18     Q    But the reality was that temporary jobs were
19          a steppingstone.  I call it a touch tone, a
20          stepping stone for certain employees that
21          had been RIF'd to later on get back into
22          full-time, permanent employment, and Sonya
23          Davenport was an example of that; am I
```

1    correct about that, ma'am?

2  A  Yes.

3  Q  Okay.  Thank you.

4  A  But I don't know when she came back.

5  Q  I think we've determined probably around

6     2000, 2001, but that's not the issue.  The

7     issue is when you talk about temporary

8     positions or non permanent positions, the

9     reality is those positions became for

10    certain employees, particularly Sonya

11    Davenport, a steppingstone so that she could

12    get back in full-time -- or did get back

13    into full-time, permanent employment with

14    the USDA.

15 A  Okay.  But if you're going to talk like

16    that, what about Gloria Rooks and Ella Webb?

17 Q  Okay.  But those people did not file EEOC

18    charges or make EEO complaints, and you've

19    already talked about that; right?

20 A  Well, that's true.

21 Q  Okay.  Yeah.  Whether they're black or

22    white, nonetheless, they had not filed EEO

23    complaints, written letters complaining

| | |
|---|---|
| 1 | about disparate treatment of blacks, et |
| 2 | cetera.  You've already talked about how |
| 3 | none of those people talked about that with |
| 4 | EEO complaints; correct? |
| 5  A | Yeah.  That's true. |
| 6  Q | Okay.  All right.  And when you hear the |
| 7 | term harassment as a person in personnel, |
| 8 | doesn't that put your antennae up that that |
| 9 | harassment could well be sexual harassment |
| 10 | or racial harassment?  When you hear that |
| 11 | around your office, don't you get really |
| 12 | concerned that you may be facing -- USDA may |
| 13 | be facing a sexual harassment case or racial |
| 14 | harassment case.  That's the two types of |
| 15 | harassment that people typically talk about |
| 16 | in the employment area. |
| 17  A | Uh-huh. |
| 18  Q | Do you agree? |
| 19  A | Yeah. |
| 20  Q | Okay.  All right.  And the letter -- I think |
| 21 | it's Exhibit 12, Plaintiff's and |
| 22 | Defendant's, talked about harassment in |
| 23 | that.  And so you're antennae did not go up. |

```
 1          You did not get suspicious, but that,

 2          indeed, was what Ms. McCall was talking

 3          about, racial harassment.  You didn't

 4          consider that?

 5                    MR. NEELEY:  Object to form.

 6   A    On her job where she wrote about her

 7          employment?

 8   Q    Yeah.  And Art Powers harassing her.

 9                    MR. NEELEY:  Object to form.

10   A    Well, this is the one -- actually, I do not

11          remember seeing this letter.

12   Q    But you could have seen it, though; right?

13   A    Yeah, I could have seen it.

14   Q    And if you had seen it, would you have not

15          thought, well, I need to investigate or

16          somebody needs to investigate whether she's

17          talking about racial harassment or sexual

18          harassment.  She could be subjected to one

19          or both types since she was a female, and he

20          was a male; since she was black, and he was

21          white.

22                    MR. NEELEY:  Object to the

23                form.
```

```
 1   Q   Correct?  And you knew that he was a white
 2       male and that she was a black female.
 3   A   Uh-huh.
 4   Q   So you knew that the realm of possibilities
 5       was very great that the harassment that she
 6       was talking about could have been either
 7       sexual harassment or racial harassment.
 8                   MR. NEELEY:  Object to form.
 9   A   If I would have seen the letter.
10   Q   Okay.  All right.  Very good.
11   A   I don't know if I saw it.
12   Q   All right.  Now, I'm holding together the
13       investigative file, and you help put this
14       thing together by getting up documents, et
15       cetera, et cetera; right?
16   A   I helped with it, I guess.
17   Q   Okay.
18   A   It's probably made up of documents that I
19       sent.
20   Q   What did you do to prepare for this
21       deposition?  Did you review this document,
22       this big, thick, blue binding?
23   A   I saw it the other day, and I just glanced
```

```
 1           through things that I thought would pertain

 2           to me.

 3    Q      Okay.  Well, let me show you this:  The

 4           affidavit of Carmel McAlpine.  You've been

 5           talking about Mr. McAlpine today; right?

 6                          MR. NEELEY:  Object to the

 7                   form.

 8    A      Uh-huh.

 9    Q      Okay.  He says in paragraph four of this

10           affidavit, I believe the offices were

11           consolidated prior to the RIF in such a way

12           that minorities disproportionately became

13           the lowest ranked employees on the retention

14           list in their competitive area.  As a

15           result, minorities were disproportionately

16           affected by the RIF.  Do you see that?

17    A      Yes.

18    Q      And so having read this, whether you read it

19           before today or not, having read this to

20           you -- you've got it in front of you; right?

21    A      No.

22    Q      Okay.  Please get it so you can review.

23    A      What exhibit is it?
```

```
1   Q    This is Mr. McAlpine -- this is

2        Plaintiff's -- excuse me.  Exhibit F-8.

3   A    Okay.

4   Q    Did it ever become your concern in 1997,

5        1998, in that time period, that there was

6        something wrong with how these employees

7        were ranked on the retention list?  You

8        talked about Ms. McCall being ranked last.

9        Did you ever try to -- did you ever consider

10       that Mr. Powers or someone had something to

11       do with ranking these employees so the

12       blacks were disproportionately ranked lower?

13  A    No, sir.  There wasn't any way to -- that

14       would be, like, fixing the RIF, and there

15       was just no way to do that.

16  Q    I see.  Well, you talked about, and I think

17       that was Plaintiff's Exhibit -- was it 23?

18                  MR. ATCHISON:  What's the

19                  exhibit that you have the document

20                  with, the last one you went

21                  through, Rand?  It was a long

22                  exhibit with attachments.

23                  MR. NEELEY:  Three.
```

```
 1   Q   Exhibit 3.  Okay.  All right.  Just a
 2       moment.  It was 3, dated January 23rd.
 3       That's why I kept on thinking it was Exhibit
 4       23.  All right.  I believe somewhere in here
 5       you've testified that her employment date
 6       was adjusted back to 1976.  That's
 7       Ms. McCall's.
 8   A   Right.
 9   Q   As per Plaintiff's Exhibit 3; correct?
10   A   Yeah.
11   Q   Okay.  Now, how far back were the other RIF
12       employees adjusted back in time to beat out
13       Ms. McCall?  Now, you said she was the
14       lowest one.  She was the poorest ranked, the
15       worst ranked one of the bunch that were
16       RIF'd.  I think you gave 11, 12 names; am I
17       correct?
18   A   Oh, no.
19   Q   She wasn't?  What are you saying, then?
20   A   She was not ranked with these employees.
21       She was -- except the employees that were in
22       her office.
23   Q   Okay.  Well, let's talk about them.
```

```
1    A    Okay.

2    Q    That's even easier.  Who was in her office

3         at Crenshaw County?

4    A    Okay.

5    Q    Ms. Davenport.

6    A    Yeah.  All right.  She was a 5.

7    Q    I'm not asking what she was.  I'm asking

8         about how she was ranked.

9    A    But they were ranked by grade and then by

10        their dates.

11   Q    Okay.  All right.  She was a 5.  All right.

12        We'll talk about 4s and 5s, then.  I

13        understand.  All right.  Who else?

14   A    Sandra Welch was a 6.  And Arlesa Hunter was

15        a 5.  Lisa McCall was a 4, and Betty

16        Blackmon -- I want to say Betty was a 5.

17   Q    Okay.  Well, if you're telling the Court

18        that the ranking was a competitive

19        ranking -- I take it that's what you're

20        saying.  They were competing against each

21        other.  But it was only competing within a

22        GS level, there was nobody that Ms. McCall

23        was competing against.
```

| | | |
|---|---|---|
| 1 | A | That's true. |
| 2 | Q | Okay. |
| 3 | A | But according to the RIF plan, all GS-4s |
| 4 | | were going to be RIF'd. |
| 5 | Q | But that didn't happen.  You've agreed that |
| 6 | | has not happened.  There were GS-4s that |
| 7 | | were re-employed. |
| 8 | A | But they were RIF'd.  They were RIF'd, sir. |
| 9 | Q | I understand they were RIF'd, but they were |
| 10 | | re-employed as 4s. |
| 11 | A | Yeah.  Later on. |
| 12 | Q | That's what I'm saying.  And Ms. McCall |
| 13 | | never got the opportunity to be re-employed, |
| 14 | | never was told that she could be re-employed |
| 15 | | as a 4; am I correct about that? |
| 16 | A | Actually, she could have applied for the |
| 17 | | position in Baldwin County that came open |
| 18 | | prior to the RIF. |
| 19 | Q | We're not talking about the RIF right now in |
| 20 | | these questions. |
| 21 | A | Well, I mean, that would have kept her from |
| 22 | | being RIF'd. |
| 23 | Q | Well, we're only talking about the RIF right |

1     now.  At the point of RIF, she was RIF'd,

2     and at no point after the RIF was she ever

3     given the opportunity to come into a GS-4

4     position that she was qualified.  Am I

5     correct about that?

6                    MR. NEELEY:  Object to the

7               form.

8  A   That's true --

9  Q   Thank you.

10 A   -- because there were no permanent

11     positions.

12 Q   Well, but there were temporary positions

13     that were stepping stones.

14                    MR. NEELEY:  Object to form.

15               We've talked about permanent,

16               temporary.  It applied to the

17               permanent, not the temporary.

18               You've established there were

19               temporaries available.  Lets's

20               move on.

21 Q   Okay.  All right.  Let me ask you a

22     question.

23 A   Okay.

1    Q    What significance of your statement that she

2         was the lowest ranked employee -- what's the

3         significance of that in your mind?  You made

4         some sort of statement to that effect.

5    A    The lowest ranked as far as grade level.

6    Q    Okay.  I understand that.  Now, in this

7         rating scenario, is there any significance

8         about her being the lowest ranked in the

9         rating with the adjusted year back in 1976.

10        Is there any significance in that?

11   A    No.  If there would have been other GS-4s in

12        the office, she would have competed with

13        them.  But, actually, in reality, they would

14        have been gone too because all 4s were gone.

15   Q    Okay.

16   A    Okay?

17   Q    Okay.  I understand that.  But for

18        re-employment purposes, if there had been

19        multiple 4s, then her year of service that

20        was adjusted back to 1976 would have been

21        important; correct?

22   A    Yes.

23   Q    But, otherwise, since there were not any 4s,

```
 1        that became insignificant; am I correct
 2        about that?
 3   A    Since all 4s were going to be abolished, it
 4        didn't matter.  If she would have had 30
 5        years service, it wouldn't have mattered.
 6                 MR. ATCHISON:  Rand, I do
 7              believe we are finished, but let
 8              me check one more thing to make
 9              sure.  We'll take another short
10              break.
11                 (At which time, a break was
12              held.)
13                 MR. ATCHISON:  Just for the
14              sake of the Record, I have no
15              further questions.
16                 MR. NEELEY:  I am finished.
17   Q    A little housekeeping, Ms. Price.  There is
18        a report of investigation that we were
19        discussing today.  I may well have a copy of
20        it.  Plaintiff's Exhibit 19 -- we've been
21        referencing another exhibit, which now I've
22        marked Plaintiff's Exhibit 20.
23                 (At which time, the
```

```
 1                        referred-to document was

 2                        marked as Plaintiff's Exhibit

 3                        No. 20 by the Reporter.)

 4    Q    Plaintiff's Exhibit 19, I believe, was an

 5         earlier EEOC investigative report.  Is that

 6         what this is, if you know?  You can flip

 7         through it and look at it.  I take it that

 8         your office is involved in putting those

 9         things together and the documents that go

10         into them.  That's what it appears to be,

11         does it not?

12    A    Yes, sir.

13    Q    Okay.  And the big, thick, as I call it, New

14         York telephone book, blue, bound

15         investigative file we've marked as 20, you

16         certainly know about it.

17    A    Yes.

18    Q    And that's part of the official EEO

19         investigative record.

20    A    Yeah.

21    Q    Thank you.  That's all.

22                        (At which time, the
                           deposition concluded at
23                         approximately 4:30 p.m.)
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3   STATE OF ALABAMA,

 4   ELMORE COUNTY,

 5

 6        I, Shannon P. Yost, Certified Shorthand

 7   Reporter and Commissioner for the State of

 8   Alabama at Large, do certify that I reported the

 9   deposition of:

10                      BARBARA PRICE

11   who was first duly sworn by me to speak the

12   truth, the whole truth, and nothing but the truth

13   in the matter of:

14           IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF ALABAMA
15                    NORTHERN DIVISION

16   LISA MCCALL,

17            Plaintiff,

18            V.        CIVIL ACTION NO. 2:06CV39-MHT

19   MIKE JOHANNS, SECRETARY,
     DEPARTMENT OF AGRICULTURE,
20

21            Defendant.

22   On March 26, 2007.

23        The foregoing 167 computer-printed pages
```

1   contain a true and correct transcript of the

2   examination of said witness by counsel for the

3   parties set out herein.

4   The reading and signing of same is hereby waived.

5       I further certify that I am neither of kin

6   nor of counsel to the parties to said cause, nor

7   in any manner interested in the results thereof.

8       This 10th day of April, in the year of our

9   Lord, 2007.

10

11

12

13   Shannon P. Yost,

14   Certified Shorthand Reporter
     and Commissioner for the

15   State of Alabama at Large

16   Commission Expires 6/1/09

17

18

19

20

21

22

23